GIBSON, DUNN & CRUTCHER LLP
Randy M. Mastro
Alexander H. Southwell (*pro hac application pending*)
200 Park Avenue
New York, NY  10166-0193
Phone: 212.351.3825
Fax: 212.351.5219
E-mail: RMastro@gibsondunn.com
*Attorneys for Nonparty Gibson, Dunn & Crutcher LLP*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 2:15-cr-00193-SDW |
| v. | Oral Argument Requested |
| WILLIAM BARONI, et. al, | Return Date:  September 21, 2015 |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
NONPARTY GIBSON, DUNN & CRUTCHER LLP
TO QUASH DEFENDANTS' SUBPOENA *DUCES TECUM*
<u>PURSUANT TO RULE 17(c)</u>**

# **TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................... 1

BACKGROUND .......................................................................................................... 2

APPLICABLE LAW .................................................................................................... 6

ARGUMENT ............................................................................................................... 8

I.     The Subpoena For Metadata Does Not Meet Rule 17(c)'s
       Relevancy, Admissibility, And Specificity Requirements ................................ 9

       A.     The Metadata Is Irrelevant Because The Criminal Case Against Defendants
              Does Not Arise From Or Concern The History Or Management
              Of The Interview Memoranda. ............................................................... 9

       B.     The Metadata Is Inadmissible And Cannot Be
              Brought In Through Defendants' Flawed Impeachment Rationale .................... 12

       C.     The Subpoena Fails To Specify the Metadata With Requisite Particularity ....... 15

II.    The Subpoena Improperly Seeks Information
       Protected By The Work-Product Doctrine ..................................................... 16

CONCLUSION ............................................................................................................. 19

# TABLE OF AUTHORITIES

Page(s)

## Cases

*ACLU v. CIA*,
No. Civ. 10-436, 2015 WL 3777275 (D.D.C. June 18, 2015) ............................................. 16

*Aguilar v. Immigration & Customs Enforcement Div.*,
255 F.R.D. 350 (S.D.N.Y. 2008) ................................................................................... 10, 11

*Bowman Dairy Co. v. United States*,
341 U.S. 214 (1951) ..................................................................................................... 7, 15

*Brady v. Maryland*,
373 U.S. 83 (1963) ............................................................................................................ 9

*Eisai Inc. v. Sanofi-Aventis U.S.*,
No. 08-cv-4168, 2012 WL 1299379 (D.N.J. Apr. 16, 2012) .............................................. 12

*Fla. Bar v. MacNamara*,
132 So. 3d 165 (Fla. 2013) ................................................................................................ 14

*Giglio v. United States*,
405 U.S. 150 (1972) ........................................................................................................... 9

*Hagenbuch v. 3B6 Sistemi Elettronici Industriali S.R.L.*,
No. 04-cv-3109, 2006 WL 665005 (N.D. Ill. Mar. 8, 2006) ............................................. 11

*In re Von Bulow*,
828 F.2d 94 (2d Cir. 1987) ............................................................................................... 18

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing*,
No. 05-cv-138, 2006 WL 5097354 (E.D. Ky. Dec. 18, 2006) .......................................... 11

*Kyko Glob., Inc. v. Prithvi Info. Sols., Ltd.*,
No. Civ. 13-1034, 2014 WL 2694236 (W.D. Wash. June 13, 2014) ................................. 18

*Lopez v. United States*,
373 U.S. 427 (1963) ........................................................................................................... 9

*Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*,
No. 05-cv-74423, 2007 WL 4098213 (E.D. Mich. Nov. 16, 2007) ................................... 11

*N.J. Legislative Select Comm. on Investigation v. Kelly*,
No. L-350-14, 2014 WL 1760028 (N.J. Super., Mercer Cnty., Apr. 9, 2014) ..................... 3

*United States v. Amirnazmi*,
645 F.3d 564 (3d Cir. 2011) ............................................................................................... 7

*United States v. Cherry*,
876 F. Supp. 547 (S.D.N.Y.1995) ..................................................................................... 11

*United States v. Cuthbertson,*
    630 F.2d 139 (3d Cir. 1980) ............................................................. 6, 7, 8, 13, 15

*United States v. Cuthbertson,*
    651 F.2d 189 (3d Cir. 1991) ................................................................. 2, 7, 8, 13

*United States v. Einsenhart,*
    43 Fed. Appx. 500 (3d Cir. 2002) ...................................................................... 15

*United States v. Georgiou,*
    No. 09-cr-88, 2009 WL 2973035 (E.D. Pa. Sept. 16, 2009) ........................ 14, 15

*United States v. Krall,*
    No. 07-cr-607-01, 2009 WL 2394288 (E.D. Pa. Aug. 4, 2009) ......................... 15

*United States v. Louis,*
    No. 04-cr-203, 2005 WL 180885 (S.D.N.Y. Jan 27, 2005) ............................... 16

*United States v. Merlino,*
    No. 99-cr-0363, 2001 WL 283165 (E.D. Pa. Mar. 19, 2001)............................. 16

*United States v. Murray,*
    103 F.3d 310 (3d Cir. 1997) ............................................................................. 15

*United States v. Nektalov,*
    No. S203CR.828, 2004 WL 1574721 (S.D.N.Y. July 14, 2004) ......................... 8

*United States v. Nixon,*
    418 U.S. 683 (1974) .......................................................................... 2, 7, 15, 17

*United States v. Nobles,*
    422 U.S. 225 (1975) ................................................................................. 17, 18

*United States v. Onyenso,*
    No. 12-cr-602, 2013 WL 5322651 (D.N.J. Sept. 20, 2013) ............................. 13

*United States v. Tillman,*
    No. 08-cr-254, 2009 WL 3401721 (W.D. Pa. Oct. 20, 2009) ............................. 7

*United States v. Weisberg,*
    No. 08-cr-347, 2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011) ....................... 11, 16

*United States v. Wirth,*
    No. 11-cr-256, 2012 WL 1110540 (D. Minn. Apr. 3, 2012)............................. 17

*Westinghouse Elec. Corp. v. Repub. of Philippines,*
    951 F.2d 1414 (3d Cir. 1991) ........................................................................ 18

*Williams v. Sprint/United Mgmt. Co.,*
    230 F.R.D. 640 (D. Kan. 2005) ...................................................................... 10

*Wyeth v. Impax Labs., Inc.,*
    248 F.R.D. 169 (D. Del. 2006) ....................................................................... 11

iii

**Rules**

Fed. R. Civ. P. 26(b)(3)(A) .......................................................................... 17

Fed. R. Civ. P. 26(b)(3)(B) .......................................................................... 17

Fed. R. Crim. P. 17(c)(1) .............................................................................. 6

Fed. R. Evid. 401 .......................................................................................... 9

Fed. R. Evid. 403 ........................................................................................ 13

**Other Authorities**

David Hricik & Chase Edward Scott, *Metadata: The Ghosts Haunting e-Documents*,
26 Computer & Internet Lawyer 23 (2009) ................................................. 14

David Hricik, *I Can Tell When You're Telling Lies: Ethics and Embedded
Confidential Information*,
30 J. Legal Prof. 79 (2006) ......................................................................... 14

Mark J. Magyar, *Much Ado About Nothing: No Tapes, Transcripts of Mastro
Interviews*,
NJ Spotlight (Apr. 9, 2014), *available at*
http://www.njspotlight.com/stories/14/04/09/much-ado-about-nothing-no-tapes-
transcripts-of-mastro-interviews/?p=all ...................................................... 5

Press Release, Office of the Governor of N.J., Christie Administration Takes Steps to
Conduct Internal Review and Further Cooperate with
U.S. Attorney Inquiry (Jan. 16, 2014),
http://www.state.nj.us/governor/news/news/552013/approved/20140116a.html .................. 4

Press Release, Office of the Governor of N.J., Internal Review Team Puts Forward
Comprehensive and Exhaustive Report (Mar. 27, 2014),
http://nj.gov/governor/news/news/552014/pdf/20140327a.pdf ........................... 4

*Report of Gibson, Dunn & Crutcher LLP Concerning Its Investigation on Behalf of the
Office of the Governor of New Jersey into Allegations Regarding the George
Washington Bridge Lane Realignment and Superstorm Sandy Aid to the City of
Hoboken* (Mar. 26, 2014) ...................................................................... 3, 4

*The Sedona Principles, Second Edition: Best Practices Recommendations and
Principles for Addressing Electronic Document Production*
(Sedona Conference Working Group Series 2007) .................................. 10, 11

U.S. District Court for the District of New Jersey,
*Guidelines for Editing Metadata, available at*
http://www.njd.uscourts.gov/sites/njd/files/
EditMetaDataGuidePublic.pdf ........................................................... 10, 14

## INTRODUCTION

Defendants inappropriately attempt to exploit Federal Rule of Criminal Procedure 17(c) as a sweeping discovery tool against a nonparty, Gibson Dunn & Crutcher LLP ("GDC" or the "Firm"), targeting a law firm's work product, already knowing that most of what they seek does not exist.  GDC has already effectively complied with the subpoena *duces tecum* that Defendants directed at the Firm by producing all of the memoranda of the interviews it conducted during its investigation on behalf of the Office of the Governor of New Jersey ("OGNJ"), which were publicly released after GDC issued its findings.  Accordingly, GDC seeks only narrow relief here: an order quashing the subpoena insofar as it further demands the Firm's electronically-stored information—known as "metadata," reflecting, at most, dates and times of access to documents and the like, but none of the documents' actual contents—utterly unmoored to any aspect of the criminal case against these Defendants.  Otherwise, the Firm has no other information responsive to this subpoena.  The Court should therefore now summarily reject the Defendants' continuing demand by quashing what remains of this subpoena and avoiding further waste of time and judicial resources.

In particular, Defendants' subpoena demands two items: *first*, notes, transcripts, and recordings of the witness interviews GDC conducted on OGNJ's behalf concerning the September 2013 realignment or alteration of the George Washington Bridge access lanes in the Borough of Fort Lee, New Jersey; and, *second*, "[a]ny and all metadata and the document properties for" the memoranda GDC released to the public memorializing those interviews.  Ltr. Order on Defs.' Appl. (ECF No. 24), at 2 ("Ltr. Order").  As to the *first* demand, the Objections and Responses the Firm served today on Defendants, through counsel, resolves the entire dispute by explaining that no notes, transcripts, and recordings of the witness interviews exist separate from the interview memoranda that GDC released to the public and that GDC furnished today to

Defendants.  As to the *second* demand—the only branch of the subpoena still in controversy before this Court—the subpoena should be quashed, because Defendants have not demonstrated that the metadata demanded is relevant and admissible on any issue that will arise at trial and is specifically identified, as required under controlling law.  Indeed, the only argument that Defendants have proffered to support the demand for the metadata is that it somehow bears on impeachment of as-yet-unidentified trial witnesses—a contention predicated on precisely the kind of speculation about trial events that the Third Circuit has held to be improper.  *United States v. Cuthbertson*, 651 F.2d 189, 195 (3d Cir. 1991) ("*Cuthbertson II*").

Because the only branch of Defendants' subpoena as to which a controversy now remains amounts to a quintessentially forbidden "fishing expedition," *United States v. Nixon*, 418 U.S. 683, 699-700 (1974), it should be quashed as unreasonable and oppressive under well-established principles governing application of Rule 17(c)(2).

## BACKGROUND

**1. Indictment.**  The Government obtained a nine-count grand jury indictment in April 2015 charging Defendants with conspiring to misuse (18 U.S.C. § 371), and actually misusing, property of an organization receiving federal benefits (18 U.S.C. §§ 2, 666(a)(1)(A)); conspiring to commit (18 U.S.C. § 1349), and actually committing, wire fraud (18 U.S.C. §§ 2, 1343); conspiring to injure and oppress the civil rights of certain individuals (18 U.S.C. § 241); and acting under color of law to deprive those individuals of their civil rights (18 U.S.C. §§ 2, 242).

The Indictment concerns events that allegedly occurred while Defendant William E. Baroni ("Baroni") served as the Deputy Executive Director of the Port Authority of New York and New Jersey ("Port Authority") prior to his resignation from that office in December 2013 (Indictment ("Ind.") at 1 ¶ 1.A), and while Defendant Bridget Anne Kelly ("Kelly") was an OGNJ employee, serving as Deputy Chief of Staff for Legislative and Intergovernmental Affairs

until January 9, 2014 (Ind. at 1 ¶ 1.B).[1]  The Indictment arises from an alleged scheme by Defendants to "cause traffic problems" in the Borough of Fort Lee, New Jersey (Ind. at 7 ¶ 10) by "reduc[ing]" from three to one the number of local access lanes to the upper level of the George Washington Bridge, without public warning in September 2013 (Ind. at 5-6 ¶ 5).  The alleged impetus for Defendants' scheme was the decision of the Fort Lee mayor, Mark Sokolich, not to endorse the 2013 re-election campaign of the Governor.  *See, e.g.*, Ind. at 7 ¶ 10.

Defendants further allegedly "concocted and promoted a sham story that reducing the number of lanes . . . was for a traffic study."  Ind. at 6 ¶ 7.  Those efforts, the Indictment alleges, included "misleading statements and false representations" during Baroni's testimony regarding the Fort Lee incident to the New Jersey Assembly Transportation, Public Works, and Independent Authorities Committee (the "Assembly Transportation Committee"), a state legislative committee "that investigated certain activities related to the Port Authority" (Ind. at 5 ¶ 1.L, 22-23 ¶¶ 53-56), and a false claim by Kelly in December 2013 that "she had nothing to do with the lane and toll booth reductions" (Ind. at 24 ¶ 58).

**2. GDC Investigation and Report.**  The Governor directed termination of Kelly's OGNJ employment in January 2014 after the disclosure of certain documents, obtained by the Assembly Transportation Committee, which contradicted her December 2013 claim that she had no role in the Fort Lee incident.[2]  The Governor ordered an inquiry into the matter, and OGNJ

---

[1] Kelly was "fired from her position" on January 9, 2014.  *N.J. Legislative Select Comm. on Investigation v. Kelly*, No. L-350-14, 2014 WL 1760028 (N.J. Super., Mercer Cnty., Apr. 9, 2014) ("*Select Comm.*") (slip op., at 8).

[2] *Report of Gibson, Dunn & Crutcher LLP Concerning Its Investigation on Behalf of the Office of the Governor of New Jersey into Allegations Regarding the George Washington Bridge Lane Realignment and Superstorm Sandy Aid to the City of Hoboken* 10 (Mar. 26, 2014) ("Report"), *available at* https://dspace.njstatelib.org/xmlui/bitstream/handle/10929/31544/i622014c.pdf?sequence=1&isAllowed=y; *see* Press Release, Office of the Governor

thereafter retained GDC as outside counsel to conduct an "internal review to uncover the facts surrounding" the Fort Lee incident and cooperate with the inquiry by the U.S. Attorney.[3]  Several days later, OGNJ asked GDC also to investigate separate allegations in January 2014 by the Hoboken mayor, Dawn Zimmer, that certain officials attempted "to coerce her into advancing a stalled real estate project being pursued by a private developer (the Rockefeller Group) in exchange for" approval of the City of Hoboken's applications for state-administered federal funds appropriated to assist the recovery from Superstorm Sandy.  Report at 12.

GDC publicly released the report of its investigation in March 2014, providing copies to the U.S. Attorney's Office and to the joint special committee that the State Legislature formed to investigate the Fort Lee incident, the New Jersey Legislative Select Committee on Investigation. Among the voluminous documents GDC personnel examined were "contemporaneous emails and text message exchanges harvested from both the Governor's Office and personal email accounts and devices," supplemented by "more than 70 interviews, the substantial majority in person."  Report at 38.  GDC did not interview Defendants.  *Id.*

GDC publicly released in April 2014 the 75 memoranda summarizing the witness interviews conducted during the investigation, and provided copies to the U.S. Attorney's Office and to the New Jersey Legislative Select Committee on Investigation.[4]  GDC personnel prepared

of N.J., Internal Review Team Puts Forward Comprehensive and Exhaustive Report 3 (Mar. 27, 2014) (quoting *id.*), http://nj.gov/governor/news/news/552014/pdf/20140327a.pdf (Ex. C to Southwell Decl.).  The Report is available to this Court upon request.

[3]  Press Release, Office of the Governor of N.J., Christie Administration Takes Steps to Conduct Internal Review And Further Cooperate With U.S. Attorney Inquiry (Jan. 16, 2014), http://www.state.nj.us/governor/news/news/552013/approved/20140116a.html (Ex. D to Southwell Decl.).

[4]  The co-chair of the legislative committee, John Wisniewski, publicly confirmed his understanding that GDC had not "videotape[d], audiotape[d]" or had "a stenographer make transcripts of any of the interviews."  *See, e.g.*, Mark J. Magyar, *Much Ado About Nothing:*

the interview memoranda using the Microsoft Word program, and released them in PDF (Adobe Acrobat) format, leading to the recording of metadata associated with common operation of those computer programs.  Decl. of Alexander H. Southwell ¶ 15 ("Southwell Decl.").  The metadata associated with the interview memoranda does not contain the contents of any of the interview memoranda.  *Id.*

 **3.  Defendants' Rule 17(c) Application.**  Defendants applied in May 2015 for a subpoena *duces tecum* to GDC, demanding (1) notes, transcripts, and recordings of the GDC witness interviews, and (2) "[a]ny and all metadata and the document properties for" the interview memoranda.  *See* Ltr. Order at 2 (quoting ECF No. 16).  In correspondence with the Court concerning Defendants' application in June 2015, GDC observed that, as the legislative committee co-chair had previously indicated, the Firm did not tape or transcribe the interviews, and GDC further described the process for preparing the interview memoranda.  The Firm explained: "Under our protocol and practice for this investigation, witness interviews were summarized electronically by one attorney while the interviews were being conducted and then edited electronically into a single, final version.  Those final interview memoranda were then printed and ultimately released publicly."  Letter from Randy M. Mastro to the Honorable Susan J. Wigenton, U.S. District Judge, at 5 (June 8, 2015) (Ex. A to Southwell Decl.); *see* Letter from Randy M. Mastro to the Honorable Susan J. Wigenton, U.S. District Judge, at 1 (June 10, 2015) (Ex. B to Southwell Decl.).  The Firm therefore "has no recordings, transcripts, or notes memorializing our interviews, other than the interview memoranda summarizing Gibson Dunn's

---

*No Tapes, Transcripts of Mastro Interviews*, NJ Spotlight (Apr. 9, 2014), *available at* http://www.njspotlight.com/stories/14/04/09/much-ado-about-nothing-no-tapes-transcripts-of-mastro-interviews/?p=all (Ex. E to Southwell Decl.).

interviews." Ex. A to Southwell Decl., at 5.  Defendants nevertheless persisted in urging approval of their application for the subpoena as proposed.

The Court granted that application based on the "preliminary" papers submitted, observing that, as a motion to quash under Rule 17(c)(2) was not then before it, the Court did not "address or opine on" any arguments in GDC's correspondence, and directing the Firm to "produce the responsive documents and/or file the appropriate motion(s)."  Ltr. Order at 5.  As recounted above, GDC has responded to the subpoena's first demand by serving on Defendants, through counsel, its Objections and Responses explaining again that no notes, transcripts, or recordings exist of the interviews, and that no documents exist responsive to Item 1 of the subpoena other than the interview memoranda already released—interview memoranda furnished today to Defendants.  Southwell Decl. ¶ 16.

## APPLICABLE LAW

Rule 17(c)(1) provides that "[a] subpoena may order the witness to produce any . . . documents . . . or other objects the subpoena designates.  The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." Rule 17(c)(2) continues:  "On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive."  The narrowly confined function of a Rule 17(c) subpoena is to allow the moving party to "obtain[] relevant evidentiary material that the moving party may use at trial" in a criminal case.  *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980) ("*Cuthbertson I*").  A subpoena under Rule 17(c) is not to be used as a "means of discovery" or otherwise to supplement the specific and limited discovery permitted under Rule 16 of the Federal Rules of Criminal Procedure.  *See id.*  Accordingly, to establish that a subpoena is not "unreasonable or oppressive" under Rule 17(c)(2), the party seeking

production "must clear three hurdles:  (1) relevancy; (2) admissibility; (3) specificity."  *Nixon*, 418 U.S. at 700.  That is, the proponent of the subpoena must meet the burden of demonstrating:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Cuthbertson I*, 630 F.2d at 145 (quoting *Nixon*, 418 U.S. at 699-700) (footnote omitted); *see also Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951) (invalidating subpoena component "not intended to produce evidentiary materials" that thus was "merely a fishing expedition to see what may turn up").

Courts strictly hold subpoena proponents to those requirements to screen out Rule 17(c) subpoenas that are driven by "an impermissible discovery motive," and that attempt an "end run around *Nixon*."  *United States v. Amirnazmi*, 645 F.3d 564, 595 (3d Cir. 2011); *see Cuthbertson I*, 630 F.2d at 146 ("[c]ourts must be careful that [R]ule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in [Rule] 16").  In that regard, the Third Circuit has warned against the "failure to discriminate between potential exculpatory material in the possession of the prosecution, generally available under the teachings of *Brady v. Maryland*, and exculpatory evidence in the possession of third parties. Only the latter is retrievable under a [R]ule 17(c) subpoena; naked exculpatory material held by third parties that does not rise to the dignity of admissible evidence simply is not within the rule."  *Cuthbertson II*, 651 F.2d at 195.  A subpoena that is "not reasonably targeted toward the receipt of material admissible evidence" should be quashed.  *See United States v. Tillman*, No. 08-cr-254, 2009 WL 3401721, at *1 (W.D. Pa. Oct. 20, 2009).

7

Furthermore, even if material demanded might be admissible for impeachment purposes at trial, Rule 17 is not a ground for *pretrial production* of that material to the moving party when the contents of trial witness testimony remain merely conjectural or hypothetical.  *See Cuthbertson II*, 651 F.2d at 195 ("simply hearsay" materials, the only potential use for which was "for purposes of impeachment," was not properly "obtained" pretrial:  "Only after a witness has testified will his prior inconsistent statement cease to be hearsay, *see* Fed. R. Evid. 801(c), but *we are unable to speculate* on the likelihood of that occurrence.") (emphasis added); *Cuthbertson I*, 630 F.2d at 145-46 ("statements made by nonwitnesses have no value as possible prior inconsistent statements to impeach trial testimony," and a "general assertion that [demanded] material might contain exculpatory information" is a "mere hope" that does not "justif[y] enforcement of a subpoena under [R]ule 17(c)").

## ARGUMENT

GDC's production of the interview memoranda and its explanation to Defendants that moots the controversy between GDC and Defendants as to the first demand in the subpoena.  *See United States v. Nektalov*, No. S203CR.828, 2004 WL 1574721, at *2 (S.D.N.Y. July 14, 2004) (refusing on mootness grounds to enforce subpoena targeting records that Government proffered did not exist).  The actual controversy before the Court is thus limited to the dispute concerning only the second demand—a demand that cannot be squared with Rule 17(c)'s relevancy, admissibility, and specificity requirements, and that in any event calls for material protected from disclosure by the work-product doctrine.

## I.  The Subpoena For Metadata Does Not Meet Rule 17(c)'s Relevancy, Admissibility, And Specificity Requirements

**A.     The Metadata Is Irrelevant Because The Criminal Case Against Defendants Does Not Arise From Or Concern The History Or Management Of The Interview Memoranda.**

Defendants fail by a wide margin to meet the relevance requirement of Rule 17(c), and, indeed, the metadata associated with the GDC interview memoranda is patently irrelevant to the Government's case as charged in the Indictment against Defendants or any potential defense. Relevance hinges on whether the information sought has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Here, the facts "of consequence to the determination of " this criminal case, *id.*, are those alleged in the Indictment, given that "[t]he function of a criminal trial is to seek out and determine the truth or falsity of the charges brought against the defendant," *Lopez v. United States*, 373 U.S. 427, 440 (1963).

The Indictment is based on the Government's 16-month investigation.  *See, e.g.*, Gov't Memo on Mot. for Protective Order at 1 (ECF No. 14).  The Government's case likewise rests on "more than 1.5 million pages of documents and other materials" that the Government "obtained from numerous individuals and entities" (*id.* at 1-2), along with anticipated testimony from Defendants' alleged co-conspirator (Gov't Reply on Mot. for Protective Order at 8 (ECF No. 21)) and other witnesses.  And Defendants will of course be entitled to substantial disclosure from the Government, concerning the Government's case as charged in the Indictment, as secured by authorities such as Rules 16 and 26.2, the Jencks Act, 18 U.S.C. § 3500, and constitutional decisions such as *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).

By the same token, the Indictment does not rest on the interview memoranda from GDC—indeed, the Indictment does not so much as *mention* the GDC investigation—let alone metadata accompanying the interview memoranda.  In that regard, for purposes of assessing the relevance and admissibility of the information sought, metadata, or "data about data," can be understood as "electronically-stored evidence that describes the 'history, tracking, or management of an electronic document."  *Aguilar v. Immigration & Customs Enforcement Div.*, 255 F.R.D. 350, 354 (S.D.N.Y. 2008) (quoting *Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 646 (D. Kan. 2005)).  Metadata thus encompasses "formatting codes, formulae, and other information associated" with an electronic document.  *Id.* (quoting *The Sedona Principles, Second Edition: Best Practices Recommendations and Principles for Addressing Electronic Document Production* cmt. 12a (Sedona Conference Working Group Series 2007) (Ex. F to Southwell Decl.)).[5]

But even on that somewhat expansive understanding of the term "metadata," the "history" or "management" of GDC's interview memoranda will not have *any* "consequence to the determination" of the Government's case against Defendants as charged in the Indictment or any cognizable defense.  The contents of any of the interview memoranda are not contained in the metadata, *see* Southwell Decl. ¶ 15, and GDC's manner of preparing the interview memoranda is fundamentally irrelevant to this criminal case.

Comparison to civil discovery confirms the remoteness of the metadata from the case at hand.  In civil actions governed by the Federal Rules of Civil Procedure, courts have consistently

---

[5]  For a description of Microsoft Word and PDF (Adobe Acrobat) document metadata, see U.S. District Court for the District of New Jersey, *Guidelines for Editing Metadata* 3 ("DNJ Guidelines"), *available at* http://www.njd.uscourts.gov/sites/njd/files/ EditMetaDataGuidePublic.pdf (Ex. G to Southwell Decl.).

recognized that nearly all metadata lacks evidentiary value because it is not relevant:  "In most cases and for most documents, metadata does not provide relevant information."  *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing*, No. 05-cv-138, 2006 WL 5097354, at *8 (E.D. Ky. Dec. 18, 2006).[6]  Discovery into metadata is thus commonly restricted to a narrow set of civil cases—those in which civil claims or defenses turn on "who received what information and when."  *See Aguilar*, 255 F.R.D.at 354 (quoting *Hagenbuch v. 3B6 Sistemi Elettronici Industriali S.R.L.*, No. 04-cv-3109, 2006 WL 665005, at *3 (N.D. Ill. Mar. 8, 2006)).  But, of course, civil discovery is much *broader* than criminal discovery.  *See, e.g.*, *United States v. Cherry*, 876 F. Supp. 547, 553 (S.D.N.Y.1995).  So, under Rule 17(c) of the Federal Rules of *Criminal* Procedure, the movant accordingly must show even more than would be required under the civil rules to establish the subpoena's validity.

Defendants utterly fail to make any such showing here.  The metadata concerning the GDC interview memoranda is a far cry from situations in which electronic "history" and "management" of the documents would plainly be relevant—*e.g.*, metadata demonstrating tampering with documents in a case alleging the defendant made false entries in records, *cf.* 18 U.S.C. § 1519, or metadata describing documents timely authorizing the custodian of a bank account to handle it in a particular manner, *see United States v. Weisberg*, No. 08-cr-347, 2011 WL 1327689, at *7 (E.D.N.Y. Apr. 5, 2011) (allowing limited inquiry into metadata that could

---

[6]  *See also Wyeth v. Impax Labs., Inc.*, 248 F.R.D. 169, 171 (D. Del. 2006) ("Most metadata is of limited evidentiary value, and reviewing it can waste litigation resources."); *Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, No. 05-cv-74423, 2007 WL 4098213, at *2 (E.D. Mich. Nov. 16, 2007) (excluding metadata from compelled discovery where it had no "evidentiary benefit" and was "unduly burdensome"); *cf. Sedona Principles*, *supra*, at 4 ("In most cases … metadata will have no material evidentiary value—it does not matter when a document was printed, who typed the revisions, or what edits were made before the document was circulated.").

establish defendant's allegedly illegal transactions had been duly authorized). Such situations are *nothing* like the one posed by the instant subpoena, and Defendants make no such claim. Their failure to present a coherent theory for the relevance of the metadata, standing alone, is reason to quash the subpoena.[7]

**B.     The Metadata Is Inadmissible And Cannot Be Brought In Through Defendants' Flawed Impeachment Rationale**

In any event, even assuming for argument's sake that the metadata associated with the GDC interview memoranda were deemed somehow relevant, Defendants cannot establish the independent requirement that the metadata be admissible under the Federal Rules of Evidence. The only contention Defendant makes as to admissibility (ECF No. 16 at 12) is that the metadata was generated during the preparation of the interview memoranda, and that "if a dispute arises at trial . . . as to the content of the summaries or notes," the metadata will purportedly enable Defendants "to identify which Gibson Dunn attorney prepared the document in question in order to call the attorney as a witness." That contention is incorrect on numerous interrelated fronts.

*First*, the argument hinges on potential use of the information for impeachment at trial in the event certain witnesses testify in certain ways. The contention therefore relies on *exactly* the kind of speculation the Third Circuit concluded was unacceptable in *Cuthbertson II*, because it is

---

[7] To be sure, Defendants' demand for metadata would not be permissible even under the more generous civil discovery framework, where courts "guard against" "unreasonably cumulative or duplicative" discovery, and restrict it when "the burden or expense of the proposed discovery outweighs its likely benefit" under Federal Rule of Civil Procedure 26(b)(2)(C). *See, e.g.*, *Eisai Inc. v. Sanofi-Aventis U.S.*, No. 08-cv-4168, 2012 WL 1299379, at *6 (D.N.J. Apr. 16, 2012) ("The purpose of [the] rule of proportionality [in Fed. R. Civ. P. 26(b)] is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry."). Here, the proportionality rule would foreclose the discovery request, because the burden on the nonparty is far out of proportion to any hypothetical benefit the metadata would have for Defendants' trial preparation.

"[o]nly *after* a witness has testified" that the "prior inconsistent statement" of the witness becomes admissible, and the court may not "speculate on the likelihood of that occurrence." *See Cuthbertson II*, 651 F.2d at 195; *see also Cuthbertson I*, 630 F.2d at 144 ("such statements ripen into evidentiary material for purposes of impeachment only if and when the witness testifies at trial"). Before this Court, Defendants do not assert they will call, nor have they said they expect the Government to call, any particular witness as to whom GDC prepared an interview memorandum, so the identity of the witnesses is itself an exercise in conjecture—a failure compounded by the further prognostication that the witness will testify contrary to the contents of the pertinent memorandum and the erroneous presupposition that the metadata will somehow bear on the substance of the witness's prior inconsistent statement. Defendants' emphasis on the need to "identify" GDC attorneys also ignores the reality that each interview memorandum identifies on its face the attorneys who conducted the interviews. Defendants' "potential impeachment" argument, premised on an attenuated chain of events, is thus purely speculative and foreclosed by precedent. *See, e.g.*, *United States v. Onyenso*, No. 12-cr-602, 2013 WL 5322651, at *3 (D.N.J. Sept. 20, 2013) (nonparty's motion to quash subpoena granted where, "[a]t this time, neither [the nonparty seeking quashal] nor [the nonparty's spouse] have received a subpoena to testify at trial").

*Second*, whatever relevance the metadata would have under Rule 401 would be "substantially outweighed" under Rule 403 by the confusing nature of the metadata under Rule 403 (and Defendants have made no attempt to show otherwise). Under Rule 403, the court may exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, *confusion of the issues*, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403

(emphasis added); *see United States v. Georgiou*, No. 09-cr-88, 2009 WL 2973035, at **3-4 (E.D. Pa. Sept. 16, 2009) (refusing to enforce Rule 17(c) subpoena for records of cooperating witness and its law firm because Government-provided discovery was "more than ample to allow a jury to appraise the biases and motivations" of witness "without confusing the jury's understanding of the crimes charged," and court "would . . . be inclined to exclude" records under Rule 403).  Here, the at-best marginal relevance of the metadata and "document properties" demanded for the interview memoranda would be far overborne by its significant risk of "confusion of the issues" that will be presented to the lay jury.  As is widely recognized, the names the computer programs at issue (Microsoft Word and Adobe Acrobat) assign to various items of metadata in many instances do not conform to the ordinary English usage of those names.  For example, the metadata purporting to specify the date the document was "created" is confusing.  *See Fla. Bar v. MacNamara*, 132 So. 3d 165, 170 (Fla. 2013) (opposing experts agreed that metadata purporting to describe date of file creation is confusing "because if someone moves a file or copies a file to another folder, or in some situations when someone re-saves the file, the creation date will change").[8]  Because the obvious risk of jury confusion from

---

[8] Among the other fields of metadata that have been recognized as confusing are those purporting to specify (1) the document's author, *see DNJ Guidelines*, at 2 ("Court users have expressed concerns regarding authorship metadata.  When authors create a document using previous versions created by other authors, the original author's name is inherited, leading readers to think it was written by someone else."); (2) the "total editing time," *see* David Hricik, *I Can Tell When You're Telling Lies: Ethics and Embedded Confidential Information*, 30 J. Legal Prof. 79, 84 & n.22 (2006) (when value in Microsoft Word metadata field called "Total editing time" is 205 minutes, "the file could simply have been open on the screen for 205 minutes; the amount of time indicated does not necessarily mean that [the purported author] was working on the file for all of those 205 minutes.") (Ex. H to Southwell Decl.); and (3) the "number" of the revisions the document has undergone, *see* David Hricik & Chase Edward Scott, *Metadata: The Ghosts Haunting e-Documents*, 26 Computer & Internet Lawyer 23, 24 (2009) (Microsoft Word metadata indicating "that the document was in its 44th revision" means that "it had been opened and closed 44 times"—not that the document

presentation of this evidence would be heavy, and the metadata concerning the history and tracking of the interview memoranda would carry no "significant probative value" weighing against that risk, Defendants cannot establish the admissibility of the metadata demanded under Rule 403, and the balance tilts sharply against the subpoena. *See Georgiou*, 2009 WL 2973035, at *4; *cf. United States v. Murray*, 103 F.3d 310, 319 (3d Cir. 1997) (Alito, J.) (Rule 403 exclusion required when "legitimate probative value" of evidence "was unquestionably slight" in comparison with its "grave danger of unfair prejudice").

Defendants' maintenance of their demand for metadata notwithstanding those barriers to admissibility shows that the subpoena amounts to an impermissible "fishing expedition," *Nixon*, 418 U.S. at 699-700; *see Bowman Dairy Co.*, 341 U.S. at 221. "[A]lthough a defendant's subpoena may be motivated only by the venerable principle of 'nothing ventured, nothing gained,' more is needed to sustain a subpoena than the defendant's own subjective belief (*i.e.* hope) that he or she may find something useful by casting a subpoena upon the waters." *United States v. Einsenhart*, 43 Fed. Appx. 500, 505 (3d Cir. 2002) (citing *Cuthbertson I*, 630 F.2d at 146); *see also United States v. Krall*, No. 07-cr-607-01, 2009 WL 2394288, at *6 (E.D. Pa. Aug. 4, 2009). Defendants here offer nothing more than such "subjective belief" inadequate to justify a Rule 17(c) under controlling law.

### C. The Subpoena Fails To Specify the Metadata With Requisite Particularity

The subpoena independently fails to satisfy Rule 17's specific-identification requirement. The subpoena's second demand is for "[a]ny and all metadata and the document properties," an inherently vague and sweeping request, further confirming that the subpoena is the kind of "fishing expedition" courts avoid. *Nixon*, 418 U.S. at 699. In at least two respects, the "vague

---

necessarily underwent material changes between each instance of opening and closing) (Ex. I to Southwell Decl.). GDC requests that this Court take judicial notice of those authorities.

and inexact request does not pass muster under the 17(c) standard." *United States v. Merlino*, No. 99-cr-0363, 2001 WL 283165, at *7 (E.D. Pa. Mar. 19, 2001).

*First*, the request for "any and all" metadata lacks the required specificity. For example, in *United States v. Weisberg*, the court quashed a Rule 17(c) subpoena to the extent that it requested "all documents, electronically stored information including metadata, and objects concerning and related to the creation, maintenance, terms, conditions and termination" of an escrow account. No. 08-cr-347, 2011 WL 1327689, at *6 (E.D.N.Y. Apr. 5, 2011). The court deemed the request "insufficiently focused," recognizing that it is appropriate to "reject[] as too broad a Rule 17(c) subpoena requesting 'any and all' documents relating to several categories of subject matter." *Id.* (quoting *United States v. Louis*, No. 04-cr-203, 2005 WL 180885, at *5 (S.D.N.Y. Jan 27, 2005)).

*Second*, Defendants here employ the terms "metadata" and "document properties" without even *attempting* to define those potentially very broad terms. Because metadata includes a variety of information, and because courts must be assured that the information sought will yield relevant, admissible evidence, courts require greater specificity in requests for metadata than Defendants have provided. *See, e.g.*, *Weisberg*, 2011 WL 1327689, at *10 (requiring party seeking production to define the "metadata" sought); *cf. ACLU v. CIA*, No. Civ. 10-436, 2015 WL 3777275, at *6 n.10 (D.D.C. June 18, 2015) (noting that a request for the "underlying factual information" contained in a document may not be recast as a request for "metadata").

## II.  The Subpoena Improperly Seeks Information Protected By The Work-Product Doctrine

Because the subpoena for metadata fails to meet the elements of Rule 17(c), there is no need for the Court to go further. In any event, the subpoena for metadata is unreasonable and oppressive on the alternative ground that the information sought is protected under the work-

product doctrine.  Given that there is no need to reach the work-product doctrine in this case, we address it only in summary form here, and request opportunity to brief the issue in further detail if that would be helpful to the Court.  *See Nixon*, 418 U.S. at 698 (if court sustains challenge to subpoena based on failure to satisfy the requirements of Rule 17(c), there is "no occasion to reach the claim of privilege asserted with respect to the subpoenaed material.")

The "core" of the "work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.  But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system."  *United States v. Nobles*, 422 U.S. 225, 237-38 (1975).  Even when materials are protected by the work-product doctrine because they were "prepared in anticipation of litigation or for trial," and even when the requesting party can show "substantial need for the materials to prepare its case" and that the party "cannot, without undue hardship, obtain their substantial equivalent by other means," the court must at all times "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney . . . concerning the litigation."  Fed. R. Civ. P. 26(b)(3)(A), (B).

Although experience with subpoenas for metadata is still in its infancy, courts already have begun to recognize that metadata associated with documents composed by attorneys in the course of representing clients unquestionably can qualify for protection under the work-product doctrine.  "Metadata, almost by definition, shows the mental processes of the drafter of a document by revealing the drafter's drafting decisions and steps."  *United States v. Wirth*, No. 11-cr-256, 2012 WL 1110540, at *4 (D. Minn. Apr. 3, 2012); *see id.* ("[e]lectronic draft summaries with intact metadata, in particular, are entitled to strong protection" under work-product doctrine); *cf. Kyko Glob., Inc. v. Prithvi Info. Sols., Ltd.*, No. Civ. 13-1034, 2014 WL

2694236, at *2 (W.D. Wash. June 13, 2014) (noting that impermissible "metadata mining is expressly aimed at the kind of information one would expect to be protected by attorney-client privilege and/or work-product protections."). In the same vein here, while the contents of any of the interview memoranda are not contained in the metadata, *see* Southwell Decl. ¶ 15, aspects of the history and management of the interview memoranda are or purport to be shown, and those aspects too are protected under the work-product doctrine, especially given that the work-product doctrine is an "intensely practical one, grounded in the realities of litigation." *Nobles*, 422 U.S. at 238.

Defendants err in contending (ECF No. 16 at 9) that public distribution of the Report and the interview memoranda means that GDC "clearly waived any privilege that may have applied to the materials created during its investigation." The extrajudicial disclosure of certain privileged material (here, the interview memoranda) constitutes a "partial waiver," and release of "a portion of [the] privileged communications" allows continued assertion of "the privilege as to the remaining portions of the same communications" (here, the metadata associated with the interview memoranda). *See Westinghouse Elec. Corp. v. Repub. of Philippines*, 951 F.2d 1414, 1423 n.7 (3d Cir. 1991). Under the "partial waiver" principle that "applies equally in the context of the work-product doctrine" and the attorney-client privilege, *id.* at 1430, "[w]hen a party discloses a portion of otherwise privileged materials while withholding the rest, the privilege is waived *only as to those communications actually disclosed*, unless a partial waiver would be unfair to the party's adversary," *id.* at 1426 n.12 (emphasis added); *see also In re Von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987) ("[T]he extrajudicial disclosure of an attorney-client communication—one not subsequently used by the client in a judicial proceeding to his adversary's prejudice—does not waive the privilege as to the undisclosed portions of the

communication.").  But, of course, in the Government's prosecution of Defendants, GDC is not a "party," and has no "adversary"—so there is simply no basis for refusing to apply the "partial waiver" principle.  Release of the interview memoranda therefore did not waive *any* privilege or protection as to the associated metadata, including the work-product doctrine.

## CONCLUSION

For the foregoing reasons, the subpoena should be quashed under Rule 17(c)(2).

Dated:  August 21, 2015
New York, New York

Respectfully submitted,
GIBSON, DUNN & CRUTCHER LLP

/s/ Randy M. Mastro
Randy M. Mastro
Alexander H. Southwell (*pro hac application pending*)
200 Park Avenue
New York, NY  10166-0193
Phone: 212.351.3825
Fax: 212.351.5219
E-mail: RMastro@gibsondunn.com

*Attorneys for Nonparty*
*Gibson, Dunn & Crutcher LLP*

19