**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Susan D. Wigenton |
|  | : | Crim. No. 15-193 (SDW) |
| v. | : |  |
| WILLIAM E. BARONI, JR. and BRIDGET ANNE KELLY | : |  |
|  | : |  |

---

**BRIEF OF THE UNITED STATES IN OPPOSITION TO**
**DEFENDANTS' DISCOVERY MOTIONS**

---

PAUL J. FISHMAN
United States Attorney
970 Broad Street, Room 700
Newark, New Jersey 07102
 (973) 645-2742

On the Memorandum:

Lee M. Cortes, Jr.
Vikas Khanna
David W. Feder
Assistant United States Attorneys

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ......................................................................................................... 6

I.     THE GOVERNMENT HAS PRODUCED DISCOVERY IN A STANDARD
       FORMAT AND HAS NO ADDITIONAL OBLIGATION TO REVIEW THE
       DISCOVERY AND IDENTIFY POTENTIAL BRADY MATERIALS ........................... 6

       A.     The Government need not scour the discovery already produced to Defendants
              for potential Brady material. ................................................................ 6

       B.     The discovery does not require reformatting. ....................................... 12

       C.     The Government has complied fully with accepted protocols for ESI discovery
              management. ...................................................................................... 14

II.    THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR THE
       GOVERNMETN TO CHALLENGE THE PRODUCTION FROM THE OGNJ. .......... 17

III.   THE GOVERNMENT HAS SATISFIED, AND WILL CONTINUE TO SATISFY,
       ITS BRADY OBLIGATIONS BY DISCLOSING INFORMATION IN ITS
       POSSESSION THAT IS ARGUABLY FAVORABLE TO THE DEFENSE. ................ 19

       A.     The Government will provide the records requested by Defendants that are
              relevant to the specific issues previously disclosed by the Government. ............ 19

              1.     Information provided by Governor Christie ............................... 20

              2.     Information provided by Gretchen DiMarco ............................ 20

              3.     Information regarding Philip Kwon ........................................... 21

       B.     The Government will not provide additional materials requested by Baroni
              concerning information provided in discovery. ..................................... 22

IV.    THE GOVERNMENT HAS SATISFIED ITS DISCOVERY OBLIGATIONS
       REGARDING BARONI'S FORMER PORT AUTHORITY HARD DRIVE ................ 23

       A.     The Government has not conducted forensic testing of the Hard Drive but,
              subject to taking into account the Port Authority's privilege claims regarding
              certain records included in the Hard Drive, will enable Baroni to do so. ............. 24

       B.     There is no Brady issue regarding the Hard Drive, and Baroni is not entitled at
              present to what, if any, Jencks Act material pertains to the Hard Drive ............... 24

V. DEFENDANTS' MOTIONS FOR BILLS OF PARTICULARS SHOULD BE DENIED.................................................................................... 26

 A. A Bill of Particulars Is Not Warranted Because The Indictment And Discovery Give Defendants More Than Enough Information About The Charged Crimes. .................................................................... 26

 B. Responses to Defendants' Requests for Particulars............................................. 30

  1. Requests for the identification of unindicted co-conspirators and other unnamed individuals. .............................................................. 30

  2. Requests for additional detail regarding "manner and means" allegations. ...................................................................... 31

  3. Requests regarding the location of alleged conduct. ............................... 31

  4. Request for specific count three wire communications. ........................... 32

  5. Requests for information concerning Port Authority practices and lane and toll booth configurations. .................................................... 32

  6. Request for information regarding the value of misapplied property....... 33

VI. THE GOVERNMENT WILL CONTINUE TO ABIDE BY ITS GIGLIO OBLIGATIONS.................................................................................... 34

VII. DEFENDANTS ARE NOT ENTITLED TO EARLY PRODUCTION OF JENCKS MATERIAL. ...................................................................................... 36

VIII. KELLY'S REQUEST FOR IMMEDIATE DISCLOSURE OF RULE 404(B) EVIDENCE SHOULD BE DENIED, BECAUSE THE GOVERNMENT WILL GIVE RULE 404(B) NOTICE IN ACCORDANCE WITH THE DISCOVERY ORDER. ............................................................................................ 37

IX. KELLY'S REQUEST FOR DISCLOSURE OF "UNCHARGED CRIMINAL ACTS" EVIDENCE IS MOOT BECAUSE THE UNITED STATES IS COMPLYING WITH RULE 16. ......................................................................................... 38

X. KELLY'S MOTION THAT THE UNITED STATES PRESERVE ITS "ROUGH NOTES" AND "DRAFT REPORTS" IS MOOT, AS THE UNITED STATES HAS AND WILL CONTINUE TO PRESERVE THOSE NOTES. ........................................ 39

XI. KELLY'S MOTION FOR EXPERT DISCLOSURES IS PREMATURE. .................... 40

XII. BARONI'S UNSUPPORTED DEMAND FOR ALL SUBPOENAS ISSUED BY THE GOVERNMENT SHOULD BE REJECTED BECAUSE THE SUBPOENAS

ARE NOT EVIDENCE, LET ALONE EXCULPATORY OR MATERIAL
EVIDENCE.................................................................................................... 40

XIII.   BARONI IS NOT ENTITLED TO A REPRESENTATION BY THE GOVERNMENT
ABOUT WHEN ITS DISCOVERY DISCLOSURES WILL END................................ 41

XIV.   TRIAL SHOULD BE HELD IN THE DISTRICT OF NEW JERSEY BECAUSE
BARONI HAS NOT DEMONSTRATED THAT THE ENTIRE POOL OF
PROSPECTIVE JURORS IS SO PREJUDICED THAT A CHANGE OF VENUE IS
REQUIRED PRIOR TO VOIR DIRE. ........................................................... 42

A.   A finding of presumed prejudice in this case is foreclosed by Supreme Court
and other recent precedent. .................................................................. 44

B.   Baroni has not met his heavy burden to establish presumed prejudice. .............. 49

1.   The size and characteristics of Northern New Jersey weigh heavily
against finding presumed prejudice. ......................................................... 49

2.   The content of the coverage is largely factually based and not unduly
inflammatory. ............................................................................. 51

3.   Trial will begin more than two years after the allegations surfaced. ........ 53

4.   Baroni's claim of media interference is deficient because the trial has
yet to begin. ............................................................................. 53

CONCLUSION.................................................................................... 55

## PRELIMINARY STATEMENT

On April 23, 2015, a grand jury sitting in Newark, New Jersey returned a nine-count Indictment against defendant William E. Baroni, Jr. and defendant Bridget Anne Kelly ("Defendants"). The Indictment alleges, among other things, that Baroni, the former Deputy Executive Director of the Port Authority of New York and New Jersey (the "Port Authority"), and Kelly, the former Deputy Chief of Staff for Legislative and Intergovernmental Affairs in the Office of the Governor of the State of New Jersey (the "OGNJ"), defrauded and misused the property of the Port Authority to facilitate and conceal the causing of traffic problems in the Borough of Fort Lee and interfered with the travel rights of the residents of Fort Lee, all in order to punish Fort Lee's mayor, Mark Sokolich, for not endorsing New Jersey Governor Christopher J. Christie's reelection in November 2013. David Wildstein, the former Director of Interstate Capital Projects at the Port Authority, pled guilty on May 1, 2015, to conspiring with Baroni and Kelly in the same scheme. The Indictment was unsealed on the same day.

Since the Indictment, and in accordance with the Court's Order for Discovery and Inspection (the "Discovery Order"), the Government has provided extensive discovery to Defendants. The Government initially made discovery available for in-person inspection on May 19, 2015. It then produced the majority of the discovery to Defendants on or about July 7, 2015, although the Government has made several supplemental discovery productions in the nearly five months since its initial disclosures. In producing records to Defendants, the Government has, among other things:

- organized the productions in individual, separate folders that identified the specific custodian/source of the particular records;

- provided a detailed index that identified the records by specific custodian/source for each production;

- included other information to identify the records, such as Bates-stamp numbers;

- provided the defense with records in exactly the same format in which the Government received them from third parties;

- provided, whenever possible, electronic records in a searchable format, such as PDFs, or in files that are loadable into a discovery platform;

- provided privilege logs that were produced by third parties, such as the OGNJ;

- turned over detailed lists produced by the OGNJ, Chris Christie for Governor, Inc., and the New Jersey Republican State Committee that identified the specific custodians of particular documents by Bates-stamp numbers; and

- highlighted the OGNJ's custodians list in color to differentiate custodians primarily associated with the allegations made by the Mayor of Hoboken from those with information related to the allegations in the Indictment.

Additionally, with respect to certain hard copy materials that the Government has made available to Defendants for their inspection, after Baroni and counsel reviewed those materials and selected approximately six boxes of materials for copying, the Government had those materials scanned and produced them to both Defendants in a Bates-stamped PDF format.

Despite this carefully organized production, Defendants have filed motions wrongly complaining that the extensive discovery provided by the Government was a "document dump"—the indiscriminate disclosure of voluminous records. Defendants contend that the amount and, for some productions, the format of the discovery make it difficult, if not impossible, to prepare for trial. They ask the Court to order the Government to catalogue for them any potential *Brady* and *Giglio* materials within the productions that the Government has already disclosed, reformat certain discovery in accordance with their preferred format, and challenge the content and format of the production provided by the OGNJ.

There is no question that the discovery has been extensive. But the Government's efforts to satisfy its discovery obligations, as outlined above, also are extensive. Defendants' characterization of the Government's discovery as a "document dump" is meritless and contrary

2

to controlling precedent. There is no need—and the Government has no obligation—to reformat the discovery, which was provided electronically in a text-searchable format, or to comb the discovery—the majority of which Defendants have had for nearly five months—to identify what, if any, materials in the discovery might be favorable to Defendants. Courts have roundly rejected imposing such requirements on the Government. And, with respect to the OGNJ production, Defendants cannot enlist the Government to do what they can do themselves—issue the OGNJ a subpoena for additional information.

Defendants also seek transcripts, agent reports, and other information in the discovery or otherwise in the Government's possession regarding several issues: (1) Governor Christie's account of why meetings between members of his administration and Jersey City Mayor Steven Fulop were cancelled in the summer of 2013; (2) the account provided by Baroni's administrative assistant about conversations that she had with Baroni and Wildstein about the lane and toll booth reductions; and (3) potential exculpatory information that Port Authority attorney Philip Kwon may have. Importantly, Defendants learned about each of these issues because the Government disclosed them to Defendants consistent with its practice of providing information, even where that information is only, at best, arguably favorable to the defense. These disclosures fully complied with the Government's disclosure obligations.

Similarly, the Government disclosed that a Port Authority hard drive used by Baroni (the "Hard Drive") had been provided to the Government by Wildstein, and the Government produced to Defendants non-privileged records from the Hard Drive and the Port Authority's corresponding privilege log. Then, at Baroni's request, the Government subsequently supplied additional detail regarding the Hard Drive's acquisition. Still not content, Baroni seeks still more information—including the results of non-existent forensic testing and relevant grand jury

testimony, as well as reports of interviews that constitute potential *Giglio* and Jencks Act material.

Defendants then make a host of other standard discovery requests, most of which are governed by case law and/or the Court's Discovery Order. These include a request for a bill of particulars, which is unnecessary given the detailed Indictment and the expansive discovery disclosures.

Defendants also request the early production of *Giglio* and Jencks Act materials. Yet their briefs fail to acknowledge contrary legal authority, and they fail to mention the Government's proposal to mutually exchange *Giglio* and Jencks materials. On October 20, 2015, the Government proposed a compromise consistent with the newly adopted Criminal Trial Scheduling and Discovery Order, Standing Order 15-2, which was signed by Chief Judge Simandle on September 22, 2015, and which will become effective for felony cases commenced on or after April 1, 2016 (the "Standing Order").[1] Specifically, the Government proposed that the parties enter into an agreement to provide more information about witness statements and impeachment material than that required by law and to provide that information in advance of the time required by law. *See* Standing Order ¶ 12. Upon such an agreement, the Government would provide to the defense, approximately 45 days before trial, the Jencks and *Giglio* material for its witnesses, and if no such material existed for a witness, the Government would also advise the defense of the general substance of the witness's anticipated testimony. *See id.* ¶ 13. Upon such an agreement and the Government's disclosure of witness material as described above, each Defendant would provide reverse Jencks and impeachment material for its witnesses (including

---

[1] Standing Order 15-2 is available on the website for the District of New Jersey at: http://www.njd.uscourts.gov/standing-orders.

Defendants themselves) and, if no such material existed for a witness, would advise the Government of the general substance of the witness's anticipated testimony. This would be done as soon as possible after the Government's disclosures and, in any event, well before the start of trial. *See id.* ¶ 14. Defendants apparently have declined to explore this option, instead seeking immediate disclosure of these materials.

In addition, Baroni alone moves for a change of venue, claiming that pretrial publicity would make it impossible to empanel an impartial jury in Northern New Jersey. This argument overlooks the strong public interest in prosecuting crimes in the district where they occur and, as the Supreme Court recently held, that it is nearly impossible to establish that a fair jury cannot be empanelled in a vicinage the size of Northern New Jersey.

Defendants' motions should be denied in accordance with the reasons set forth below.

**ARGUMENT**

I.   **THE GOVERNMENT HAS PRODUCED DISCOVERY IN A STANDARD
     FORMAT AND HAS NO ADDITIONAL OBLIGATION TO REVIEW THE
     DISCOVERY AND IDENTIFY POTENTIAL *BRADY* MATERIALS.**

The Government is fully cognizant of its obligations pursuant to *Brady v. Maryland*, 373

U.S. 83 (1963). The record reflects exactly that: the Government has disclosed, in an abundance

of caution, material in its possession that could arguably be considered favorable to the defense.

Should any additional information come to light, the Government will continue to make prompt

disclosures.

    A.   **The Government need not scour the discovery already produced to
          Defendants for potential *Brady* material.**

Baroni criticizes the Government for dumping "millions of pages" of documents without

identifying whatever *Brady* materials they contain. BB19-23.[2] Indeed, Baroni contends that the

Government "has an obligation to look at every page and provide *Brady* information to the

defendant." BB19. He is wrong.

While *Brady* imposes affirmative obligations on the Government regarding the *disclosure*

of exculpatory information, it "impose[s] no additional duty on the prosecution team members to

ferret out any potentially defense-favorable information from materials that are so disclosed."

*United States v. Pellulo*, 399 F.3d 197, 212 (3d Cir. 2005); *see also Dukes v. Pappas*, 405 F.

App'x 666, 669 (3d Cir. 2010) (unpublished) ("*Brady* does not require the government 'to

facilitate the compilation of exculpatory material that, with some industry, defense counsel could

marshal on their own.'") (quoting *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002)).

---

[2] "BB" refers to the "Brief in Support of Mr. Baroni's Discovery Motions and Motion for a
Change of Venue." "KB" refers to Kelly's "Brief in Support of Omnibus Discovery Motions."
"D_" refers to page number of an exhibit submitted with Baroni's brief.

As summarized above, the Government has provided extensive and ongoing discovery and has produced documents electronically, and in the same format it received them. In most cases, the Government provided documents in a searchable format or a format readily convertible to permit searching. The Government also has provided extensive and detailed indices and guidance. Moreover, in an abundance of caution, the Government has alerted Defendants to particular information that may prove favorable to the defense and the sources of that information, all in a manner consistent with controlling case law and the Court's Discovery Order.

Defendants claim that this is not enough: They want the Court to order the Government to pull out anything within those materials that is or could be favorable to the defense. Every circuit court and most district courts that have assessed similar requests, including the Third Circuit and the District of New Jersey, have denied them. *See Rhoades v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011); *United States v. Warshak*, 631 F.3d 266, 295-98 (6th Cir. 2010); *United States v. Skilling*, 554 F.3d 529, 576-77 (5th Cir. 2009), *reversed in part on other grounds*, 561 U.S. 358 (2010); *Pelullo*, 399 F.3d at 212; *United States v. Jordan*, 316 F.3d 1215, 1253-54 (11th Cir. 2003); *Runyan*, 290 F.3d at 245-46; *United States v. Mmahat*, 106 F.3d 89, 94 (5th Cir. 1997), *abrogated on other grounds*, *United States v. Estate of Parsons*, 367 F.3d 409 (5th Cir. 2004); *United States v. Eisenberg*, 773 F. Supp. 662, 687-88 (D.N.J. 1991) (rejecting defendant's contention "that he should not have to expend the effort required to review a substantial number of documents in order to ascertain whether they contain exculpatory information").[3] As Judge Posner recently observed in denying a similar request by defendants in

---

[3] *Accord United States v. Faux*, Crim. No. 14-28, 2015 WL 1190105, at *7 (D. Conn. Mar. 16, 2015); *United States v. Mohammad*, Crim. No. 10-389, 2012 WL 1605472, at *2 n.3 (N.D.

*United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011), "[t]o charge prosecutors with knowledge of exculpatory evidence buried in the computer databases of institutions that collect and store vast amounts of digitized data would be an unreasonable extension of the *Brady* rule." *Id.* at 567.

These cases make clear that the Government is neither responsible for preparing the defense, nor in a better position to identify exculpatory material than the defense. As an example, an individual defendant in the Enron case argued, like Defendants here, that the volume of discovery prevented the effective review of the Government's disclosures. *Skilling*, 554 F.3d at 576. The Fifth Circuit refused to order the Government to dig favorable material out of several hundred millions of pages of documents, holding that "the government was in no better position to locate any potentially exculpatory evidence than was [the defendant]." *Id.* at 577. A decision in the Southern District of New York agreed:

> Placing a higher burden on the Government to uncover such evidence would place prosecutors in the untenable position of having to prepare both sides of the case at once. Indeed, the adversarial system presumes that the defense will be more highly motivated to uncover exculpatory evidence, so if anything the onus is on defense counsel to conduct a more diligent search for material potentially favorable to his client. This is especially true considering that, if exculpatory evidence exists, the defense is in

---

Ohio May 8, 2012); *United States v. AU Optronics Corp.*, Crim. No. 09-110, 2011 WL 6778520, at *1-*2 (N.D. Cal. Dec. 23, 2011); *United States v. Briggs*, 831 F. Supp. 2d 623, 629 (W.D.N.Y. 2011); *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 454-57 (S.D.N.Y. 2011); *United States v. Hazelwood*, Crim. No. 10-150, 2011 WL 2565294, at *20 (N.D. Ohio June 27, 2011); *United States v. Simpson*, Crim. No. 09-249, 2011 WL 978235, at *8-*9 (N.D. Tex. Mar. 21, 2011); *United States v. Ohle*, Crim. No. 08-1109, 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011); *United States v. Dunning*, Crim. No. 07-1390, 2009 WL 3815739, at *1-*2 (D. Ariz. Nov. 12, 2009); *United States v. Ferguson*, 478 F. Supp. 2d 220, 242 (D. Conn. 2007); *Brown v. United States*, Crim. No. 02-14, 2006 WL 1582421, at *3 (M.D. Ga. June 5, 2006); *United States v. W.R. Grace*, 401 F. Supp. 2d 1069, 1080-81 (D. Mont. 2005).

> the best position to know what such evidence might be and where
> it might be located.

*Ohle*, 2011 WL 651849, at *4.

In addition, contrary to Defendants' convoluted logic, *see* BB21, 41, a large amount of discovery does not automatically contain a large amount of material favorable to the defense. The Southern District of New York rejected a similar argument:

> Defendants baldly assert that "the government undeniably
> encountered exculpatory audio that is inconsistent with its theory
> of Defendants' guilt. Yet the Government failed to identify that
> audio during its review, knowing full well that Defendants likely
> would be unable to find it once it was placed back into the mass of
> discovery later produced to the defense." . . . This bare, conclusory
> allegation does not justify an order requiring the Government to
> undertake the organizational and analytical burdens that
> Defendants would foist upon it to facilitate the preparation of their
> defense.

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 455 (S.D.N.Y. 2011).

Moreover, Defendants do not allege that the Government engaged in bad faith or deliberate efforts to knowingly hide *Brady* material in the discovery. Indeed, Baroni emphasized that he made his *Brady* motion "*without in any way alleging bad faith.*" BB39 (emphasis in original). The cases in this area recognize that, absent prosecutorial misconduct—the Government's provision of voluminous material does not run afoul of *Brady*. *See Warshak*, 631 F.3d at 297-98 (finding no evidence of prosecutorial "bad faith" in disclosure); *Skilling*, 554 F.3d at 577 (finding no *Brady* violation where there was no indication that government knowingly hid exculpatory evidence within voluminous disclosures).

Courts have declined to compel the Government to identify exculpatory material within discovery that dwarfed the amount involved here. *See United States v. AU Optronics Corp.*,

Crim. No. 09-110, 2011 WL 6778520, at *1 (N.D. Cal. Dec. 23, 2011) (37 million pages); *United States v. Simpson*, Crim. No. 09-249, 2011 WL 978235, at *8 (N.D. Tex. Mar. 21, 2011) (200 terabytes); *United States v. Dunning*, Crim. No. 07-1390, 2009 WL 3815739, at *1 (D. Ariz. Nov. 12, 2009) (in a case involving 22 hard drives of discovery, "*Brady* does not mean that the Government must take the evidence that it has already disclosed to Defendant, sift through this evidence, and organize it for Defendant's convenience").

Baroni disregards this overwhelming precedent and instead relies on *United States v. Salyer*, Crim. No. 10-61, 2010 WL 3036444, at *3, *6 (E.D. Cal. Aug. 2, 2010), a decision that clearly has not been adopted nationwide, is outside the norm for this District and Circuit, and arises under distinguishable facts. In *Salyer*, the magistrate judge recognized that *Brady* does not require the Government to identify exculpatory information from within material disclosed to the defense. *Id.* at *2. The judge nevertheless ordered the Government to identify potentially exculpatory information within materials already disclosed, on the grounds that no authority limited its discretion to impose that requirement as a matter of "case management." *Id. Salyer*, however, involved a single defendant who was detained and had "little practical ability in the jail setting to be of much assistance in the search as he [could] do no document review, either hard copy or electronically, absent the physical presence of counsel in the jail." *Id.* at *7. Indeed, the court in *Salyer* noted the contrast with another district court decision in the Ninth Circuit, *United States v. W.R. Grace*, 401 F. Supp. 2d 1069, 1080 (D. Mont. 2005), where the court refused to order the Government to review the discovery provided to identify *Brady*, in part, because "there were multiple defendants in that criminal case with some overlapping discovery needs, and that the defendants were apparently not detained pending trial making their search for *Brady* materials much easier." *Id.* at *6; *Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d at 456

10

(distinguishing *Salyer*, in part, based on fact that defendants were not detained). Here, of course, neither Defendant is incarcerated; they are thus capable of participating in the review process (indeed, both Defendants have inspected personally the discovery at the U.S. Attorney's Office).

In addition, Defendants are not reviewing discovery on a blank slate. The Government has provided a 36-page Indictment that contains detailed factual allegations. Defendants have a working familiarity with the two largest productions—those obtained from the OGNJ and Port Authority—based on their previous employment. *Cf. Pelullo*, 399 F.3d at 211 (explaining that defendant was in best position to review discovery comprised largely of his own documents). The core allegations in the Indictment have been the subject of public hearings before the state legislature and a public report commissioned by the OGNJ that summarized interviews of witnesses and a review of OGNJ documents pertaining to the lane and toll booth reductions. *See Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d at 456 (distinguishing *Salyer*, in part, based on "ongoing parallel civil litigation with overlapping documents and evidence"). The Government gave Defendants and their counsel extensive, in-person briefings concerning the proofs against them before they were indicted. And, again, the Government provided discovery in an electronic, searchable format, whereas *Salyer* involved a large amount of hard copy documents that could not be electronically text searched. *See United States v. Weaver*, 992 F. Supp. 2d 152, 156 (E.D.N.Y. 2014) (distinguishing *Salyer* on this basis). Thus, many of the "case management" concerns in *Salyer* are not at issue here.

Baroni also complains that the Government failed to identify a single document as *Brady*, BB21, even though, as noted above, *Brady* is a rule of disclosure, not identification. But Baroni cannot conjure a *Brady* violation where the Government has no obligation to scour the discovery for his trial purposes in the first place. *See Warshak*, 631 F.3d at 297-99. That is

11

Baroni's job, and before trial in this matter commences in April 2016, he will have had nearly nine months with the bulk of the discovery in which to do it.

**B.      The discovery does not require reformatting.**

Defendants' complaints about the formatting of the discovery are puzzling. Defendants received the productions in the same manner that the Government received them. *See Dunning*, 2009 WL 3815739, at *1 ("Defendant has precisely the same image of the hard drives the Government possesses."). The bulk of the discovery, including most of the OGNJ production, is in PDF, which the court in *United States v. Briggs*, Crim. No. 10-184, 2011 WL 4017886, at *8 (W.D.N.Y. Sept. 8, 2011), a case relied upon by Kelly, *see* KB33-34, recognized as a "searchable format." *Id.* at *8. Any document produced as a PDF in a non-searchable format can easily be made searchable through "optical character recognition" ("OCR") conversion with just a few mouse clicks. Additionally, the Government disclosed "load-ready" files that can be uploaded into a database and "easily searched" for keywords, phrases, and file types whenever it received those types of productions from the third party sources. *See Weaver*, 992 F. Supp. 2d at 156 (rejecting defendants' requests to instruct the Government to identify *Brady* materials in voluminous discovery). Moreover, Defendants know their own defenses in a way that the Government does not. Thus, they can craft and refine electronic searches of the discovery that are tailored to their defenses in a way that the Government's searches simply could not be.

Kelly asks the Court to direct the Government to produce discovery in a format consistent with the protocols set forth under Federal Rule of Civil Procedure 34(b)(2)(E)(ii). KB32-37. Though Kelly acknowledges that Rule 34(b)(2)(E)(ii) does not control criminal discovery, KB32-33, she cites two decisions in which courts have looked to Rule 34 to direct the production

of voluminous electronically stored information ("ESI"), KB33-35. Those decisions, however, involved circumstances different from those at issue here.

In *Briggs*, for example, the court did invoke Rule 34 in ordering the Government to organize and reformat voluminous ESI to make it searchable. 2011 WL 4017886, at *8-*9. Critically, however, the Government in that case actually generated and compiled the discovery. Thus, the Government was responsible for creating the format in which the materials were produced, meaning that the Government was in the "better position to organize this mass of information and re-present it in a manner that is searchable by the defense." *Id.* at *8. Here, by contrast, the materials about which Kelly complains were secured from third parties and produced by the Government in the same format in which they were received. Moreover, as noted above, the *Briggs* court ultimately approved a production of ESI in "PDF searchable format," *id.*, the same format in which the Government produced the bulk of the discovery in this case, including the OGNJ production.

The other case cited by Kelly, *United States v. Stirling*, Crim. No. 11-20792 (S.D. Fla. June 5, 2012) (KB, Ex. D), involved the treatment of Skype chats uncovered by the Government during a forensic examination of the defendant's computer. *Id.* at 2. Though the defendant had a forensic copy of the computer, the information located by the Government was "not readily available by opening the folders appearing in the hard drive or disk." The Government did not turn over the Skype evidence to the defendant, but used it in rebuttal to impeach the defendant's testimony. *Id.* The court granted a new trial, finding that "[i]f, in order to view ESI, an indigent defendant such as Stirling needs to hire a computer forensics expert and obtain a program to retrieve information not apparent by reading what appears in a disk or hard drive, then such a defendant should so be informed by the Government which knows of the existence of the non-

apparent information." *Id.* at 4-5. The court concluded that simply providing the forensic image—when the Government knew of the Skype chat log—did not satisfy Rule 16(a)(1)(B)(i)'s requirement that the Government disclose any relevant written or recorded statement by the defendant if it is known to the Government and in its possession. *Id.*

*Stirling* has no application here, where the Government has not located material arguably favorable to the defense through forensic testing that has not otherwise been produced to Defendants. In short, the Government is not relying on sophisticated forensic analysis to elicit or synthesize evidence that would not be reasonably apparent to Defendants.

**C.    The Government has complied fully with accepted protocols for ESI discovery management.**

Kelly charges that the Government has failed to abide by the set of best practices for ESI discovery management set forth in the Criminal ESI Discovery Protocol (the "Protocol") (D37-58), which was issued by the Department of Justice on February 13, 2012. KB35-37.[4] These claims are misplaced. Kelly fundamentally misapprehends the nature and structure of the Protocol. The Protocol prominently states that it sets forth "a collaborative approach to ESI discovery involving mutual and interdependent responsibilities." Protocol at 3. Its recommendations "may not serve as a basis for allegations of misconduct or claims for relief and they do not create any rights or privileges for any party." *Id.* at 5. In essence, the Protocol

_____

[4] The Protocol is officially titled the "Recommendations for Electronically Stored Information (ESI) Discovery Production in Federal Criminal Cases." It was issued by the Department of Justice and Administrative Office of the U.S. Courts Joint Working Group on Electronic Technology in the Criminal Justice System and is available at http://www.fd.org/docs/litigation-support/final-esi-protocol.pdf. The Protocol was the product of collaboration between the Department of Justice, the Office of Defender Services (ODS), Federal Defender Organizations (FDO), private attorneys who accept Criminal Justice Act (CJA) appointments, representatives of the Administrative Office of United States Courts, and liaisons from the United States Judiciary.

14

describes a set of best practices that form the steps of a process, and not a set of rules for the parties to flourish like swords.

Moreover, the discovery the Government has provided in this case—including the manner in which it was produced—complies with the Protocol. The Government obtained the ESI in this case from third parties. The Protocol recommends that "ESI obtained from third parties should be produced in the format(s) it was received or in a reasonably usable format(s)." *Id.* at 6. The receiving party cannot dictate how the producing party's discovery will be produced: "the producing party is not obligated to undertake additional processing desired by the receiving party that is not part of the producing party's own case preparation or discovery production." *Id.* at 4. Thus, even if, as Kelly complains, the discovery is "a hodgepodge of different formats," KB36, that is because different third parties produced documents in a "hodgepodge" of different formats.[5]

The excerpts of the guidance quoted by Defendants direct that, "where a producing party elects to engage in *processing* of ESI, the results of that processing should, unless they constitute work product, be produced in discovery along with the underlying ESI so as to save the receiving party the expense of replicating the work." KB36 (quoting Protocol at 7) (emphasis added). Here, the Government has not engaged in any substantial "processing" of the discovery materials, which would require the Government to produce results of such processing.

In sum, and consistent with controlling case law and the best practices set forth in the Protocol, the Government has conscientiously gone to considerable effort to provide Defendants

---

[5] Of course, Kelly's complaint that the discovery is a "hodgepodge" of different formats does not make it so. The discovery materials consist largely of PDFs, TIFFs, natives (*i.e.*, Microsoft Word, Excel, Powerpoint, and Outlook files, among others), or as files loadable into a database. These formats are standard ESI.

with the materials and information gathered during the investigation in accordance with the Government's discovery obligations. The Government timely produced documents in electronic, searchable or search-convertible formats and, where possible, load-ready files that defense counsel can easily load into Concordance or an equivalent database. The Government has produced records that are in large part Bates-stamped and has identified the custodians/sources of the records produced. Defendants have the discovery in the same format in which the Government has it.

Defendants already have proven adept at parsing the discovery to locate what they submit are favorable materials. *See, e.g.*, BB8, 11, 16, 21, 24, 42; *see Briggs*, 2011 WL 4017886, at *6 ("By citing in their motions from this discovery, defendants there had shown they were capable of navigating the discovery. . . ."). Neither Defendant is incarcerated and thereby hindered from reviewing the discovery. The Government has neither hidden defense-favorable material in the discovery, nor provided discovery with the intention of padding it with superfluous information. *See Skilling*, 554 F.3d at 577. Furthermore, the Government has given Defendants a 36-page Indictment that refers to numerous specific emails and text messages and serves as a roadmap for locating critical evidence in the discovery. Thus, Defendants need not review the discovery "in a vacuum," as Baroni contends, BB47; there is more than sufficient detail in the charging document from which counsel can identify and focus in on the key evidence in the discovery.

In sum, if the discovery materials contain information favorable to the defense, Defendants are now best equipped to find it. Defendants' motion for an order specifically identifying *Brady* materials contained within produced materials should be denied.

16

## II.    THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR THE GOVERNMETN TO CHALLENGE THE PRODUCTION FROM THE OGNJ.

Aside from their more general complaints about the production, Defendants criticize the content and scope of materials that the Government obtained from the OGNJ pursuant to grand jury subpoenas. As with all ESI in this case, the Government gave Defendants the OGNJ production in the same format in which the Government received it, specifically, a combination of PDF, TIFF, and native format documents (*i.e.*, Microsoft Excel and PowerPoint files).

In particular, Baroni invokes *Brady* in contending that the Government must: (1) challenge the OGNJ's assertions of privilege and corresponding redactions and the manner in which the OGNJ compiled its privilege log; and (2) elicit additional responsive documents from the OGNJ. BB19-34.[6] But Defendants cannot foist responsibility for addressing those issues on the Government simply by invoking *Brady* or by criticizing the Government's position vis-à-vis the OGNJ production.

If Defendants find the form and content of the OGNJ's production to be deficient, they are more than capable of challenging the production. The Government has no obligation to do it for them. *See United States v. Combs*, 267 F.3d 1167, 1173 (10th Cir. 2001). Moreover, "the government cannot be required to produce that which it does not control and never possessed or inspected," *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir. 1975), even if "the prosecution could 'readily' have obtained" the requested materials, *Strohl v. Grace*, 354 F. App'x 650, 654 (3d Cir. 2009) (unpublished).

---

[6] Kelly similarly asserts that many of the privilege assertions on behalf of the OGNJ were improper. KB25-32.

17

In *United States v. Meregildo*, 920 F. Supp. 2d 434, (S.D.N.Y. 2013), for example, the defendant sought to compel the Government to obtain  information about a cooperator's social media account that was in the exclusive control of a third party. He "argue[d] that, even if information was never in the Government's possession, the Government has a duty to go out and find it." *Id.* at 445. The district court rejected this claim, holding that, while "[t]he Government cannot avoid its *Brady* obligations by being willfully blind to the information in front of it," it "is not responsible for information that is not in its possession." *Id.*

Courts also have roundly rejected Defendants' efforts to "expand the government's duty to include issuing subpoenas to force production of documents in the possession of non-government third parties." *United States v. Bartko*, Crim. No. 09-321, 2011 WL 2471556, at *4 (E.D.N.C. June 21, 2011); *see, e.g.*, *United States v. Celestin*, 612 F.3d 14, 22 (1st Cir. 2010); *United States v. Sarras*, 575 F.3d 1191, 1215 (11th Cir. 2009); *Strohl*, 354 F. App'x at 654; *United States v. Redcorn*, 528 F.3d 727, 744 (10th Cir. 2008); *United States v. Heppner*, 519 F.3d 744, 750 (8th Cir. 2008); *United States v. Hughes*, 211 F.3d 676, 688 (1st Cir. 2000); *United States v. Turner*, 104 F.3d 217, 220 (8th Cir. 1997); *United States v. Flores*, 540 F.2d 432, 438 (9th Cir. 1976) (*per curiam*).

Furthermore, a defendant's compulsion power under Federal Rule of Criminal Procedure 17(c) is just as powerful as that of the Government. *See* 2 Charles Alan Wright et al., *Federal Practice & Procedure* § 275 (4th ed. 2009). Defendants have identified what they consider deficiencies in the OGNJ production and have a procedural mechanism by which to address them. *United States v. Origel*, Crim. No. 09-2688, 2010 WL 1654134, at *2-*3 (D. Ariz. Apr. 20, 2010) (where Government lacks *Brady* disclosure obligation because requested material is not under Government control, Rule 17 is mechanism for defense witness to obtain information).

18

The Government need not—and has no obligation to—do this work for Defendants. *See United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991) (stating that *Brady* does not require Government to provide defendants with information obtainable through "reasonable diligence"). Instead, as Baroni acknowledges in the alternative, Defendants can use a Rule 17(c) to subpoena the OGNJ for the information they seek. BB35-36.[7]

### III.   THE GOVERNMENT HAS SATISFIED, AND WILL CONTINUE TO SATISFY, ITS *BRADY* OBLIGATIONS BY DISCLOSING INFORMATION IN ITS POSSESSION THAT IS ARGUABLY FAVORABLE TO THE DEFENSE.

#### A.   The Government will provide the records requested by Defendants that are relevant to the specific issues previously disclosed by the Government.

The Government has complied with its disclosure obligations during discovery and has taken an expansive view regarding what might be considered favorable to the defense. In this vein, in a letter to Defendants dated July 22, 2015 (the "July Letter"), the Government provided information that it obtained during the investigation: (1) Governor Christie's account of why meetings between members of his administration and Jersey City Mayor Steven Fulop were cancelled in the summer of 2013, BB39-40; KB21-23 (2) the account provided by Baroni's administrative assistant Gretchen DiMarco about conversations that she had with Baroni and Wildstein about the lane and toll booth reductions, KB23-24; and (3) potential exculpatory information that Port Authority attorney Philip Kwon may know, BB40-41; KB24. The Government explained then, and reiterates now, that it made these disclosures in an abundance of

---

[7] While the Government has no obligation to assist Defendants in this regard or to subpoena additional records from the OGNJ at this stage, *see, e.g.*, *United States v. Todd*, 424 F.3d 525, 534 (7th Cir. 2005), the Government likely will not object to a properly formulated Rule 17(c) subpoena to obtain information from OGNJ. The Government reserves its ability to challenge the admissibility of any such materials at trial or to challenge any subsequent defense motion under Rule 17 to compel the pretrial production of witness statements or impeachment material.

caution and without conceding that any of the information is exculpatory under *Brady*. Defendants claim that this was not enough. Specifically, Defendants request additional information, including witness transcripts and agent reports, regarding these matters. BB37-43; KB20-24. In an abundance of caution, and reserving its rights to challenge subsequent requests for additional information and the admissibility of these records for purposes of impeachment, the Government will provide certain of the requested records, as follows:

### 1.     Information provided by Governor Christie

In the July Letter, the Government advised Defendants:

> Governor Christopher J. Christie advised, in substance, that: (1) after he learned that a number of his cabinet members were planning to go to Jersey City to meet with Mayor Steven Fulop, he expressed the view, although he did not recall to whom, that he did not think that the meetings needed to occur because Mayor Fulop did not merit any kind of special treatment; (2) Mayor Fulop was not a friend or an ally and was an adversary of New Jersey State Senate President Stephen Sweeney; and (3) Governor Christie did not want the meetings with Mayor Fulop to have an adverse impact on his own relationship with Senate President Sweeney.

July Letter at 12. Although this disclosure is more than adequate, the Government will nevertheless provide records of Governor Christie's relevant statements—on this issue only—in redacted form.

### 2.     Information provided by Gretchen DiMarco

With respect to DiMarco, the Government advised in the July Letter:

> Gretchen DiMarco, former Special Assistant to then Port Authority Deputy Executive Director Baroni, advised, in substance that: (1) during the week of the lane and toll booth reductions, after reading Mayor Sokolich's September 12, 2013 letter addressed to defendant Baroni, DiMarco asked defendant Baroni what had the Mayor done and he responded, "Nothing;" (2) after the reductions ended, Wildstein and defendant Baroni expressed the sentiment that it was ridiculous that the people of Fort Lee had expedited

20

> access to the GWB; (3) after the reductions ended, Wildstein told
> her that the Port Authority police had expressed unhappiness with
> having to go out every morning and put cones out to segregate the
> local access lanes, and (4) she believed Wildstein referenced Paul
> Nunziato, the head of the Port Authority Police Benevolent
> Association, as the source of that information about the reaction of
> the Port Authority police, but she was not certain.

*Id*. at 13. While this disclosure also fully complies with the Government's obligations, the

Government will provide records of DiMarco's relevant statements—on this issue only—in

redacted form.

### 3.      Information regarding Philip Kwon

The Government disclosed the following with regard to Kwon in the July Letter:

> Based upon discussions with Geoffrey S. Berman of Greenberg
> Traurig, LLP, the attorney for Philip Kwon, Port Authority Deputy
> General Counsel, Kwon may have information with respect to the
> subject matter of the Indictment.

*Id*. at 13. The Government formulated this disclosure based upon preliminary discussions it had

with Kwon's lawyer only, not with Kwon. At no time has the Government interviewed Kwon as

part of its investigation. The Government determined based on its discussions with Kwon's

counsel that Kwon may have information arguably favorable to the defense.

In these circumstances, Kwon's lawyer has requested that the Government not disclose

the substance of the lawyer's statements. Nevertheless, in an abundance of caution, the

Government advised the defense that Kwon may have information with respect to the subject

matter of the Indictment and identified Kwon's attorney so Defendants could contact him. In

light of Defendants' request, the Government is prepared to provide to the Court *in camera*

further information about its discussions with Kwon's attorney, but respectfully submits that

Kwon's attorney may wish to be heard before the Government proceeds to do so.

**B.**     **The Government will not provide additional materials requested by Baroni concerning information provided in discovery.**

Baroni requests information about two additional issues related to information that the Government disclosed in discovery. First, he seeks information about email exchanges between Scott Rechler, the Vice-Chairman of the Port Authority's Board of Commissioners, and David Garten, Rechler's Chief of Staff, regarding the lane and toll booth reductions, BB41-42. The Government has satisfied its disclosure obligations by producing these email exchanges in discovery. To the extent that statements made about the email exchanges constitute *Giglio* and Jencks material, the Government need not disclose them so far in advance of trial. *See infra* Parts VI & VII. The same applies to Baroni's request for information about the selection of the first day of school as the start date for the lane and toll booth reductions, BB42, and Wildstein's statements regarding the cancellation of meetings with Mayor Fulop, BB43. To the extent statements about those matters constitute *Giglio* and Jencks material, the Government need not disclose them immediately.

The Government will continue to disclose information that even arguably qualifies as *Brady*. It should not, however, have to "re-review" the discovery in light of its previous disclosures or based on other issues raised by Baroni. BB43. As explained in Part I.A, the Government is fulfilling its *Brady* obligation by making extensive discovery available to Defendants and through its other disclosures described throughout this submission.

IV.   **THE GOVERNMENT HAS SATISFIED ITS DISCOVERY OBLIGATIONS REGARDING BARONI'S FORMER PORT AUTHORITY HARD DRIVE.**

Baroni seeks relief relating to the Government's disclosure of the Hard Drive, which previously was used by Baroni and that Wildstein removed from the Port Authority and stored at his residence. The Government disclosed the existence of the Hard Drive on August 12, 2015, when it produced records from the Hard Drive, and explained that the Hard Drive had been provided to the Government by Wildstein. Baroni requested additional explanation regarding the Hard Drive. In its September 10, 2015 response, the Government provided the following detailed information about the circumstances under which Wildstein removed the Hard Drive from the Port Authority and the manner in which Wildstein gave it to the Government:

> David Wildstein advised, in substance, that: (1) sometime prior to the fall of 2013, the hard drive in Baroni's Port Authority computer was replaced because of a problem he was having with his computer; (2) Baroni and Wildstein agreed that, if there was potentially sensitive information on the hard drive, it should not be left available to be accessed by others and that Wildstein would retain the hard drive; (3) a Port Authority staff member (possibly Gretchen DiMarco or Ana Abelians) provided the hard drive to Wildstein; (4) Wildstein kept the hard drive in his office desk at the Port Authority until he took it home when he resigned from the Port Authority in December 2013; (5) following his resignation, Wildstein provided the hard drive to his counsel; and (6) Wildstein did not attempt to access the hard drive.
>
> Wildstein subsequently provided the hard drive through his counsel to the Government.

D10.

23

**A.   The Government has not conducted forensic testing of the Hard Drive but, subject to taking into account the Port Authority's privilege claims regarding certain records included in the Hard Drive, will enable Baroni to do so.**

Contrary to Baroni's speculation, BB9-13, the Government has not subjected the Hard Drive to forensic testing within the scope of Rule 16(a)(1)(F). Thus, Baroni's request for the results of such testing should be denied. However, subject to taking appropriate measures in light of the Port Authority's assertion that certain records included in the Hard Drive are privileged,[8] the Government is willing to make an imaged replica of the Hard Drive available to Baroni in case he wishes to conduct his own examination. *See United States v. Staton*, 605 F. App'x 110, 115 n.8 (3d Cir. 2015) (unpublished), *cert. denied*, 136 S. Ct. 162 (2015), & *cert. denied*, 136 S. Ct. 255 (2015) (holding that the Government satisfied its disclosure obligations, in part, by allowing Defendant to inspect hard drives and other electronic devices).

**B.   There is no Brady issue regarding the Hard Drive, and Baroni is not entitled at present to what, if any, Jencks Act material pertains to the Hard Drive.**

Baroni's requests for grand jury testimony, interview memoranda, and other records relating to the Hard Drive are meritless. Baroni twists the facts disclosed by the Government regarding the Hard Drive to create a false sense of urgency and to convey the impression that the situation requires immediate disclosure of materials to which he is not presently entitled. He spins a one-sided narrative that is only tenuously connected to the Government's disclosure statement, larded with speculation and conjecture regarding the circumstances of how Wildstein came to possess the Hard Drive. BB8-9. While Baroni is not obligated to accept Wildstein's

---

[8] On September 14, 2015, the Government provided Defendants with the Port Authority's privilege log identifying records from the Hard Drive which the Port Authority claimed were privileged.

representations as relayed by the Government, Baroni's efforts to ratchet up the evidentiary significance of a device whose contents the Government has already disclosed to him fall flat.

Baroni demands immediate disclosure of grand jury testimony and interview memoranda related to the Hard Drive under *Brady*, *Giglio*, and the Jencks Act. BB14-18. But there is no grand jury testimony regarding the Hard Drive. And even if there were, Baroni offers only a "general assertion," backed by his own conjecture regarding the Hard Drive, that "grand jury transcripts may contain exculpatory evidence" on this issue. *United States v. Bishop*, Crim. No. 11-38, 2012 WL 1677429, at *5 (M.D. Pa. May 14, 2012). This is far from the requisite "strong showing of a particularized need for the information that outweighs the public interest in grand jury secrecy." *Id.* (citing Fed. R. Crim. P. 6(e)(3)(E)(i)); *United States v. McDowell*, 888 F.2d 285, 289 (3d Cir. 1989)).

As for Baroni's request for interview memoranda, the Government simply has no additional information to give. The information disclosed in the Government's September 10, 2015 letter mirrors what Wildstein has disclosed. Moreover, the Government has fulfilled whatever arguable *Brady* obligation it has by disclosing the essential facts regarding the Hard Drive; the Government need not produce the interview report itself at this time. *See United States v. Shyne*, 617 F.3d 103, 107-08 (2d Cir. 2010) (*per curiam*) (rejecting argument that government obliged to disclose notes of proffers of non-testifying co-conspirators, holding that the Government complied with due process obligations by conveying substance of statement by letter).

Accordingly, having already disclosed records from the Hard Drive, the Port Authority's privilege log for Hard Drive materials, and information regarding Wildstein's possession of the

Hard Drive, the Government has no further obligation to obtain or provide additional information, including further information about chain of custody for the Hard Drive, BB11.[9]

## V.   DEFENDANTS' MOTIONS FOR BILLS OF PARTICULARS SHOULD BE DENIED.

Defendants have filed motions for bills of particulars, arguing that despite its length, the Indictment somehow fails to apprise them of facts they must be prepared to defend against at trial. Baroni seeks particulars regarding: (1) the names of unindicted co-conspirators and "others" referred to in the Indictment; (2) the alleged manner and means of the charged conspiracies; (3) the location where Baroni committed the acts alleged in the Indictment; and (4) the wire communications that form the basis for the wire fraud conspiracy charged as Count Three. BB50-64. Kelly requests additional detail concerning: (1) unindicted co-conspirators; (2) the Port Authority's procedures for traffic studies; (3) agreements regarding the allocation of toll booths for the local access lanes; and (4) the value of the misapplied property alleged in Counts One and Two. KB4-12. In light of the detail in the Indictment itself, the wealth of information available through discovery, and supplemental information provided by the Government, however, Defendants' motions should be denied.

### A.   A Bill of Particulars Is Not Warranted Because The Indictment And Discovery Give Defendants More Than Enough Information About The Charged Crimes.

Defendants seek far more than the law permits. They effectively ask the United States to reveal much of its trial strategy and prematurely commit to specific evidentiary proofs. As Judge

---

[9] The Discovery Order directs that authentication and chain of custody challenges be made after the Government has produced an exhibit list. *See* D6, ¶¶ 7-8. Limiting authentication and chain of custody arguments to trial exhibits ensures that defendants will not make such challenges to evidence that the Government does not intend to introduce at trial.

Ackerman once explained, Rule 7(f) "does not require the United States Attorney to furnish a three dimensional colored motion picture of the prosecution's proof prior to trial." *United States v. Caruso*, 948 F. Supp. 382, 395 (D.N.J. 1996) (citations omitted). Simply put, Defendants' "requests probe too deeply into the Government's theory and method of proof" and disclosure of such facts "is not necessary to inform the defendants . . . of the nature of the charges against them." *United States v. Mannino*, 480 F. Supp. 1182, 1185 (S.D.N.Y. 1979). Furthermore, most of Defendants' requests are answered by the detailed, 36-page Indictment, as supplemented by the extensive discovery provided thus far. Defendants' requests should be denied.

A bill of particulars is required only when an indictment is too vague to permit the defendant to (a) understand the charges and prepare a defense, (b) avoid unfair surprise, and (c) assert a claim of double jeopardy where appropriate. *United States v. Urban*, 404 F.3d 754, 771-72 (3d Cir. 2005) "Only where an indictment fails to perform these functions, and thereby 'significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial[,]' will we find that a bill of particulars should have been issued." *Id*. (internal citations omitted). As long as the indictment enables the defendant to understand the accusations against him and the central facts that the United States will present at trial, a bill of particulars is unwarranted. *See United States v. Rosa*, 891 F.2d 1063, 1066-67 (3d Cir. 1989); *United States v. Zolp*, 659 F. Supp. 692, 706 (D.N.J. 1987); *United States v. Deerfield Specialty Papers, Inc.*, 501 F. Supp. 796, 809-10 (E.D. Pa. 1980).

"A bill of particulars . . . is not intended to provide the defendant with the fruits of the government's investigation, but is instead intended to give the defendant the *minimum* amount of information necessary to permit the defendant to conduct his own defense." *United States v. Mariani*, 90 F. Supp. 2d 574, 590-91 (M.D. Pa. 2000) (Vanaskie, C.J.) (emphasis added) (citing

*United States v. Smith*, 776 F.2d 1104 (3d Cir. 1985)); *see also United States v. Eufrasio*, 935 F.2d 555, 575 (3d Cir. 1991); *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971). "A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant; or disclose its legal theory." *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003); *see also United States v. Jabali*, Crim. No. 01-801, 2003 WL 22170595, *3 (E.D.N.Y. Sept. 12, 2003) (stating that requests "for exact dates, places, and times in which events occurred . . . ignore the proper scope and function of a bill of particulars and are to be denied").

Nor should a bill of particulars "unduly freeze [the government] to its proofs at trial." *United States v. Boffa*, 513 F. Supp. 444, 485 (D. Del. 1980). Requiring the Government to provide factual detail about its theory of the case "would unfairly define and limit the government's case due to the fact that the evidence at trial must conform to the allegations in a bill of particulars." *United States v. Surine*, Crim. No. 07-304, 2007 WL 4365739, at *2 (M.D. Pa. Dec. 12, 2007).

In addition, the Third Circuit has emphasized that a bill of particulars is unnecessary in those cases where, as here, the United States supplements a detailed charging document with substantial discovery. *Urban*, 404 F.3d at 772; *see also United States v. Munoz*, 736 F. Supp. 502, 504 (S.D.N.Y. 1990) (provision of substantial discovery weighs against ordering bill of particulars). Where, as here, "discovery provided by the government fills in the outline of the indictment, the necessity for a bill of particulars declines." *Caruso*, 948 F. Supp. at 393; *United States v. Beech-Nut Nutrition Corp.*, 659 F. Supp. 1487, 1499-1500 (E.D.N.Y. 1987)

(government's production of 30,000 documents in discovery "must have answered a great many, if not all, of defendants' requests" for discovery and a bill of particulars).

The circumstances of this case obviate the professed need for additional clarity with respect to the allegations in the Indictment. Count One of the Indictment is 26 pages long, and provides a wealth of detailed information about the nature of the charged conspiracy and Defendants' specific roles in carrying out its aims. Moreover, discovery in this case has been extensive, and Defendants have had at their disposal for some time documentary evidence that will be used by the Government to prove its case. Indeed, one of Defendants' complaints is that the Government has provided too much discovery. KB7-8; BB58. But, by virtue of that discovery, Defendants now have "'that minimum amount of information necessary'" for their "'*own* investigation'" such that "there is no need to order the bill of particulars requested by Defendant." *United States v. Grasso*, 173 F. Supp. 2d 353, 367 (E.D. Pa. 2001) (quoting *Smith*, 776 F.2d at 1111). Ordering a bill of particulars now "would force the Government to a full stop on the continuing factual development of its case." *United States v. Williams*, Crim. No. 14-70, 2015 WL 4662706, at *4 (M.D. Pa. Aug. 6, 2015). And while it is true that the Government cannot "dump" a mountain of documents on a defendant and claim that this is an adequate substitute for a bill of particulars where one would otherwise be required, such wholesale "dumping" did not take place in this case. As explained above, and contrary to Defendants' claims, "the Government has provided [discovery] in an organized and comprehensible fashion." *United States v. Skelos*, Crim. No. 15-317, 2015 WL 6159326, at *13 (S.D.N.Y. Oct. 20, 2015).

In addition, before the Indictment was returned, the Government gave Defendants and their counsel extensive, in-person briefings concerning the proofs against them. And Defendants' requests for additional detail run counter to the public claims of both counsel that Defendants

already have formulated defenses to the allegations in the Indictment. Furthermore, Defendants have long had access to the public reports of the New Jersey Legislature's Select Committee on Investigation and the report commissioned by the OGNJ concerning the lane and toll booth reductions.

Under the foregoing authority, the Indictment, discovery, and additional disclosures here clearly "contain[] sufficient factual and legal information for the defense to prepare its case." *United States v. Wabo*, 290 F. Supp. 2d 486, 490 (D.N.J. 2003); *see also United States v. Atwell*, Crim. No. 13-560, 2015 WL 2092687, at *5 (D.N.J. May 5, 2015) (Wolfson, J.) ("discovery, combined with the sufficiency of the allegations contained in the Superseding Indictment, negates the need for a bill of particulars"). Accordingly, Defendants' requests for a bill of particulars should be denied.

**B.      Responses to Defendants' Requests for Particulars.**

Though the Government respectfully submits that it is obvious that the individual requests contained in Defendants' motions go far beyond what is required to be disclosed in a bill of particulars, the Government responds below to each one in turn. In some cases, the information requested already has been disclosed to Defendants. In others, Defendants transparently seek to delve into evidentiary matters that must await the Government's proof at trial.

**1.      Requests for the identification of unindicted co-conspirators and other unnamed individuals.**

The Indictment refers to "other" co-conspirators. In every such instance, the Indictment specifies that the "others" include Wildstein, who the Government alleges was a criminally culpable co-conspirator. *See* Indictment, Count 1, ¶¶ 2, 4, 8; Count 3, ¶¶ 2, 4; Counts 4-7, ¶ 2;

Count 8, ¶¶ 2, 4. Wildstein separately has pled guilty to the misapplication and civil rights conspiracies charged in the Indictment as Counts One and Eight.  Nevertheless, the Government will, in a document to be filed under seal, identify any other individual about whom the Government has sufficient evidence to designate as having joined the conspiracy.

### 2. Requests for additional detail regarding "manner and means" allegations.

The principal means by which the Government alleges Defendants carried out the objectives of the charged conspiracies are specifically identified in the Indictment. Indeed, Count One of the Indictment alone has 50 "manner and means" paragraphs, and identifies 30 separate overt acts. *See* Indictment, Count One ¶¶ 8-59. To the extent that the evidence at trial will include proof of other means, the Government is not required to disclose that evidence in a bill of particulars. *See United States v. Clarke*, Crim. No. 05-17, 2006 WL 3615111, at *8 (S.D.N.Y. Dec. 7, 2006) ("It is well settled that defendants need not know the means by which it is alleged they performed acts in furtherance of the conspiracy.") (quotation omitted). Rule 7(f) does not require the Government to reveal "the precise details that a defendant and his alleged co-conspirators played in forming and executing a conspiracy." *Boffa*, 513 F. Supp. at 485.

### 3. Requests regarding the location of alleged conduct.

As Baroni surmises, BB62-63, the conduct underlying the Government's overt act allegations occurred principally in New Jersey and New York. Additional specification as to which alleged act occurred in which state is beyond the scope of a bill of particulars. *See United States v. Jones*, 447 F. App'x 319, 323 (3d Cir. 2011) (no error where district court denied request for bill of particulars specifying locations of drug sales); *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir. 1975) (rejecting request for particulars regarding the "when, where and

31

how" of other overt acts not alleged in the indictment). At trial, and consistent with allegations in the Indictment, *see, e.g.*, ¶ 59(J), the Government will introduce proof sufficient to establish venue in the District of New Jersey, *see Whitfield v. United States*, 543 U.S. 209, 218 (2005) ("venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense").

### 4.   Request for specific count three wire communications.

Baroni asks the Government to identify the wire communications alleged as part of the Count Three wire fraud conspiracy. The Indictment provides more than sufficient detail regarding numerous wire communications made in furtherance of the alleged conspiracy. Count Three specifically references the "means and methods" set forth in Count One, which include multiple wire communications, the dates of the communications, and the participants, and Counts Four through Seven identify the specific communications that form the basis of the substantive fraud counts. The Government has produced records reflecting all of the communications referenced in the Indictment to Defendants. No additional detail is required. *See United States v. Wilson*, Crim. No. 13-396, 2014 WL 2218009, at *1 (D. Neb. May 29, 2014) (denying request for bill of particulars in conspiracy and wire fraud prosecution where Government disclosed a significant amount of discovery materials relating to each Count of the Superseding Indictment).

### 5.   Requests for information concerning Port Authority practices and lane and toll booth configurations.

Kelly's requests for additional detail regarding (1) the Port Authority's procedures for traffic studies, and (2) any agreements memorializing the configuration of the local access lanes are a matter for the Government's proof at trial and, therefore, beyond the scope of a bill of

32

particulars. The Government can represent, based on current information, that the Port Authority does not have written procedures about how to conduct traffic studies, and that the subject lane configuration was not established by any formal agreement. If Kelly requires additional information regarding these subjects, she can seek it directly from the Port Authority.

### 6.        Request for information regarding the value of misapplied property.

Kelly requests specifics regarding the Port Authority property that the conspirators allegedly misapplied, and the Government's valuation of that property. These requests relate to matters of proof for trial and are therefore beyond the scope of a bill of particulars. The Government can represent, however, that it will offer multiple methods of proof regarding the $5,000 requirement. *See United States v. Robinson*, 663 F.3d 265, 275-76 (7th Cir. 2011) (acknowledging that Government was permitted to offer "alternative methods of proof" to satisfy the $5,000 requirement in § 666(a)(1)(B)). For example, the Government anticipates that the $5,000 requirement will be satisfied by proof of the following, among others:

- compensation paid to Port Authority personnel in connection with the lane and toll both reductions, including, "additional toll booth operator[s] . . . [who served as] backup[s] for the toll booth operator[s] covering . . . the lone remaining toll booth that [was] accessible to the Local Approach," Indictment, Count 1, ¶ 21, "Port Authority Police Department [officers who] work[ed] during an extended Peak Period to respond to additional traffic in Fort Lee from the Local Approach," *id.*, and "Port Authority employees in the Traffic Engineering department and [the Tunnels, Bridges, and Terminals department who] spent time collecting and reviewing traffic data, believing it was necessary to do so, *id.*, Count 1, ¶ 22; *see United States v. Wecht*, Crim. No. 06-26, 2006 WL 1835818, at *14-*16 (W.D. Pa. June 29, 2006) (employee services qualify as property and part of aggregate value);

- losses suffered by the Port Authority by virtue of the lane and toll booth reductions, including losses stemming from "a legitimate Port Authority traffic study at Center and Lemoine Avenues in Fort Lee" that was spoiled by the congestion resulting from the reductions and that had to be repeated, *id.*, Count 1, ¶ 25; and

33

- the value of the access lanes to the upper level toll plaza of the George Washington Bridge and the toll booths there, or other Port Authority property affected by the scheme.

## VI. THE GOVERNMENT WILL CONTINUE TO ABIDE BY ITS *GIGLIO* OBLIGATIONS.

The Government also is fully aware of its obligations to disclose evidence that may be used to impeach the credibility of government witnesses. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). Disclosure of evidence that may be used to discredit government witnesses is not directly exculpatory, however, and therefore need not be disclosed well in advance of trial. The Third Circuit held in *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983), that disclosure of *Giglio* material on the day that the witness in question testifies sufficiently insures a defendant's right to a fair trial, stating:

> The Brady material in this case was information that [the defendant] could use on cross-examination to challenge the credibility of government witnesses. For that type of material, we think [the defendant's] right to a fair trial will be fully protected if disclosure is made the day that the witness testifies. Disclosure at that time will fully allow [the defendant] to effectively use that information to challenge the veracity of the government's witnesses.

*Id.* Consistent with this view, federal courts routinely have refused to order pretrial production of *Giglio* materials. *See, e.g.*, *United States v. Tejada*, Crim. No. 12-312, 2013 WL 3786299, *5-*6 (D.N.J. July 17, 2013) (Linares, J.); *United States v. Singh*, Crim. No. 12-121, 2012 WL 2501032, *6 (E.D.N.Y. June 27, 2012); *United States v. Giffen*, 379 F. Supp. 2d 337, 347 (S.D.N.Y. 2004); *United States v. Earls*, Crim. No. 03-364, 2004 WL 350725, *8 (S.D.N.Y. Feb. 25, 2004); *United States v. Giampa*, 904 F. Supp. 235, 281-82 (D.N.J. 1995).

The Court's Discovery Order in this case is consistent with this body of case law. The Order provides that the Government need only "produce all statements within the meaning of the

Jencks Act, 18 U.S.C. § 3500, and impeachment evidence within the meaning of *Giglio v. United States*, 405 U.S. 150 (1972), sufficiently in advance of the witness's testimony to avoid delay in the trial." Discovery Order, D4-5, ¶ 4.

On October 20, 2015, the Government proposed a compromise consistent with the newly adopted Standing Order. The Government specifically proposed that the parties enter into an agreement to provide more information about witness statements and impeachment material than that required by law and to provide that information in advance of the time required by law. *See* Standing Order ¶ 12. Upon such an agreement, the Government would provide to the defense, approximately 45 days before trial, the Jencks and *Giglio* material for its witnesses, and if no such material existed for a witness, the Government would also advise the defense of the general substance of the witness's anticipated testimony. *See id.* ¶ 13. Upon such an agreement and the Government's disclosure of witness material as described above, each Defendant would provide reverse Jencks and impeachment material for its witnesses (including Defendants themselves) and, if no such material existed for a witness, would advise the Government of the general substance of the witness's anticipated testimony. This would be done as soon as possible after the Government's disclosures and, in any event, well before the start of trial. *See id.* ¶ 14. Rather than respond to the Government's offer or provide a counterproposal, Defendants filed their motion, contending that, as a matter of law, *Giglio* materials must be produced immediately in this case to allow for their effective use at trial. BB44-49; KB13-20.

None of Defendants' professed reasons for needing impeachment material "immediately," however, require that this Court depart from the well-established law that the Government is not required to disclose *Giglio* materials months in advance of trial. Baroni's expectation that this case "will turn on witness testimony," BB47, does not distinguish it from

35

the myriad other cases where the Government was not required to make *Giglio* disclosures far in advance of trial. Indeed, it is hard to imagine that many criminal trials "turn on" anything other than "witness testimony." In addition, Defendants' complaints about the utility of the discovery are overblown, particularly that disclosure of *Giglio* material would necessitate an additional page-by-page review of the entire production. *See* KB19-20. Indeed, the searchability of the discovery would obviate the need for such a review. There are, therefore, no special circumstances requiring early disclosure of impeachment material in this case.

While there is no provision for early production of *Giglio* material, the United States proposes to provide such material when it disseminates Jencks Act material to Defendants in advance of trial. Disclosure in this manner will be more than adequate to afford defense counsel time to prepare for cross-examination, to prevent unnecessary delays in the trial, and to satisfy Defendants' due process rights. *See Higgs*, 713 F.2d at 44; *United States v. Kopituk*, 690 F.2d 1289, 1337-41 & n.47 (11th Cir. 1982). Accordingly, the Court should deny Defendants' requests for the immediate disclosure of impeachment materials.

## VII.   DEFENDANTS ARE NOT ENTITLED TO EARLY PRODUCTION OF JENCKS MATERIAL.

Kelly claims that the early production of material covered by the Jencks Act, 18 U.S.C. § 3500, is necessary to protect her due process rights and prevent delays at trial. KB12-13. As a statutory matter, the Government has no obligation to produce Jencks material until the witness has testified, 18 U.S.C. § 3500, although many federal prosecutors routinely turn over Jencks material at least a few days before the witness testifies. *See United States v. Maury*, 695 F.3d 227, 248 n.18 (3d Cir. 2012). The Government will do the same here by disclosing Jencks material consistent with the directive in the Discovery Order, D4-5, ¶ 4, and simultaneously with

its production of *Giglio* material. This early, voluntary disclosure will afford defense counsel a more than adequate opportunity to prepare for cross-examination without delaying the trial. *See Weaver*, 992 F. Supp. 2d at 160 (denying request for early Jencks disclosure in light of Government's representation that it was aware of obligation and would make timely disclosure).

Of course, Defendants have a reciprocal duty to produce to the Government prior statements of their witnesses*, see* Fed. R. Crim. P. 26.2, and the Government has reminded counsel of this obligation in its discovery letters. In light of the Government's willingness to produce Jencks material prior to the testimony of its witnesses, the Government requests that the Court direct counsel to provide defense Jencks material similarly in advance of the testimony of defense witnesses to avoid delay in the trial, which is what the Court's Discovery Order requires. D5, ¶ 4.

## VIII.   KELLY'S REQUEST FOR IMMEDIATE DISCLOSURE OF RULE 404(B) EVIDENCE SHOULD BE DENIED, BECAUSE THE GOVERNMENT WILL GIVE RULE 404(B) NOTICE IN ACCORDANCE WITH THE DISCOVERY ORDER.

In contravention of the Discovery Order, Kelly asks this Court to "order the Government to disclose any and all Rule 404(b) evidence immediately." KB38. The Discovery Order requires the United States to disclose such evidence no later than ten days before the start of trial, or by March 25, 2016, more than four months from now. D4, ¶ 3.

The Government acknowledges its obligation to make pretrial disclosure of Rule 404(b) evidence. The rule itself requires "reasonable notice in advance of trial." Fed. R. Evid. 404(b). If the United States decides to offer any evidence pursuant to Rule 404(b), it will do so by the time fixed by the Discovery Order. Such disclosure should not delay the start of the trial, particularly since the voir dire in this case is expected to be protracted, and the Court can decide any Rule

404(b) issues during that period. *See United States v. Blackwell*, 954 F. Supp. 944, 968 (D.N.J. 1997) (denying motion to accelerate the disclosure of Rule 404(b) evidence; disclosure "at least three days before trial . . . [was] adequate").[10] In a three-sentence paragraph devoid of either case-specific explanation or citation to authority, Kelly requests the immediate disclosure of Rule 404(b) evidence. KB38. She provides no good reason, however, why the Government's Rule 404(b) disclosure obligation should be so accelerated.

Kelly's motion for early disclosure of Rule 404(b) material should be denied.

## IX. KELLY'S REQUEST FOR DISCLOSURE OF "UNCHARGED CRIMINAL ACTS" EVIDENCE IS MOOT BECAUSE THE UNITED STATES IS COMPLYING WITH RULE 16.

Kelly asks the Court to direct the Government to "disclose all uncharged criminal acts evidence it intends to introduce at the same time it is required to disclose all 404(b) material." KB38.

As explained elsewhere, the Government is aware of its Rule 16 discovery obligations, which encompass its obligation to produce what the Third Circuit refers to as "intrinsic evidence." *See United States v. Green*, 617 F.3d 233, 248-49 (3d Cir. 2010) (explaining that "evidence is intrinsic if it 'directly proves' the charged offense" and that "uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate

---

[10] *See United States v. Morales,* 280 F. Supp. 2d 262, 274-75 (S.D.N.Y. 2003) (denying a motion for immediate disclosure of Rule 404(b) evidence and permitting the Government "to provide notice of all Rule 404(b) material not later than fourteen days before the start of trial"); *see also United States v. Solomonyan,* 451 F. Supp. 2d 626, 646 (S.D.N.Y. 2006) (denying a motion for immediate disclosure of Rule 404(b) evidence; "[t]he motion is premature because the government has not yet decided what evidence [it] will seek to introduce").

the commission of the charged crime") (citations and quotation marks omitted).[11] Kelly's request for simultaneous notice of intrinsic and Rule 404(b) evidence is misplaced. Under the Third Circuit's formulation, intrinsic evidence "directly proves the charged offense" and, therefore, "is not evidence of some 'other' crime." *Id.* at 249 (quoting *United States v. Gibbs*, 190 F.3d 188, 218 (3d Cir. 1999)). There is thus no rule requiring notice or some other special disclosure of what Kelly calls "uncharged criminal acts evidence" apart from the general precepts of Rule 16. *See United States v. Northington*, Crim. No. 07-550, 2013 WL 420296, at *3 n.6 (E.D. Pa. Feb. 4, 2013). Extrinsic Rule 404(b) evidence, by contrast, requires that the proponent "provide notice of his intention to use the evidence," *Green*, 617 F.3d at 249, and the Government will provide such notice pursuant to the time fixed by the Discovery Order, *see supra* Part VIII. Otherwise, the Government has produced, and will continue to produce, intrinsic evidence, if any exists, as part of its ongoing Rule 16 discovery.

## X.    KELLY'S MOTION THAT THE UNITED STATES PRESERVE ITS "ROUGH NOTES" AND "DRAFT REPORTS" IS MOOT, AS THE UNITED STATES HAS AND WILL CONTINUE TO PRESERVE THOSE NOTES.

Kelly asks the Court to compel the Government to preserve all "rough notes" of interviews and "draft reports" prepared by the "law enforcement agents" in this case. KB39-40.

The federal prosecutors and law enforcement agents who comprise the prosecution team in this case are all aware of and have complied with their obligations under *United States v. Ammar*, 714 F.2d 238, 259 (3d Cir. 1983), to preserve notes of interviews and handwritten drafts

---

[11] Kelly cites the Second Circuit's "inextricably intertwined" test for the admission of uncharged criminal acts as non-404(b) evidence. KB38 (quoting *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012)). The Third Circuit, in *Green*, renounced this formulation, 617 F.3d at at 246 (citing *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007), and instead articulated its own test for what it referred to as "intrinsic evidence," *id.* at 248-49.

of reports. The prosecutors will review the rough notes to determine whether they contain any material impeachment information. The United States is not required to disclose those materials to the defense on demand. *See United States v. Brown,* 303 F.3d 582, 590 (5th Cir. 2002); *United States v. Muhammad,* 120 F.3d 688, 699 (7th Cir. 1997). Rather, if so directed by the Court, the United States will submit those materials to the Court for *in camera* review and possible disclosure to Defendants. *See United States v. Vella,* 562 F.2d 275, 276 (3d Cir. 1977) (notes should be kept so that the trial court can determine whether they should be made available to the defendant); *accord United States v. Ramos,* 27 F.3d 65, 68 (3d Cir. 1994).

## XI.   KELLY'S MOTION FOR EXPERT DISCLOSURES IS PREMATURE.

Kelly seeks prompt disclosure of any expert witnesses that the Government intends to present at trial. KB40-41. Should the Government decide to present expert testimony in its case-in-chief, the Government will provide notice and a written summary that complies with Fed. R. Crim. P. 16(a)(1)(G) and the Discovery Order, D2, ¶ 1(e).

## XII.   BARONI'S UNSUPPORTED DEMAND FOR ALL SUBPOENAS ISSUED BY THE GOVERNMENT SHOULD BE REJECTED BECAUSE THE SUBPOENAS ARE NOT EVIDENCE, LET ALONE EXCULPATORY OR MATERIAL EVIDENCE.

Baroni seeks all subpoenas that the Government issued in the course of its investigation. This request is confined to a single sentence in a preliminary list of relief sought; Baroni does not otherwise brief the matter. BB5, ¶ 9. Baroni offers no basis to believe that the subpoenas (which are not evidence) are exculpatory or that they fall within any other category of required discovery. Similarly absent is any legal authority holding that the Government is required to produce third party subpoenas to a defendant in a criminal case. Defendants are not entitled to track the United States' investigatory tactics, *see Moore v. Illinois*, 408 U.S. 786, 795 (1972),

except to the extent that the information is exculpatory or otherwise falls into a required category of discovery, *see United States v. Facteau*, Crim. No. 15-10076, 2015 WL 6509120, at *2 (D. Mass. Oct. 28, 2015) (denying request for subpoenas upon finding that "subpoenas would be of limited value and would do little more than to provide the Defendants with greater insight into the Government's investigation"). The subpoenas are neither exculpatory nor otherwise discoverable.

The Government has no obligation to produce copies of the subpoenas issued in this case. The grand jury subpoenas are not subject to production under Rule 16 or any other authority. Rule 16(a)(1)(E) requires the Government to provide, upon request from the defense, copies of any items in its possession, custody or control if the item is: (1) material to preparing the defense; (2) the government intends to use the item in its case-in-chief; or (3) the item was obtained from or belongs to the defendant. The Government has provided copies of relevant documents obtained during the course of this investigation, including those obtained by grand jury subpoena. It is the documents, not the subpoenas, which have evidentiary value and may be material to the preparation of the defense. Baroni offers no explanation as to why he needs copies of the actual subpoenas to prepare his pretrial motions. Because the Government has complied with its discovery obligations as to grand jury records, and Baroni has failed to advance any valid reason for production of the subpoenas, Baroni's motion to compel production of the grand jury subpoenas should be denied.

## XIII. BARONI IS NOT ENTITLED TO A REPRESENTATION BY THE GOVERNMENT ABOUT WHEN ITS DISCOVERY DISCLOSURES WILL END.

Baroni asks the Court to direct the Government to state when discovery will be complete. BB73. The request must be denied in light of Rule 16(c)'s continuing disclosure requirement:

> A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if:
>
> (1) the evidence or material is subject to discovery or inspection under this rule; and
>
> (2) the other party previously requested, or the court ordered, its production.

Fed. R. Crim. P. 16(c); *see also* Discovery Order, D5, ¶ 5 ("Any duty of disclosure and discovery set forth herein is a continuing one and the attorneys for all parties shall produce any additional discoverable information.").

## XIV. TRIAL SHOULD BE HELD IN THE DISTRICT OF NEW JERSEY BECAUSE BARONI HAS NOT DEMONSTRATED THAT THE ENTIRE POOL OF PROSPECTIVE JURORS IS SO PREJUDICED THAT A CHANGE OF VENUE IS REQUIRED PRIOR TO VOIR DIRE.

Baroni—but not Kelly—contends that pretrial prejudice will prevent Defendants from obtaining a fair trial in the Newark Vicinage of the District of New Jersey, pointing to the media coverage of the lane and toll booth reductions and of this prosecution. This request should be denied.

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," Art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," Amend. 6. It also secures to criminal defendants the right to trial by "an impartial jury," Amend. 6, and to due process of law, Amend. 5. Taken together, these provisions require a change of venue at a defendant's request only in the "extreme case" where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378, 381 (2010).

The mechanism for seeking a change of venue based on pretrial prejudice is Federal Rule of Criminal Procedure 21(a), which provides:

> Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

The decision to grant or deny a motion to change venue is committed to the sound discretion of the district court. *Martin v. Warden, Huntingdon State Corr. Inst.*, 653 F.2d 799, 804 (3d Cir.1981). So is the request for an evidentiary hearing on such a motion. *See United States v. Wilcox*, 631 F.3d 740, 747 (5th Cir. 2011). "A district court abuses its discretion [only] when it makes an error of law or if it bases its decision on a clearly erroneous assessment of the evidence." *Id.* (citation and internal quotation marks omitted). Defendants carry a "heavy burden" when moving to transfer venue under Rule 21(a). *United States v. Savage*, Crim. No. 07-550, 2012 WL 2376680, at *3 (E.D. Pa. June 25, 2012).

The Court should reject Baroni's contention that pretrial prejudice will prevent Defendants from obtaining a fair trial in the Newark Vicinage of the District of New Jersey—a large and diverse area with a population of approximately four million. Baroni argues that the Court must accept that contention without first questioning even one potential juror about his or her ability to be fair and impartial. But "[p]rejudice from pretrial publicity is rarely presumed." *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007). And Baroni certainly has not met his burden of showing, as he must, that the pretrial publicity is "so hostile and so pervasive . . . even the most careful voir dire process would be unable to assure an impartial jury." *Savage*, 2012 WL 2376680, at *3.

43

Moreover, courts have long recognized the strong public interest in trying criminal cases in the district where they occurred. *United States v. Burge*, Crim. No. 08-846, 2009 WL 2386147 (N.D. Ill. July 29, 2009), is an example:

> The government argues, and the court agrees, that a change of venue would be inconvenient and contrary to the administration of justice. All of the witnesses necessary to prove the government's case are likely to be located within the Northern District of Illinois, where the alleged torture and physical abuse took place. Given the court's familiarity with this case and the Seventh Circuit's admonition in *Peters* that it is appropriate and preferable for the court to determine juror prejudice during voir dire, it would also be inefficient and inappropriate to change venue at this time. Finally, this forum has a strong interest in this case, not only because the intended effects of the crimes with which Burge is charged were directed at the justice system in the county where this court sits, but also because the public has had a long-standing interest in the allegations of police torture and physical abuse underlying the case.

*Id.* at *8.

Given the strong public interest in prosecuting crimes in the district where they occur, and the near impossibility of showing that a fair jury cannot be empanelled in a district the size of Northern New Jersey, Baroni's motion for change of venue should be denied.

**A.  A finding of presumed prejudice in this case is foreclosed by Supreme Court and other recent precedent.**

Normally, screening questionnaires and voir dire are sufficient to "detect and defuse juror bias" and ensure a fair trial. *See Skilling*, 561 U.S. at 381, 385. Accordingly, most courts agree that

> [w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity. . . . Indeed, we have ruled that a trial court's method of

44

> holding its decision . . . in abeyance until the conclusion of the voir
> dire is clearly the preferable procedure.

*United States v. Campa*, 459 F.3d 1121, 1145, 1146-47 (11th Cir. 2006) (citation and internal quotation marks omitted); *accord United States v. Yousef*, 327 F.3d 56, 155 (2nd Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where *voir dire* reveals that an impartial jury cannot be impanelled would a change of venue be justified."); *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986), *superseded by statute on other grounds as stated in United States v. Guerrero*, 894 F.2d 261, 267 (7th Cir. 1990) ("[It] was an appropriate exercise of the district court's discretion and ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors, instead of in the vacuum of a hearing without reference to prospective jurors."); *United States v. Gullion*, 575 F.2d 26, 28 (1st Cir. 1978) ("We find that the trial judge did not abuse his discretion in denying the motion for a change of venue until he could consider the effect of any pretrial publicity at the time of conducting the voir dire of prospective jurors."); *United States v. Haldeman*, 559 F.2d 31, 61 (D.C. Cir. 1976) ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire. The defendant will then be entitled to any actions necessary to assure that he receives a fair trial.").

It is true that, "[in] rare cases, the community is so predisposed that prejudice can be presumed, and venue must be transferred as a matter of law." *United States v. Abello-Silva*, 948 F.2d 1168, 1176-77 (10th Cir. 1991). Baroni argues that this is one of those rare cases, but Supreme Court precedent dictates otherwise.

The Supreme Court presumed jury prejudice on the basis of negative community sentiment and pretrial publicity in three cases decided nearly 50 years ago: *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). The facts of those cases are instructive. Wilbert Rideau was tried in a Louisiana parish of 150,000 people and convicted of robbery, kidnaping, and murder. *Rideau*, 373 U.S. at 724. Police interrogated him in jail following his arrest and filmed his confession. *Id.* On three separate occasions shortly before trial, which took place less than two months after his arrest, a local television station broadcast the film to audiences ranging from 20,000 to 53,000 individuals. *Id.* In reversing Rideau's conviction, the Supreme Court wrote:

> What the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder. . . . this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

*Id.* at 726.

The trial in *Estes* was "conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). And in *Sheppard*, "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." *Sheppard*, 384 U.S. at 355. Each of these cases, the Supreme Court later wrote, involved "a state-court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy*, 421 U.S. at 798.

46

Five years ago, in *Skilling*, the Court made clear that prejudice may not be presumed from negative community sentiment or pretrial publicity except under circumstances that equal those of *Rideau*, *Estes*, and *Sheppard*. Skilling was the former CEO of Enron, a large Houston-based corporation that collapsed into bankruptcy as a result of fraud. *Skilling*, 561 U.S. at 368. A "large number of victims [lived] in Houston—from the [t]housands of Enron employees . . . [who] lost their jobs, and . . . saw their 401(k) accounts wiped out, to Houstonians who suffered spillover economic effects." *Id.* at 375-76 (internal citations and quotation marks omitted).

Skilling was charged in federal district court in Houston and moved for a change of venue, contending that "hostility toward him in Houston, coupled with extensive pretrial publicity, had poisoned potential jurors." *Id.* at 369. To support this claim, "Skilling, aided by media experts, submitted hundreds of news reports detailing Enron's downfall; he also presented affidavits from the experts he engaged portraying community attitudes in Houston in comparison to other potential venues." *Id.* at 369-70. Notwithstanding these submissions, the district court held that Skilling had not "establish[ed] that pretrial publicity and/or community prejudice raise[d] a presumption of inherent jury prejudice" such that "questionnaires and voir dire . . . [could not] ensure an impartial jury." *Id.* at 372-73.

The Supreme Court agreed that a presumption of prejudice was unwarranted. After reviewing the facts of *Rideau*, *Estes*, and *Sheppard*, the Court held that "[i]mportant differences separate Skilling's prosecution from those in which we have presumed juror prejudice." *Skilling*, 561 U.S. at 381-82. The Court explained:

> First, we have emphasized in prior decisions the size and
> characteristics of the community in which the crime occurred. In
> *Rideau*, for example, we noted that the murder was committed in a

47

parish of only 150,000 residents. Houston, in contrast, is the fourth most populous city in the Nation: At the time of Skilling's trial, more than 4.5 million individuals eligible for jury duty resided in the Houston area. . . . Second, although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight. Rideau's dramatically staged admission of guilt, for instance, was likely imprinted indelibly in the mind of anyone who watched it. . . . Third, unlike cases in which trial swiftly followed a widely reported crime, *e.g.*, *Rideau*, 373 U.S., at 724, over four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse.

*Id.* at 382-83

Last year, in *United States v. Tsarnaev*, Crim. No. 13-10200, 2014 WL 4823882, at *3 (D. Mass. Sept. 24, 2014), a district court judge sitting in the District of Massachusetts held that the trial of one of the alleged perpetrators of the 2013 Boston Marathon bombings—which resulted in the deaths of three spectators and injuries to scores more, involved a protracted manhunt that effectively closed down Boston and neighboring communities, and received "extensive" media coverage—should remain in Boston because it was not "one of the rare and extreme cases for which a presumption of prejudice is warranted." *Id.* at *3. In denying the defendant's Rule 21(a) motion, the court emphasized the size of the district—roughly five million people—and its diversity, the diminishment of media scrutiny over time, and that a jury could not be empaneled anywhere in the country whose members were wholly unaware of the bombings. *Id.* at *2-3. The court's initial holding in *Tsarnaev* withstood two subsequent rounds of district court briefing, one in which the defendant presented additional evidence regarding the extensive publicity the case had received, *United States v. Tsarnaev*, Crim. No. 13-10200, 2015 WL 45879 (D. Mass. Jan. 2, 2015), and another after an assessment of juror responses to pre-

48

selection questionnaires, *United States v. Tsarnaev*, Crim. No. 13-10200, 2015 WL 505776 (D. Mass. Feb. 6, 2015). Most recently, the First Circuit refused to issue a writ of mandamus to compel transfer. *In re Tsarnaev*, 780 F.3d 14 (1st Cir. 2015). Its reasoning is particularly instructive here:

> [A]ny high-profile case will receive significant media attention. It is no surprise that people in general, and especially the well-informed, will be aware of it. Knowledge, however, does not equate to disqualifying prejudice. Distinguishing between the two is at the heart of the jury selection process.

*Id.* at 15.

### B.   Baroni has not met his heavy burden to establish presumed prejudice.

When determining whether prejudice may be presumed based upon pretrial publicity, courts look to the following factors:

(i)   the size and characteristics of the community;

(ii)   the general content of the news coverage (including facts such as whether the stories referenced the defendant's confession or other similarly blatantly prejudicial information, whether the news account was factual and objective versus sensational, inflammatory, or slanted toward the prosecution, and whether the stories focus on the defendant personally as opposed to the crime itself);

(iii)   the timing of the media coverage relative to the commencement of the trial; and

(iv)   whether there was any media interference with actual courtroom proceedings.

*Savage*, 2012 WL 2376680, at *3-*4. Assessment of these factors demonstrates that transfer of venue is not warranted here.

### 1.   The size and characteristics of Northern New Jersey weigh heavily against finding presumed prejudice.

The circumstances of this case are far closer to those of *Skilling* and *Tsarnaev* than to those of *Rideau*, *Estes*, or *Sheppard*. Northern New Jersey is part of the largest metropolitan area in the nation, and the Newark Vicinage of the District of New Jersey, from which jurors will be

summoned, covers approximately 1,700 square miles, and includes approximately four million people.[12] It comprises a mixture of urban, suburban, and rural communities, and its population is multi-ethnic, multi-racial, and economically diverse. All sectors of the economy are well-represented, including the professions, manufacturing, agriculture, trade, and the arts. Here, as in *Skilling*, it strains credulity to assert that 12 fair and impartial jurors cannot be found in so large, widespread, and diverse a population. *See United States v. Salameh*, Crim. No. 93-180, 1993 WL 364486, *1 (S.D.N.Y. Sep. 15, 1993) (declining to move trial of first World Trade Center bomber out of the Southern District of New York in part because "jurors from this district, one of the largest and most diverse districts in the country," are as likely to be fair and impartial "as jurors from other parts of the country").

Baroni also overstates the significance of the relationship between a percentage of the venire pool and the Port Authority. BB68. Admittedly, the Vicinage contains a large number of people who have regular contact with some aspects of the Port Authority, *i.e.*, those who travel on the PATH train, through the Lincoln Tunnel, or via Newark Liberty International Airport. However, if as Baroni suggests, prejudice could be presumed based on the relationship between a public entity and its patrons, then virtually any case involving allegations of public corruption against prominent officials would warrant transfer. But cases involving Governors and Senators routinely remain in the jurisdiction where they were indicted. Moreover, a much smaller number of potential jurors were actual victims of the lane and toll booth reductions.

Even if the percentage of victims had been considerably higher, the Supreme Court, in *Skilling*, rejected the argument that "Enron's sheer number of victims trigger[ed] a presumption

---

[12] Data obtained from http://quickfacts.census.gov/qfd/states/34000.html.

50

of prejudice." 561 U.S. at 384. The Court held instead that "the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," and that "the extensive screening questionnaire and follow-up *voir dire* were well suited to that task." *Id.* The same is true here.

### 2. The content of the coverage is largely factually based and not unduly inflammatory.

Press coverage of the lane and toll booth reductions has undoubtedly been extensive, but "[t]he fact that jury members may have been exposed to press reports or other community reaction . . . [and] may have formed a tentative opinion" does not, by itself, "establish a constitutional violation." *Rock v. Zimmerman*, 959 F.2d 1237, 1253 (3d Cir. 1992), *overruled on other grounds by Brecht v. Abrahamson*, 507 U.S. 619 (1993). That is especially true where, as here, the coverage has been largely factual, as opposed to inflammatory, *United States v. Diehl-Armstrong*, 739 F. Supp. 2d 786, 795 (W.D. Pa. 2010), and has "contained no confession or other blatantly prejudicial information" as in *Rideau. Skilling*, 561 U.S. at 381. That alone is enough to defeat a claim of presumed prejudice. *See*, *e.g.*, *Haldeman*, 559 F.2d at 61-62 (holding that Watergate defendants were not entitled to change of venue because "the pretrial publicity in this case, although massive, was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession. It is true that some of the pieces . . . are hostile in tone and accusatory in content . . . [but the bulk] consists of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations.").

The courts have repeatedly held that "the due process guarantee of trial by a fair and impartial jury can be met even where . . . virtually all of the veniremen admit to some knowledge

of the defendant due to pretrial publicity." *United States v. Bliss*, 735 F.2d 294, 297-98 (8th Cir. 1984). *Accord Knapp v. Leonardo*, 46 F.3d 170, 176 (2nd Cir. 1995) (finding no manifest error in state court's determination that jury was impartial despite defense argument that 83% of veniremen were excused because they had prejudged the case); *United States v. Drougas*, 748 F.2d 8, 30 (1st Cir. 1984) ("[T]he sixth amendment does not require that each juror's conscious mind be *tabula rasa*, let alone his or her subconsciousness.").

Moreover, the Supreme Court has repeatedly held that "pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976); *accord Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 404 n.1 (1970) (Rehnquist, J., concurring) ("In fact, as both the Court and the dissent recognize, the instances in which pretrial publicity alone, even pervasive and adverse publicity, actually deprives a defendant of the ability to obtain a fair trial will be quite rare.") (collecting cases).

The press coverage of the lane and toll booth reductions—and, in particular, Defendants' alleged roles—has not been nearly as "prejudicial and conclusory" as Baroni suggests. BB69-71. First, while the press coverage has been extensive, it has largely been clustered around new developments in the case. Second, the lion's share of media attention seems focused on how the story might affect Governor Christie's presidential campaign. When it comes to Defendants' roles and the events underlying the Indictment, the media has by and large reported the story factually, not sensationally, notwithstanding what are undoubtedly the most negative clippings Baroni could find. *See United States v. Lindh*, 212 F. Supp. 2d 541, 549 (E.D. Va. 2002) (finding no presumption of prejudice where extensive national pretrial coverage, which included "opinions . . . specifically designed to inflame or persuade readers," was on the whole, factual rather than inflammatory).

52

### 3. Trial will begin more than two years after the allegations surfaced.

In general, the sooner the trial begins in a well-publicized case, the greater the risk of prejudice. *See Skilling*, 561 U.S. at 383. In *Rideau*, the defendant's trial started almost two months after his televised confession. 373 U.S. at 724. In *Tsarnaev*, by contrast, a delay of two years after the Boston Marathon bombing "allowed the decibel level of publicity about the crimes themselves to drop and community passions to diminish." *In re Tsarnaev*, 780 F.3d at 22. Trial here similarly will commence more than two years after the events of this case attracted public scrutiny. Although the public interest in this case may remain high, "that would be true wherever trial is held, and the reporting has largely been factual." *Id.* As a result, there is no reason to presume before voir dire that it would be impossible to seat a fair and impartial jury.

### 4. Baroni's claim of media interference is deficient because the trial has yet to begin.

Finally, no change of venue is warranted here where it simply cannot be reasonably anticipated that media coverage will "utterly corrupt[]" the trial. *Skilling*, 561 U.S. at 380 (quotation omitted). Proceedings in this case will be a far cry, for instance, from those in *Sheppard*, where the media "took over practically the entire courtroom" and thrust jurors "into the role of celebrities." 384 U.S. at 353, 355.

Neither Defendants nor the media have given any reason to believe that media interference will be so severe as to warrant a change of venue. Respectfully, if there is any doubt about this, the Court should proceed to voir dire, so that it may assess the potential for prejudice based on the jurors' responses rather than presuming prejudice based on media coverage. Questions regarding media exposure and any resulting prejudice can be addressed in pretrial jury questionnaires.

Like Baroni, the Government seeks a fair trial in a venue where the Court can seat 12 impartial jurors; the Government is confident, however, that screening questionnaires and voir dire will be sufficient to achieve that goal. Rule 21(a) "has been applied almost exclusively in cases in which pervasive pretrial publicity has inflamed passions in the host community past the breaking point." *United States v. Walker*, 665 F.3d 212, 223 (1st Cir. 2011). That is not the case here. Baroni has not shown, and cannot show, that this case meets the requirements laid down by the Supreme Court for a change of venue based on presumed prejudice. Accordingly, Baroni's Rule 21(a) motion must be denied.

**CONCLUSION**

The Court should deny Defendants' motions in accordance with the reasons set forth above.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney
970 Broad Street, Room 700
Newark, New Jersey 07102
(973) 645-2742


/s/ *Lee M. Cortes, Jr.*
By:   Lee M. Cortes, Jr.
      Assistant U.S. Attorney


/s/ *Vikas Khanna*
By:   Vikas Khanna
      Assistant U.S. Attorney


/s/ *David W. Feder*
By:   David W. Feder
      Assistant U.S. Attorney


Dated: Newark, New Jersey
       November 24, 2015

55