**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. No. 15-193 (SDW) |
| WILLIAM BARONI, et. al, | |
| Defendants. | |

**DECLARATION OF RANDY M. MASTRO IN SUPPORT OF MOTION OF
NONPARTY OFFICE OF THE GOVERNOR OF NEW JERSEY
TO QUASH DEFENDANTS' SUBPOENA *DUCES TECUM***

I, RANDY M. MASTRO, hereby declare under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

1.      I am an attorney licensed to practice law in numerous state and federal courts,

including before this Court.  I am a partner in the law firm of Gibson, Dunn & Crutcher, LLP

("Gibson Dunn") and counsel for nonparty Office of the Governor of New Jersey ("OGNJ") in

this matter.  I make this declaration in support of the OGNJ's Motion to Quash Defendants'

Subpoena *Duces Tecum*, in part.

2.      This is the second time in this case that Gibson Dunn has had to file a motion to

quash a subpoena that counsel for Defendants William Baroni and Bridget Anne Kelly have

directed to our Firm and/or the OGNJ.  The subpoena *duces tecum* now at issue was requested by

Defendants' counsel at this Court's February 5, 2016 hearing and authorized after Defendants'

counsel represented to this Court that they would be seeking the same documents that the U.S.

Attorney's Office subpoenaed from the OGNJ.  Because the OGNJ was not a party to that

hearing, I respectfully take this opportunity to clarify the record and address several

misimpressions criminal defense counsel have conveyed in petitioning this Court to permit them

to issue subpoenas *duces tecum*, including this one to the OGNJ that we now move to quash, in part.

3.　　I have been a Gibson Dunn partner for nearly two decades and currently serve as Co-Chair of the Firm's Litigation Practice Group.  Before then, I spent most of my legal career in public service.  In the early 1980s, I clerked for Justice Alan Handler of the New Jersey Supreme Court.  From 1985 to 1989, I served as an Assistant U.S. Attorney and Deputy Chief of the Civil Division in the U.S. Attorney's Office for the Southern District of New York, where I specialized in organized crime cases and received several of the U.S. Justice Department's highest honors, including the Attorney General's Distinguished Service Award.  In the early 1990s, I became a partner at Gibson Dunn.  From 1994 to 1998, I left the Firm to return to public service—this time to serve the City of New York as the Mayor's Chief of Staff and then as Deputy Mayor of New York City.  In late 1998, I returned to Gibson Dunn and have practiced here ever since, often challenging government action but also representing public entities and public officials across the political spectrum, including the Port Authority of New York and New Jersey ("Port Authority"), the Hudson River Park Trust, the Battery Park Authority, and former City Councilman and now-Mayor Bill de Blasio, former City Comptroller Bill Thompson, and former City Public Advocate Betsy Gotbaum—all Democrats—in challenging Mayor Bloomberg's legislative initiative to overturn voter-ratified term limits.  *See Molinari v. Bloomberg*, 564 F.3d 587 (2d Cir. 2009).  I also serve as the Vice Chair of the Legal Aid Society of New York City and on the Board of Overseers of the University of Pennsylvania Law School, where I teach as an Adjunct Professor.

**OGNJ's Engagement Of Gibson Dunn And Its Investigation Team**

4.　　On January 16, 2014, the OGNJ engaged Gibson Dunn to investigate allegations concerning the George Washington Bridge toll lane realignment at Fort Lee ("lane

realignment").  On January 18, 2014, the OGNJ expanded the engagement, tasking Gibson Dunn also to investigate the allegations made by Hoboken Mayor Dawn Zimmer concerning Superstorm Sandy aid allocation.  Over the course of the next two months, Gibson Dunn interviewed more than 70 witnesses (memorializing those witness interviews in detailed memoranda totaling nearly 500 pages) and reviewed more than 250,000 documents, including texts and emails of the Governor, the Lieutenant Governor, and many of their senior staffers. We were also tasked with responding to several sweeping subpoenas directed to the OGNJ by the U.S. Attorney for the District of New Jersey ("Grand Jury Subpoenas") and the New Jersey Legislative Select Committee on Investigation, producing reams of documents responsive to those sweeping subpoenas and memorializing privilege claims in detailed privilege logs.  Our investigation team included five former federal prosecutors, whose backgrounds are described below.  Four of us served as Assistant U.S. Attorneys in the Southern District of New York, and all four of us are registered Democrats—a fact that I note because we were retained by the OGNJ under Governor Christie's administration to conduct this internal investigation, which we conducted at all times in an independent, non-partisan manner.  We had but one overriding objective—to find the facts and then accurately report them.  After all, we knew that ours would be the first of several investigations to report our findings and that other investigations, including the federal grand jury probe that resulted in the criminal charges here, would report their conclusions later.  Thus, our only incentive was to get it right, and we knew we would be judged later by whether we got it right.  We believe we got it right, and the confirmation that we did is the fact that these other investigations reached conclusions consistent with ours as to who was involved or may have been involved in this scheme concerning the George Washington Bridge lane realignment.

Declaration of Randy M. Mastro                3
Crim. No. 15-193 (SDW)

5.      In addition to me, our investigation team included the following Gibson Dunn partners:  Alexander H. Southwell is a partner in Gibson Dunn's New York office, a member of the Firm's White Collar Defense and Investigations practice group, and Co-Chair of the Privacy, Cybersecurity, and Consumer Protection practice group.  From 2001 to 2007, Mr. Southwell served as Assistant U.S. Attorney for the Southern District of New York, during which time he specialized in prosecuting financial and securities fraud, public corruption, and cybercrimes and was a member of that Office's Securities and Commodities Fraud Task Force.

6.      Reed Brodsky is a partner in Gibson Dunn's New York office and a member of the Firm's White Collar Defense and Investigations practice group.  Before joining Gibson Dunn in 2013, Mr. Brodsky served as Assistant U.S. Attorney for the Southern District of New York, during which time he specialized in prosecuting financial and securities fraud and was a member of that Office's Securities and Commodities Fraud Task Force.

7.      Avi Weitzman is a partner in Gibson Dunn's New York office and a member of the Firm's White Collar Defense and Investigations practice group.  Before joining Gibson Dunn in 2012, Mr. Weitzman served as Assistant U.S. Attorney for the Southern District of New York during which time he specialized in prosecuting financial and securities fraud and organized crime and was a member of that Office's Securities and Commodities Fraud Task Force.

8.      Debra Wong Yang is a partner in Gibson Dunn's Los Angeles office and has served as Co-Chair of the Firm's Crisis Management, White Collar Defense and Investigations, and Privacy, Cybersecurity, and Consumer Protection practice groups.  From 2002 to 2006, Ms. Yang served as the U.S. Attorney for the Central District of California.  Prior to that, from 1997 to 2002, Ms. Yang served as a California state court trial judge and from 1990 to 1997, Ms. Yang

served as an Assistant U.S. Attorney in the Central District of California, during which time she

specialized in prosecuting violent crimes, white-collar crimes, arson, and computer crimes.

**The Gibson Dunn Investigation, Report, And Interview Memoranda**

9.      In conducting this investigation, Gibson Dunn received the voluntary cooperation

of the Governor and everyone then employed at the OGNJ.  We were able to interview these

witnesses, sometimes multiple times.  We also reviewed documents from their government and

personal files, including their emails and text messages.  While we could not compel anyone

outside the Governor's Office to cooperate with our investigation, we received voluntary

cooperation from many former employees of the Governor's Office and independent witnesses

as well.  Some of these individuals even provided documents from both their work and personal

email accounts.  In addition to reviewing a huge volume of OGNJ documents and

communications, our team was permitted to review, among others, certain documents collected

and produced by the Port Authority in response to related subpoenas, which included documents

from Defendant Baroni's files, among others.  Report at 36–37.

10.      On March 26, 2014, Gibson Dunn delivered its 344-page final report (the

"Report") to the OGNJ detailing its investigation findings and recommendations concerning the

lane realignment allegations and Mayor Zimmer's Superstorm Sandy aid allegations.  The OGNJ

directed Gibson Dunn to release the Report to the public, which Gibson Dunn then did.

Concerning the lane realignment, Gibson Dunn found that "David Wildstein (then of Port

Authority) and Bridget Kelly (then one of the Deputy Chiefs of Staff in the Governor's Office)

knowingly participated in [a] plan to realign toll lanes leading onto the George Washington

Bridge at Fort Lee, at least in part, for some ulterior motive to target Mayor Sokolich."  Report at

2. Gibson Dunn further found some level of involvement and participation in this plan by

Defendant Baroni warranting further investigation—namely, that "throughout the lane

realignment, between September 9 and 13, 2013, Baroni refused to respond to persistent communications from Fort Lee officials," including communications from Mayor Sokolich "describ[ing] the severity of the traffic impacts and assert[ing] that the matter was an 'urgent' one of 'public safety'" (*id.* at 118)—although Gibson Dunn acknowledged that it was unable to determine what the specific "ulterior motive" was that motivated Mr. Wildstein and Defendant Kelly to execute this plan targeting Mayor Sokolich and whether Defendant Baroni was aware of that "ulterior motive," (*id.* at 2).

11.     The Report's detailed findings were documented and annotated by more than 1,000 endnotes, and at the time of its release, the OGNJ also authorized the release of hundreds of contemporaneous documents referenced in the Report and its endnotes.

12.     Shortly after the release of the Report, the OGNJ further directed Gibson Dunn to publicly release the lengthy memoranda it prepared detailing its interviews of more than 70 witnesses.  All of those interview memoranda were also provided to the U.S. Attorney's Office, and those witness interview memoranda relating to the lane realignment issue were provided to the New Jersey Legislative Select Committee on Investigation.

### Gibson Dunn's Investigation Interview Procedures

13.     As previously explained, we interviewed more than 70 witnesses in two months during our investigation.  We interviewed many of these witnesses more than once.  At least two attorneys attended each interview—one leading the questioning and another responsible for memorializing the interview's substance in a contemporaneous memorandum created electronically during the interview.  Our goal was to memorialize the information gathered quickly, efficiently, and accurately.  These memoranda included both factual information and the attorneys' mental impressions of the witnesses.  Then, after each interview, the memoranda were reviewed to ensure consensus on accuracy and substance.

14.     This Court, in quashing the Defendants' subpoena for interview notes that did not exist, questioned the manner in which Gibson Dunn documented the substance of witness interviews.  The Court wrote that, "[i]n the past," Gibson Dunn had "tak[en] and preserv[ed] contemporaneous notes of witness interviews," as "[a]ttorneys are trained scrupulously" to do, but that Gibson Dunn "intentionally changed its approach in this investigation."  Doc. 52 at 5–6. The Court further wrote: "Although GDC did not delete or shred documents, the process of overwriting their interview notes and drafts of the summaries had the same effect.  This was a clever tactic, but when public investigations are involved, straightforward lawyering is superior to calculated strategy.  The taxpayers of the State of New Jersey . . . deserve better."  *Id.* at 7.

15.     While I have the utmost respect for this Court, I did not personally have the opportunity to reply to certain misimpressions I believe Defendants' counsel conveyed in opposing our motion to quash about our Firm's "past" practice and what is typical of internal investigations, particularly "public" ones.  I do so briefly now.

16.     Defendants' counsel referred the Court to *Gruss v. Zwirn*, No. 09 Civ. 6441 (S.D.N.Y.), in which, several years ago, our Firm, acting on behalf of a private investment fund, conducted an internal investigation in which individual attorneys of our Firm each took handwritten notes that they fully expected under prevailing law at the time would be protected from disclosure in their entirety as attorney work product.  But when that assertion of privilege was later challenged in a civil litigation pending in the S.D.N.Y., the District Court, over our Firm's objection, ordered disclosure of those notes, at least to the extent of reflecting "fact" work product.  *See Gruss v. Zwirn*, 2013 WL 3481350, at *13 (S.D.N.Y. July 10, 2013).  While this decision seemed contrary to prevailing law at the time, some other courts issued similar rulings around that same time.  *See, e.g.*, *Vasquez v. City of New York*, 10 Civ. 6277, 2014 WL 6356941,

Declaration of Randy M. Mastro                            7
Crim. No. 15-193 (SDW)

at *1–2 (S.D.N.Y. Nov. 14, 2014) (ordering disclosure of notes and memoranda "created in connection with witness interviews" by county prosecutors); *SEC v. Vitesse Semiconductor Corp.*, No. 10 Civ. 9239, 2011 WL 2899082, at *3–4 (S.D.N.Y. July 14, 2011) (compelling production of handwritten notes from internal investigation).

17.     In the wake of *Gruss* and these other recent decisions, it is understandable why counsel conducting internal investigations have had to re-evaluate their approaches, being particularly sensitive to and cognizant of privilege waiver issues, as well as the discoverability and accuracy of the records they create.  There is no one rule or one approach to be used in all internal investigations.  One size does not fit all.  In establishing protocols for our investigation on behalf of the OGNJ, we endeavored to make attorney writings documenting witness interviews an accurate reflection of the information conveyed relevant to the investigation.  Our mandate was to find the facts and report them accurately.  But we also knew that there were other ongoing investigations focusing on the same subject matter, so we strived to make as accurate as possible whatever records we did create.

18.     While I acknowledge the Court's characterization of our work as a "public investigation," it is not the case that "public investigations" require all present to take contemporaneous notes of witness interviews for production later.  While note-taking practices differ from agency to agency, when I did investigations as an Assistant U.S. Attorney, we typically conducted interviews accompanied by F.B.I. agents, one of whom was responsible for memorializing each interview in a memorandum.  We did not typically take separate notes ourselves.  If such a witness were called to testify in a subsequent prosecution, the criminal defendant's counsel would be provided with that one interview memorandum.  Moreover, government investigators are not obligated to take notes during their interviews of witnesses.

*See United States v. Rodriguez*, 496 F.3d 221, 224–25 (2d Cir. 2007).  Thus, we conducted this "public investigation" consistent with the manner in which many others have conducted past "public investigations."

19.     We considered our primary obligation here to be to uncover the facts and then accurately report them.  There was a cloud hanging over the Governor's Office at the time, and the OGNJ and the public deserved to know the truth.  We believe we got to the truth and accurately reported the facts, distinguishing between what we were able to conclude as a matter of fact and what warranted further investigation.  And that is borne out by the fact that subsequent investigations (including the one leading to Defendants' indictment in this criminal case) reached the same basic conclusions.[1]

20.     Moreover, our interview memoranda accurately reflected witnesses' accounts in all material respects, and that was corroborated by the testimony that several of those same witnesses gave when called before the New Jersey Legislative Select Committee on Investigation.  Indeed, six months after our Report was released, that Committee—which was widely regarded as hostile to the Governor—expressly found, as we had, "that the lane closures were directly implemented by Bridget Anne Kelly, . . . and that Kelly worked in close concert

---

[1] As the Indictment here makes clear, the Government ultimately reached the same basic conclusions that we earlier reached in our investigation.  *See Winners and Losers*, PolitiFax: A Weekly Electronic Newsletter on Politics in New Jersey, May 6, 2015, at 4 (observing that our conclusions and the Government's "match almost exactly").  The one new publicly identified source developed by the U.S. Attorney's Office unavailable to us was David Wildstein, who could not be compelled to cooperate with our investigation but later entered into a plea agreement to cooperate with the Government.  It was Wildstein who provided the Government with answers to the questions we concluded warranted further investigation— namely, the ulterior motive that motivated Wildstein and Defendant Kelly to target Mayor Sokolich, and the direct involvement of Defendant Baroni as a knowing participant in their scheme.

with Wildstein[.]"  Interim Report to the New Jersey Legislature Regarding the September 2013 Closure of George Washington Bridge Access Lanes in Fort Lee, N.J. (Dec. 8, 2014) ("Committee Report") at 1.  While the Committee, like us, could not conclusively determine that Mayor Sokolich's endorsement decision led to the events at issue, the Committee found, as we did, that "it is clear that Kelly and Wildstein were motivated in part by political considerations," and that "[e]vidence also suggests that causing traffic problems was considered a form of retaliation by Kelly and Wildstein," *id.* at 115.  The Committee also found, as we did, that "Baroni . . . intentionally ignored pleas for assistance from . . . [Mayor] Sokolich, and did so in concert with Wildstein, Baroni's subordinate," and that "[t]he evidence indicates that Bill Baroni was aware of the impending lane closures before they were implemented," *id.* at 2, 116.  And the Committee concluded, as we did, that "it is clear that Kelly and Wildstein were principal actors in closing Fort Lee's access lanes.  It is equally clear that Baroni . . . [was], at the very least, contemporaneously aware of the lane closures."  *Id.* at 117.

21.     Indeed, witnesses who testified before the Committee confirmed the accuracy and fairness of what was reported in the Gibson Dunn interview memoranda, including one witness who testified his interview memorandum was "absolutely accurate."  *See, e.g.*, Transcript of Drewniak's Testimony Before the Committee on May 13, 2014 at 58; *see also id.* at 64–65, 74–75, 129.

22.     Defendants' counsel have nevertheless seized upon inconsequential differences in the accounts of only two witnesses—Christina Genovese Renna and Kevin O'Dowd—between what Gibson Dunn reported in interview memoranda and what those witnesses said during their Committee hearing testimony.  As this Court has already recognized, "those discrepancies are seemingly minor."  Doc. 52 at 10 n.10.  For example, Ms. Renna, who worked for Defendant

Kelly in the Governor's Office of Intergovernmental Affairs (IGA), testified before the Committee that there were "little details" and "minor facts" in her interview memorandum that differed from her recollection at the time of her testimony, but that she was "largely happy" and "pleased" with how "Gibson Dunn portrayed" the "information" and "words" she "gave them." Transcript of Renna's Testimony Before the Committee on May 6, 2014 ("Renna Tr.") at 41, 183.  In other words, Ms. Renna testified that the core of her account was accurately reported, particularly the Gibson Dunn memorandum's description of Defendant Kelly's consternation about communications with Mayor Sokolich around the time of the George Washington Bridge lane realignment and Defendant Kelly's December 2013 request, after being confronted by her immediate supervisor inquiring at the behest of the Governor about any involvement she may have had in the lane realignment, that Ms. Renna delete a September 2013 email Defendant Kelly sent her during the lane realignment reflecting Defendant Kelly's hostility toward Mayor Sokolich—an email in which Defendant Kelly responded "Good" when informed an "extremely upset" Mayor Sokolich had contacted the IGA office to complain about the lane realignment.  *Id.* at 41, 90–97, 109–13, 183 (true and correct copies of which are attached here as Exhibit A); Renna Tr. at Tab 20 (emails dated September 12, 2013 exchanged between Defendant Kelly and Ms. Renna) (true and correct copies of which are attached as Exhibit B).[2]

---

[2]   In other words, when Defendant Kelly requested in December 2013 that Ms. Renna delete that September 2013 email, Defendant Kelly, in effect, sought to prevent that evidence confirming her contemporaneous knowledge and involvement in the lane realignment from reaching the Governor.  Of note, Ms. Renna kept a copy of the email that Defendant Kelly requested Ms. Renna delete.  Renna Tr. at 111.  It was not until January 2014 that Ms. Renna made known she had kept a copy of Defendant Kelly's email and produced it to us, as well as other investigators.  *Id.* at 113.

**Defendants' Counsel's Recent Actions**

23.     I mention this now-settled issue only because Defendants' counsel have since continued their strategy of attacking our work at every turn, instead of focusing on the criminal charges against their clients, which resulted from a wholly independent grand jury investigation conducted by the U.S. Attorney's Office.  Criminal defense counsel's attempts to smear us are unseemly enough; but they have now overreached again on this latest subpoena, issuing one much broader in scope than what they requested of this Court, necessitating our latest motion to quash, in part.  And they have gone even farther afield since then, issuing eight separate trial subpoenas to Gibson Dunn lawyers who worked on this investigation, including me.  Of course, none of us can testify on personal knowledge to any of the facts constituting the crimes alleged here.  And any other testimony we might be asked to give would go only to collateral issues about how we conducted our investigation that have no relevance in this trial, which concerns the U.S. Attorney's prosecution resulting from a wholly independent investigation commenced before ours began and conducted for more than a year after ours concluded.

24.     It is apparently criminal defense counsel's intention to turn this trial into a sideshow about, as Mr. Critchley put it in open court on February 5, 2016, whether to "trust" Gibson Dunn.  Tr. at 15:19–25.  While a baseless smear on his part, it is also completely beside the point.  Our investigation and report are consistent with the conclusions reached independently by the U.S. Attorney's Office, the federal grand jury, and the New Jersey Legislative Select Committee on Investigation.  Defense counsel's attempt to attack Gibson Dunn's investigation is a distraction from the criminal case and the independent work of the Federal Government and the grand jury.

25.     First, criminal defense counsel went through the exercise of subpoenaing notes they knew did not exist.  Now, criminal defense counsel want to go through a similar exercise,

issuing another subpoena seeking to pierce deliberative process privilege, even though they know from our detailed privilege log that these documents have nothing to do with the charges in this Indictment.  The OGNJ properly asserted deliberative process privilege over documents utterly irrelevant to the charges in the Indictment but otherwise hypothetically responsive to the sweeping Grand Jury Subpoenas that the U.S. Attorney directed to the OGNJ during the Government's much broader investigation (which included a wholly separate line of inquiry into Hoboken Mayor Zimmer's Superstorm Sandy aid allocation allegations that the Government ultimately found no basis to pursue).  And Defendants' counsel must have realized before moving for the instant subpoena that these privileged documents have nothing to do with the lane realignment issue, because they had received from the Government our detailed privilege log, which made clear, through detailed descriptions, the subject matter of each document and the grounds for withholding it.

26.    Even worse, the subpoena actually issued by Defendants' counsel to the OGNJ vastly exceeds the scope of that which they represented to this Court they would request. Defendants filed separate discovery motions in November 2015, seeking, *inter alia*, authorization to direct a Rule 17(c) subpoena to the OGNJ "to obtain *the same documents from the Office of the Governor of New Jersey that the government received*" in response to the Grand Jury Subpoenas.  Doc. 43-1 at 35 (emphasis added).  Then, they repeated this same refrain in subsequent filings: "Ms. Kelly respectfully requests that the Court authorize a Rule 17(c) subpoena for the *identical documents and information demanded by the government/grand jury subpoenas*"; and "Mr. Baroni plans to use *essentially the same requests contained in the government's subpoena*."  Doc. 57 at 19; Doc. 58 at 12 (emphasis added).  Indeed, Mr. Critchley reiterated at the February 5, 2016 hearing that Defendants sought "a Rule 17(c) subpoena that

would allow us *to essentially serve the same subpoena the Government served* on Gibson Dunn

to put us in a position to challenge and have standing to challenge those [deliberative process]

privilege assertions." Tr. at 13:11–18 (emphasis added).  But that is not what Defendants'

counsel then did.  They, instead, served a much broader subpoena, even though we understand

Defendant Baroni's counsel communicated with the U.S. Attorney's Office before issuing this

subpoena and was advised by that Office that their subpoena was much broader than the ones

actually served on the OGNJ by the U.S. Attorney's Office.  In other words, this Court trusted

Defendants' counsel to honor their commitments and issue a subpoena consistent with their

representations, but Defendants' counsel then did something very different—which is yet another

reason why we are moving to quash this subpoena, in part.

27.     We have now provided the Defendants with all of the documents we produced to

the U.S. Attorney's Office in response to its Grand Jury Subpoenas; we have properly asserted

deliberative process privilege in withholding other documents, all of which, while otherwise

falling within those subpoenas, have nothing to do with the lane realignment at issue here; and

Defendants' latest subpoena exceeds the scope permitted by this Court, based on Defendants'

counsel's express representations that they would serve a subpoena that would be "essentially . . .

the same" as the Government's.  For all these reasons, it is respectfully requested that the Court

now quash this subpoena, in part.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

28th day of April, 2016 at New York, New York.


_____/s/  Randy M. Mastro_____

Randy M. Mastro


Declaration of Randy M. Mastro            14
Crim. No. 15-193 (SDW)

# Exhibit A

# *Committee Meeting*

of

## NEW JERSEY LEGISLATIVE SELECT COMMITTEE ON INVESTIGATION

*"The testimony of Christina Genovese Renna concerning the committee's investigation into all aspects of the finances, operations, and management of the Port Authority of New York and New Jersey, and any other matter raising concerns about abuse of government power or an attempt to conceal an abuse of government power, including, but not limited to, the reassignment of access lanes in Fort Lee, New Jersey, to the George Washington Bridge"*

**LOCATION:**   Committee Room 11
State House Annex
Trenton, New Jersey

**DATE:**   May 6, 2014
10:00 a.m.

## MEMBERS OF COMMITTEE PRESENT:

Senator Loretta Weinberg, Co-Chair
Assemblyman John S. Wisniewski, Co-Chair
Senator Nia H. Gill
Senator Linda R. Greenstein
Senator Kevin J. O'Toole
Assemblywoman Marlene Caride
Assemblyman Louis D. Greenwald
Assemblyman Paul D. Moriarty
Assemblyman Michael Patrick Carroll
Assemblywoman Amy H. Handlin
Assemblywoman Holly T. Schepisi



## ALSO PRESENT:

Charles A. Buono Jr.
Michael R. Molimock
*Office of Legislative Services*
*Committee Aides*

Francisco Maldonado
*Senate Majority*
Kate McDonnell
*Assembly Majority*
*Committee Aides*

Frank Dominguez
*Senate Republican*
Keith Loughlin
*Assembly Republican*
*Committee Aides*

**Meeting Recorded and Transcribed by**
**The Office of Legislative Services, Public Information Office,**
**Hearing Unit, State House Annex, PO 068, Trenton, New Jersey**

job to contact them during the workday, versus potential endorsers.  That work happened after 5:00.

SENATOR WEINBERG:  So excuse me, Ms. Renna. There was a mandatory directive after 5:00 that said, "These people are hands-off mayors?"

MS. RENNA:  *Mandatory directive* were not my words.  You notice they are not in quotation marks.  Those were Gibson Dunn's words.  That was their characterization; they were never words I would use.  I would never use *mandatory directives* except in one incident, which we can circle back to.  They were not my words.

SENATOR WEINBERG:  Did you correct that with Gibson Dunn when you saw that characterization?

MS. RENNA:  I didn't see these until it came out publicly.

SENATOR WEINBERG:  So you didn't have a chance to correct any of their characterizations of people's interviews?

MS. RENNA:  Correct -- or some of their facts.  There are minor facts in my interview throughout it that are just--  There are some inaccuracies.

SENATOR WEINBERG:  Do you know what other inaccuracies are contained here that you can recall?

MS. RENNA:  Sure.  For example, there are 60 affected towns, not 16.  An important error in the report was this mandatory directives; it has gotten a lot of attention and is upsetting to me because it was not my characterization at all, nor would it be.  The phone call I exchanged with Bridget Kelly on December 12:  She called me, I called her back.  The call dropped mid-conversation; we tried to call each other back.  I actually

When she says something along the lines of, "Someone tells me something's okay," I took that to mean that feeds into that insecurity that she has. That someone told her something, and just knowing Bridget she wouldn't challenge really anyone, even at her level or above her at all.  I mean, she doesn't--  I really don't want to pile onto Bridget, but--

ASSEMBLYMAN WISNIEWSKI:  Well, I just--  With all due respect, it also sounds like something that you did, because you weren't willing to challenge Bridget Kelly.

MS. RENNA:  If that's what you want to say, that's fine.

ASSEMBLYMAN WISNIEWSKI:  Well, but I've asked you why you didn't challenge Bridget Kelly, and you said, "It's just not something you did."

MS. RENNA:  I didn't want to feed her frustration that (indiscernible); I just didn't.

ASSEMBLYMAN WISNIEWSKI:  You didn't want to feed her frustration?

MS. RENNA:  And aggravation.  And she--

ASSEMBLYMAN WISNIEWSKI:  Why was she--

MS. RENNA:  --was enormously overwhelmed, and enormously stressed with day-to-day life.  And again, I served her day in and day out and tried to make her life easier, which I told her a million times.

ASSEMBLYMAN WISNIEWSKI:  At the end of that phone call she asked you to do her a favor.

MS. RENNA:  She didn't put it that way.

ASSEMBLYMAN WISNIEWSKI:  She asked you to do something for her.

90

MS. RENNA:  Correct.

ASSEMBLYMAN WISNIEWSKI:   What did she ask you to do?

MS. RENNA:  Well, it wasn't the end of the phone call; it was the middle of the phone call.  But she said that she--  I brought this e-mail chain up --  the "Good" e-mail chain up to her.

ASSEMBLYMAN WISNIEWSKI:  You raised it in that phone call?

MS. RENNA:  I raised it to her.  She led by saying, "I didn't know anything about this -- the lane closures."  I countered with, "Well, yes you did, because Mayor Sokolich called Evan and I e-mail you about it." And that's when the tune started to change; that's when her demeanor changed.  And she knew exactly what e-mail I was talking about.  She said that she--  She responded to me by saying, "Oh, are you talking about the e-mail I responded to with, "Good?"  And I said, "Yes."  And she said, "Well, 'good' can mean a bunch of different things.  You can read that a bunch of different ways,'" and she sounded very nervous.  And then she said, "You know, just do me a favor and get rid of it."

ASSEMBLYMAN   WISNIEWSKI:     And   what   did   you understand her to mean by "get rid of it?"

MS. RENNA:  Well, I clarified.  I said, "You want me to delete the e-mail?"  I said that to her.

ASSEMBLYMAN WISNIEWSKI:  Yes.

MS. RENNA:  And she said, "Yes.  Listen, I'm getting a lot of questions, and I'm just really nervous.  And, you know, I can't take getting grilled about this over and over again."  So she sort of said yes, but moved

on and never actually reacknowledged the point again, if that makes sense. She acknowledged it, she confirmed  it, she moved on and didn't address it again.  And right around then is when the call dropped.

        ASSEMBLYMAN WISNIEWSKI:  For the second time?

        MS. RENNA:  No, the first time.

        ASSEMBLYMAN WISNIEWSKI:  First time?

        MS. RENNA:  Yes.

        ASSEMBLYMAN WISNIEWSKI:  When she asked you to get rid of it, and you confirmed that she wanted you to delete it, did you challenge her in any way saying, "Bridget, that might not be a good idea; there's a legislative committee investigating this"?

        MS. RENNA:  No.  I couldn't get a word in edgewise at that point.  She was talking very fast, talking in circles.  The call dropped mid-sentence.  And the topic never came back up in the second half of the conversation.

        ASSEMBLYMAN WISNIEWSKI:  And this e-mail was on a private Gmail account.

        MS. RENNA:  Correct.

        ASSEMBLYMAN WISNIEWSKI:  You had access to Bridget's private Gmail account?

        MS. RENNA:  No.

        ASSEMBLYMAN WISNIEWSKI:  Well, how would you--  She wanted you to delete it from your e-mail account?

        MS. RENNA:  Yes.  That is what I assumed she meant, yes.

        ASSEMBLYMAN WISNIEWSKI:  Okay.  I'm curious that of all the transactions, this phone call at 8:45 at night -- which you clearly

didn't anticipate -- in that phone call you were able to pinpoint this one e-mail communication.  How did that rise to the surface?  Was it significant to you in some way?

ASSEMBLYMAN WISNIEWSKI:  It's the only thing I knew about the Fort Lee

MS. RENNA:  It's the only thing I knew about the Fort Lee lane closures.  Mayor Sokolich never reached out again.  This was it; this was all I knew.  I knew that I had this on this e-mail exchange, because I remembered.  I remembered the call coming in.

ASSEMBLYMAN WISNIEWSKI:  So you deleted the copy of the e-mail that you had.

MS. RENNA:  Correct.

ASSEMBLYMAN WISNIEWSKI:  On your e-mail account.

MS. RENNA:  Correct.

ASSEMBLYMAN WISNIEWSKI:  But then you did something else.

MS. RENNA:  Before I deleted it I forwarded it to another account to preserve it.

ASSEMBLYMAN WISNIEWSKI:  This e-mail account that you deleted it from, this was your e-mail account.

MS. RENNA:  Correct.

ASSEMBLYMAN WISNIEWSKI:  Did anyone else have access to it?

MS. RENNA:  No.

ASSEMBLYMAN WISNIEWSKI:  Why would you delete it from an e-mail account that no one else would see and then send it to another e-mail account?

MS. RENNA:  I wanted to be able--  If she asked me, if it came up again in conversation, I wanted to be able to tell her in good faith that I did what she asked me to do.  But I also knew that I had never been asked to do anything like that before.   I felt the request could have been inappropriate. And, candidly, I was uncomfortable with it.  So I did what she asked me to do, but I protected myself as well.  That's the way I look at it.

ASSEMBLYMAN WISNIEWSKI:  Why do you use the term you *protected* yourself?

MS. RENNA:  I mean, being asked to delete an e-mail is a strange request and a unique request.  And, you know, in four years of working in IGA, I was never asked to do anything that I felt uncomfortable with.

ASSEMBLYMAN WISNIEWSKI:  You thought it was wrong?

MS. RENNA:  And I just thought it was--  I thought it was strange; I thought it was strange.  And I felt she was paranoid -- that's really what I felt.

ASSEMBLYMAN WISNIEWSKI:  This strange request -- the next morning, you were at work?

MS. RENNA:  Yes.

ASSEMBLYMAN WISNIEWSKI:  Did you talk to anybody in terms of somebody who oversees ethics, or law, or chief counsel, or anybody like that and say, "Hey, I just want to let you know I got this strange request."  Did you talk to anybody?

MS. RENNA:  I did not.

ASSEMBLYMAN WISNIEWSKI:  Why not?

94

MS. RENNA:  I didn't think I needed to.  I just didn't.

ASSEMBLYMAN WISNIEWSKI:  All right.  So I'm just trying to understand.  So the night before you thought it was "strange," correct?

MS. RENNA:  Yes.

ASSEMBLYMAN WISNIEWSKI:  But you didn't report it to anybody.

MS. RENNA:  Again, we're looking at this on the back end view.  I didn't think that it rose to a level of having to go to an ethics officer for it.  I just--  I didn't -- not at the time.

ASSEMBLYMAN WISNIEWSKI:  Now, you were aware at that time that there were legislative hearings on this issue.

MS. RENNA:  I was, yes.

ASSEMBLYMAN WISNIEWSKI:  Okay.  And notwithstanding the fact that there are legislative hearings on this issue, Bridget Kelly asked you to delete an e-mail from your own personal e-mail account.  You delete it, and preserve it somewhere else, but you don't think it rises to the level to talk to somebody.

MS. RENNA:  I didn't, no.

ASSEMBLYMAN WISNIEWSKI:  Okay.  When did you eventually talk to anybody about this deletion?

MS. RENNA:  I brought it to Regina Egea on January 9.

ASSEMBLYMAN WISNIEWSKI:  Why on January 9?

MS. RENNA:  That was the day after it became exposed -- Bridget's involvement in the lane closures.

ASSEMBLYMAN WISNIEWSKI:  Okay.  And who did you talk to?

MS. RENNA:  Regina Egea.

ASSEMBLYMAN WISNIEWSKI:  Okay.

MS. RENNA:  That's who I brought it to.

ASSEMBLYMAN WISNIEWSKI:  And did you talk to anybody else?

MS. RENNA:  Not at that time.

ASSEMBLYMAN WISNIEWSKI:  Okay.  And what was her response when you brought it to her attention?

MS. RENNA:  Regina didn't say much.  She looked surprised.  I explained to her the timestamps, and the different e-mail addresses, and why they varied.  And I just explained to her that I felt a responsibility to turn it over in light of what came out yesterday.  And I knew the Governor was going to have a press conference later that morning, and I just wanted to make sure the Governor had all the information I knew on this before he got up behind the podium, essentially.  So I brought this down to Regina first thing in the morning.

ASSEMBLYMAN WISNIEWSKI:  So the e-mails--  The *Bergen Record* story came out on January 8.

MS. RENNA:  Yes.

ASSEMBLYMAN WISNIEWSKI:  You waited until January 9 to go to Regina.

MS. RENNA:  Correct.

ASSEMBLYMAN WISNIEWSKI:  When you saw the story on January 8, why didn't you go to Regina on January 8?

MS. RENNA:  Candidly, I was--  We were all completely in shock.  It was a day of -- not to be dramatic -- but it was a day of a lot of

96

tears in the office.  A lot of people were very upset about what transpired. A lot of people were genuinely in shock by it all.  I'm getting upset even talking about it.  It was just traumatic for definitely the entire IGA team. There are a lot of younger people on the staff.  My door was a revolving door that day of people upset, asking for advice on what to do.

I did this first thing in the morning.

ASSEMBLYMAN WISNIEWSKI:  On January 9?

MS. RENNA:   The next day, before I even interacted with my staff, as a matter of fact.

ASSEMBLYMAN WISNIEWSKI:   Up until that point in time--  So that conversation between you and Bridget Kelly on the evening of December 12, through January 9 -- did you speak to anybody either about the request to delete the e-mail or the content of the e-mail?

MS. RENNA:  Not that I can recall, no.

ASSEMBLYMAN WISNIEWSKI:   There are references to there being an inquiry made in the Governor's Office staff if anybody was aware of an e-mail or any communications related to the bridge issue -- which I think was in December before the Governor had his December 13 press conference.

Were you aware there was this inquiry within the Governor's Office if anybody had any knowledge?

MS. RENNA:  I wasn't aware of that, but I can recall it now.

ASSEMBLYMAN WISNIEWSKI:   Nobody knocked on your door and said, "Do you know anything?  Does anybody know anything?"

SENATOR GILL:  And that--  Okay, so on--  I'll go back.  On November 25, Bill Baroni testifies in front of the Assembly Transportation Committee.  All the while there are reports about political retribution regarding the lanes.  And then on December 7, David Wildstein resigns.  On December 12 the Assembly Transportation Committee subpoenas documents from Mr. Baroni, Mr. Foye, Mr. Wildstein, and other Port Authority figures.  Were you aware of any of these events at that time?

MS. RENNA:  Yes.

SENATOR GILL:  I'll be finished in a little while.

So that on December 12, according to Mr. O'Dowd's interview memo, we know that the Governor had a private meeting with Bill Stepien, his campaign manager, and a separate private meeting with Mr. O'Dowd, his chief of staff, where the Governor, according to Mr. O'Dowd's interview memo, discussed the Fort Lee closures.  Mr. O'Dowd's interview memo also states, "By that time, December 12, there was speculation in the press that the lane realignment was political retribution."  It goes on to say that "following the conversation with the Governor, O'Dowd, executing the Governor's directives, spoke to Ms. Kelly and instructed her to look for any e-mails, texts, etc. regarding the lane closings."

Now, were you aware of that when it took place?

MS. RENNA:  No, I wasn't.

SENATOR GILL:  Okay.

Thereafter, on that same day, you had a conversation with Ms. Kelly, correct?

MS. RENNA:  Yes.

SENATOR GILL:  And would that be December 12?

MS. RENNA:  Yes.

SENATOR GILL:   Okay.   And in that conversation you testified that Ms. Kelly asked you to delete Exhibit 20, which is your e-mail.

MS. RENNA:  Yes.

SENATOR GILL:  Okay.  Now, when she asked you to delete-- Let me rephrase that.  Did you--  Would it be correct to characterize the issues in the e-mail as relating to governmental business?

MS. RENNA:  Yes.

SENATOR GILL:   Now, what was your reaction when Ms. Kelly, on December 12, asked you to delete what was governmental information, which was the e-mail?  What was your reaction?

MS. RENNA:  I thought it was strange. It's the only request like that I've ever received.

SENATOR GILL:  And you knew that it was a governmental e-mail you were deleting?

MS. RENNA:  Yes, which is why I preserved a copy

SENATOR GILL:  Well, I'm going to get to why you preserved (indiscernible).

And you didn't delete the e-mail immediately, did you?

MS. RENNA:  No, the next day.

SENATOR GILL:  It took you 15 hours, until the next day, on December 13, before you deleted the e-mail, correct?

MS. RENNA:  Correct.

SENATOR GILL: And you didn't delete the e-mail until you forwarded your e-mail to another one of your personal accounts.

MS. RENNA:  Correct.

SENATOR GILL:  And was that the account where you kept your Banana Republic coupons?

MS. RENNA:  Yes.

SENATOR GILL:  Now, why did you wait 15 hours before you deleted the e-mail?

MS. RENNA:  Because I wanted to sleep on the request; I thought it was odd.   Not to mention the fact I have three stepchildren to pack lunches for and get to school the next day.  So when I came in during the course of work the next day, is when I did the deletion and preservation of the e-mail.

SENATOR GILL:  So you deleted it in order to misrepresent to Kelly that in fact you deleted it.  And you kept it in order to preserve and protect any interests you may have in the e-mail.

MS. RENNA:  Yes, not just any interests I had; but any global issue that came out of the request to delete it.  I've never been asked to do that.  I thought it was the right thing to do.

SENATOR GILL:  You thought it was the right thing to do -- to delete it?

MS. RENNA:  I did.  And preserve a copy.

SENATOR GILL:  And preserve it and not tell anyone.

MS. RENNA:  Correct.

SENATOR GILL:  Okay.

Now, were you aware that on December 13, the same morning that you deleted the September 12 e-mail to Ms. Kelly, that Ms. Kelly actually provided a copy of your e-mail without her response of, "Good," to Mr. O'Dowd following their senior staff meeting?

111

MS. RENNA:  I was not aware of that.

SENATOR GILL:  And that Ms. Kelly also forwarded your e-mail to Mr. Wildstein?

MS. RENNA:  I was not aware of that either.

SENATOR GILL:  Did you know that Mr. O'Dowd gave your e-mail, provided to him by Ms. Kelly, to the Governor prior to the Governor's conference on December 13?

MS. RENNA:  I don't know if that's accurate or not.

SENATOR GILL:  I didn't ask you if it was accurate; I asked you if you were aware.

MS. RENNA:  I wasn't aware.

SENATOR GILL:  Okay.  Now, to the accuracy of it -- I will refer you to Mr. O'Dowd's interview memo.  And in that interview memo he states that's so.

MS. RENNA:  Thank you.

SENATOR GILL:  If you want to check that out.

MS. RENNA:  Thank you.

SENATOR GILL:  You're welcome.

Now, I'm on January 9 -- and we'll frame this a bit so we--  The *Bergen Record* reported that Ms. Kelly e-mailed Mr. Wildstein, stating the infamous, "Time for some traffic problems in Fort Lee."  It was on that day that you decided to come forward with your e-mail and the fact that Ms. Kelly had asked you to delete your e-mail September -- had asked you to delete your September 12 e-mail, correct?

MS. RENNA:  Correct.

SENATOR GILL:  Okay.  And also on January 9, the Governor held a press conference announcing Ms. Kelly's firing, correct?

MS. RENNA:  Yes.

SENATOR GILL:  And it was January 9 when you first spoke to Melissa Orsen, the Lieutenant Governor's Chief of Staff.  And you spoke to the Lieutenant Governor's Chief of Staff and you told her about the September 12 e-mail and the request to delete.

MS. RENNA:  Correct.

SENATOR GILL:  And then you--  On that same day, Ms. Orsen -- who is the Lieutenant Governor's Chief of Staff -- directed you to talk to Regina Egea who, I might add, by that time was named by the Governor to be his next Chief of Staff.  Did you go to Regina Egea and say that there's a September 12 e-mail, and tell her what it was and that you had been directed to delete it?

MS. RENNA:  Yes.

SENATOR GILL:  And did you tell either of those two persons -- the Lieutenant Governor's Chief of Staff and the Governor's named new Chief of Staff -- that you also kept a copy?

MS. RENNA:  Yes, I did.

SENATOR GILL:  Okay.  And then Ms. Egea then directed you to speak to Chris Porrino?

MS. RENNA:  Porrino (indicating pronunciation).  Yes.

SENATOR GILL:  Porrino.

MS. RENNA:  Yes.

SENATOR GILL:  And he was the Governor's Counsel.  Was that correct?

113

day.  And we did get into some of those details and he did ask some questions.

ASSEMBLYMAN WISNIEWSKI:  Thank you very much.

MS. RENNA:  No problem.

SENATOR WEINBERG:  Senator Gill.

SENATOR GILL:  Yes.

Now that you maintain that the Gibson Dunn report is accurate as to your interview, except for the issues that you've already raised -- correct?

MS. RENNA:  I believe I said that I was largely happy with the portrayal that Gibson Dunn portrayed with the information I gave them.  I believe that's how I put it.

SENATOR GILL:  Okay.  So I'm not concerned with you being happy; I'm concerned with if you think the Gibson Dunn report is accurate with respect to your interview.

MS. RENNA:  Largely I think it's accurate, yes.

SENATOR GILL:  And the part that you think is not accurate you have already stated for the record.

MS. RENNA:  I would have to go through again, as we discussed with the Chairwoman, to make sure that I'm not missing anything.

SENATOR GILL:  Well, you did answer Senator O'Toole's--

MS. RENNA:  And I said I was largely pleased with the portrayal of my words in the Gibson Dunn interview notes, yes.

SENATOR GILL:  Okay, now let's see how pleased you are with this.  If we can go to Exhibit 28, and we will go to Page 18.  And I

183

Exhibit B

XFINITY Connect

XFINITY Connect

cmgenovese@comcast.net

± Font Size -

## Fwd: Fort Lee

From : Christina Genovese Renna <christina.m.genovese@gmail.com>
Subject : Fwd: Fort Lee                                        Fri, Dec 13, 2013 11:38 AM
    To : CMGenovese@comcast.net

---------- Forwarded message ----------
From: Bridget Anne Kelly <bridgetannekelly@yahoo.com>
Date: Thu, Sep 12, 2013 at 11:44 PM
Subject: Re: Fort Lee
To: Christina Genovese Renna <christina.m.genovese@gmail.com>

Good.

On Sep 12, 2013, at 3:36 PM, Christina Genovese Renna <christina.m.genovese@gmail.com> wrote:

This afternoon, Evan received a call from Mayor Sokolich.  It came from a number he was not familiar with that
was actually a secretary who patched the Mayor through to Evan.

The Mayor is extremely upset about the reduction of toll lanes from 3 to 1.  Not only is is causing a horrendous
traffic back up in town, First Responders are having a terrible time maneuvering the traffic because the back
up is so severe.

The Mayor told Evan that he has no idea why Port Authority decided to do this, but there is a feeling in town
that it is government retribution for something.  He simply can't understand why that would be the case
however, because he has always been so supportive of the Governor.

Sokolich explained that the Council wants to organize a press conference with picketers at the foot of the
bridge.  The Mayor feels he is about to lose control of the situation and that he looks like a "fucking idiot."

Evan told the fine Mayor he was unaware that the toll lanes were closed, but he would see what he could find
out.

--
Christina Genovese Renna
c. 856.466.6653

--
Christina Genovese Renna
c. 856.466.6653

CGR   48