**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA

v.

WILLIAM E. BARONI, JR. and
BRIDGET ANNE KELLY

Honorable Susan D. Wigenton,
United States District Judge

Crim. No. 15-193

---

**BRIEF IN OPPOSITION TO THE OFFICE OF THE GOVERNOR OF NEW
JERSEY'S MOTION TO QUASH MR. BARONI'S RULE 17(c) SUBPOENA**

---

On the brief:

Michael Baldassare, Esq.
Jennifer Mara, Esq.
Dillon Malar, Esq.

**BALDASSARE & MARA LLC**
570 Broad Street, Suite 900
Newark, New Jersey 07102
(973) 200-4066

*Attorneys for Defendant William E. Baroni, Jr.*

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ............................................................................... 1

    A.    The Governor's Phone And Emails ............................................................ 2

    B.    Newly Obtained Documents That Gibson Dunn Did Not Disclose ..................... 2

    C.    Gibson Dunn Persists In Making Privilege Assertions That Are Clearly
        Without Legal Support.............................................................................. 4

    D.    Gibson Dunn's Opposition ...................................................................... 4

II.    MR. BARONI WAS AUTHORIZED TO ISSUE THIS SUBPOENA. ........................... 5

    A.    Mr. Baroni's Requests Are Merely More Specific Than The Government's
        Subpoena.............................................................................................. 5

    B.    To The Extent Necessary, Mr. Baroni Hereby Moves For A Rule 17(c)
        Subpoena Encompassing All Material The Court Deems Outside The
        Scope Of The Original Subpoena. ............................................................. 9

III.    THE SUBPOENAED INFORMATION SATISFIES THE APPLICABLE
        LEGAL STANDARD. ...................................................................................... 11

    A.    Introduction......................................................................................... 11

    B.    The General Legal Standard .................................................................... 11

    C.    Mr. Baroni has Satisfied Nixon's Relevance Requirement. ............................ 12

        1.    The Legal Standard ..................................................................... 12

        2.    Gibson Dunn's Opposition Is Not Persuasive And, Therefore, Its
            Motion Should Be Denied. ........................................................... 14

    D.    Admissibility........................................................................................ 18

        1.    The Legal Standard ..................................................................... 18

        2.    Gibson Dunn's Arguments Fail. .................................................... 20

        3.    There Are Multiple Obvious Bases Upon Which The Material Is
            Admissible. ............................................................................... 22

    E.    The Subpoena Demands Are Sufficiently Specific. ...................................... 23

        1.    The Legal Standard ..................................................................... 23

        2.    Gibson Dunn's Argument's Fail .................................................... 24

IV.    THE ELEVENTH AMENDMENT DOES NOT REQUIRE QUASHING THE
        SUBPOENA. ................................................................................................ 29

V.    THE MOTION TO QUASH SHOULD BE DENIED BECAUSE THE OGNJ
        HAS IMPROPERLY INVOKED THE DELIBERATIVE PROCESS
        PRIVILEGE. ................................................................................................. 31

    A.    The Documents Withheld By GDC Are Relevant To This Case........................ 31

B.  The OGNJ Has Improperly Invoked The Deliberative Process Privilege. .......... 34

C.  Even Assuming Arguendo That The OGNJ Has Properly Invoked The Deliberative Process Privilege, Mr. Baroni's Need For The Documents Outweighs The OGNJ's Need For Secrecy. ....................................................... 37

VI.  CONCLUSION ............................................................................................................. 39

I.      **PRELIMINARY STATEMENT**

Regarding Mr. Baroni's motion for a Rule 17(c) subpoena, the Court stated:

> I do think the factors under *Nixon* are clearly satisfied.  It's not a fishing expedition.   There is potentially very relevant and potentially admissible information that may be gleaned from what is received from the Governor's Office.

Feb. 5 Tr. at 24.  Nothing has changed.  Mr. Baroni asked the same questions as the government; however, in light of the revelations regarding Gibson Dunn's approach to this case, Mr. Baroni asked the questions more specifically, without leaving the firm any room to maneuver.  Despite all this, Gibson Dunn returns to court, seeking to quash this Subpoena.

Your Honor has the last chance to remedy the persistent (and so far successful) efforts of the Governor and his lawyers to withhold information despite a legal obligation to disclose it.  The Legislature subpoenaed the material Mr. Baroni seeks.  Gibson Dunn fought back and, eventually, the Legislature ran out of time.  The government subpoenaed the same material.  Gibson Dunn made an incomplete and abominable production.  Inexplicably, the government acquiesced and accepted from the Governor's lawyers what it would never permit from a private party.

Mr. Baroni comes to Your Honor with his freedom on the line.  Absent action by this Court, the Governor and his lawyers will have their final victory.  The subpoenaed material, such as the Governor's phone, will remain hidden and Mr. Baroni will stand trial, deprived of that information.  This is Gibson Dunn's last stand and Mr. Baroni implores the Court to grant the relief necessary for him to receive a fair trial and to mount a defense.  Your Honor has wide discretion in ruling on this motion.

Respectfully, the time is now.

A.     **The Governor's Phone And Emails**

The Governor claims he is immune from turning over his phone.  The Governor also claims he is immune from turning over emails sent and received from at least two personal, non-government email accounts over which he conducted the State's business.

In fighting Mr. Baroni's subpoena, Gibson Dunn relies on the failed tactics of Richard Nixon.  President Nixon's tapes were not immune from a subpoena.  Neither is Governor Christie's phone.

Adding to the mystery, and despite a filing spanning hundreds of pages, Gibson Dunn deftly avoids saying whether or not it still has the Governor's phone.  The location of that device – and those of his senior staff – remains a closely guarded secret.

B.     **Newly Obtained Documents That Gibson Dunn Did Not Disclose**

The more documents Mr. Baroni obtains and reviews, the more deficiencies in Gibson Dunn's document productions are exposed.  There are documents produced in discovery from the Governor's personal email accounts that were not produced by Gibson Dunn.  Consider, for example, a December 14, 2013 email from the Governor to David Samson, then-Chairman of the Port Authority:

> From: Chris and Mary Pat Christie
>
> Sent: Saturday, December 14, 2013 04:48:32 PM
>
> To: Samson, David
>
> Subject: Aide to Gov. Cuomo Confirms NJ Gov. Chris Christie's Comments on GWB Flap - Daily News
>
>     Per our earlier conversation…
>
> http://m.nydailynews.com/blogs/dailypolitics/2013/12/aide-to-gov-cuomo-confirms- nj-gov-chris-christie-comments-on-gwb-flap

D1.

The brevity of this email belies its significance.  Governor Christie's much discussed and lengthy press conference regarding the lane closures occurred on Friday, December 13, 2013. The following day, *i.e.*, the date of the above email, saw a great deal of activity:

On December 14, 2013, the day after the Governor's press conference, DuHaime called Wildstein and spoke to him for twenty minutes. Immediately afterwards, DuHaime called Stepien for a seven-minute conversation. About an hour later, DuHaime called O'Dowd for twenty minutes. The contents of these phone calls are currently unknown.

At about 2:30 p.m., DuHaime and the Governor spoke for a total of 26 minutes. At about 4:20 p.m., the Governor and DuHaime traded two two-minute calls, but it is not known if they connected. Again, the contents of these calls are currently unknown.

Another series of calls commenced at 5:38 p.m., when DuHaime called Drewniak for four minutes. Shortly afterwards, Wildstein called DuHaime, and they spoke for eight minutes. Immediately after this conversation, DuHaime again called Drewniak for another four minutes and then called Wildstein back, also immediately. Directly after this second call with Wildstein, Stepien called DuHaime for a four-minute conversation. Shortly afterwards, DuHaime called Drewniak for a third conversation lasting three minutes.

While the contents of these various calls are also unknown, the back-to-back nature of them gives the appearance that DuHaime was discussing a common topic with Drewniak, Stepien, and Wildstein.

N.J. Leg. Interim Report at 108-09 (footnotes omitted).

In the middle of these calls, at 4:48 p.m., the Governor sent the above email to David Samson. It is unclear whether Governor Christie and Mr. Samson's "prior conversation" was over the phone, via text or email. Neither the Legislature nor the government appear to have obtained the Governor's phone records. Mr. Samson's available phone records do not contain information for December 14, 2013.

This email, and other documents, firmly establish that Gibson Dunn – relying on, as discussed, *infra*, an overly narrow view of relevance and responsiveness – has withheld documents related to the lane closures. For this reason alone, the motion to quash should be denied.

### C. Gibson Dunn Persists In Making Privilege Assertions That Are Clearly Without Legal Support.

The deficiencies with Gibson Dunn's production have been well-documented for this Court. Gibson Dunn persists in make legally untenable assertions of privileges, and continues to redact documents because information is, in the firm's sole opinion, "personal," a basis upon which redaction is not appropriate. The firm also has made unilateral decisions regarding the relevance of subpoenaed documents.

Further, despite specific instructions from Mr. Baroni regarding the format and scope of the production to be made, Gibson Dunn continues to do as it pleases. Indeed, rather than move to quash based upon the instructions provided by Mr. Baroni, which had been sent to cure the deficiencies in the prior production, Gibson Dunn simply ignored them in its brief and did not conform its production to the instructions provided.

### D. Gibson Dunn's Opposition

Backed into a corner, lacking support from the law or the facts, and knowing that this Court is onto its tactics, Gibson Dunn submits a brief worthy of a panicked *pro se.* At various turns, Gibson Dunn asks the Court to quash the Subpoena based upon the following words or phrases: "brazenly demanding," "shamelessly," "smear tactics," "ham-handed maneuvering," "doubled down," "stunt," "openly flouted," "amorphous and grasping demands," "misleadingly trumpeted," "transparent attempt to embroil," "abuse," "sideshow," "launched an impermissible fishing expedition," "knowingly misled," "sheer speculation," "guesswork," and "knowingly baseless."

Mr. Baroni needs no drama to defend himself on both the law and the facts. For the reasons set forth in the following Sections, Gibson Dunn's motion should be denied.

## II.   MR. BARONI WAS AUTHORIZED TO ISSUE THIS SUBPOENA.

### A.   Mr. Baroni's Requests Are Merely More Specific Than The Government's Subpoena.

Gibson Dunn's first line of defense complains that the Subpoena is beyond the scope permitted by the Court. Br. at 12-14. Mr. Baroni did precisely what he said he would: seek essentially the same information sought by the government. Gibson Dunn is unhappy because Mr. Baroni asked for the material in a manner that allowed the firm no wiggle-room. To put it colloquially, Mr. Baroni asked the same question as the government, but he asked it the right way.

Mr. Baroni was specific, pointed, and thorough. The Subpoena's specific requests and detailed instructions were necessitated by the manner in which Gibson Dunn "organized" its production to the government, as well as its specious privilege assertions and the use of an invented "personal" basis for withholding and redacting documents. Mr. Baroni's proper subpoena backs Gibson Dunn into a corner. And the firm does not like it.

Thus, Gibson Dunn makes numerous arguments, all of which are unpersuasive and should be rejected by the Court in deciding this motion.

First, Gibson Dunn argues that the Subpoena should be quashed because Mr. Baroni chose to "defy the Government's explicit warning" regarding the Subpoena. Br. at 13. The government's "okay" of the Subpoena, however, was not a condition of its issuance. The proposed Subpoena was given to the government as a courtesy merely so the government could decide if it wished oppose its issuance. That much is clear from the government's March 10, 2016 letter to Mr. Baroni which was written just before or shortly after its previously undisclosed conversations with Gibson Dunn.[1]  D2.  Southwell Cert. at ¶ 13-14 [Doc. No. 111-2 at 6-7].[2]

---

[1]  This letter incorrectly asserts that Mr. Baroni did not accept the government's offer to read the subpoenas to his counsel. That is not accurate. The Rule 17(c) Subpoena is based on the main subpoena served on Gibson Dunn, which was read to counsel over the phone. Mr. Baroni merely made the language more specific and provided the firm with instructions that, in light of Gibson Dunn's history in this case, were necessary to ensure full compliance.

[2] Notably, Gibson Dunn's brief does not mention these conversations that were kept from the defendants.

The government stated, "we reserve our right to raise this issue with the Court once you have served the subpoena." The government did not do so – and still has not done so – and that is the end of the government's involvement with the Subpoena.

It is unknown why the government would not join Mr. Baroni's opposition, thereby tacitly supporting Gibson Dunn's motion to quash. One would think the government would want a much information as possible, particularly given the public nature of this prosecution. The government's decision to wait on the sidelines is troubling.

But more importantly, Gibson Dunn argues that the Subpoena should be quashed because Mr. Baroni had the audacity to "defy the Government's explicit warning." According to Gibson Dunn, Mr. Baroni should defend himself as the prosecution sees fit. Gibson Dunn might defend its clients that way. Mr. Baroni's lawyers do not. Let this point be clear: *Gibson Dunn is hereby given an "explicit warning" that defense counsel will pursue all available remedies to defend Mr. Baroni, even if it requires calling Gibson Dunn to account for its actions, over and over and over again.* Defense counsel will not be intimidated by resumes and self-serving affidavits. Impressive pedigrees and a wealth of legal experience (supplied to the Court by Gibson Dunn lawyers for reasons unknown) did not prevent Gibson Dunn from failing to produce critical documents, from making specious privilege assertions (such as the assertion that communications between Wildstein and Drewniak was covered by the attorney-client privilege even though neither is a lawyer and they work at separate entities); or from charging New Jersey taxpayers $10,000,000 for an investigation plagued by "opacity and gamesmanship." Op. at 7 [Doc. No. 52 at 7]. Indeed, one could argue that, based upon the pedigrees and experience of those involved, the Gibson Dunn lawyers should have known better.[3]

---

[3] The Mastro Certification touts the unbiased nature of the Gibson Dunn lawyers involved in its investigation. Mastro Cert. at ¶ 4 [Doc. No. 111-3 at 3]. That Certification also supplied abundant information regarding specific lawyers, one of whom is Debra Wong Yang. Mastro Cert. at ¶ 8-9 [Doc. No. 111-3 at 4-5]. Mr. Baroni raises no objection to Ms. Yang's qualifications, but the Certification – again, served upon the Court for reasons unknown – should not peddle unbiased lawyers, without explaining Ms. Yang's longstanding friendship and professional interactions with the Governor, including attending his inauguration, securing lucrative business from him, and a great deal more. Nor should the Certification omit the fact that on one particular day, Ms. Yang billed the taxpayers for time working on the investigation, only to later that day cross the river and host a fundraiser for the Governor.

Further, Gibson Dunn's interaction with the government regarding its "explicit warning" proves what Mr. Baroni has been stating all along:  Gibson Dunn is running the show and, unfortunately for Mr. Baroni and Ms. Kelly, the firm is doing an abominable job.  Consider the following facts, which are taken from Gibson Dunn's  certifications and correspondence from the U.S. Attorney's Office, and <u>all of which were kept secret by Gibson Dunn and the government:</u>

- Gibson Dunn receives Mr. Baroni's Subpoena on March 10, 2016.

- Gibson Dunn quickly calls the government "on two occasions" to discuss the Subpoena *even though* the government was not a party to Mr. Baroni's motion for the Rule 17(c) subpoena, *even though* the government should be in the business of getting more evidence (*e.g.*, the Governor's phone), not less evidence,[4] *even though* Gibson Dunn and the government repeatedly deny working together and coordinating their efforts, and *even though* the government has no standing to interfere with the Rule 17(c) subpoena granted by this Court.

- Rather than refuse to discuss conversations it had with defense counsel – as is the normal course when dealing with anyone other than lawyers for the Governor/former U.S. Attorney for the office prosecuting this case – the government immediately capitulates and tells Gibson Dunn all it wants to know.

- And, after all that, neither Gibson Dunn nor the government saw fit to tell Mr. Baroni about the conversations.

Thus, the government's "explicit warning" *that Gibson Dunn – not the government – seeks to enforce* is irrelevant to whether the Subpoena should be quashed.

 <u>Second</u>, Gibson Dunn cannot carry its burden because Mr. Baroni's Subpoena contains, as counsel promised, "essentially the same requests contained in the government's subpoena …."

---

See generally www.njspotlight.com/stories/15/12/10/christie-s-bridgegate-lawyer-is-raising-money-for-christie-2016; www.nj.com/opinion/index.ssf/2016/02/christies_independent_ bridgegate_lawyers_now_fundi.html.

[4] Again, queries are necessary:  Why doesn't the government want to see the Governor's phone?  Why doesn't the government want Mr. Baroni to have access to it?  Why is the government consulting in secret with the Governor's lawyers regarding a subpoena for his phone?

Br. at 8  The firm is apoplectic because the Subpoena leaves no room for gamesmanship or more opacity.  Mr. Baroni asked the same question as the government, but he asked it the right way. The specificity of his request was necessitated by the revelations regarding Gibson Dunn's production and the manner of its investigation.  The more that came to light, the more obvious it was that Gibson Dunn needed either (a) guidance on how to respond to a subpoena or (b) requests that left no room for interpretation.

Ultimately, Gibson Dunn really only complains about two topics in the Subpoena.  In the first instance, Gibson Dunn claims that the Governor's phone (and the other devices turned over to Gibson Dunn which, as touted by the Governor on several occasions, demonstrated full cooperation with the investigation) are beyond the subpoena served by the government.  Br. at 13.  That is not true.  Indeed, **nowhere in this argument does Gibson Dunn deal with the actual language of the government's subpoena.**  After listing the relevant topics, individuals and timeframe, that subpoena instructs that:

> The production of the above-referenced records should specifically include all records of communications (in whatever form, including … text messages, voicemails, instant communications)….  In addition, the above-referenced records should include all such records maintained on all … mobile devices and tablet computers ….

Despite that, Gibson Dunn claims the Subpoena goes too far.  That is not the case.

Further, Gibson Dunn complains about the request for the documents referred to in a specific paragraph of the taxpayer funded Gibson Dunn report.  That pronouncement is, of course, ridiculous.  As to the latter, the request regarding Page 39 of the Gibson Dunn Report is necessitated by the broad, repeated, and never-ending list of deficiencies in the firm's production.  *Gibson Dunn earned that request.*

Third, the lone case cited by Gibson Dunn in support of this argument is *Bowman Dairy Co. v. United States*, 341 U.S. 214 (1951).  Br. at 13.  Although Gibson Dunn cherry picks the phrase "fishing expedition" from *Bowman*, the facts and the holding demonstrate precisely why this motion should be denied.  *Bowman* focused on the interplay between Rule 16 and Rule

17(c).  *Id.* at 215-16.  Gibson Dunn is not subject to Rule 16, so the core of *Bowman* is inapplicable.  *Bowman* was also concerned with the need to protect confidential informants.  *Id.* 218-21.  There are no such concerns in this case.

The remaining relevant part of *Bowman* – a small part of a short opinion – deals with one subpart (bolded and underlined below) of a Rule 17(c) subpoena that sought:

> all documents, books, papers and objects (except memoranda prepared by Government counsel, and documents or papers solicited by or volunteered to Government counsel which consist of narrative statements of persons or memoranda of interviews), obtained by Government counsel, in any manner other than by seizure or process, (a) in the course of the investigation by Grand Jury No. 8949 which resulted in the return of the indictment herein, and (b) in the course of the Government's preparation for the trial of this cause, if such books, papers, documents and objects, (a) have been presented to the Grand Jury; or (b) are to be offered as evidence on the trial of the defendants, or any of them, under said indictment; or **(c) are relevant to the allegations or charges contained in said indictment, whether or not they might constitute evidence with respect to the guilt or innocence of any of the defendants** ….

*Id.* at 216.  The Court ordered the government to comply with the subpoena except for sub-part (c) because it was too broad.  *Id.* at 221.

The Subpoena served by Mr. Baroni is similar to the sub-parts the Supreme Court concluded were enforceable, not the part the Court held unenforceable.  Thus, Mr. Baroni's Subpoena is far more specific in terms of dates, subject matter and individuals.

For all these reasons, Gibson Dunn's first – and presumably what it deems to be the most important – basis to quash does not carry the burden.

**B.  To The Extent Necessary, Mr. Baroni Hereby Moves For A Rule 17(c) Subpoena Encompassing All Material The Court Deems Outside The Scope Of The Original Subpoena.**

Of course, the preceding discussion demonstrates that the Requests are appropriate.  In the interest of saving time, however, Mr. Baroni hereby moves for a Rule 17(c) subpoena for all material the Court determines is outside the scope of the government's subpoena.  The briefing

on Gibson Dunn's pending motion to quash – including this brief – is sufficient for the Court to assess whether a supplemental Rule 17(c) subpoena is warranted.  Aside from satisfying *Nixon*, a new subpoena will avoid Mr. Baroni serving a trial subpoena for the material, receiving it on the eve of trial, and thereby possibly delaying the proceedings.   *Neither Mr. Baroni nor the government wants that to happen.*

## III.   THE SUBPOENAED INFORMATION SATISFIES THE APPLICABLE LEGAL STANDARD.

### A.   <u>Introduction</u>

Mr. Baroni's Rule 17 Subpoena is appropriate because, in the parlance of *Nixon*, there is a "sufficient likelihood" – based upon the "total context" of this case and all "rational inference[s]" – that the Subpoena will lead to relevant and admissible evidence. *Nixon*, 418 U.S. at 700-701.  If the Court concludes that the Requests for, among other things, the phones of the Governor and his top staff do not satisfy *Nixon*, so be it.  But it is not for Gibson Dunn to make that pronouncement and expect the Court and Mr. Baroni to fall in line just because the government has done so for the past two years.

The Legislature tried to get the information Mr. Baroni seeks.  Gibson Dunn resisted and, eventually, the Legislature ran out of time.  The government sought all the information set forth in the Requests.  Again Gibson Dunn resisted and ignored its obligations.  For some reason, the government did not fight back.  Perhaps the government erred and took Gibson Dunn at its word.  Perhaps the government, like the Legislature, ran out of time and needed to seek an indictment.  The reasons for the government's capitulation to Gibson Dunn's tactics may never be known.

*<u>This Court has the last chance to remedy Gibson Dunn's actions and ensure Mr. Baroni and Ms. Kelly have a fair trial as guaranteed by the Sixth Amendment .</u>*

### B.   <u>The General Legal Standard</u>

The Court is familiar with the applicable legal standard set forth in *Nixon*:  Mr. Baroni's request must seek relevant, admissible, and specific information.  As discussed in the following Sections, these factors have a particular gloss in the setting of a Rule 17(c) subpoena.  That is so because during trial, decisions regarding relevance and admissibility are made when all the parties and the court know what the evidence is and the context in which it is offered.  Here, neither the Court nor Mr. Baroni have sufficient information to make such arguments or decisions because Gibson Dunn is the only party that knows what the evidence is.  As in *Nixon*,

the Court should evaluate this Rule 17 subpoena in light of the "context" of the requests, permitting Mr. Baroni all "rational inferences." *Nixon*, 418 U.S. at 700.

### C.   Mr. Baroni has Satisfied Nixon's Relevance Requirement.

#### 1.   The Legal Standard

Mr. Baroni would not normally burden the Court with a legal summary of "relevance." It is necessary here because Gibson Dunn relies upon an overly narrow interpretation of relevance that is contrary to well-established law.[5]  Relevance is defined by Federal Rules of Evidence 401 and 402, which read:

> Evidence is relevant if:
>
> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
>
> (b) the fact is of consequence in determining the action.
>
> Relevant evidence is admissible unless any of the following provides otherwise:
>
> - the United States Constitution;
> - a federal statute;
> - these rules; or
> - other rules prescribed by the Supreme Court.
>
> Irrelevant evidence is not admissible.

Fed. R. Evid. 401 & 402.

Given these definitions, courts have consistently held that "relevance" casts a much broader net than Gibson Dunn depicts for this Court.  As the Third Circuit described it, "[t]he plain meaning of the Rule demonstrates that the scope of relevant evidence is intended to be broad, and the authorities support such a broad reading."  *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 922 (3d Cir. 1985) (citing *United States v. Clifford*, 704 F.2d 86 (3d Cir. 1983); *United States v. Steele*, 685 F.2d 793 (3d Cir. 1982); *Carter v. Hewitt*, 617 F.2d 961 (3d Cir.

---

[5] As just one example, Gibson Dunn has asserted that the Governor's emails with top staff and advisors regarding David Wildstein's resignation in December of 2013 were not responsive to the Legislature's subpoena regarding the lane closures.  D10.  Of course, absent action by this Court what else Gibson Dunn has unilaterally decided to withhold based upon its legally flawed definition of relevance may never be known.

1980).  "The standard of relevance established by the Federal Rules of Evidence is not high." *Carter*, 617 F.2d at 966.  Indeed, "Rule 401 does not raise a high standard."  *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009) (citing *United States v. Kemp*, 500 F.3d 257, 295 (3d Cir. 2007); *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 109-110 (3d Cir. 1999).

In the context of a Rule 17 subpoena, "relevance" is particularly broad for a very obvious reason.  During trial, whether or not evidence is "relevant" can be fully and fairly evaluated by the court and the parties because they know what it is and the very specific reason for which it is being offered.  In the context of a Rule 17 subpoena, only the party seeking to quash the subpoena knows for sure what the putative evidence is.  The court cannot examine the evidence to make a full and fair determination.  Neither can the defendant, whose liberty is at stake.  And, of course, the law does not support any party – especially a *non*-party with limited knowledge of the entire prosecution – to make a unilateral determination on relevance and say, as Gibson Dunn does, "Trust us."

*Nixon* provides guidance and demonstrates why Mr. Baroni – as the Court concluded when it authorized the Subpoena – satisfies the relevance prong of the inquiry.  In *Nixon*, the special prosecutor issued a Rule 17(c) subpoena for tape recorded conversations between President Nixon and others.  418 U.S. at 683.  The district court denied the President's motion to quash and took possession of the tapes.  *Id.* at 689.  The Supreme Court held that <u>even though the prosecutor was not able to provide a full description of the tapes</u> – it appears because the district court had not disclosed them to the prosecutor – he had met the relevance requirement.  The Court stated:

> With respect to many of the tapes, the Special Prosecutor offered the sworn testimony or statements of one or more of the participants in the conversations as to what was said at the time.

*Id.* at 700.  Based upon that information, the Court concluded that there was

> a <u>sufficient likelihood</u> that each of the tapes contains conversations relevant to the offenses charged in the indictment.

*Id.* (citing *United States v. Gross*, 24 F.R.D. 138 (S.D.N.Y. 1959) (emphasis added). Regarding the tapes for which the prosecutor had not provided sworn testimony or statements, the Court found that

> the identity of the participants and the time and place of the conversations, <u>taken in their total context</u>, permit a <u>rational inference</u> that at least <u>part of the conversations</u> relate to the offenses charged in the indictment.

*Id.* (emphasis added).

To ensure fundamental fairness when dealing with a motion to quash a Rule 17 subpoena, the *Nixon* court denied a motion to quash because the party who had served the subpoena provided materials that "<u>taken in their total context</u>, permit a <u>rational inference</u> that at least <u>part of the</u>" information and items sought by the subpoena had to be produced. *Id.* (emphasis added). Thus, under circumstances analogous to this case, the Court considered the <u>context of the requests</u>, and relied <u>upon rational inferences</u> even if <u>only a portion</u> of the responsive material, *e.g.*, a document or a recording, related to the charges.

Against this clear legal standard, the Court receives Gibson Dunn's hyperbolic argument that information on the Governor's phone, those of his senior staff, and other material regarding the Fort Lee lane closures have "*no* relevance whatsoever to the allegations in the Indictment," and that the Subpoena requests "flagrantly defy" *Nixon*'s relevance requirement, rely on "guesswork" and "openly flout[]" the relevance requirement. Br. at 14-15 (emphasis in original). As set forth in the following Section, Gibson Dunn is wrong and its argument on this point fails.

> 2.    Gibson Dunn's Opposition Is Not Persuasive And, Therefore, Its Motion Should Be Denied.

<u>First</u>, Gibson Dunn claims it has produced "all documents related to and contemporaneous with the lane realignment as described in the Indictment (none of which has been withheld as privileged)." Br. at 14. That statement warrants response on several fronts. Gibson Dunn's use of the word "and" rather than "or" is troubling. By the plain language of that

sentence, Gibson Dunn believes that information is relevant only if it relates to the lane closures ***and*** was created contemporaneously with the closures.  Thus, according to Gibson Dunn, the relevant period ends on Friday, September 13, 2013.  Of course, Gibson Dunn elsewhere argues that relevance determined by the Indictment.  Even under that overly narrow view, September 13, 2013 is not the relevant timeframe because the timeframe in the Indictment extends through December 2013.  Ind. at 5, ¶ 2.  Indeed, a critical portion of the government's case focuses on Mr. Baroni's legislative testimony, which occurred on November 25, 2013.  Ind. at 27, ¶ CC.

In its reply brief, Gibson Dunn may retreat from the preposterous position that relevancy is based upon the week of the closures.  There is evidence, however, that whatever the firm says now, the damage is already done, *i.e.*, the production to the government – which mirrors the production to Mr. Baroni – was compiled based upon an overly narrow concept of relevancy.  For example, Gibson Dunn has taken the position that the Governor's emails regarding David Wildstein's resignation in December of 2013 were not responsive to the Legislature's subpoena regarding the lane closures.  D10.  Of course, absent action by this Court we may never know what else Gibson Dunn has unilaterally decided to withhold based upon its legally flawed definition of relevance.  Even applying Gibson Dunn's overly narrow view that relevance is limited to the four-corners of the Indictment, those emails with the Governor regarding David Wildstein are relevant because the Indictment explicitly discusses the resignation.  Ind. at 2, ¶ C; 24, ¶ 58.[6]

Further, a tome could be written in response to Gibson Dunn's claim that it did not withhold any relevant documents based upon privilege.  Br. at 14.  Mr. Baroni has already provided the Court with many examples to put the falsity to that argument.  And, given the inadequate information provided on the privilege and redaction logs (which conveniently omit entries for critical documents, *e.g.*, the Governor's schedule for the week of the lane closures),

---

[6] Those emails are dated within the period covered by the Indictment.  Ind. at 5, ¶ 2 (charged timeframe August to December 2013).

Gibson Dunn once against argues, in essence, "Trust us.  We're Gibson Dunn.  Just read our resumes."  The Court should reject that argument.

Second, Gibson Dunn seeks credit for producing documents that Mr. Baroni never asked for, i.e., documents "concerning the allegations of the Hoboken Mayor[.]"  Br. at 14.  Aside from the fact this has nothing to do with Nixon's relevancy requirement, Mr. Baroni did not subpoena those documents.  Gibson Dunn produced those documents for its own convenience so that it did not have to alter the production it made in response to the government's subpoenas, which did seek the Hoboken information.  Simply because Gibson Dunn produced more documents does not mean the firm produced the right documents.

Third, Gibson Dunn argues that the Requests bear no relation to the charges in the Indictment and that Mr. Baroni made no attempt to show such a relationship in his discovery motions.  Br. at 15.  This Court disagreed, found Mr. Baroni had met the standard, and permitted him to serve the Rule 17 Subpoena.

It is not, as Gibson Dunn argues, "guesswork" or "sheer speculation" that the Requests contain relevant evidence.  As in Nixon, the "total context" and "rational inference[s]" of the requests are more than sufficient to satisfy the relevance requirement.  Nixon, 418 U.S. at 700. Merely by way of example:

- It is clear, however, that such documents exist and that Gibson Dunn has failed to produce them.  This context gives rise to a fair inference that more responsive documents (emails, texts, voicemails) exist and are being withheld.  (Gibson Dunn's usual argument that there is nothing to complain about because we have discovered the documents from other sources,[7] is not helpful.  Those revelations are evidence of the problem, not the complete solution.)

---

[7] This is a well-established tactic of Gibson Dunn, i.e., withhold the document, get caught holding it back and when confronted, say, in essence, "What's the problem?  You have it."  Consider the letters between Gibson Dunn and Jenner and Block (counsel for the New Jersey Select Committee on Investigation).  D10.  The Committee confronted Gibson Dunn with its failure to produce a December 6, 2013 email related to Wildstein's resignation. D10.  **Gibson Dunn's response does not explain or justify its failure to produce that important document.** Rather, it responded, "the Committee already has in its possession the specific communications about which you inquire."  Id.  And, the firm continues to avoid saying – with carefully chosen words reminiscent of its description

- By Gibson Dunn's own words, the firm took an overly narrow – contrary to law – view of relevance when preparing the production.  Only Gibson Dunn could proclaim that emails to and from the Governor regarding David Wildstein's resignation are not relevant to the lane closures.  Once again, the context and fair inferences support a conclusion that relevant documents were withheld.

- In the context of this case, there is more than a fair inference (some would say there is a conclusion) that Gibson Dunn withholds relevant documents to this very day.  That supports Mr. Baroni's requests for records regarding himself and others, as well as the Governor's phone, the phones of his senior staff, and the forensic analyses thereof.

Those documents are particularly important because Gibson Dunn concluded that there was "no evidence that [Mr. Baroni] … knew of the ulterior motive here, besides the claimed purpose of conducting a traffic study."  GDC Report at 1.  Since the government's entire case hinges on the alleged "ulterior motive," Gibson Dunn's conclusion is critical to Mr. Baroni's defense.

Just as in *Nixon*, the sworn testimony, statements, context and rational inferences establish a "sufficient likelihood," 418 U.S. at 700, that the Rule 17 Subpoena here seeks relevant evidence.  For example, Regina Egea (then the Director of the Authorities Unit of the Office of the Governor of New Jersey) testified before the Legislature that she sent the Governor texts as she watched critical testimony before the Legislature.  It has since been discovered that Ms. Egea exchanged numerous texts with the Governor during the testimony of three key witnesses.[8]  It appears that the texts were exchanged at critical moments of the testimony,[9] and that she and the Governor were texting contemporaneously with the testimony of key Port

---

for how it interviewed over 70 witnesses without taking a single note – whether any other documents exist.  Gibson Dunn said, "we do not possess any non-privileged responsive records that have not been produced."

[8] *See* Interim Report To the New Jersey Legislature Regarding The September 2013 Closure George Washington Bridge Access Lanes In Fort Lee, N.J., at 98-99, available at www.njleg.state.nj.us/legislativepub/lsi_report.asp.

[9] http://www.wnyc.org/story/christie-aide-exchanged-messages-their-cover-story-unravelled/.

Authority employees before that same committee.[10]  Those texts are purported gone, but with his liberty and reputation on the line, Mr. Baroni is not required to accept anyone else's conclusion, especially when Gibson Dunn refuses to produce the actual phone, a certified mirror image of the phone, or even a forensic analysis (which was funded by the taxpayers).  Ms. Egea and the Governor's texts are also critical because the allegation is that Ms. Egea prepared Mr. Baroni to give the Legislature false testimony.  The Legislative testimony is replete with acknowledgements that high-ranking members of the Governor's staff communicated about the lane closures and the testimony before the Legislature via text from their mobile devices.

Gibson Dunn has the phones; thus, the firm is not required to seek out any phones or tablets.  (If Gibson Dunn no longer has the phones it should so state in its reply brief.)  Mr. Baroni has gone no further than what the Governor gave to the lawyers as part of his advertised full cooperation with the investigation.  Further, it is clear that the Governor and relevant people were communicating via these devices during the time in question and about the very allegations in the Indictment.

Gibson Dunn has repeatedly taken an overly narrow (and legally untenable) view of what is or is not relevant.  The Court need only consider Gibson Dunn's position that communications between the Governor and (among others) Michael Drewniak regarding David Wildstein's resignation are not responsive to a request regarding the Fort Lee lane closures.  And, here again, Gibson Dunn claims that it knows best, that it has made the proper relevance calls, and so on. For the reasons detailed in every brief Mr. Baroni has filed with this Court, Gibson Dunn has forfeited the right to have its judgment trusted, *particularly in a criminal case.*

    **D.**    **Admissibility**

        1.    The Legal Standard

Gibson Dunn would have this Court believe that the only path to satisfying *Nixon*'s admissibility prong requires the subpoena's proponent to (a) have a witness list, (b) demonstrate

---

[10] *Supra*, n.8.

that the material is not hearsay from non-witnesses, and (c) overcome every possible Rule 403 scenario well-before trial.  Br. at 16.  To read Gibson Dunn's opposition, one would conclude that admissibility in this context turns exclusively on prior statements admissible only as impeachment material.  That is not the law.

The subpoena's proponent must simply provide the Court with a *potential* basis for admissibility as permitted by *any* Rule of Evidence.  Indeed, the seminal case, *Nixon*, says precisely that.  After addressing the co-conspirator exception to the hearsay rule, the Court stated, "Here, however, there are other valid *potential* evidentiary uses for the same material …." 518 U.S. at 702 (emphasis added).  The Court could not elaborate on what those bases might be because the tapes were under seal and had not been transcribed.  *Id.*  Similarly, in *United States v. Cuthbertson*, 651 F.2d 189, 195 (3rd Cir. 1981), after dealing with impeachment material, the Court observed that, "Neither the Government nor defendants have asserted a relevant exception to the hearsay rule."  Thus, it is clear that there are many bases upon which *Nixon*'s admissibility prong may be satisfied, without any regard to co-conspirator statements or impeachment material.

In this case, there are numerous evidentiary bases that apply to the subpoenaed materials, such as:

- Rule 803(6) (business records);

- Rule 803(7) (the absence of a business record);

- Rule 803(10) (the absence of a public record);

- Rule 804(a)(1) (witness unavailable based upon a privilege assertion);

- Rule 804(a)(2) (witness refuses to testify despite a court order); and

- Rule 804(a)(3) (statement against interest).

Thus, as detailed in the following Section, Gibson Dunn's argument is wrong on the law and misapplies the facts.[11]

2. <u>Gibson Dunn's Arguments Fail.</u>

<u>First</u>, Gibson Dunn argues that Mr. Baroni has not satisfied the *Nixon* admissibility requirement because "[n]o trial witnesses have yet been disclosed."  Br. at 16.  Gibson Dunn cites no legal authority to support that a witness list a requirement of *Nixon*'s admissibility prong.  The firm just says things and expects them to be taken as gospel.  Moreover, and as the biographies provided to the Court establish, the Gibson Dunn lawyers know full well from their time as prosecutors that to the extent a witness list is ever provided, it happens so close to trial that it would render Rule 17 subpoenas useless.

As the Gibson Dunn lawyers know, a general witness list has been available for years based upon the media, Gibson Dunn's report and interview memoranda, the allegations in the Indictment and simple common sense.  It is clear that the government will call as witnesses, among others:

- David Wildstein
- Michael Drewniak
- Philip Kwon
- Kevin O'Dowd
- Regina Egea
- Michael DeFilipis
- Paul Nunziato
- Mark Sokolich
- Patrick Foye
- David Garten
- Cedric Fulton
- Robert Durando
- Scott Rechler

Thus, Gibson Dunn's invented witness list requirement carries no weight with the issues before the Court.

---

[11] Gibson Dunn might argue that a Rule 403 analysis is required because that Rule is the only bar to the admission of relevant evidence.  That is wrong.  Relevant evidence could be excluded for many reasons unrelated to Rule 403, *e.g.*, authentication (Rule 901), need for personal knowledge (Rule 602), the best evidence rule (Rule 1002).

20

Gibson Dunn also argues that Mr. Baroni must demonstrate that the Requests "will yield evidence more probative than disruptive at trial under Rule 403 …." Br. at 16. *Nixon*, of course, does not articulate this requirement and never engages in a Rule 403 analysis. Thus, Gibson Dunn demands that Mr. Baroni and the Court make specific 403 assessments before trial, without having the documents, and without context (the real touchstone of Rule 403). That argument is woefully inadequate for several reasons.

This is not the time for decisions under Rule 403, which requires "subjective balancing" by the Court. *United States v. Washington*, 969 F.2d 1073, 1081 (D.C. Cir. 1992) . It is difficult to conceive how this or any Court could satisfy the Third Circuit's instruction that

> [Rule 403] balancing should be performed in the first instance and on the record by the trial court who is in the best position to determine the weight to be given the various relevant factors.

*United States v. Lebovitz*, 669 F.2d 894, 901 (3d Cir. 1982). Indeed, it is unfair for Gibson Dunn to impose that burden on the Court at this juncture.

The cases upon which Gibson Dunn relies are easily distinguishable and, therefore, they are of little use to the Court in deciding this motion.

- *Rosario v. Carillo*, Civ. No. 08-4495, 2011 WL 4901348 (D.N.J. Oct. 13, 2011). *Rosario* is a civil case regarding excessive force and has nothing to do with a Rule 17(c) subpoena. In response to an *in limine* motion at the time of trial, the Court excluded a video taken over three years after the incident involving different people.

- *United States v. Murray*, 103 F.3d 310, 319 (3d Cir. 1997). This case does not involve a Rule 17(c) subpoena. Rather, this murder case deals with a trial court's decision to admit evidence at trial of a prior murder that might have been committed by the defendant.

- *United States v. Dupree*, Crim. No. 10-627, 2011 WL 2006295 (E.D.N.Y. May 23, 2011). The Court quashed a Rule 17(c) subpoena in part with respect to documents sought from outside the timeframe of the charges, that only related to

one defendant, and were only possibly related to some, but not all of the Counts. The posture and the facts of the case are substantially different that those with which Gibson Dunn must grapple.  Here, the Subpoena focuses on the relevant topics and is generally keyed to the Indictment and the subpoena served by the government when fashioning the charges against Mr. Baroni.

- *United States v. Georgiou*, Crim. No. 09-88, 2009 WL 2973035 (E.D. Pa. Sept. 16, 2009).  This case deals with *Nixon*'s relevance prong.  There is literally one sentence at the end of the opinion regarding Rule 403.  It provides no analysis.

- *United States v. Mason*, Crim. No. 05-324, 2008 WL 1909115 (D. Ore. Apr. 26, 2008).  The defendant sought *additional* information regarding a particular topic. Mr. Baroni does not see additional information; rather, he seeks information that Gibson Dunn has withheld despite clear legal obligations to disclose it.

Lastly, Gibson Dunn argues that a "general assertion" of admissibility is insufficient.  Br. at 16.  In that same sentence, however, Gibson Dunn concedes that neither Mr. Baroni nor Ms. Kelly made such an argument.  Thus, Gibson Dunn's opposition to its own argument – not advanced by the defendants – is of no help to the Court in deciding this motion.

3.      There Are Multiple Obvious Bases Upon Which The Material Is Admissible.

Even a cursory comparison of the Requests with the Federal Rules of Evidence demonstrate a "sufficient likelihood," *Nixon*, 518 U.S. at 700, that the subpoenaed material will be admissible.  For example:

- Requests 1-5 clearly seek documents that are admissible as business records under Rule 806(6).

- The absence of an entry, message, or the like in official records is directly implicated by the Indictment.  *E.g.*, Ind. at ¶¶ 23-25.  Thus, Rules 803(7) and (8) apply.

- Privilege assertions have already and will continue to be made in this case. Gibson Dunn has made vast use of the Deliberative Process Privilege, and has relied upon the Executive Privilege. It is a certainty that individuals will assert their Fifth Amendment rights in this case. Those assertions will come from anyone denominated by the government as an unindicted co-conspirator. Thus, Rule 804(a)(1) applies.

- Given the number of players, their positions, and the amount of testimony already given connected to the lane closures, there is also a "substantial likelihood" that Rule 804(a)(3) (statement against interest) will be used to admit evidence.

The point will not be belabored. There are more than sufficient bases upon which the Court should find that the Requests seek admissible material.

    **E.**    <u>**The Subpoena Demands Are Sufficiently Specific.**</u>

        1.    <u>The Legal Standard</u>

The requests in a Rule 17(c) subpoena must be made with specificity. *Nixon*, 518 U.S. at 700. Guidance is provided in *Bowman Dairy Co. v. United States*, 341 U.S. 214 (1951), a case upon which *Nixon* relied in formulating the three-part standard. In Bowman, the subpoena's proponent served a Rule 17(c) subpoena seeking:

> all documents, books, papers and objects … obtained by Government counsel … (a) in the course of the investigation by Grand Jury No. 8949 which resulted in the return of the indictment herein, and (b) in the course of the Government's preparation for the trial of this cause, if such books, papers, documents and objects, (a) have been presented to the Grand Jury; or (b) are to be offered as evidence on the trial of the defendants, or any of them, under said indictment; or (c) are relevant to the allegations or charges contained in said indictment, whether or not they might constitute evidence with respect to the guilt or innocence of any of the defendants.

*Id.* at 217. Though seemingly very broad, the Court ordered the government to comply with all of them, save request (c). Thus, the question for this Court is whether Mr. Baroni's Rule 17(c) Subpoena is more like requests (a) and (b) in *Bowman*, than it is like request (c). The Court has

already made its findings by permitting Mr. Baroni to serve the subpoena.  Gibson Dunn's arguments – which try to analogize the Requests to the amorphous (c) in *Bowman*, are unpersuasive and do not require a change of course by this Court.

2.     Gibson Dunn's Argument's Fail

<u>First</u>, Gibson Dunn argues with flowery language that the Subpoena requests are "amorphous and grasping demands," "excessively broad and unduly burdensome," a "fishing expedition," and demands for "everything under the sky."   But the firm never analyzes the language of the Requests in light of the Indictment and the fair inferences and context of this case.   When that evaluation is undertaken, it becomes clear that the Subpoena requests are sufficiently specific to satisfy *Nixon*.

| <u>Subpoena Request</u> | <u>Specificity</u> |
|---|---|
| <u>Documents</u> | |
| 1. All records relating to the closure of the access lanes for the Borough of Fort Lee onto the GWB ("Fort Lee access lanes") at any time including, but not limited to, September 9-13, 2013. | Because Gibson Dunn does not engage in a specific analysis, it is difficult to determine if its motion argues that Request 1 lacks specificity. <br><br> In any event, this request focuses on the **Fort Lee access lanes**, *i.e.*, the heart and soul of this Indictment. <br><br> Request 1 does not seek material regarding the entrance or exit of any other Port Authority bridge or tunnel. <br><br> Nor does Request 1 seek information regarding any other transportation mechanism under the Governor's control, *e.g.*, the Pulaski Skyway, the Bayonne Bridge, the Garden State Parkway, Newark Airport, the Atlantic City Airport. |

| | |
|---|---|
| | It seems unlikely that this Request could be challenged for lack of specificity. This Request is carefully tailored. |
| 2. All records relating to the Fort Lee access lanes regarding:<br><br>• alteration of the Fort Lee access lanes;<br><br>• consideration of altering Fort Lee access lanes;<br><br>• impact or potential impact on traffic flow through the Borough of Fort Lee resulting from any alteration of the Fort Lee access lanes; and<br><br>• all traffic studies or tests pertaining to Fort Lee access lanes. | This Request bears the same specificity characteristics as Request 1. |
| 3. All records related to all traffic studies or tests pertaining to the GWB, its access lanes and approaches. | This Request is specific to several allegations in the Indictment. Ind. at 11, ¶ 23.<br><br>Moreover, the Request is limited to "**traffic** studies or tests," not every study conducted regarding the GWB, of which there are many, *e.g.*, netting/guardrails to prevent suicides.<br><br>Finally, not only is this Request limited to traffic studies, it is **specific to the GWB**, *i.e.*, the one Port Authority crossing at issue in this case. It does not seek any studies (traffic or otherwise) related to the Holland or Lincoln Tunnels, Newark Airport, etc. |
| 4. All records relating to the Borough of Fort Lee or Mayor Mark Sokolich. | This Request is as specific as possible. The Indictment charges retaliation against Mayor Sokolich. He is mentioned throughout the Indictment and his texts and messages are quoted numerous times in that document.<br><br>This Request does not seek information regarding all mayors being courted for endorsements, or all mayors in towns that host a Port Authority entity, *e.g.*, Bayonne, Weehawken. In fact, this Request is so specific that it does not seek information related to Jersey City Mayor Steven Fulop |

25

| | |
|---|---|
| | even though he is mentioned in text messages quoted and relied upon in the Indictment.  Ind. at 13, ¶ 28; 21, ¶ 49.<br><br>There is nothing vague, overbroad or unduly burdensome about this Request. |
| 5. All records relating to the following:<br>• William E. Baroni;<br>• David Wildstein;<br>• Bridget Anne Kelly; and<br>• William Stepien. | This Request is specific.  The four individuals are specifically discussed by Gibson Dunn regarding its conclusions.  The term "records" is explicitly and clearly defined in Section I of the Subpoena.  The Indictment reaches back to March 2011. Ind. at 7, ¶ 9. |
| 6. A list of all personnel within the OGNJ from January 1, 2013 to present, and all mobile numbers and email addresses issued to, assigned to, used by or subscribed to by those personnel. | This Request is appropriate based upon the lack of information provided thus far, as well as the mountain of information (as set forth in the Indictment) showing that the Governor's Office ran largely through private emails and text messages. |
| 7. All subpoenas received from the U.S. Attorney's Office for the District of New Jersey related to, or seeking documents regarding, the Fort Lee access lanes. | This Request is specific to the USAO-NJ, **not all subpoenas** received from law enforcement agencies or, for that matter from the New Jersey Legislature.  This request is **further narrowed** and specified because it is limited to the Fort Lee access lanes. |
| 8. All Documents and information referred to in the first full paragraph on Page 39 of the March 26, 2014 Gibson Dunn & Crutcher LLP Report. | This Request is appropriate based upon the lack of information provided and Gibson Dunn's track record in connection with this matter.  Full disclosure is warranted. |
| **Physical Items** | |
| 1.  Produce for inspection all phones and other Devices (collectively "Devices"), *e.g.*, iPads, computers, tablets, etc., including but not limited to those identified in the first full paragraph on Page 39 of the March 26, 2014 Report of Gibson Dunn & Crutcher LLP. | This Request is no more than a specific articulation of what the government asked for.  As noted throughout this brief, Mr. Baroni asked the question in a more pointed manner. |
| 2.   Produce all forensic analyses conducted | This Request is narrow and specific on its face. |

26

| | |
|---|---|
| upon or related to all such Devices. | The taxpayers paid millions of dollars to the consulting company hired by Gibson Dunn. Given the void of documents produced from, for example, the Governor's phone, this request is proper. |
| 3.   All Documents demonstrating a chain of custody for each Device. | This request is narrow and specific.   There is nothing   burdensome   about   this   request.   **Indeed, Gibson Dunn never mentions, let alone objects to, this request.** |

Second, Gibson Dunn argues that the Indictment is based upon the timeframe of August to December 2013.  Br. at 18.  That is wrong.  The Indictment alleges wrongdoing starting in March 2012.  Ind. at 7, ¶ 11.

Third, Gibson Dunn argues a combination of the following:  there is no evidence that documents were destroyed; the firm should not have to create a log of such documents; and (in one throwaway sentence) that the Tenth Amendment bars Mr. Baroni's subpoena.  Br. at 19. Each argument is address in turn.

There is evidence that Gibson Dunn disposed of, lost or otherwise made sure that certain documents never saw the light of day.  This Court has already found that Gibson Dunn's actions regarding the witness interviews had the same effect as shredding documents.  Op. at 7 [Doc. No. 52 at 7].  There are numerous documents – luckily uncovered by Mr. Baroni in the productions of other custodians – that Gibson Dunn should absolutely have produced but did not.  Nor are those documents listed on any privilege or redaction log.

Consider, for example an April 7, 2013 email exchange between Bill Stepien and Governor Christie.  D13.  This email is well within the March 2012 timeframe alleged in the Indictment.  Ind. at 7, ¶ 11.  This email contains detailed discussion of mayoral endorsements and, of course, this prosecution is based upon Mayor Sokolich's failure to endorse the Governor for re-election.  *This document was not produced by Gibson Dunn.  As far as Mr. Baroni can discern, it is not listed on any privilege log.*[12]  A further example is an April 23, 2013 email

---

[12] If this document is listed on a log, as part of its reply brief, a Gibson Dunn attorney should file a certification attaching the relevant page.

exchange between Mr. Stepien and the Governor.  D14.  Again, this is well within the timeframe in the Indictment and deals with the critical issue of mayoral endorsements for the upcoming re-election.  *This document was not produced by Gibson Dunn.  As far as Mr. Baroni can discern, it is not listed on any privilege log.  See also D15 (same).*

Thus, Gibson Dunn's confident proclamation that "[t]here is absolutely no basis to conclude that any OGNJ documents have been 'disposed of,' as Defendants have implied," Br. at 19, is just plain wrong.  Something went terribly wrong here and Gibson Dunn must account for its actions.  Given that Gibson Dunn has billed New Jersey taxpayers over $10 million (and the number continues to climb as Gibson Dunn defends itself rather than just turning over the documents), it should produce a list of the documents and items it lost, destroyed or otherwise failed to maintain.  *For example, if communications with the Governor located in the productions of other custodians are not on the Governor's phone because it was deleted, Mr. Baroni has a right to know that.  Moreover, Gibson Dunn has no right to conceal that fact.*

Gibson Dunn's two-sentence Tenth Amendment argument requires no response.  There is no analysis at all, let alone the full-fledged discussion this Court deserves before it takes action based upon the Tenth Amendment.  *Cheney*, the lone citation here, does not mention the Tenth Amendment.

## IV.     THE ELEVENTH AMENDMENT DOES NOT REQUIRE QUASHING THE SUBPOENA.

The OGNJ advances a new argument, asserting that the Governor is immune from turning over his phone despite the fact that he used it to conduct the State's business via at least two personal email accounts.  That material, as well as all the other information the OGNJ refuses to disclose is not protected by the Eleventh Amendment for the following reasons.

First, the Court need not reach this constitutional issue because Mr. Baroni's subpoena was authorized.  Once the Court rejects the OGNJ's argument on that point, its motion should be denied and that disposes of this issue.

Second, Eleventh Amendment immunity is an affirmative defense and, as such, the OGNJ bears the burden to establish this protection.  *ITSI T.V. Prod. v. Agricultural Ass'n*, 3 F.3d 1289, 1291 (9th Cir. 1993) (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775 (1991)).  Indeed, the OGNJ could be required to satisfy a five-part test on this issue.  *Id.* at 1292.  An assertion that, "No exception to the immunity applies in this context[,]" Br. at 20, without any discussion whatsoever is woefully inadequate.  The Court deserves far more than a cursory one-paragraph argument before being asked to decide a constitutional question of this magnitude *in a criminal case.*  Indeed, the OGNJ does not cite any criminal cases which, of course, implicate a defendant's Sixth Amendment rights.   For this reason alone, the Eleventh Amendment argument should be rejected.

Third, the OGNJ relies heavily on cases discussing tribal immunity.  Br. at 20 & n.12 (citing *Bonnet v. Harvest (U.S.) Holdings, Inc.*, 714 F.3d 1155 (10th Cir. 2014); *Alltel Comm. LLC v. DeJordy*, 675 F.3d 1100, 1105 (8th Cir. 2012).  Tribal immunity and sovereign immunity are "distinct concepts."  *United States v. Univ. Mass.*, -- F. Supp. 3d --, 2016 WL 82997, at *2 (D. Mass. Mar. 3, 2016) (citing *Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 753-59 (1998); *Hans v. Louisiana*, 134 U.S. 1, 11-15 (1890)).  As the court noted very recently in *University of Massachusetts*, both *Bonnet* and *Alltel* are tribal immunity cases that "do not apply" if a party is asserting "state sovereign immunity pursuant to the Eleventh Amendment."  *Id.*  Once *Bonnet*

and *Alltel* are disregarded, there is scant legal support for this argument and certainly not enough to warrant quashing Mr. Baroni's subpoena.[13]

    <u>Fourth</u>, there is abundant law holding that Eleventh Amendment immunity does not apply to a third-party subpoena to an arm of the state.  As one court put it:

> While "Eleventh Amendment immunity entitles a state not only to protection from liability, but also from suit, including the burden of discovery, as a party, within the suit," *Univ. of Texas at Austin v. Vratil*, 96 F.3d 1337, 1340 (10th Cir. 1996), "Eleventh Amendment sovereign immunity does not protect non-party state entities from responding to [third-party] discovery requests." *Arista Records LLC v. Does 1–14*, No. 7:08cv205, 2008 WL 5350246, at *4 (W.D.Va. Dec. 22, 2008) (emphasis added) ….

*Ali v. Carnegie Inst. of Wash.*, 306 F.R.D. 20, 30 n.8 (D.D.C. 2014) (citing *In re Mo. Dep't of Natural Res.*, 105 F.3d 434, 436 (8th Cir.1997) ("There is simply no authority for the position that the Eleventh Amendment shields government entities from discovery in federal court."); *Allen v. Woodford*, 544 F. Supp. 2d 1074, 1078-79 (E.D. Cal. 2008) (concluding that "issuance and required compliance with a third-party subpoena by State custodians of records in an action in which the State is not a party" does not constitute "any suit in law or equity" within the meaning of the Eleventh Amendment, and thus that "the Eleventh Amendment does not apply to preclude discovery from a State agency").  *See also U. Mass*, 2016 WL 829971, at *2.  Here again, the OGNJ's brief argument does not carry its burden to establish Eleventh Amendment immunity.

    For all these reasons, the Court should decline the OGNJ's request to quash the subpoena on this basis.

---

[13] The OGNJ also ignores the important legal distinction that, under some circumstances, sovereign immunity operates differently when asserted by a federal entity as opposed to a state.  *Arista Records LLC v. Does 1-14*, No. 7:08cv205, 2008 WL 5350246, at *5 (W.D. Va. Dec. 22, 2008) (collecting and discussing cases).

## V.   THE MOTION TO QUASH SHOULD BE DENIED BECAUSE THE OGNJ HAS IMPROPERLY INVOKED THE DELIBERATIVE PROCESS PRIVILEGE.

In its moving brief, the OGNJ argues that the requests should be quashed because (1) the withheld and redacted documents over which it has claimed privilege are "irrelevant," (2) it has properly invoked the deliberative process privilege over those documents, and (3) the defendants have not shown an actual need for those documents.  For the reasons discussed herein, the OGNJ is wrong and, thus, the motion to quash should be denied in its entirety.

### A.   The Documents Withheld By GDC Are Relevant To This Case.

The OGNJ begins its argument by stating that "[t]hrough the Unauthorized Demands, Defendants are seeking the documents OGNJ withheld as privileged, but those materials are completely irrelevant to this case[.]"  Br. at 21.  It is unclear what the OGNJ means by this statement, as it does not identify which so-called "unauthorized demand" relates to the withheld documents.  Indeed, the OGNJ withheld and redacted essentially the same documents and provided essentially the same privilege logs in response to both the government's subpoenas (or the so-called "authorized" demands) and Mr. Baroni's Rule 17(c) subpoena (containing the so-called "unauthorized demands").  If by this statement the OGNJ means to refer to the defendants' prior challenge to its privilege assertions made in response to the government's subpoenas, it is accurate in that Mr. Baroni hereby reiterates that challenge with respect to the privilege assertions made by the OGNJ in response to his Rule 17(c) subpoena.  To that end, Mr. Baroni relies upon and incorporates the pertinent arguments set forth in his moving and reply briefs in support of his Omnibus Discovery Motions, Docket Entry Nos. 43 & 58.

As discussed in Mr. Baroni's prior briefs, the deliberative process privilege is extremely narrow and allows the government to withhold documents that contain "confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice," only in a very limited set of circumstances.  *In re Grand Jury*, 821 F.2d 946, 959 (3d Cir. 1987) (citing *NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 150-54 (1975)); *see also National Wildlife Federation v. U.S. Forest Service*, 861 F.2d 1114, 1116-17 (9th Cir. 1988).

31

The privilege is only intended to "to prevent injury to the quality of agency decisions." *Sears, Roebuck & Co.*, 421 U.S. at 151. "The accepted rationale is that frank and open discussions within governmental agencies would be 'chilled' if the personal opinions and ideas of government personnel involved in the decision-making process were subject to public scrutiny." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 198 F.R.D. 540, 543 (W.D. Wash. 2000) (citations omitted). "Like all evidentiary privileges that derogate a court's inherent power to compel the production of relevant evidence, the deliberative process privilege is narrowly construed." *Id.* at 543 (citing *Redland Soccer*, 55 F.3d at 856). In order to qualify, a document must be "predecisional" or "antecedent to the adoption of agency policy." *National Wildlife*, 861 at 1117 (quoting *Jordan v. United States Department of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978)). Thus, the privilege does not protect "[c]ommunications made subsequent to an agency decision." *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993). The document must also be "deliberative," meaning "it must actually be related to the process by which policies are formulated." *National Wildlife*, 861 at 1117 (quoting *Jordan*, 591 F.2d at 774).

The privilege does not protect factual information, "even if such information is contained in an otherwise protectable document, as long as the information is severable." *Redland Soccer Club*, 55 F.3d at 854 (citing *In re Grand Jury*, 821 F.2d at 959). In sum, the privilege does not apply to "information that does not disclose the deliberative process, communications unrelated to the formulation of law or policy, and routine reports." *Greenpeace*, 198 F.R.D. at 543.

The documents sought by Mr. Baroni's subpoena are clearly relevant to this case. They are essentially the same ones sought by the government's prior grand jury subpoenas, presumably because the government deemed them relevant to the charges ultimately brought in this case. Throughout its brief, however, the OGNJ continuously labels the documents subpoenaed by the defendants and withheld or redacted by the OGNJ on (specious) privilege grounds as "irrelevant." But the OGNJ alone has taken it upon itself to decide which documents are relevant and which documents are not. As is made clear by the Declaration of Alexander H.

Southwell ("Southwell Dec."), the OGNJ first engaged in this self-styled culling process when it received the subpoenas from the government in this case. Mr. Southwell explains that:

> OGNJ and the Government therefore engaged in conversations customary to responding to subpoenas, which assisted in prioritizing and tailoring the requests and search procedures so that OGNJ would produce documents of actual use to the Government's investigation, not simply all ESI theoretically responsive to the Grand Jury Subpoenas.

Southwell Dec., ¶ 3. Despite all of this "prioritizing and tailoring" in coordination with the government, Gibson Dunn attorneys engaged in an extra review of the documents to further reduce the number that would be produced. According to Mr. Southwell, they "undertook an extensive review of OGNJ's documents for privilege, conducting a methodical, document-by-document analysis to determine *whether each document was related to or contemporaneous with the lane realignment as described in the indictment* …." *Id.*, ¶ 7 (emphasis added). In other words, after conferring with the government and agreeing to more specific search terms and a significantly shortened timeframe in order to produce documents "of actual use" to the government, Gibson Dunn nevertheless conducted its own additional "relevance" determination to decide which documents it would withhold on asserted privilege grounds.

The OGNJ apparently relies on this same self-serving method of document production and privilege assertion in response to Mr. Baroni's Rule 17(c) subpoena. Respectfully, Gibson Dunn, on behalf of the OGNJ, is not entitled to unilaterally determine which documents are "irrelevant" and then refuse to produce those documents based on that determination. Moreover, it bears noting that Gibson Dunn has in the past been taken to task – rightfully so – for its overly restrictive view of what constitutes relevant information in this context and its foot-dragging with respect to the production of responsive documents. For example, in a letter to Mr. Southwell regarding the OGNJ's production to the New Jersey Select Committee on Investigation, Special Counsel to the Committee Reid Schar stated:

> In your May 23, 2014 reply, you took a narrow view of the prior subpoenas and asserted that communications related to Mr. Wildstein's resignation did not concern the September 2013

33

> closure of the George Washington Bridge access lanes for Fort Lee, NJ, and were, therefore, non-responsive. Without conceding the validity of your view of responsiveness, the Committee's June 13 Subpoena was specifically intended to address your comments and to make plain that documents concerning Mr. Wildstein's resignation were expected to be produced.
>
> Given this history, the Committee is surprised to see that OOG has still not produced from Gov. Christie's accounts the communications he is known to have had related to Mr. Wildstein's December 6, 2013 resignation.

D10. Given Gibson Dunn's aforementioned stance that documents related to David Wildstein's resignation are not related to the closure of the Fort Lee access lanes, its judgment regarding what is and is not responsive to the Rule 17(c) subpoena at issue here is questionable at best. Indeed, the Court should reject the OGNJ's argument that the documents it withheld and redacted based upon the deliberative process privilege (and other privileges) should not be subjected to the Court's scrutiny because they are "irrelevant" to this case. The Court should require the OGNJ to support its assertions of privilege in each instance. For the reasons discussed *infra*, the OGNJ has failed to provide such support and, thus, the withheld and redacted documents should be produced immediately.

### B.    The OGNJ Has Improperly Invoked The Deliberative Process Privilege.

The OGNJ bears the burden of proving that the documents withheld and redacted based upon the deliberative process privilege fall within the scope of that privilege. It has failed to carry its burden here for the following three reasons. First, the Declaration of Heather V. Taylor ("Taylor Declaration"), which was filed in support of the motion to quash, is inadequate. In order to assert the deliberative process privilege, the following three procedural requirements must be satisfied:

> 1.    the head of the department which has control over the matter must make a formal claim of privilege after actually considering the matter;
>
> 2.    the responsible agency official must provide precise and certain reasons for asserting the privilege over the government information or documents at issue; and

34

> 3.      the government information or sought to be shielded from
> disclosure must be identified and described.

*United States v. Ernstoff*, 183 F.R.D. 148, 152 (D.N.J. 1998).  Here, the Taylor Declaration fails to satisfy these requirements because it provides very little in the way of substance.  It is barely four pages long, does not address specific assertions of privilege or provide "precise and certain reasons" for asserting the privilege in each instance, and instead simply recites boilerplate language regarding the deliberative process privilege.  Moreover, it is not clear that Ms. Taylor, as Custodian of Records for the Office of the Governor of New Jersey, is an appropriate candidate to provide such a declaration.   *See United State v. O'Neill*, 619 F.2d 222, 225-26 (3d Cir. 1980) (privilege must be asserted by the head of the agency).

Even if Ms. Taylor is an appropriate declarant, relevant case law establishes that her declaration needs to contain significantly more information.  In *United States v. Pechiney Plastics Packaging, Inc.*, a case relied upon by the OGNJ, the Court held that the supporting declaration provided by the government was insufficient because it failed to establish that a particular document was pre-decisional.  2013 WL 1163514, at *24 (D.N.J. March 19, 2013).  There, the declaration provided the following description of an EPA/NJDEP meeting memorandum:

> This document is a memorandum authored by EPA's Remedial
> Project Manager, Stephen Cipot, which contains the author's notes
> taken during a meeting between EPA and the State of New Jersey
> Department of Environmental Protection ("NJDEP") regarding the
> Pohatcong Valley Groundwater Contamination Site.   The
> memorandum presents the concerns, comments, and positions
> raised by the NJDEP on EPA's remedial approach for the
> Pohatcong Valley Groundwater Contamination Site.   The
> communication with the NJDEP was made as part of EPA's
> obligations to ensure meaningful and substantial State involvement
> in EPA's implementation of CERCLA.  It reflects consultation on
> matters between EPA and the State of New Jersey and the role of
> the State of New Jersey as a support agency under CERCLA,
> pursuant to 40 C.F.R. 300.515(e), state involvement in selection of
> remedy.

*Id.* Despite this fairly detailed description, the Court found that the declaration "fail[ed] to specify the final decision to which this memorandum is tied," and that it was "entirely unclear from the . . . Declaration whether the EPA/NJDEP Meeting Memo is pre-decisional." *Id.* Thus, the Court concluded that the government failed to carry its burden of proving that the deliberative process privilege applied and ordered the government to produce the document. *Id.*

Clearly, the Taylor Declaration falls far short of what is required to establish that the deliberative process privilege applies to the thousands of documents at issue here. The declaration discusses the documents in general terms and recites boilerplate language regarding the privilege. It does not identify any final decisions to which particular documents are tied or explain how any particular documents are "pre-decisional" or "deliberative." This Court should, therefore, find that the OGNJ has failed to carry its burden of proving that the deliberative process privilege applies and order it to produce the documents at issue immediately.

Second, the privilege logs prepared by Gibson Dunn fail to provide sufficient information to evaluate the thousands of claims of privilege. As noted in Mr. Baroni's prior moving brief, "[a] proper privilege log must include, for each withheld document, the date of the document, the name of its author, the name of its recipient, the names of all people given copies of the document, the subject of the document, and the privilege or privileges asserted." *Torres v. Kuzniasz*, 936 F. Supp. 1201, 1208 (D.N.J. 1996) (citing *Wei v. Bodner*, 127 F.R.D. 91, 96 (D.N.J. 1989)). *See also D & D Assoc., Inc. v. Bd. of Educ. of N. Plainfield*, No. CIV.A. 03-1026 MLC, 2011 WL 1871110, at *7 (D.N.J. May 13, 2011) ("The description of each document in a privilege log must contain sufficiently detailed information to allow the court to determine whether the elements of the attorney-client privilege have been established, including dates, authors, and recipients.") (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476–77 (E.D. Pa. 2005)) (internal quotations omitted). "The standard for testing the adequacy of the privilege log is whether, as to each document, it sets forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed. The focus is on the specific descriptive portion of the log, and not on the conclusory invocations of the

36

privilege or work-product rule, since the burden of the party withholding documents cannot be discharged by mere conclusory or ipse dixit assertions." *S.E.C. v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 144 (S.D.N.Y. 2004) (*quoting Golden Trade, S.r.L. v. Lee Apparel Co.,* 1992 WL 367070 (S.D.N.Y. Nov.20, 1992) (internal quotations omitted)).

Even a brief perusal of the logs attached to the Taylor Declaration will show the Court that many of the entries lack basic information, such as the author of the document, the recipient of the document, etc. In addition, the descriptions of the documents are vague and provide none of the information necessary to determine whether the invocation of the privilege is legally justified. As discussed *supra*, relevant case law establishes that more is needed. For this reason as well, the motion to quash should be denied.

Third, the documents are neither pre-decisional nor deliberative. It is readily apparent, even by their cryptic descriptions in the privilege logs, that most if not all of the documents have absolutely nothing to do with agency policymaking. And, as discussed at length *supra*, the Taylor Declaration does nothing to expand upon those descriptions so as to provide the requisite support for the privilege assertions. Thus, the OGNJ has failed to carry its burden of establishing that the deliberative process privilege applies. The motion to quash should be denied.

C.     **Even Assuming Arguendo That The OGNJ Has Properly Invoked The Deliberative Process Privilege, Mr. Baroni's Need For The Documents Outweighs The OGNJ's Need For Secrecy.**

Even if the OGNJ has properly asserted the deliberative process privilege, which it has not, the documents should nonetheless be produced because Mr. Baroni's need for the documents far outweighs the OGNJ's need for secrecy. *See In re Grand Jury*, 821 F.2d 946, 951 (3d Cir. 1987) (deliberative process privilege may be overcome if party requesting documents demonstrates "a sufficient need for the material in the context of the facts or nature of the case, or a prima facie showing of misconduct"). Here, the Indictment alleges the misuse of government resources by the defendants and "others" at both the OGNJ and the Port Authority. And, unlike the civil cases upon which the OGNJ relies, this is a criminal case in which Mr.

Baroni's liberty is at stake.  Thus, Mr. Baroni's interest in the subpoenaed documents overrides any interest the OGNJ has in maintaining the confidentiality of those documents.  Accordingly, the motion to quash should be denied and the responsive documents should be produced immediately.

## VI.   <u>CONCLUSION</u>

For all the foregoing reasons, Mr. Baroni respectfully requests that the Court deny the motion to quash.

Respectfully submitted,

**BALDASSARE & MARA, LLC**

By:_____
Michael Baldassare


By:_____
Jennifer Mara

**BALDASSARE & MARA, LLC**
570 Broad Street
Newark, New Jersey 07102
Telephone: (973) 200-4066
Facsimile: (973) 556-1076

*Attorneys for Defendant William E. Baroni, Jr.*

Dated:  June 13, 2016