GIBSON, DUNN & CRUTCHER LLP
Randy M. Mastro
Alexander H. Southwell (admitted *Pro Hac Vice*)
200 Park Avenue
New York, NY  10166-0193
Phone:  212.351.3825
Fax:  212.351.5219
E-mail:  RMastro@gibsondunn.com
*Attorneys for Nonparty*
*Office of the Governor of New Jersey*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 15-193 (SDW) |
| v. | Oral Argument Requested |
| WILLIAM E. BARONI, JR. and BRIDGET ANNE KELLY | Return Date To Be Determined |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF**
**NONPARTY OFFICE OF THE GOVERNOR OF NEW JERSEY'S**
**MOTION TO QUASH IN PART DEFENDANTS' SUBPOENA *DUCES TECUM***

## TABLE OF CONTENTS

Page

GLOSSARY .................................................................................................................. v

INTRODUCTION ........................................................................................................ 1

    A.    The Unauthorized Demands Exceed The Court's Order And
          Violate Rule 17(c)................................................................................. 5

        1.    Pretrial Production To Defendants Of The Personal And
             Other Electronic Devices Gibson Dunn Examined During
             The 2014 Investigation Is Unwarranted. .................................... 7

        2.    The Demands For "All" Kelly And Stepien Records Are
             Improper And Demonstrate Defendants' Inability To
             Satisfy Rule 17(c)'s Exacting Requirements. ........................... 14

        3.    The Subpoena Unacceptably Demands OGNJ Records
             From At Least Three Years Preceding The Events That
             Will Be Presented At Trial.................................................... 17

        4.    Defendants' Further Allegations As To Immaterial
             Production Deficiencies Lack Merit And Do Not Support
             The Unauthorized Demands. ................................................. 19

        5.    The Meritless Conflict Of Interest Claims Have No Bearing
             On OGNJ's Motion To Quash The Unauthorized Demands. ................. 21

    B.    The Eleventh Amendment Bars The Private Defendants From
          Coercing Enforcement With The Unauthorized Demands. ............................... 22

    C.    The Court Should Not Reach The Substance Of OGNJ's
          Procedurally-Correct Privilege Claim Over The Irrelevant
          Documents Withheld Until Defendants Move To Compel................................. 24

CONCLUSION............................................................................................................ 27

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Allen v. Woodford*,
    544 F. Supp. 2d 1074 (E.D. Cal. 2008) ...................................................................23

*Ayotte v. Planned Parenthood of N. New Eng.*,
    546 U.S. 320 (2006) ...................................................................22

*Bayliss v. N.J. State Police*,
    622 F. App'x 182 (3d Cir. 2015) ...................................................................24

*Chambers v. Mississippi*,
    410 U.S. 284 (1973) ...................................................................23

*Cheney v. U.S. Dist. Ct. for D.C.*,
    542 U.S. 367 (2004) ...................................................................15, 16

*Coastal States Gas Corp. v. Dep't of Energy*,
    644 F.2d 969 (3d Cir. 1981) ...................................................................24, 25

*Conoco Inc. v. U.S. Dep't of Justice*,
    687 F.2d 724 (3d Cir. 1982) ...................................................................24

*Dairyland Power Co-op. v. United States*,
    77 Fed. Cl. 330 (2007) ...................................................................25

*Fitzpatrick v. Bitzer*,
    427 U.S. 445 (1976) ...................................................................23

*Founding Church of Scientology of Washington, D.C., Inc. v. Director, FBI*,
    104 F.R.D. 459 (D.D.C. 1985) ...................................................................25

*Gen. Elec. Co. v. Johnson*,
    Civ. No. 00-2855, 2007 WL 433095 (D.D.C. Feb. 5, 2007) ...................................................................25

*Hess v. Port Auth. Trans-Hudson Corp.*,
    513 U.S. 30 (1994) ...................................................................21

*Idaho v. Coeur d'Alene Tribe*,
    521 U.S. 261 (1997) ...................................................................22

*Kaley v. United States*,
    134 S. Ct. 1090 (2014) ...................................................................23

*Kant v. Seton Hall Univ.*,
Civ. No. 00-5204, 2009 WL 5033927 (D.N.J. Dec. 14, 2009)...........................................26

*MAG Entm't, LLC v. Div. of Alcoholic Beverage Control*,
868 A.2d 1067 (N.J. Super. Ct. App. Div. 2005)..................................................15

*Morris v. Verniero*,
Civ. No. 03-1001, 2008 WL 852440 (D.N.J. Mar. 28, 2008) ...............................25

*New Jersey v. RPI Energy Mid-Atl. Power Holdings, LLC*,
Civ. No. 07-5298, 2013 WL 272763 (E.D. Pa. Jan. 24, 2013)............................24

*P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
506 U.S. 139 (1993) ..................................................................................23

*Pennwalt Corp. v. Durand-Wayland, Inc.*,
708 F.2d 492 (9th Cir. 1983) ...................................................................26

*Petruska v. Gannon Univ.*,
462 F.3d 294 (3rd Cir. 2006) ...................................................................22

*Redland Soccer Club v. Dep't of Army*,
55 F.3d 827 (3d Cir. 1995) .......................................................................25

*RTC v. Diamond*,
137 F.R.D. 634 (S.D.N.Y. 1991) ...............................................................25

*Seminole Tribe v. Florida*,
517 U.S. 44 (1996) ..............................................................................23, 24

*United States v. Armstrong*,
517 U.S. 456 (1996) .................................................................................26

*United States v. Cuthbertson*,
630 F.2d 139 (3d Cir. 1980) (*Cuthbertson I*)..........................................7

*United States v. Cuthbertson*,
651 F.2d 189 (3d Cir. 1981) (*Cuthbertson II*) ......................................17

*United States v. Eisenhart*,
43 F. App'x 500 (3d Cir. 2002) ...............................................................10

*United States v. Farrington*,
58 Fed. Appx. 919 (3d Cir. 2003)), *aff'd on other grounds*, 777 F.3d 125 (3d
Cir. 2015).....................................................................................................17

*United States v. Georgiou*,
Crim. No. 09-88, 2009 WL 2973035 (E.D. Pa. Sept. 16, 2009)............................17

*United States v. Mitchell*,
377 F. Supp. 1326 (D.D.C. 1974) ...........................................................12

*United States v. Nixon*,
    418 U.S. 683 (1974) ..................................................................... 12, 13, 15, 16, 18, 19

*United States v. O'Neill*,
    619 F.2d 222 (3d Cir. 1980) ......................................................................... 24

*United States v. Onyenso*,
    No. 12-cr-602, 2013 WL 5322651 (D.N.J. Sept. 20, 2013) ....................................... 7

*United States v. R. Enters., Inc.*,
    498 U.S. 292 (1991) ..................................................................................... 18

*United States v. Univ. of Mass., Worcester*,
    Civ. No. 13-40066, 2016 WL 829971 (D. Mass. Mar. 3, 2016)........................................ 23

*United States v. Valenzuela-Bernal*,
    458 U.S. 858 (1982) ..................................................................................... 23

*Washington v. Texas*,
    388 U.S. 14 (1967) ...................................................................................... 23

*Weatherford v. Bursey*,
    429 U.S. 545 (1977) ..................................................................................... 23

## Rules

Fed. R. Civ. P. 26(b)(1) ....................................................................................... 19

Fed. R. Crim. P. 17......................................................................................... *passim*

Fed. R. Evid. 403 ............................................................................................... 17

Fed. R. Evid. 801(c) ........................................................................................... 17

Rule 17(c) ......................................................................................................... 21

## Treatises

Adam I. Cohen & David J. Lender,
    *Electronic Discovery: Law & Practice* A-134 (2d ed. 2013). ...................................... 9

## Constitutional Provisions

Sixth Amendment ............................................................................................... 23

Eleventh Amendment.................................................................................... 4, 22, 23, 24

# GLOSSARY

| | |
|---|---|
| **KB:** | Defendant Kelly's Memorandum of Law in Opposition to the Office of the Governor of New Jersey's Motion to Quash in Part Ms. Kelly's Subpoena *Duces Tecum* (June 13, 2016) |
| **BB:** | Defendant Baroni's Brief in Opposition to the Office of the Governor of New Jersey's Motion to Quash Mr. Baroni's Rule 17(c) Subpoena (June 13, 2016) |
| **OB:** | Nonparty Office of the Governor of New Jersey's Memorandum of Law in Support of Its Motion to Quash in Part Defendants' Subpoena *Duces Tecum* (April 28, 2016) |
| **Doc. 37:** | Nonparty Gibson, Dunn & Crutcher LLP's Reply Memorandum of Law in Support of its Motion to Quash Defendants' Subpoena *Duces Tecum* (October 7, 2015) |
| **Doc. 42:** | Defendant Kelly's Memorandum of Law in Support of Omnibus Discovery Motion (November 10, 2015) |
| **Doc. 44-1:** | Defendant Baroni's Memorandum of Law in Support of His Discovery Motions and Motion for Change of Venue (November 11, 2015) |
| **Doc. 57:** | Defendant Kelly's Memorandum of Law in Reply to Government's Opposition to Defendants' Omnibus Discovery Motion (December 23, 2015) |
| **Doc. 58:** | Reply Brief in Support of Defendant Baroni's Discovery Motions and Motions for a Change of Venue (December 23, 2015) |
| **Doc. 91:** | Government Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Indictment (March 11, 2016) |
| **Doc. 124-1:** | Exhibits to Defendant Baroni's Opposition to OGNJ's Motion to Quash in Part Defendants' Subpoena *Duces Tecum* (June 13, 2016) |
| **Doc. 129:** | Letter from the Government regarding OGNJ's request to file its reply brief in support of its Motion to Quash in Part Defendants' Subpoena *Duces Tecum* on July 7, 2016 (June 24, 2016) |
| **Doc. 131:** | Letter from the Government opposing Defendant Kelly's request for an adverse inference based on spoliation of evidence (June 27, 2016) |
| **Report:** | Report Of Gibson, Dunn & Crutcher LLP Concerning Its Investigation On Behalf Of The Office Of The Governor Of New Jersey Into Allegations Regarding The George Washington Bridge Lane Realignment And Superstorm Sandy Aid To The City Of Hoboken (March 26, 2014) |

| | |
|---|---|
| **Tr.:** | Transcript of motion hearing (February 5, 2016) |
| **Grand Jury Subpoenas:** | The grand jury subpoenas that the Government directed to OGNJ and related components beginning in January 2014 and covering a broad array of topics, including the George Washington Bridge lane realignment, the Hoboken Mayor's allegations, and OGNJ's interactions with the Jersey City Mayor. |
| **1/17/2014 G.J. Subpoena:** | The grand jury subpoena covering the George Washington Bridge lane realignment directed to OGNJ by the Government on January 17, 2014. |
| **Authorized Demands:** | The demands in Defendants' subpoena that match those in the Grand Jury Subpoenas.  *See* OB 9-10. |
| **Unauthorized Demands:** | The demands in Defendants' subpoena that do not match those in the Grand Jury Subpoenas.  *See* OB 9-10. |

## INTRODUCTION

Criminal defense counsel have chosen to respond to this motion to quash their Rule 17 subpoena, not by focusing on the merits but, rather, by defaming non-parties Gibson Dunn and the Office of the Governor of the State of New Jersey ("OGNJ"), accusing them, without basis, of destroying evidence, intentionally withholding documents, and making specious privilege claims.  Gibson Dunn and the OGNJ, of course, did no such thing.  And this Court should now put an end to criminal defense counsel's unprofessional smear tactics by granting OGNJ's motion to quash.

This motion presents a simple, straightforward question:  Whether the subpoena that criminal defense counsel served exceeded the bounds of what this Court authorized, which was a subpoena of the same scope as the Government's concerning GWB-related issues.  Indeed, criminal defense counsel themselves represented to this Court at the time they sought authorization to serve this Rule 17 subpoena that they would only issue a subpoena of "essentially" the "same" scope as the Government's so that they could potentially challenge OGNJ's privilege assertions, and the Court then authorized them to issue such a subpoena based on their express representation that the subpoena would be so limited in scope.  Tr. 13:11-18.  But instead of keeping their word to the Court, criminal defense counsel have now issued a far broader subpoena that even the Government recently told the Court includes "additional demands" and does not "replicate" its original subpoena.  Doc. 129.  Therefore, these additional demands in their overbroad subpoena not authorized by the Court (the "Unauthorized Demands") cannot stand.

Instead of coming clean about their transgression, though, criminal defense counsel have now doubled down on a strategy of unseemly attacks.  They try to justify their own overreaching by making spurious accusations against the non-parties that are baseless, false, and

defamatory.  It has, by now, become obvious that criminal defense counsel want to make this case all about Gibson Dunn's internal investigation to try to deflect attention away from their clients' actions.  But this case is not about Gibson Dunn's internal investigation on behalf of the OGNJ, no matter how much criminal defense counsel try to make it so.  This case is about the wholly independent investigation conducted by the U.S. Attorney's Office and the felony criminal charges that a federal grand jury then handed down as a result of that wholly independent federal investigation.  That federal prosecutors and a federal grand jury independently investigated the circumstances surrounding the GWB lane realignment and reached the same basic conclusions as Gibson Dunn may serve as confirmation that Gibson Dunn got the "bottom line" right, but criminal defense counsel should not thereby be permitted to turn this criminal case into a sideshow about Gibson Dunn's internal investigation process, which is wholly irrelevant to determining whether their clients are guilty of the serious felony charges for which they must now stand trial.

The OGNJ has already fully complied with this subpoena's demands authorized by the Court (the "Authorized Demands") by producing to the defense everything the OGNJ produced to the Government in compliance with its grand jury subpoenas—tens of thousands of documents in total on a wide array of investigatory subjects—including all documents in the OGNJ's possession relating to and contemporaneous with the GWB lane realignment.  The OGNJ withheld no documents on privilege grounds or any other grounds in that category, as the OGNJ's counsel has repeatedly attested.  And the OGNJ's counsel even offered to submit *in camera* to the Court for its inspection documents from the OGNJ's detailed privilege log as confirmation.  In short, the OGNJ has fully complied with the Authorized Demands in the

Subpoena and now seeks to quash only the Unauthorized Demands that exceed the scope of this Court's limited subpoena authorization.

Ignoring those bounds, criminal defense counsel now make up alleged discovery abuses as supposed license for their overreaching, even though federal and state investigators—who investigated the very allegations at issue in this case and, unlike the defense here, had only an incentive to uncover the truth—pressed for sweeping discovery from the OGNJ and got it.  In other words, criminal defense counsel are manufacturing these scurrilous allegations to try to justify extraordinarily invasive discovery that Rule 17(c) simply does not permit.

For example, Defendants' Subpoena seeks production of the *entire* contents of *every* mobile phone, laptop, hard drive, and personal computer from which Gibson Dunn reviewed records.  *See* Subpoena, Demand II.B.1.  This demand encompasses millions of electronic documents—likely to include medical forms, family videos, and friends' vacation pictures—that are completely irrelevant to this criminal prosecution.  Of course, the Government did not request that in its grand jury's subpoenas—that is, the Government did not request the entire contents of any electronic device from which Gibson Dunn reviewed records, let alone every electronic device.  Rather, the Government requested what was relevant to the grand jury investigation, and the OGNJ's production included any responsive documents identified on those devices.  Yet criminal defense counsel now claim their subpoena merely asks for what the Government asked for, "but [they] asked it the right way."  BB 5.  This is sophistry unworthy of this Court.

While the OGNJ and its counsel are now forced to address criminal defense counsel's smears and misdirection and set the record straight in these reply papers, the OGNJ also reiterates what criminal defense counsel fail to confront—namely, the multiple grounds for

quashing the Unauthorized Demands.  Here are three principal reasons why this Court should now quash:

*First*, the Unauthorized Demands exceed what the Government sought through its grand jury subpoenas, and, in any event, are impermissible under Rule 17(c) because they seek information that is not relevant to the charges in the Indictment, not admissible at trial on those charges, nor articulated with the necessary specificity.

*Second*, even looking past the Unauthorized Demands' evident invalidity under Rule 17(c), the OGNJ's Eleventh Amendment immunity from suit bars these Defendants, as private citizens, from being able to coerce the State's compliance with them.

*Third*, the OGNJ properly asserted deliberative process privilege and followed the correct procedure for claiming privilege as to a set of documents withheld in whole or in part through redactions, and none of those documents concerns the GWB-related charges at issue in this case, as is apparent on the face of the OGNJ's detailed privilege log, rendering them beyond the scope of a proper Rule 17(c) subpoena in any event.

In sum, the OGNJ has already given criminal defense counsel all documents in the OGNJ's possession relating to and contemporaneous with the GWB lane realignment, as described in the Indictment and as produced to the Government pursuant to its subpoenas.  And criminal defense counsel's spurious allegations of discovery abuses are reprehensible, irresponsible, and irrelevant to the disposition of this motion.  Their Unauthorized Demands are just that—unauthorized and beyond the scope of anything reasonable, relevant and permitted for Rule 17(c) purposes.  Accordingly, the OGNJ respectfully requests that the Court now grant this motion to quash.

## A.   The Unauthorized Demands Exceed The Court's Order And Violate Rule 17(c).

Defendants' oppositions misstate the narrow issue presented by OGNJ's motion to quash in part, which concerns the Unauthorized Demands, not the Authorized Demands. *See* OB 9-10 & n.6 (clearly distinguishing Unauthorized from Authorized Demands). OGNJ produced documents fully complying with the Authorized Demands, because those demands were similar enough to the requests in the Grand Jury Subpoenas to bring them within the Court's Order. Defendants pretend as though OGNJ has not complied with the Authorized Subpoenas.[1] But OGNJ produced to Defendants more than 25,000 documents (totaling more than 178,000 pages) complying with the Grand Jury Subpoenas. Taylor Decl. ¶ 4. That volume included more than 12,000 documents complying with the 1/17/2014 G.J. Subpoena alone, which concerned the lane realignments—the focal point of the Indictment. OGNJ also produced to Defendants all available materials in OGNJ's possession related to and contemporaneous with the lane realignment as described in the Indictment (OB 11), and that to the extent any such documents were privileged, OGNJ waived that privilege (OB 7; 4/28/2016 Southwell Decl. ¶ 7).[2]

---

[1]   Baroni purports to chart (BB 24-27) the specificity of each demand, thus attempting to minimize the Unauthorized Demands, which clearly lack the requisite specificity, by focusing on the specificity of the *unchallenged* Authorized Demands. And Kelly asserts (KB 5) that she has only been provided those of her e-mails "that strictly relate to the lane realignment," but the reality is that OGNJ produced a wider array of e-mails (where they existed). Those include, for example, any e-mails related to the Fort Lee Mayor, because an Authorized Demand sought records relating to Mayor Sokolich. *See* Subpoena, Demand II.A.4.

[2]   Contrary to Baroni's contention (BB 14-15), OGNJ did *not* limit its production of information, or its conception of relevance, to the time period "end[ing] on Friday, September 13, 2013," the end of the week of the lane realignments. Instead, GDC's Report robustly described the "[A]ftermath Of The Lane Realignment" (Report 71-105), drawing on OGNJ documents from that time period, including pertinent text messages (*see, e.g.*, Report 101-03 & nn. 607-12), and GDC similarly produced thousands of documents from after the week of the lane realignments.

Defendants do not retract their misrepresentations that their subpoena to OGNJ would be "essentially the same" as the Grand Jury Subpoenas.  Having violated that commitment to the Court, Defendants now attempt to repackage the Subpoena, including the Unauthorized Demands, as matching the demands of the Grand Jury Subpoenas.  Such efforts are unavailing, as Defendants' Unauthorized Demands obviously go beyond the Grand Jury Subpoenas—as the Government explicitly warned Defendants.  After reviewing a draft of the Subpoena, the Government concluded that it "*exceeds the scope* of what the Court authorized . . . . The proposed Rule 17(c) subpoena . . . *goes beyond what was requested* in the grand jury subpoenas to the Governor's Office . . . and hence, *the Court has not authorized* a subpoena compelling the pretrial production of those materials."  Doc. 124-1 at D2-3 (3/10/2016 Government letter to Attorney Baldassare) (emphases added).  Defendants proceeded to direct the Subpoena to OGNJ despite the Government's written warning on this point—and now say they did not "go[] beyond" the Grand Jury Subpoenas at all.  Kelly's self-contradicting contention is that she "served the *exact same* subpoena the USAO issued to the OGNJ," while at the same time conceding (as she must) that it included "*additional* demands."  KB 3 (emphases added).  Baroni likewise strains credulity in asserting that the Unauthorized Demands "asked the same question as the government, but [Defendants] asked it the right way."  BB 5.  Obviously, that is not so:

Now that Defendants have received all information OGNJ had produced to the Government in compliance with the Grand Jury Subpoenas, Baroni appears to complain that Defendants "*did not subpoena* those documents" unrelated to the lane realignments (such as those concerning the allegations of the Hoboken mayor).  BB 16 (emphasis added).  But the Subpoena seeks "[a]ll Documents and information referred to in the first full paragraph on Page 39 of" the Report (Subpoena, Demand II.A.8), and that paragraph "refer[s] to" *all* of the documents GDC reviewed in preparing the Report, which clearly includes all documents OGNJ produced to the Government.  To be sure, this "Page 39" demand should be quashed to the extent it does not mirror any request in the Grand Jury Subpoenas and it does not properly seek Rule 17(c) material.  But Defendants should not be heard to complain about OGNJ producing *too much* when those documents are responsive to the Subpoena *composed by Defendants*.

Defendants clearly went "beyond" the Grand Jury Subpoenas, and the Unauthorized Demands fail to "replicate" any requests the Government made during its investigation.  Doc. 129. Moreover, even apart from the lack of authorization by this Court, the Unauthorized Demands should be quashed because they fail to meet Rule 17(c)'s fundamental requirements, which the Third Circuit has *never* "turned into a broad discovery device."  *United States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir. 1980) (*Cuthbertson I*).[3]

We refute in turn below Defendants' contentions about the individual Unauthorized Demands—(1) the demand for every device GDC examined; (2) the demand for "all" documents Kelly and Stepien ever created; and (3) the temporal instruction demanding documents back to 2010.  We then address alleged production deficiencies and conflicts of interest in subparts (4) and (5) below.

###### 1. Pretrial Production To Defendants Of The Personal And Other Electronic Devices Gibson Dunn Examined During The 2014 Investigation Is Unwarranted.

Defendants demand access to the personal devices of every employee of OGNJ whose records were reviewed.  They even insinuate that OGNJ is either withholding or has "spoliat[ed]" critical information.  *See, e.g.*, KB 12-13.  These baseless accusations are designed not to uncover truth but rather to divert focus away from the Defendants' conduct.  Defendants' demands must be quashed because they flout their prior representations underpinning this

---

[3] Baroni's attempt (BB 9-10) to get after-the-fact permission for a *new* subpoena with the Unauthorized Demands is procedurally improper and substantively futile under Rule 17(c).  Also incorrect is his contention (BB 13, 16) that this Court has already "concluded" or "found" that the Unauthorized Demands are proper under the rule.  Granting a subpoena application cannot preclude granting a non-party's subsequent motion to quash.  Courts routinely quash issued subpoenas for failure to satisfy Rule 17(c).  Fed. R. Crim. P. 17(c)(2); *see, e.g.*, *United States v. Onyeso*, No. 12-cr-602, 2013 WL 5322651, at *1, 3 (D.N.J. Sept. 20, 2013); Doc. 37 at 2.

Court's permission to issue a Rule 17 subpoena, and none of their misconduct allegations have any basis in reason or reality.

In the course of its Grand Jury investigation, the Government sought records relating to specified topics maintained in various locations (including *on* devices such as mobile phones). *See* 4/28/2016 Southwell Decl. at 12 (1/17/2014 G.J. Subpoena instruction seeking pertinent "*records maintained on* all computers, hard drives, data storage devices, *mobile phones*, and tablet computers under the care, custody or control of the Office of the Governor") (emphasis added). As is typical, the Government did not seek production of the actual personal and other electronic devices or data sources because, of course, each contains a substantial quantity of irrelevant and highly personal information.[4] Instead, the Government sought relevant information from those devices and data sources.

In accordance with the Government's requests, and as OGNJ has explained, GDC "worked with a team to search for and collect hard copy and electronic documents and records . . . including personal texts and emails of the Governor . . . and [his] senior staffers," (4/28/2016 Southwell Decl. ¶ 3), including Regina Egea (then serving as Director of the Authorities Unit). In particular, as to OGNJ employees' devices, GDC asked each employee likely to have possessed information relevant to the Grand Jury Subpoenas whether they used

---

[4]   The Government has confirmed that it did not seek production of any devices themselves: "As is typical in grand jury investigations, where an institution is represented by outside counsel, those lawyers review records, including those contained on mobile phones and computers, to identify and provide material that is responsive to subpoenas . . . . That procedure was followed in this case." Ryan Hutchins, *Former Christie allies to stand trial for Bridgegate after failed dismissal attempt*, Politico, June 14, 2016 (quoting Government's spokesperson). Defendants conspicuously failed to raise any argument concerning mobile phones and devices in their November 2015 opening briefs applying for a Rule 17(c) subpoena, thus forfeiting their devices contention, and depriving the Government of the chance to submit in Court filings an explanation concerning the devices.

personal devices or non-governmental email accounts for official purposes.  Southwell Supp. Decl., ¶¶ 6-7.  For each employee who used personal devices or personal email accounts for official purposes, GDC ensured that the contents of these devices and accounts were preserved, and then reviewed.  Southwell Supp. Decl. ¶ 7.[5]  Upon identification of any responsive materials from these sources, that responsive data was produced and the remaining data and devices were returned to the employee-owners or their counsel.  *Id.*

With regard to the Governor's personal mobile phone, GDC took custody of it and preserved its contents in the same manner in which the contents of the personal devices of other OGNJ employees were preserved.  Southwell Supp. Decl. ¶ 7.  After preserving the Governor's phone's contents, GDC searched for any responsive material and, once the search was completed, returned the phone and non-responsive data.  We understand that data has been preserved.  *Id.*  The same process was followed with regard to the Governor's personal email account.  *Id.*

The fact that the Government never sought the actual devices OGNJ employees used is alone sufficient to invalidate Defendants' demand for "all phones and other Devices" GDC examined, because the Court's subpoena authorization extended only as far as Defendants' own representations that their demands would match those of the Government.  Doc. 44-1 at 35; Doc. 57 at 19; Doc. 58 at 12; Tr. 13:11-18.  And Defendants offer no coherent explanation for their sharp break from their prior representations, which they simply ignore.  Indeed, Kelly concedes the devices demand was "additional."  KB 3.  Thus, because the demand for devices far exceeds

---

[5] Contrary to Defendants' vague assertions, there is no manipulation of electronically stored information when it is "harvested."  That is the term commonly used to refer to the process of copying electronically stored information for review and production.  *See* Adam I. Cohen & David J. Lender, *Electronic Discovery: Law & Practice* A-134 (2d ed. 2013).

the scope of the Grand Jury Subpoenas, and OGNJ has already produced to Defendants any relevant materials collected from the devices GDC reviewed during the investigation, including any materials from the personal mobile phone used by the Governor, Defendants' demand for devices must be quashed.

Defendants advance scattershot claims of destruction and withholding of evidence in an effort to justify their unwarranted demand for devices.  For example, with regard to the Governor's personal mobile phone, Baroni contends that GDC "has the phone[]," and "refuses to produce" it.  BB 18.  And Kelly presumes that GDC either has the phone or has destroyed it by insisting it is "unclear where" the Governor's phone "is, or if it still exists."  KB 11.  But this is just blatant speculation.  As stated above and sworn to:  GDC has not destroyed the Governor's personal mobile phone, and neither GDC nor anyone else is concealing it or its contents from legally valid inquiry (which Defendants' demand is not).  GDC has produced to the Government any information from the phone found to be responsive to the Grand Jury Subpoenas, and all documents GDC produced to the Government have now also been produced to Defendants.  *See* Southwell Supp. Decl. ¶ 7; 4/28/2016 Mastro Decl. ¶ 27.  In light of those undisputed facts now in the record, Defendants' conjecture about the mobile phone cannot come close to establishing that the phone itself is or contains relevant and admissible evidence at trial, as Rule 17(c) requires.  *See United States v. Eisenhart*, 43 F. App'x 500, 505 (3d Cir. 2002) ("[m]ore is needed to sustain a subpoena than the defendant's own subjective belief (*i.e.*, hope) that he or she may find something useful by casting a subpoena upon the waters").

In fact, OGNJ has been clear and open about the fact that Ms. Egea and the Governor communicated by text during the legislative hearing on December 9, 2013, and the routine and contemporaneous deletion of those texts is beyond serious dispute.  OGNJ made available to the

public the interview memorandum which stated that Ms. Egea informed GDC that "she may also have texted the Governor her thoughts about the Port Authority employees sounding professional during their December 9, 2013 testimony."  Southwell Supp. Decl. ¶ 9, Ex. A at 7.  And in her July 2014 SCI testimony, Ms. Egea further explained her use of text messages and her deletion of those messages in the ordinary course of maintaining storage on her personal mobile device. *See* Southwell Supp. Decl. ¶¶ 10 & Ex. B.  Day-to-day communications are deleted from storage devices for an array of completely benign reasons—which Defendants do not dispute. Defendants instead openly speculate that the deletion of *these* text messages was for an obviously nefarious purpose.  No facts support that allegation.  Notably, the deletion of the inconsequential communication occurred before the Government "launched its investigation in January 2014" (Doc. 131 at 2), and before GDC's investigation.

Moreover, Defendants' contention that the substance of those communications is unknown is baseless, as the text messages are plainly insignificant and irrelevant to the charges in the Indictment.  Try as they may through personal attacks to manufacture a story about these texts (KB 9-10; BB 17-18), the record is clear and undisputed because Ms. Egea has testified under oath before the SCI in detail about this exchange:  Ms. Egea made clear that the deleted text messages involved her characterization of the professionalism of Port Authority employees during the hearing and that she deleted the texts at the time as a routine matter.  *See* Southwell Supp. Decl. ¶¶ 10-11; *see also* Southwell Supp. Decl., Ex. B at 121-26 (detailing her "opinion[s]" on "professionalism" of each witness's testimony—the substance of what she "texted the Governor").

Additionally, Baroni's contention that the texts were concurrent with "the testimony of three *key* witnesses" (BB 17) (emphasis added), and therefore must have been important to the

Indictment's charges, is meritless.  The texts—which the undisputed record indicates were comments about the witnesses' professionalism while facing pointed and politicized questioning—are plainly not as pivotal as Baroni contends.  Indeed, the Indictment does not even mention this witness testimony before the Assembly Transportation Committee.  It is the falsity of *Baroni's* testimony to that Committee on November 25, 2013 that carries significance for the charges against Defendants.  *See* Indictment, Ct. 1, ¶¶ 55, 59(CC); *see also* Doc. 91 at 43 (Government argument that "Baroni's lying to a New Jersey legislative committee" was part of Defendants' "effort to maintain plausible deniability for themselves").  Defendants simply have not shown, other than through conjecture, that the text messages between the Governor and Ms. Egea would have cast any light on Baroni's testimony, which occurred several weeks *prior* to those messages.  Baroni's further contention that "the allegation is that Ms. Egea prepared Mr. Baroni to give the Legislature false testimony" (BB 18) is also an unsupported attempt to shift blame from him to others:  Both the SCI and GDC's investigation undermined such an assertion, finding that "[d]espite the significant editing proposed by Egea, Baroni's opening statement to the committee contained much of the material Egea had recommend[ed] cutting."  Supp. Southwell Decl. at 90; *see also* Report 84 ("According to Egea, Baroni's opening remarks diverged from the remarks he had earlier drafted and he did not follow Egea's advice.").[6]

---

[6]   That the text message exchange occurred during testimony that was *not even mentioned* in the Indictment shows this case is far removed from *Nixon*.  BB 2, 11-12, 13-14.  *Nixon* considered whether the Watergate Special Prosecutor had met Rule 17(c), 418 U.S. at 688-89, 698-702, in seeking the President's tape recordings and documents relating to conversations with advisors—via a subpoena that "listed in 46 paragraphs the specific meetings and telephone conversations" at issue.  *United States v. Mitchell*, 377 F. Supp. 1326, 1328 (D.D.C. 1974).  The "contents of the subpoenaed tapes could not . . . be described fully by the Special Prosecutor," but "there was a sufficient likelihood that each of the tapes contain[ed] conversations *relevant to the offenses charged in the indictment*."  *Nixon*, 418 U.S. at 700 (emphasis added).  "[M]ost of the tapes apparently contain[ed] conversations to which one or more of *the defendants named in*

Kelly draws an untenable comparison (KB 10) to her instruction to a subordinate to delete an inculpatory email.  She issued the direction after she was repeatedly and thoroughly questioned by the Governor's Chief of Staff about her involvement in the lane realignment, and after she was ordered to produce to the Governor and his Chief of Staff any documents related to her knowledge of the events.  Instead of producing that September 12, 2013 email to Wildstein containing Kelly's response of "Good" to learning that the lane realignments "upset" Mayor Sokolich, Kelly told her subordinate to destroy it—to keep the truth of her knowledge and involvement in the scheme from the Governor and others in the Governor's Office.  Indeed, this is precisely how the Grand Jury and Government has depicted the event.  *See, e.g.*, Doc. 91 at 43 (Government argument that "Kelly's directing a subordinate at the OGNJ to destroy evidence" was part of Defendants' "effort to maintain plausible deniability for themselves"); Indictment, Ct. 1, ¶¶ 41, 57, 59(DD) (describing the Sept. 12, 2013 email and Kelly's Dec. 12, 2013 direction it be deleted).  Comparing this cover-up to Ms. Egea's deletion of text messages that were unrelated to the lane realignment in the ordinary maintenance of personal mobile phone storage—even going as far as describing GDC's conduct on this issue as a "propaganda campaign" (KB 10)—is clearly baseless.[7]

---

the indictment were party."  *Id.* at 700-01 (emphasis added).  Unlike in *Nixon*, here, it is only through speculation and through a distorted reading of the Indictment that Defendants try to connect the text messages—exchanged by nonparties during testimony not mentioned in the Indictment—to the "offenses charged in the [i]ndictment."

[7]   Contrary to Defendants' cynical contention that GDC "did nothing" (KB 9) and "destroyed" evidence (KB 9, 23), the GDC investigation report made a point of addressing the fact that OGNJ staff at times used personal devices and personal email accounts to communicate matters concerning State business.  In fact, the Report describes instances of OGNJ employees and others using personal devices and email accounts more than 100 times, and even recommended action to restrict the use of personal email accounts and devices, a recommendation embodied in current OGNJ policy.  *See, e.g.*, Report 25 (presenting policy recommendation that OGNJ should "Restrict the Use Of Personal Email Accounts For Conducting Official State Business[,]" and

In sum, Defendants' demand for the entire contents of every mobile phone, laptop, hard drive, and personal computer from which Gibson Dunn reviewed records goes far beyond the Grand Jury Subpoenas.  It is overbroad and invasive in the extreme.  This Unauthorized Demand should be quashed.

### 2. The Demands For "All" Kelly And Stepien Records Are Improper And Demonstrate Defendants' Inability To Satisfy Rule 17(c)'s Exacting Requirements.

The Unauthorized Demands also include an impermissible demand for "[a]ll records related to" Kelly and Stepien—a demand neither "narrowly tailored" (KB 3) nor "specific" (BB 26).  Subpoena, Demand II.A.5.  Because the Government never sought "[a]ll records" as to Kelly and Stepien, the demand plainly does not mirror the Grand Jury Subpoenas, and they are invalid under Rule 17(c) in any event.

Kelly herself concedes that her demand for "[a]ll records" related to her and Stepien is an "additional demand" and not "the exact same subpoena [request as] the USAO issued to the OGNJ."  KB 3.  To be clear, any Kelly or Stepien document in OGNJ's possession relevant to and contemporaneous with the lane realignment was produced to Defendants.  There is nothing contrary in the record—only Defendants' unadorned speculation, and their distortion of the sworn testimony presented in support of OGNJ's motion—that additional information or "other material regarding the Fort Lee lane closures" (BB 14) remains to be disclosed.[8]  Because this demand exceeds what was sought in the Grand Jury Subpoenas, it should be quashed.

---

recommending that "[t]he Governor's Office should also make State employees aware of the implications, pursuant to public record disclosure and retention requirements, of text messaging to conduct official state business").

[8]    Unable to refute the declarations accompanying OGNJ's motion, which comprehensively explained the procedures by which, among other things, OGNJ complied with the Grand Jury Subpoenas, Baroni severely misstates those procedures in asserting that GDC "engaged in an

The demand of "[a]ll records" of Kelly and Stepien also does not meet Rule 17(c)'s stringent standard, but rather is cast in terms inappropriately borrowed from civil discovery. "The criminal subpoenas in *Nixon* were required to satisfy exacting standards of '(1) relevancy; (2) admissibility; (3) specificity.' They were 'not intended to provide a means of discovery.'" *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 386-87 (2004) (quoting *United States v. Nixon*, 418 U.S. 683, 698, 700 (1974)).[9]

As to *relevancy* to "the offenses charged in the [I]ndictment" (*Nixon*, 418 U.S. at 700): Defendants assume that whenever the Indictment mentions something, "all documents" that mention that thing must meet *Nixon*'s relevancy requirement. They posit a wild-goose-chase theory of Rule 17(c) to sustain, for example, Kelly's argument that every single document she created, sent, or reviewed during her employment at OGNJ is relevant to the Indictment because the Indictment refers to her role at IGA and IGA's function within OGNJ. KB 4-5. But neither the "operations of IGA" (KB 5) nor "mayoral endorsements" in general (BB 27-28) are pivotal

---

*extra review of the documents* to further reduce the number that would be produced." BB 33. This "extra review" claim hinges on a selective misreading of Paragraph 7 of the 4/28/2016 Declaration of Alexander H. Southwell, which, in full, makes clear that OGNJ only claimed privilege over documents that were *not* related to and contemporaneous with the lane realignment.

[9]   Ignoring OGNJ's production to Kelly of her personnel records, Kelly seems to assert some vague right to all of what she paradoxically calls "her personal government records, including government e-mails" (KB 3). Records Kelly created on the job at OGNJ are not Kelly's property; employees have no freestanding right to employer records after employment ends, particularly when they have been terminated. Contrary to Kelly's contention (KB 4 n.2), the state's public record laws have nothing to do with this federal criminal case, and the observation in the Report that government emails are "government records" that could be disclosed in response to a properly framed state-law-based request does not mean that all government emails are automatically subject to such disclosure. *See MAG Entm't, LLC v. Div. of Alcoholic Beverage Control*, 868 A.2d 1067, 1076 (N.J. Super Ct. App. Div. 2005) (Open Public Records Act, N.J.S.A. 47:1A–1–13, "does not countenance open-ended searches of an agency's files"). Furthermore, Kelly is incorrect in baldly asserting that GDC must have all emails of Kelly and Stepien (beyond those responsive to the Grand Jury Subpoenas) at the ready.

to the offenses charged in the Indictment.  The Indictment instead concerns the lane realignment and Defendants' misrepresentations to various authorities concerning the lane realignment—and only documents proving or disproving these allegations potentially meet the *Nixon* relevancy requirement for Rule 17 purposes.  OGNJ has produced those documents and has attested to that production, and Defendants have no contrary evidence other than baseless speculation.

Also incorrect is Kelly's argument that all documents with her name on them are relevant to her defense that her "alleged conduct was not aberrational or outside the scope of her employment."  KB 6.  To be clear, the Governor terminated Kelly's employment because her role in the lane realignment and her attempt to conceal that role *was* aberrational and *was* flatly inconsistent with the scope of her employment.  Kelly fails to demonstrate why the demand all documents "related to" her—without further tailoring—would be relevant at trial on an Indictment alleging criminal conduct as to her, Baroni, and Wildstein's interactions with Mayor Sokolich, and (as alleged in only one paragraph of the Indictment), Mayor Fulop.

As to *specificity*:  Defendants' demand for "all" Kelly and Stepien documents plainly is not sufficiently specific under controlling law.  The demand for "all" documents relating to Kelly from her entire tenure at OGNJ is no less sweeping than the civil discovery requests "ask[ing] for everything under the sky" which the Supreme Court *rejected* in *Cheney*.  542 U.S. at 387.  Under *Cheney*, Rule 17(c) requests must be "'precisely identified' and 'specific[ally] . . . enumerated.'"  *Id*. (quoting *Nixon*, 418 U.S. at 688 & n.5).  Defendants' demand is neither.  Defendants fail to connect "mayoral endorsements" and "operations at IGA" generally to their demand for "all" documents related to Kelly without limitation.  This type of kitchen-sink demand fails *Nixon*'s specificity requirement—and impermissibly would thrust on OGNJ the severe burden of producing large volumes of useless information.

As to *admissibility*:  Defendants also have no answer to OGNJ's explanation (OB 15-17) that the documents demanded will not be admissible at trial.  Baroni's laundry list (BB 20-23) of various hearsay exceptions in the Federal Rules of Evidence does not show that *any* of the vast and unspecified materials demanded are actually admissible.  It shows instead that to fall within any of the hearsay exceptions invoked, Baroni must speculate about undetermined documents and unknown events at trial—as to the identity of witnesses, the manner of their testimony, and conjectured deficiencies in that testimony that would trigger the hearsay exceptions.  It is exactly *that* kind of speculation that is forbidden:  "Only after a witness has testified will his prior inconsistent statement cease to be hearsay, *see* Fed. R. Evid. 801(c), but *we are unable to speculate on the likelihood of that occurrence*."  *United States v. Cuthbertson*, 651 F.2d 189, 195 (3d Cir. 1981) (emphasis added) (*Cuthbertson II*).  Moreover, the materials demanded from OGNJ are so far afield that they will waste time and confuse the jury, warranting exclusion under Rule 403.[10]

### 3.    The Subpoena Unacceptably Demands OGNJ Records From At Least Three Years Preceding The Events That Will Be Presented At Trial.

Defendants also contend (KB 7) that the temporal specification of the Subpoena is correct, because it matches the facial temporal specification of the Grand Jury Subpoenas, which initially sought documents from January 2010 to January 2014.  But as explained, through

---

[10]   Given that the Indictment does not refer to GDC's investigation, let alone to the personal devices, or to the other OGNJ records sought in the Unauthorized Demands, Defendants have no tenable argument that those materials (even assuming, *arguendo*, their marginal relevancy to the charges in the Indictment) would be anything other than *unduly confusing* for the lay jurors at trial.  Contrary to Baroni's contention (BB 21-22), no further "context" is necessary to reach that conclusion now, which warrants quashal under Rule 403.  *See, e.g.*, *United States v. Georgiou*, Crim. No. 09-88, 2009 WL 2973035, at *3-4 (E.D. Pa. Sept. 16, 2009) (granting nonparty motion to quash subpoena pretrial, based on concern "about 'all kinds of little, mini trials'" that "implicated Rule 403") (citing *United States v. Farrington*, 58 Fed. Appx. 919, 925 (3d Cir. 2003)), *aff'd on other grounds*, 777 F.3d 125 (3d Cir. 2015).

consultations with the Government, OGNJ complied with the Grand Jury Subpoenas by producing documents from January 2013 to January 2014.  4/28/2016 Southwell Decl. ¶ 4.  In contrast, Defendants demand documents *from January 2010* to the present day.  This extensive earlier time frame is not warranted because it does not mirror the production to the Government and is impermissible under Rule 17, which, of course, uses a much more searching standard than the standard for the validity of a grand jury subpoena.[11]

Just as importantly, Defendants have made no showing that the cost to OGNJ of discovery into this expanded time period would likely be offset by any practical benefit for trial use.  Defendants have not addressed the tremendous new burden their chosen temporal specification would impose on OGNJ in seeking a mass of documents from *three years of OGNJ operations* (from 2010 through the end of 2012) not portrayed in the Indictment and well before the events that are the focus of the case.  Defendants would now have OGNJ incur the tremendous burden and expense of searching for, reviewing, and producing "all" documents over the course of three years—documents that the Government itself did not require OGNJ to produce in connection with its independent grand jury investigation.  And Defendants urge

---

[11]    While a grand jury subpoena will ordinarily validly issue whenever there is a "reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation," *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991), a pretrial subpoena under Rule 17(c), by contrast, may only seek records "both relevant and admissible at trial," *id.*, at 299-300 (citing *Nixon*, 418 U.S. at 700).  Additionally, Defendants ignore the difference between grand jury and pretrial production subpoenas, and contend instead that a 2010 start date is required because "[b]etween in or about March 2011 and on or about August 12, 2013, Wildstein had separate discussions with defendant BARONI and defendant KELLY about how they could use the Local Access Lanes as leverage against Mayor Sokolich."  KB 7 (citing Indictment, Ct. 1, ¶ 9).  But the Indictment does not say that Wildstein had conversations with Kelly in March 2011 (when Kelly was not even in the role of Deputy Chief of Staff).  The more natural reading is that Wildstein had the earlier-in-time discussions with Baroni.  Communications between Baroni and Wildstein alone would *not* have been contained in OGNJ records:  OGNJ did not employ Baroni and Wildstein.

imposition of that burden without showing it would yield *any* cognizable benefit to Defendants as they prepare for trial in this criminal case, on an Indictment concerning the lane realignment scheme alleged to have occurred "[f]rom in our about August 2013 to in or about December 2013." *See, e.g.*, Indictment, Ct. 1, ¶ 2. Even if Rule 17(c) were properly used as a "means of discovery"—and precedent insists that it is not—such disproportionately burdensome discovery is not acceptable under the more generous civil framework. *See* Fed. R. Civ. P. 26(b)(1) (discovery must be "proportional to the needs of the case").

### 4. Defendants' Further Allegations As To Immaterial Production Deficiencies Lack Merit And Do Not Support The Unauthorized Demands.

Defendants also err in urging an inference of discovery misconduct based on isolated documents produced by others which were not in OGNJ's possession or production, and which Defendants misrepresent as "evidence that Gibson Dunn disposed of, lost or otherwise made sure that certain documents never saw the light of day." BB 27. But Defendants' spurious accusations are completely without merit and should be rejected. And in any event, the document-specific claims of production deficiency do not legitimate the Unauthorized Demands under Rule 17(c).

Baroni focuses on an email from a personal email account of "Chris and Mary Pat Christie" to David Samson, the Port Authority chairman, about a press article related to the lane realignment that was produced by Samson's law firm. BB 2-3 (citing D1).[12] Baroni claims that

---

[12]   Moreover, Defendants cite no cases holding that they are entitled to receive from OGNJ a duplicate of documents Defendants have been provided from other sources. Instead, as proponents of the Subpoena, it is Defendants who must show that the demanded materials "are not otherwise procurable reasonably in advance of trial by exercise of due diligence." *Nixon*, 418 U.S. at 699. The Government has provided Defendants with voluminous discovery in addition to the production by OGNJ, and so long as Defendants have the documents from one source, their inability to obtain a duplicate from another source is meaningless.

OGNJ and GDC "withheld" this "document[] related to the lane closures" (BB 3), ignoring that

the document itself, stating merely "[p]er our earlier conversation," is inconsequential.

Moreover, as explained in the Supplemental Declaration of Alexander H. Southwell, this email is

from a personal account of the Governor and his wife which GDC understood was not used by

the Governor for official business and contained nothing responsive to the Grand Jury

Subpoenas.  Nevertheless, in an effort to resolve any possible disputes, after reviewing Baroni's

allegations as to this email, GDC searched that joint marital account to determine if there were

any emails that were related to and contemporaneous with the lane realignment.  *See* Southwell

Supp. Decl. ¶ 8.  The account contained no such emails (other than the email proffered by

Baroni), generally containing personal emails concerning family logistics and other personal

topics.  *See id.*[13]

Baroni's further contention concerning three April 2013 emails which he asserts contain

"detailed discussion of mayoral endorsements" is also wrong.  BB 27-28 (citing D13-15).

Baroni does not even attempt to connect the emails to any particular request in the 1/17/2014

G.J. Subpoena.  That subpoena did not include the expansive "mayoral endorsements" topic as

an area of inquiry, and nothing on the face of the particular emails indicates that they should

have been produced in compliance with that subpoena.  Of course, the scheme alleged in the

Indictment arose based on Mayor Sokolich's refusal to endorse Governor Christie.  *See*

Indictment, Ct. 1, ¶¶ 4, 10-13.  The emails cited by Defendants do not mention Mayor Sokolich,

and even Baroni admits that his demand for "All records relating to the Borough of Fort Lee or

---

[13]   Baroni also errs in contending (BB 15, 16 n.7, 18) that negotiations with SCI counsel imply
that GDC withheld "important documents" in responding to the Grand Jury Subpoenas and
Defendants' Subpoena.  This SCI example does not illustrate a cabined view of relevance by
OGNJ, but rather, Defendants' selective and misleading use of snippets of material.  *See*
Southwell Supp. Decl. ¶¶ 12-15.

Mayor Mark Sokolich" "does not seek information regarding all mayors being courted for endorsements, or all mayors in towns that host a Port Authority entity, *e.g.*, Bayonne, Weehawken."  BB 25.  There is thus no discovery misconduct and no justification on that ground for the Unauthorized Demands.

### 5.   The Meritless Conflict Of Interest Claims Have No Bearing On OGNJ's Motion To Quash The Unauthorized Demands.

Defendants fare no better with their purported conflict of interest arguments (BB 6 n.3, KB 24-25), which amount to a baseless *ad hominem* attack on GDC.  *See, e.g.*, Mastro Supp. Decl. ¶ 9.  Nor does any purported conflict legitimize Defendants' Unauthorized Demands under Rule 17(c).

For example, Kelly's contention that GDC's representation of the Port Authority raised a conflicts problem (KB 25 n.21) rests on a fundamental misunderstanding of the relationship between OGNJ and the Port Authority.  The Port Authority is a public instrumentality, and OGNJ is an arm of one of the two States of which the Port Authority is an agency.  *See, e.g.*, *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 35-38 (1994).  Kelly's contention fails to take account of the Port Authority's unique status as a bi-state agency, and relies on no legal authority.

Defendants' conflicts contention is yet another effort simply to smear GDC, not to advance a coherent argument to the Court.

* * *

While OGNJ and GDC have sought to refute Defendants' claims of misconduct through the written submissions supporting OGNJ's motion, we respectfully request the opportunity to be

heard orally should the Court entertain any such claims of attorney misconduct. Due process

demands no less.[14]

### B. The Eleventh Amendment Bars The Private Defendants From Coercing Enforcement With The Unauthorized Demands.

Although this constitutional question need only be reached if the Court concludes that the

Unauthorized Demands are permissible under Rule 17(c), all of Defendants' contentions

concerning the Eleventh Amendment are unavailing. BB 29-30, KB 27.[15]

Baroni is wrong to argue that the Eleventh Amendment does not apply because immunity

"operates differently" (BB 30 n.13) depending on whether the government asserting it is state,

federal, or tribal. If anything, the Constitution grants States greater dignity than it does to Native

American tribes, *see Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 264-65, 281-88 (1997),

indicating that the logic recognizing nonparty *tribal* immunity from private subpoenas applies

with even greater force where, as here, a *State* is the objecting nonparty.

---

[14]   Defendants have criticized GDC for refuting the allegations of wrongdoing that Defendants leveled in their discovery motions and at oral argument on the subpoena application—assertions that GDC had no prior opportunity to refute. Contrary to Defendants' assertion, the opening brief on OGNJ's motion to quash did not seek to "relitigate" (KB 2) anything; nor has anyone tried to "intimidate[]" Defendants. BB 6. GDC has sought only to correct the record related to the baseless allegations of discovery misconduct in Defendants' discovery motions antecedent to the Subpoena. And GDC also has rebut the unfair and baseless charge that "GDC failed miserably" in its investigation. KB 24-25.

[15]   Kelly's unsupported contention (KB 27) that OGNJ has forfeited the Eleventh Amendment through "voluntary compliance" with the Authorized Demands while moving to quash the Unauthorized Demands would install an unprecedented and perverse regime. Penalizing voluntary partial compliance with a subpoena would spur unnecessary disobedience of court orders: To assert immunity as to the invalid part of a subpoena, a State would be obligated to oppose a subpoena in *toto*, rather than to seek "relief more finely drawn" to resolve the real dispute. *See Petruska v. Gannon Univ.*, 462 F.3d 294, 305 n.8 (3rd Cir. 2006). Instead, "[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem." *Id.* (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329-31 (2006)).

Baroni further errs in relying (BB 30) on out-of-circuit *civil discovery* decisions erroneously concluding that the Eleventh Amendment "do[es] not apply to nonparty discovery subpoenas," on the theory that subpoenas "will not result in a judgment or relief of any kind *requiring financial payment from the state*." *United States v. Univ. of Mass., Worcester*, Civ. No. 13-40066, 2016 WL 829971, at *3 (D. Mass. Mar. 3, 2016) (citing *Allen v. Woodford*, 544 F. Supp. 2d 1074, 1079 (E.D. Cal. 2008)) (emphasis added).  In arguing that the Eleventh Amendment does not apply because Defendants do not seek "financial payment," Defendants defy the Supreme Court, which has "often made it clear that the r*elief sought by a plaintiff suing a State is irrelevant* to the question whether the suit is barred by the Eleventh Amendment." *Seminole Tribe v. Florida*, 517 U.S. 44, 58 (1996) (emphasis added).  Defendants fail to grasp that "[t]he Eleventh Amendment is concerned not only with the States' ability to *withstand* suit, but with their privilege *not to be sued*." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 n. 5 (1993) (emphasis added).[16]

---

[16]   Contrary to Defendants' citations, (1) the Due Process Clause (KB 27) and (2) the Sixth Amendment (BB 29) are not at issue here.  *First*, "[t]here is no general constitutional right to discovery in a criminal case." *Kaley v. United States*, 134 S. Ct. 1090, 1101 (2014) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559-61 (1977)).  Where the Government, not OGNJ, is prosecuting Defendants, OGNJ cannot deprive Defendants of "the right to a fair opportunity to defend against the [prosecution's] accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  *Second*, the Sixth Amendment does not suggest that States were, at the Founding, considered "witnesses" subject to "compulsory process," and the Eleventh Amendment commands the opposite.  In any event, to make a Confrontation Clause claim, Defendants would have to show they were "arbitrarily deprived of 'testimony [that] would have been *relevant and material*, and . . . *vital to* the defense.'" *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (quoting *Washington v. Texas*, 388 U.S. 14, 16 (1967)).  Defendants have not attempted to show that the information and items sought via the Unauthorized Demands are "material, and . . . vital" to their defense.  Given the absurd overreach of the Unauthorized Demands, they cannot do so.  Moreover, Defendants cannot circumvent the immunity by pointing to Congress's power to abrogate under the Fourteenth Amendment (even if Defendants *had* advanced such an argument, which they do not).  Section 5 of that amendment is the exclusive channel for statutory abrogation of the Eleventh Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976).  But to

**C.    The Court Should Not Reach The Substance Of OGNJ's Procedurally-Correct Privilege Claim Over The Irrelevant Documents Withheld Until Defendants Move To Compel.**

OGNJ followed the correct *procedure* for claiming privilege through the declaration of Custodian of OGNJ's records, Heather Taylor, after a thorough review of its *irrelevant* records, and Defendants' assertions of procedural error are flawed.  Defendants erroneously assert (KB 13-16; BB 35) that a privilege claim invariably requires a supporting declaration from the head of the agency.  There is no such ironclad rule; to the contrary, the Third Circuit has *repeatedly* sustained privilege based on declarations from subordinate officials and from government lawyers—precedent that Defendants flatly ignore.[17]

Nor was OGNJ's declarant required herself to review *each* of the 5,415 documents withheld in whole or part, rather than rely on a subordinate's assistance for some of the review. KB 15.  The law is clear that the "high-ranking official who asserts the privilege need not have

---

abrogate by statute, Congress must have "unequivocally express[ed] its intent to abrogate the immunity," and must have "acted pursuant to a valid exercise of power."  *Seminole Tribe*, 517 U.S. at 55 (internal quotations omitted).  *Nowhere* in Rule 17(c) has Congress clearly expressed any intent to abrogate Eleventh Amendment immunity.

[17]    *See, e.g.*, *Bayliss v. N.J. State Police*, 622 F. App'x 182, 185 (3d Cir. 2015) (sustaining deliberative process privilege based on certification of officer commanding pertinent state police division); *Conoco Inc. v. U.S. Dep't of Justice*, 687 F.2d 724, 728-29 (3d Cir. 1982) (sustaining privilege based on subordinate attorney affidavits); *Coastal States Gas Corp. v. Dep't of Energy*, 644 F.2d 969, 972 (3d Cir. 1981) ("counsel's affidavit . . . described the withheld documents") (*Coastal States II*); *see also New Jersey v. RPI Energy Mid-Atl. Power Holdings, LLC*, Civ. No. 07-5298, 2013 WL 272763, at *2 (E.D. Pa. Jan. 24, 2013) (accepting declarations of agency's assistant director and research scientist).  Defendants err in contending (BB 35, KB 13-16) that an older Third Circuit decision, *United States v. O'Neill*, 619 F.2d 222 (3d Cir. 1980), prohibits an agency from claiming privilege through a declaration from a subordinate official.  In *O'Neill*, counsel for a municipality orally asserted the "law enforcement" privilege at a federal agency hearing.  That attempted assertion was improper because it was oral, and "there was no indication . . . that the department heads made the type of personal careful examination" necessary.  *Id.* at 225-26.  But the court did *not* rule that it is always inappropriate for counsel, rather than policy officials, to invoke the privilege, and OGNJ's invocation here was written, not oral.

reviewed every document for which the agency" claims privilege.  *Gen. Elec. Co. v. Johnson*, Civ. No. 00-2855, 2007 WL 433095, at *7 (D.D.C. Feb. 5, 2007).[18]  Defendants' unsupported suggestion flies in the face of the realities of modern litigation, where parties (and, indeed, nonparties such as OGNJ) are routinely asked to log hundreds of thousands of privileged documents.  Were agency heads required to review each disputed document personally, they would be substantially impeded in their other policymaking responsibilities.

Regarding the *substance* of the privilege claims, OGNJ will not address—and this Court should not address—Defendants' purported "examples" of document-specific criticisms of the privilege logs until, and only if, Defendants initiate proceedings challenging the privilege claims by moving to compel compliance.  To ensure that OGNJ and this Court has proper notice of the alleged Article III "case" or "controversy" (assuming for this purpose only there is no Eleventh Amendment bar), Defendants' motion papers must identify with specificity each document they contend has been improperly withheld and articulate all reasons why that is so.  Defendants' conclusory arguments, which continue to offer only purported "example[s]" of documents they label as inadequately described, do not provide sufficient notice.  *See e.g.*, KB 18 n.13 (argument only by "example"); Doc. 44-1 at 29-30 (same).  Nor can Defendants provide valid notice of the

---

[18]  "[I]t can hardly be intended that deliberative process material generated at the working attorney staff level . . . must be reviewed by the head of a department or agency.  Such a requirement would be an unwarranted imposition on the time of the heads of departments and agencies." *Founding Church of Scientology of Washington, D.C., Inc. v. Director, FBI*, 104 F.R.D. 459, 465 (D.D.C. 1985).  In any event, the Third Circuit has rejected "inadvertent" waiver arguments as to the deliberative process privilege. *Redland Soccer Club v. Dep't of Army*, 55 F.3d 827, 856 (3d Cir. 1995).  Courts thus "have rarely rejected the Government's invocation of the deliberative process privilege on procedural grounds." *Dairyland Power Co-op. v. United States*, 77 Fed. Cl. 330, 340 (2007); *see, e.g.*, *Morris v. Verniero*, Civ. No. 03-1001, 2008 WL 852440, at *2 (D.N.J. Mar. 28, 2008); *RTC v. Diamond*, 137 F.R.D. 634, 646 (S.D.N.Y. 1991). Were any procedural error perceived here, the correct course would be to direct OGNJ to submit a revised declaration and privilege log. *See, e.g.*, *Coastal States II*, 644 F.2d at 971, 985.

scope of the dispute by attempting to incorporate by reference (BB 31) submissions on prior motions to which OGNJ was not party and to which OGNJ could not previously have filed a response.  Moreover, the presumption of regularity supports prosecutorial decisions, in the absence of "clear evidence to the contrary" (*United States v. Armstrong*, 517 U.S. 456, 464-65 (1996); OB 22 n.14), and Defendants have not proffered "clear evidence" overcoming the presumption that prosecutors here correctly concluded, after reviewing OGNJ's privilege logs, that OGNJ had validly documented the privilege claims.[19]

For its part, OGNJ's motion to quash seeks narrow relief—an order invalidating the Unauthorized Demands—and no pending motion seeks to direct OGNJ to take *any* action concerning the privileged documents.  Denying a motion to quash is not functionally equivalent to granting a motion to compel.  *Pennwalt Corp. v. Durand-Wayland, Inc.*, 708 F.2d 492, 494 (9th Cir. 1983); *Kant v. Seton Hall Univ.*, Civ. No. 00-5204, 2009 WL 5033927, at *1 (D.N.J. Dec. 14, 2009).  Defendants' failure to move to compel, notwithstanding their prior avowal to challenge OGNJ's privilege claims, suggests their delay is tactically motivated.  Defendants' tactics should not be indulged.[20]

---

[19]   Document-by-document specification of the challenge is especially important because many of the proffered "examples" reflect errors on Defendants' part.  Take Baroni's contention (BB 15) that "the Governor's schedule for the week of the lane closures" has been "conveniently omit[ted]" from the privilege and redaction logs.  OGNJ produced the *unredacted* versions of the Governor's schedules, and the *unredacted* schedule for the week of the lane realignments, and can provide the corresponding Bates numbers upon request.  Or take Kelly's contention (KB 17) that communications between Nicole Crifo, former Senior Counsel, Authorities Unit, and Wildstein and Baroni at Port Authority about press strategy are ineligible for the deliberative process privilege because none of them "held a communications role."  That assertion falsely presupposes that lawyers and other senior policy officials can only participate in deliberations concerning press strategy if they are assigned a "communications role"—a presupposition Defendants do not (and cannot) substantiate.

[20]   In the alternative, as OGNJ proposed (OB at 29), should the Court have any concern about the potential effect of OGNJ's privilege claims on Defendants' ability to prepare for trial on the

## CONCLUSION

For the foregoing reasons, and those in the opening memorandum and all accompanying papers, OGNJ respectfully requests that this Court quash the Unauthorized Demands.

Dated:  June 28, 2016
New York, New York

Respectfully submitted,
GIBSON, DUNN & CRUTCHER LLP

/s/ Randy M. Mastro
Randy M. Mastro
Alexander H. Southwell (admitted *Pro Hac Vice*)
200 Park Avenue
New York, NY  10166-0193
Phone:  212.351.3825
Fax:  212.351.5219
E-mail:  RMastro@gibsondunn.com
*Attorneys for Nonparty*
*Office of the Governor of New Jersey*

---

charges in the Indictment, it should enter an order directing OGNJ to submit *ex parte*, as a logical sample of the documents withheld, the particular documents described by Defendant Kelly in her opening brief (Doc. 42 at 26-32) for *in camera* review.  Such a review would allow the Court to confirm the documents are completely irrelevant to the charges in the Indictment. Defendants tellingly propose no alternative sample.