**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILLIAM E. BARONI, JR. and<br>BRIDGET ANNE KELLY<br><br>    Defendants. | Crim. No. 15-193 (SDW) |

**SUPPLEMENTAL DECLARATION OF ALEXANDER H. SOUTHWELL
IN FURTHER SUPPORT OF
NONPARTY OFFICE OF THE GOVERNOR OF NEW JERSEY'S
MOTION TO QUASH IN PART DEFENDANTS' SUBPOENA *DUCES TECUM***

I, Alexander H. Southwell, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am a partner at Gibson, Dunn & Crutcher LLP, counsel for nonparty Office of the Governor of New Jersey ("OGNJ") in this matter, in which I appear *pro hac vice*.  I make this declaration in further support of the OGNJ's Motion to Quash in Part Defendants' Subpoena *Duces Tecum*.

2.      As explained in my April 28, 2016 declaration (Doc. 111-2), beginning in January 2014, the Government directed grand jury subpoenas to the OGNJ and related New Jersey Executive Branch components for various topics under investigation (the "Grand Jury Subpoenas"), including the September 2013 George Washington Bridge lane realignment near Fort Lee, New Jersey.

3.      The Grand Jury Subpoenas sought, among other items, pertinent "records maintained on all computers, hard drives, data storage devices, mobile phones, and tablet

computers under the care, custody or control of the Office of the Governor."  Doc. 111-2 at 12. The Government did not seek the production of any devices or data sources.

4.      To respond to the Grand Jury Subpoenas, the OGNJ asked GDC to assist with searching for, collecting, reviewing, and producing to the Government all materials responsive to the requests in the Grand Jury Subpoenas as part of the OGNJ's cooperation with the Government's investigation.

5.      As I have previously attested, upon being engaged by the OGNJ, I worked with a team to search for and collect hard copy and electronic documents and records, including the personal texts and emails of the OGNJ employees, including the Governor and his senior staff, including Regina Egea, then Director of the Authorities Unit.  As part of that process, GDC retained a firm specializing in forensic analysis and e-discovery to assist with information collection and retention.

6.      GDC, in accordance with conversations with the Government, identified all employees of the OGNJ likely to have possessed information relevant to the Grand Jury Subpoenas ("Custodians").  The forensic firm, at the direction of GDC, copied and preserved the contents of all government-issued devices and email accounts for each Custodian.

7.      In addition, GDC asked the Custodians whether they used any personal devices or non-governmental email accounts to conduct official business or correspond about the topics of the Grand Jury Subpoenas.  For each Custodian who used personal devices or personal email accounts in such a manner, we ensured that the contents of these devices and accounts were preserved and then applied the negotiated search terms (as described in paragraphs 3-4 of my declaration dated April 28, 2016) ("Search Terms").  Similar to how we reviewed potentially responsive documents from government devices and accounts, we reviewed any potentially

responsive documents from any personal device or account based on the Search Terms to determine whether each should be produced or not, or logged onto a privilege log.  After identifying any responsive material from a Custodian's personal device(s) or personal email account(s), the OGNJ returned all other data and the device(s) to the employee who owned that personal device or account or, where the employee had personal counsel, to the employee's personal counsel.  The same procedures were followed with the Governor's personal phone and personal email account.  We understand that data and phone have been, and continue to be, preserved.

8.     Defendant Baroni's opposition to the OGNJ's motion to quash raised a December 14, 2013 email from "Chris and Mary Pat Christie" to "Samson, David" bearing the subject line "Aide to Gov. Cuomo Confirms NJ Gov. Chris Christie's Comments On GWB Flap – Daily News."  That email was sent from a joint martial account of the Governor and his wife, which we understood was not used by the Governor for official business and contained nothing responsive to the Grand Jury Subpoenas.  In light of Baroni's opposition, and in an effort to resolve any possible disputes, GDC searched that joint marital account to determine if there were any emails that were related to and contemporaneous with the lane realignment.  The account contained no such emails (other than the email proffered by Baroni), generally containing personal emails concerning family logistics and other personal topics.

9.     Over two weeks after Baroni's legislative testimony that is the highlighted in the Indictment (Ct. 1, ¶¶ 55, 59(CC)), the New Jersey Assembly Transportation Committee took testimony under oath from three Port Authority employees concerning the lane realignment: Patrick Foye (Executive Director of the Port Authority), Cedric Fulton (Director of Tunnels, Bridges, and Terminals), and Robert Durando (George Washington Bridge General Manager).

Then-Director of the Authorities Unit, Regina Egea, listened to this December 9, 2013 hearing. Ms. Egea informed GDC that she believed she had communicated by text with the Governor during the hearing about her thoughts on the Port Authority employees' professionalism during their testimony. Attached hereto as Exhibit A is a true and correct copy of the GDC memorandum of Ms. Egea's interview, which memorialized this point at page seven. Ms. Egea also informed GDC that, at some point prior to GDC's internal investigation (and the Government's investigation), she had deleted these text messages in the ordinary course of maintaining her personal phone.

10.     On July 17, 2014, the New Jersey Legislative Select Committee on Investigation ("SCI") took the testimony under oath of Ms. Egea concerning the Committee's investigation into the operations of the Port Authority and the lane realignment. During this testimony, Ms. Egea confirmed that which she had previously told GDC, providing additional detail in response to questioning by several SCI members. Attached hereto as Exhibit B is a true and correct copy of excerpts of Ms. Egea's sworn testimony on this topic before the SCI on July 17, 2014. Ms. Egea made clear that she commented on the professionalism of the witnesses during their testimony in texts with the Governor during the December 9 hearing. *See* Ex. B at 124, 126. Ms. Egea further made clear that she had deleted these text messages as a matter of course while maintaining her personal phone and she believed she had done so prior to January 8, 2014. *See* Ex. B at 125. This explanation was to the apparent satisfaction of the SCI as reflected in its final report, a true and correct copy of the relevant excerpt of which is attached hereto as Exhibit C.

11.     To be clear, GDC, on behalf of the OGNJ, preserved both Ms. Egea's and the Governor's personal phones but the December 9th text exchange between them about the professionalism of the witnesses at the hearing was not present on either device. This means that

the texts had been deleted in the ordinary course prior to collection of the data from the phones. The OGNJ and GDC do not possess the December 9th text exchange between Ms. Egea and the Governor.   These undisputed facts, supported by Ms. Egea's sworn testimony, and the circumstances regarding the text exchange between the Governor and Ms. Egea and their phones obviate the need for further affidavits sought by defense counsel.

12.    When the SCI commenced its investigation in January 2014, the SCI issued subpoenas to the OGNJ on various topics related to the September 2013 George Washington Bridge lane realignment near Fort Lee.   Attached as Exhibit D is a true and correct copy of the January 27, 2014 and February 10, 2014 subpoenas from the SCI to the OGNJ.   These subpoenas took a different, narrower form than the Grand Jury Subpoenas.   In particular, these SCI subpoenas did not call for documents and communications related to David Wildstein or traffic studies.

13.    As it had with responding to the Grand Jury Subpoenas, the OGNJ asked GDC to assist with searching for, collecting, reviewing, and producing to the SCI all documents responsive the subpoenas.   Much in the same way as the OGNJ made its production to the Government, GDC, on behalf of the OGNJ, and counsel for the SCI engaged in conversations regarding the SCI subpoenas, which assisted in prioritizing and tailoring the search procedures to the actual requests from the SCI.   Among the issues we discussed about the OGNJ's response to the specific SCI requests was whether materials about David Wildstein's resignation were responsive.   Specifically, on May 23, 2014, I wrote to SCI counsel confirming the OGNJ's view that communications concerning "the resignation of former Port Authority official David Wildstein" were not responsive to the SCI subpoenas and therefore were not produced.   Doc. 124-1 at 6.   Recognizing this gap resulting from the narrow language in the SCI subpoenas, on

June 13, 2014, the SCI issued another subpoena directed to the OGNJ seeking, among other items, documents and communications concerning "the resignation . . . of David Wildstein from his previous position" at the Port Authority.  Attached hereto as Exhibit E is a true and correct copy of that subpoena.

14.     Baroni raises my correspondence with SCI counsel in his opposition to the the OGNJ's motion to quash, claiming it evidences the OGNJ's improperly narrow view of relevancy that extends to the Grand Jury investigation and response to Defendants' Rule 17 subpoena.  BB 15, 16 n.7, 18.  Specifically, Baroni highlights an August 25, 2014, letter from SCI counsel to me, which suggested that the OGNJ did not produce documents concerning the Wildstein resignation; Baroni asserts that SCI counsel's suggestion means that the OGNJ has withheld "important documents" in responding to the Grand Jury Subpoenas issued by the *Government*.  BB 15, 16 n.7, 18.

15.     This is wrong and misleading.  While it is correct that the OGNJ initially did not produce to the SCI documents related to Wildstein's resignation, that was because they were not responsive to the initial, narrowly-drawn, SCI subpoenas, as plainly explained to counsel for the SCI.  This gap in the SCI's requests is what prompted the June 13, 2014 subpoena from the SCI, which fixed the gap.  *See* Exhibit E.  Moreover, the OGNJ produced those documents to the SCI and pointed out that SCI counsel's view in the August 25th letter that the OGNJ had not produced the Wildstein resignation documents was mistaken.  *See* October 10, 2014 letter from Southwell to Schar attached hereto as Exhibit F.  The October 10th letter noted that OGNJ had produced the communications concerning Wildstein's resignation more than *five months* before, and noted the Bates numbers at which the requested communications could be found in the OGNJ's production.  Baroni's selective use of my correspondence with the SCI should thus be rejected

because it is factually wrong.   The full record plainly demonstrates that the OGNJ's views of responsiveness to the SCI subpoena's particular requests have no bearing on the OGNJ's position as to relevancy or responsiveness to the Grand Jury Subpoenas or Defendants' Rule 17 subpoena, and thus no bearing on the instant motion to quash.

I declare under penalty of perjury that the foregoing is true and correct.   Executed on this 28th day of June, 2016 at New York, New York.

Alexander H. Southwell

# Exhibit A

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:         File

From:      Gibson, Dunn & Crutcher LLP

Re:         Egea Interview Memorandum

_____

On January 17, 2014, February 6, 2014, and February 19, 2014, Regina Egea was interviewed by Alexander H. Southwell and Sarah Vacchiano of Gibson Dunn.  Egea was not represented by counsel during the interviews.  All information contained herein was provided by Egea or as indicated.  The information in brackets was obtained from publicly-available sources, not from the interview itself.  Egea has not read or reviewed the memorandum and has not adopted or approved its contents.  Southwell began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Egea refrain from discussing the investigation and interview with others.  Egea stated that she agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.       Background

[*Egea earned a BA from Montclair University in New Jersey and an MBA in Marketing from Fordham University.  She also completed the International Executive Program at the International Institute for Management Development in Lausanne, Switzerland.  Prior to joining state government, Egea was Senior Vice President for AT&T where she managed a 300-person team supporting AT&T business sales force.  She was elected to local government in Harding Township (Morris), New Jersey in 2008.  Egea left AT&T in 2008 to work for the Christie for Governor campaign and policy team in 2009.*]

Upon the change in administration, Egea worked for the Policy Office, but only for two weeks until she was appointed Chief of Staff for the State Treasurer.  In February 2012, she was appointed as Director of the Authorities Unit under Governor Christie.  In December 2013, she was promoted to Chief of Staff, although currently and as a practical matter, Egea noted that Kevin O'Dowd remains in that role and Egea remains in charge of the Authorities Unit.

Page 2

### A.      Role and Responsibilities

Egea runs the Authorities Unit, which, Egea explained, oversees numerous different state commissions and authorities, such as NJ Transit, the Port Authority of New York and New Jersey, and the casino commission.  The role of the Authorities Unit is to generally monitor the work of the Authorities and specifically review agenda items to be presented to the boards of the Authorities, in order to ensure the agenda items are legally appropriate and consistent with policies the Governor's Office has supported.

Egea said that she oversees four attorneys who serve as deputies in the Authorities Unit: one senior counsel and three associate counsel.  Each deputy oversees 12-15 authorities.

Egea primarily interacts with other employees in the Governor's Office on issues of policy.  On the policy side, Egea interfaces with the Chief Counsel's office.  Egea said that her interactions with the Office of Legislative and Intergovernmental Affairs ("IGA") are limited; she would only interact with IGA when local events are scheduled by an authority.

Egea regularly interacted with former Chief Counsel Charlie McKenna, most often in person.  She infrequently interacts with Kevin O'Dowd.

As head of the Authorities Unit, Egea said that she infrequently interacts directly with the Governor.

### B.      Interactions with the Port Authority of New York & New Jersey

Nicole Crifo was the Authorities Unit deputy responsible for the Port Authority.  Egea explained that Crifo now works for the Port Authority full-time.  While serving in the Authorities Unit, Crifo was responsible for reviewing the agendas for Port Authority board meetings in order to confirm appropriateness.  In this role, Crifo mostly worked with David Wildstein but also worked with Bill Baroni.  Prior to scheduled Port Authority board meetings, Egea and Crifo discussed any agenda items of concern and outlined questions they should ask.  They would then obtain final versions of the agenda and attend the board meetings.

During Crifo's maternity leave, Kirsten Sundstrom attended Port Authority committee and board meetings on behalf of the Authorities Unit.  Egea recalled attending one meeting during Crifo's maternity leave.  Egea noted that Peter Simon now oversees the Port Authority on behalf of the Authorities Unit.

Aside from discussing board agenda items, Egea reported that there were "regular," but not weekly, communications with Port Authority representatives, mostly involving any communication that went to the Port Authority board.  The Port Authority would also sometimes share statements they planned to issue to the press with the Authorities Unit, but in most cases Egea would not comment on Port Authority press releases.  Egea noted that aside from the fact

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

that the Port Authority is the "busiest" relationship the Authorities Unit manages, there is nothing different about that relationship than the Unit's relationship with the other Authorities. Port Authority personnel infrequently attend meetings at the Authorities Unit. If Port Authority personnel were to attend a meeting it would be for a specific purpose, and the attendees would be either Bill Baroni or project-specific teams (for example, Port Authority members of the Hurricane Sandy or Bayonne Bridge project teams).

Egea said that she has a good professional relationship with Bill Baroni. She said she does not socialize with Baroni outside of work, aside from having seen Baroni at an event on election night and possibly one additional professional or social event. David Wildstein mostly liaised with Crifo, aside from when Egea recalled interacting with Wildstein when there was a plane crash at the Atlantic City airport. Egea also recalled seeing Wildstein at one professional social event.

### C.    Interactions with IGA

Egea knew Bill Stepien from working on the Governor's first campaign, but they did not socialize. They did not interact when she was working for the State Treasurer. Egea interacted with Bridget Kelly on various issues, and they had a professional, but not a social, relationship.

## II.    Chronology of the George Washington Bridge Events

### A.    Spring 2013

Egea had no knowledge of anyone reaching out to the Fort Lee Mayor or his office for an endorsement in spring 2013.

### B.    August 2013

Egea was not aware at the time of the Kelly/Wildstein Fort Lee communications in August 2013 that later came to light in the media.

### C.    September 9-13, 2013 – George Washington Bridge Lane Realignment

Egea was not aware at that time of the lane realignment from September 9-13. She was not aware of the Fort Lee Mayor's requests for assistance with traffic problems during that period.

#### 1.    9/11 Memorial Event

Egea was aware of the public 9/11 Memorial event taking place, but was not involved in planning it or deciding who should attend. After the 9/11 event, Egea recalled talking to Baroni, who commented that he had seen the Governor at the event. The conversation covered a number

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

of topics.  If Baroni mentioned Fort Lee traffic problems Egea could not recall that topic coming up.  Egea could not recall precisely when this conversation occurred and commented that it might have been later in the context of the Foye email (see below).

### 2.     Patrick Foye's Email

Egea first learned of Foye's September 13 email from Baroni.  Egea did not recall if Baroni called her to discuss Foye's email before he forwarded the email to her, or if he forwarded the email and then called her to discuss, but she recalled having a phone conversation with Baroni about Foye's email.  Egea thought Baroni had mentioned something about a traffic study prior to Egea reading Foye's email, because she recalled that when she read the email she then realized that the email concerned the traffic study that Baroni had mentioned.  During this phone conversation, Egea asked Baroni what Foye's email was all about, and Baroni said that the Port Authority was doing a traffic study.  Egea recalled that Baroni explained they were studying the inefficiencies in the current lane alignments and that there was a view that it was inefficient to have so many lanes dedicated along the side of the plaza.  The focus of their conversation was on why Foye would have sent such an email, and Baroni commented that Foye was simply interfering and meddling, offering no explanation for why Foye sent the email.  Egea found this to be a common refrain, as there were regularly tensions between the New York and New Jersey Port Authority representatives.  Because the Foye email was laced with accusations, Egea asked if Baroni had done anything wrong, and Baroni responded that nothing inappropriate had been done.  Egea felt reassured by Baroni's response.

Egea recalled forwarding Foye's September 13th email to Crifo.  Egea said that she likely discussed the email with Crifo, but did not recall the conversation.  Egea did not recall discussing the email with anyone else in the Governor's Office.

### D.     October 1, 2013 *Wall Street Journal* Article

After the *Wall Street Journal* article came out on October 1, 2013, Egea recalled speaking separately with both Baroni and Crifo about the article.  Egea was flabbergasted that the email was leaked.  Egea discussed with both Baroni and Crifo that someone (likely Foye) must be feeding the press with the intent of embarrassing and accusing Baroni.  The focus of the discussions was on the apparent tension between Baroni and Foye.

Egea recalled that she may have also had a similar discussion with Maria Comella because this involved the press, although they agreed this was an internal Port Authority matter for it to respond to.  At some point during this time, Egea recalled that she may have been asked by someone in the Governor's Office how she knew about the Fort Lee traffic issue, and she would have responded that the Port Authority was doing a traffic study and that she knew about the Foye email but considered it an internal Port Authority matter.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

Egea was scheduled to meet with Baroni and Wildstein at the State House at 3 p.m. on October 2, 2013 to discuss a Port Authority capital project related to transporting trash. Crifo was also scheduled to attend the meeting. Egea cancelled the meeting with Baroni and Wildstein to attend a meeting with the Governor about the Economic Opportunity Act with the Governor, Michele Brown from the New Jersey Economic Development Authority, and other members of senior staff.

### E.  October 7, 2013 – Port Authority Committee Meeting

At some point, Egea heard that Senator Weinberg had informed the Port Authority that she wanted to appear at an upcoming Port Authority committee meeting. Baroni called Egea about it, and he told her that this was not standard at committee meetings, as public comment periods are generally held only during board meetings. Egea discussed the issue with Crifo, and she recalls that their view was that there was no guidance one way or the other—it was not standard to have public comment at a committee meeting, but there was nothing that prevented it. Because it was a policy call, Egea referred Baroni to McKenna. Egea recalled that on the morning of the committee meeting, Egea emailed Baroni asking how the question had been resolved regarding Senator Weinberg's request to speak at the committee meeting. Baroni responded that the Senator would be allowed to speak for the customary three minute limit.

Egea thought she told McKenna that Baroni would be calling about Senator Weinberg's request. Egea remembered that McKenna's reaction had been that, as a courtesy, the legislator should be allowed to speak.

Crifo also attended the October 16 Port Authority board meeting and provided Egea with a meeting update afterwards. At that time, Egea understood that the lane realignment was being internally reviewed by the Port Authority.

### F.  November 2013, 2013 – Baroni's Testimony

#### 1.  Review of Baroni's Draft Testimony

Egea recalled hearing at some point that Assemblyman Wisniewski wanted Port Authority representatives to appear at a hearing and explain what happened regarding the Fort Lee lane realignment. Prior to the hearing, Egea reviewed Baroni's opening statement. He provided a hard copy of his opening statement to Egea. Baroni asked Egea to only make comments and circulate revisions in hard copy. Egea shared the opening statement with Crifo, and they both reviewed and joined a conference call with Baroni on November 19, 2013, to discuss his opening statement and provide their comments. Egea recalled that the conference call was scheduled for a half hour but lasted longer than that. Egea believed she gave a hard copy of her handwritten comments to Crifo, who brought them to Baroni, as she had a meeting at the Port Authority. Egea did not believe she emailed her comments and did not retain a copy of her proposed revisions or the revised draft statement after discussing the upcoming testimony

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

with Baroni prior to it occurring.  Egea recalled the nature of her comments were to keep the statement short and simple, and for Baroni to simply address what he had been asked to talk about—what did they do, and why did they do it.  Egea also conveyed to Baroni that he should acknowledge that he did not follow normal protocol for communicating about operational decisions and should acknowledge his error in that regard.  She further thought Baroni should include the traffic study results, which she recalled based on the statement, showed that there was improvement on Tuesday and Wednesday (there was not improvement on Monday because there had been a crash on the Cross-Bronx Expressway).  Egea recalled telling Baroni to stay focused on that.  The topic of who authorized or knew about the lane realignment did not come up in this conversation.  There was also nothing in her conversation with Baroni or the materials Egea reviewed reflecting that anyone in the Governor's Office knew about the traffic study, and there was nothing suggesting that in any of the materials she saw.  Egea understood the lane realignment to be a Port Authority traffic optimization opportunity.

Egea recalled a second conference call with Crifo, Baroni and Wildstein to discuss Baroni's draft testimony, but she did not have a specific recollection of the substance of that call.  The calls were done on speakerphone, and Egea stated that there could have been other participants on the call from the Port Authority, but she does not remember anyone else participating except Crifo, Baroni and Wildstein.

Egea mentioned to McKenna that she was helping Baroni to be clear and concise in his statement.  Besides McKenna and Crifo, she did not talk to anyone else in the Governor's Office about this.  She is not aware of whether McKenna spoke to Baroni.

Egea saw at least two hard copy versions of Baroni's testimony (an initial and revised version), but she no longer has any copies.  Looking at the handwritten comments on a draft copy of Baroni's testimony released publicly by the Select Committee on Investigation, Egea confirmed the handwriting was mostly hers and confirmed which of the handwritten comments belonged to her.  Egea also explained what the comments meant.  All of the comments were consistent with how Egea described what she had been trying to effectuate through her comments on Baroni's draft testimony.

Egea recalled Kelly asked if Egea knew what the substance of Baroni's testimony was going to be.  Egea told Kelly that she had been on a call with Baroni about his testimony and was working on Baroni's opening statement. Egea recalled giving a copy of Baroni's draft testimony to Kelly.

Egea listened to Baroni's testimony online alone in her office.  She said that Baroni used an opening statement that she had not seen before and that he had not taken a lot of her advice.  Egea recalled thinking that Baroni admitted that the Port Authority had a business problem but had not communicated the problem effectively.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

### G.      December 2, 2013 – Press Conference

Egea found out shortly before the Governor's December 2, 2013 press conference that the Governor planned to announce Egea as Chief of Staff, replacing O'Dowd.  Shortly before the press conference started, the Governor called Egea to ask her to make remarks about her announcement as incoming Chief of Staff.  She did not recall questions asked during the press conference about the lane realignment, in part, because she was distracted by the events.

### H.      December 6, 2013 – Wildstein's Resignation

Egea was not part of the internal discussions about Wildstein's resignation.  She knew he was going to resign, but could not recall how she knew.

### I.      December 9, 2013 – Wisniewski Committee Hearing

Prior to the December 9, 2013 Assembly Transportation Committee hearing, Egea did not know what the witnesses were going to say.  Egea listened to the testimony online and thought the Port Authority employees sounded professional.

Egea did not specifically recall any internal discussions about the testimony, although she believed she probably discussed it with Crifo and McKenna.  Egea believed she may also have texted the Governor her thoughts about the Port Authority employees sounding professional during their December 9, 2013 testimony.

### J.      December 13, 2013

#### 1.      Senior Staff Meeting

Egea attended the senior staff meeting with the Governor an hour or two before the press conference on December 13, 2013.  Senior staff were seated around a conference table.  Egea did not recall where she was seated at the table, and added that O'Dowd and McKenna were seated on each side of the Governor where they typically sat.  Drewniak and Matt McDermott (Appointments Director) arrived late to the meeting.

In that meeting, Egea recalled Governor Christie making statements that his Administration was not handling itself well lately.  The Governor said he wanted to go out and publicly talk about the Fort Lee lane realignment issue, but he had to know beforehand whether any of his senior staff were involved.  The Governor sternly communicated that if anyone had any information on the lane realignment, they needed to come forward and immediately communicate that information to O'Dowd or McKenna.  The Governor added that he was about to go out publicly and would say that no one in that room was involved if that were the case, so now was the time to come forward and tell the truth if anyone there knew anything.  He spent

some time reiterating these points.  The focus of the comments was on the motivation for the lane realignment and the accusations of political retribution.

Egea recalled O'Dowd calling her the night before to ask if she knew anything on this topic; she told him no.  McKenna also went to Egea before the senior staff meeting on December 13, 2013 and she told him she did not have any information.

### 2.    Post-Senior Staff Meeting and Pre-Press Conference

After the senior staff meeting but prior to the press conference on December 13, 2013, Egea recalled seeing Kelly, Stepien and O'Dowd talking in Kelly's office.  Egea recalled Kelly was sitting at her desk and Stepien and O'Dowd were standing.  Egea did not know what they were talking about, and did not recall the tenor of the meeting or the demeanor of Kelly, Stepien or O'Dowd.

### 3.    Press Conference

Egea recalled being aware generally that the Baroni resignation was coming, in part, because she knew Gramiccioni had been slotted into that role.  She became aware of this around two or three weeks prior to the day his resignation was announced, probably from a mention at a senior staff meeting.

### K.    January 8, 2014

### 1.    Kelly's Emails Revealed in *The Bergen Record*

Egea became aware of the press reports on the Kelly/Wildstein communications the morning of January 8, 2014.  Egea believed that Crifo sent her a text to look at *The Bergen Record* article, which Egea then read.  She then called O'Dowd, who said he was just reading the article.

Egea recalled being at a 10 a.m. scheduling meeting that was leanly attended.  Kelly was not at the meeting, and the press reports were not discussed.  Egea believed she was the only senior staff member who attended the scheduling meeting on January 8.

### 2.    Meeting at Drumthacket

On January 8, 2014, O'Dowd asked Egea to go to Drumthwacket at noon.  Egea recalled that in attendance were the Governor, Kevin O'Dowd, Charlie McKenna, Paul Matey, Maria Comella, Michele Brown, Bill Palatucci, Mike DuHaime, Chris Porrino, and over the course of the day, others.  Egea left Drumthwacket to go home at approximately 7:45 p.m that evening.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

Egea described being blindsided by the press reports and was trying to figure out what it all meant (referring to the Kelly/Wildstein email of August 13, 2013). She had never seen the most troubling Kelly/Wildstein exchange and had no inkling of any such thing. During this gathering, Egea further recalled the Governor saying that he needed to know who knew what. Egea also recalled telling the group that she had talked to Baroni about his testimony. She did not remember what anyone else said about who knew what. Egea further recalled that the Governor made the decision to fire Kelly and that Porrino was to speak to Kelly the next morning to do that. Egea also commented on talking points that Comella was drafting for the Governor's January 9, 2014, press conference the next day.

The following day, Egea was in the Governor's office before the press conference, along with others.

### L.       January 9, 2014 – Press Conference

Shortly before Governor Christie's press conference announcing the termination of Kelly, Cristina Renna came to Egea's office. Egea commented that she didn't really know Renna but recognized her. Renna said that she wanted Egea to know about "this" before the press conference, then pulled out a copy of a September 2013 email about one of her subordinates having spoken with the Fort Lee Mayor about traffic at the time of the lane realignment. Egea relayed that Renna told her she had forwarded the email to Kelly to inform Kelly, and Kelly replied, "good." Renna added that the reason she was bringing this up was that on December 12, 2013, Kelly had directed her to delete the email. Renna relayed to Egea that she had, in fact, forwarded the email to a second personal account to preserve it, and then deleted it from the original account. The print out of the email was from Renna's personal account.

Renna also told Egea that she thought Baroni had pursued an endorsement from the Mayor of Fort Lee at some point. Egea relayed this information to Porrino the next day. Approximately two days later, Melissa Orsen told Egea that Renna had come to see Orsen first on January 9, 2014 and Orsen told Renna that she should go see Egea. Egea thought that another IGA staffer, Vincent Napolitano, was also present during this meeting with Renna, but she was not sure.

After the press conference, Egea and Porrino met with the IGA team because Egea was concerned that they had felt blindsided as well. Porrino instructed them not to delete any relevant documents.

Egea said that she has not had any conversations with Kelly since she was fired. Egea also said that she has not had any conversations with Wildstein, Baroni, or Stepien since then.

### III.   Document Retention Notices

Egea received the document retention notices and is in compliance with them.

Exhibit B

# *Committee Meeting*

of

## NEW JERSEY LEGISLATIVE SELECT COMMITTEE ON INVESTIGATION

*"The testimony of Regina Egea concerning the committee's investigation into all aspects of the finances, operations, and management of the Port Authority of New York and New Jersey, and any other matter raising concerns about abuse of government power or an attempt to conceal an abuse of government power, including, but not limited to, the reassignment of access lanes in Fort Lee, New Jersey, to the George Washington Bridge"*

**LOCATION:** Committee Room 11
State House Annex
Trenton, New Jersey

**DATE:** July 17, 2014
10:00 a.m.

## MEMBERS OF COMMITTEE PRESENT:

Senator Loretta Weinberg, Co-Chair
Assemblyman John S. Wisniewski, Co-Chair
Senator Linda R. Greenstein
Senator Kevin J. O'Toole
Assemblywoman Marlene Caride
Assemblyman Paul D. Moriarty
Assemblywoman Amy H. Handlin



## ALSO PRESENT

Philip M. Mersinger
Michael R. Molimock
*Office of Legislative Services*
*Committee Aides*

Francisco Maldonado
*Senate Majority*
Kate McDonnell
*Assembly Majority*
*Committee Aides*

Frank Dominguez
*Senate Republican*
Keith A. Loughlin
*Assembly Republican*
*Committee Aides*

Tony Barkow, Esq.
*Special Counsel*

***Meeting Recorded and Transcribed by***
**The Office of Legislative Services, Public Information Office,**
**Hearing Unit, State House Annex, PO 068, Trenton, New Jersey**

MS. EGEA:  My comment--   So is this something that's in here, or are you reading from something else?

MR. MALDONADO:  Page 7 of Tab 37.

SENATOR WEINBERG:  Tab 37, page 7.

MR. MALDONADO:  Section I.

SENATOR WEINBERG:  Section I.  Do you have a copy of that text that you might have sent to the Governor?

MS. EGEA:  I do not.

SENATOR WEINBERG:  Because I will tell you that we have made a request of the Office of the Governor for any texts or e-mails, and we don't have that either.  And if, in fact, you may have texted the Governor about that, why would you not have been able to supply it?

MS. EGEA:  I did not retain it.

SENATOR WEINBERG:  Okay.

MS. EGEA:  So would you like me to respond on this?

SENATOR WEINBERG:  Yes, go ahead.  I'm sorry.

MS. EGEA:  So the comments I made about the professionalism really related to Mr. Fulton.  I thought he was very balanced and professional in his presentation and his discussion of alternatives, and in the ways that he analyzed the opportunity to test traffic and how they approach that in the Port Authority.

SENATOR WEINBERG:  And what about at that same hearing, Mr. Foye's testimony, which I referred to you earlier -- the 25 percent of the lanes and they carry 26 percent of the traffic? Did you think that was credible?

MS. EGEA:   Honestly, Senator, I don't remember him saying that.  So--

SENATOR WEINBERG:   But you do remember Mr. Durando's testimony -- er, Mr. Fulton's testimony?

MS. EGEA:  Mr. Fulton, yes.

SENATOR WEINBERG:  Yes.

MS. EGEA:  Yes, yes, he went first.  Mr. Fulton went first and, as I said, I think he was very professional; and I thought very complete in his testimony.  I just don't remember; I'm not saying he didn't say it, I'm just saying I don't recall that.

SENATOR WEINBERG:  He did say it, yes.

MS. EGEA:  I don't doubt you.

SENATOR WEINBERG:   Your attorney might disagree with my interpretation, but he did say it.  And he also testified to the fact that there wasn't a legitimate traffic study, and a whole lot of other things -- which, apparently--  Well, my question is, did you text the Governor about that testimony?

MS. EGEA:   I don't think--   I mean, I remember there were--  My evaluation of Mr. Fulton, that he was professional, and Mr. Foye, I thought, was, for me, his description of his relationship with Mr. Baroni was less confrontational than I observed it to be. It was more conciliatory, and that surprised me.  And Mr. Durando, I thought, was a fairly honest and, you know, a 30-year employee trying to do the right thing.  And so, those were my assessments.

SENATOR WEINBERG:  Okay.  Were you in the habit of texting the Governor?

MS. EGEA:  Not frequently, no.

SENATOR WEINBERG:  And why did you delete a text? Are you in the habit of deleting texts that you send to the Governor's Office, or to the Governor?

MS. EGEA:  No, no.  It was--  Look, we've all been refreshed, in the Governor's Office, about our obligation to retain. So I was not consistent in what I retained, on the texting side, versus not.

SENATOR WEINBERG:  So there were other texts that you've deleted?

MS. EGEA:  Overall?

SENATOR WEINBERG:  Yes.

MS. EGEA:  Some of my subordinates, where I summarize where I get some information -- it's possible, certainly.

SENATOR WEINBERG:  All right, let's just make sure we all understand this correctly.  You deleted that text, where you don't ordinarily delete texts? Is that correct?

MS. EGEA:  No, no.

SENATOR WEINBERG:  All right, then tell me the--

MS. EGEA:  When I've been using text with some of my subordinates, when they're at an Authority meeting, we will frequently try to stay in touch that way.  And I don't retain them all.  So I would not want to give--

SENATOR WEINBERG:  Okay, but this was not a subordinate.  This was the Governor.

MS. EGEA:  No, that's true, that's true.  But I'm just using that as an example.

SENATOR WEINBERG:  Well, you texted the Governor.

MS. EGEA:  Yes.

SENATOR WEINBERG:  About sworn testimony.  You were giving your opinion about the veracity, or the professionalism -- your words  -- of this sworn testimony.

MS. EGEA:  Which was being recorded and available.

SENATOR WEINBERG:  Right.  And you didn't think it was necessary to maintain a text that you sent to the Governor?

MS. EGEA:  Well, no I did not.  Because I'm happy to disclose everything that was in it, and it was not at all substantive and, as I say, it's public record what the testimony was.

SENATOR WEINBERG:  So it was solely your decision to delete it, is that correct?

MS. EGEA:  Yes, yes.

SENATOR WEINBERG:  Okay.

Did you delete it right after you sent it?  Did you delete it an hour later?  Did you just automatically go through and delete?

MS. EGEA:  I don't remember.  Yes, I don't remember.

SENATOR WEINBERG:  You don't recall.

MS. EGEA:  I don't.

SENATOR WEINBERG:  Do you review your texts--  They usually show up per person, I guess--

MS. EGEA:  Usually.

SENATOR WEINBERG:  --in a string.  So do you review them at the end of every day?  Do you review them--

MS. EGEA:  It varies, it varies.

SENATOR WEINBERG:  At the end of each day, generally?

MS. EGEA:  No, it varies.

SENATOR WEINBERG:  Okay.  Do you have any idea if you deleted it after January 8?

MS. EGEA:  I don't know, but I believe it was before; but I don't know.

SENATOR WEINBERG:  Why would you believe it was before, if you don't know?

MS. EGEA:  Well, as a matter of course, I don't keep--  I wouldn't have kept those texts as a matter of course for a long time unless I needed them for something.  But I certainly disclosed and handed over all of the documents that I had, and texts that I had.

SENATOR WEINBERG:  Okay.  And you do know that the testimony that you were referring to was sworn testimony, under oath?

MS. EGEA:  Absolutely.

SENATOR WEINBERG:  From all three of these people, including Mr. Foye -- that he was under oath.

MS. EGEA:  Yes, I am quite aware of that.

SENATOR WEINBERG:  Okay.  But how did you characterize his testimony under oath, then, if I may?  In your personal opinion.

125

MS. EGEA:  As I indicated, I thought his testimony was just surprisingly conciliatory in his description of his relationship with Bill.

SENATOR WEINBERG:  Okay, but what about the gist of his testimony -- that there was no traffic study, that those lanes carry 26 percent, etc.  What about the real meat of his testimony?

MS. EGEA:  Are you asking me what I think now?

SENATOR WEINBERG:  Yes -- no, what did you think then?

MS. EGEA:  What I thought was that he made statements about the lack of a traffic study, but I didn't see a lot of evidence produced.  I'm not doubting his testimony, I was still in search of the, "how do we know that?" and the answer to that question -- and I didn't see that.

SENATOR WEINBERG:  On December 9, you were still in search, but you had not yet demanded to see any results of any internal study or ask Mr. Foye if, in fact, he had such--

MS. EGEA:  Well, he had testified to it.  So he was under oath, to your point, so I believed him.

SENATOR WEINBERG:  All right, thank you very much.

Assemblywoman Caride.

ASSEMBLYWOMAN CARIDE:  Yes, thank you.

Yes, good afternoon.

MS. EGEA:  Good afternoon.

ASSEMBLYWOMAN CARIDE:  I just want to stay on the questions with regards to the December 9 meeting, because I am

ASSEMBLYMAN MORIARTY:   When you deleted these things, did you think then, or now, that it could have violated some ethical law?

MS. EGEA:  Well, as I said, we've all been refreshed on the requirement to retain documents.  So I think in the current procedures that we're all following, I would not.

ASSEMBLYMAN MORIARTY:  Has the Governor's Office implemented new procedures?

MS. EGEA:  Yes.

ASSEMBLYMAN MORIARTY:   Did they put them in writing?

MS. EGEA:  Yes.

ASSEMBLYMAN MORIARTY:  Can we get a copy?

MS. EGEA:  I think you'd have to ask the Governor's Office, but they have been distributed to all the Governor's Office.

ASSEMBLYMAN MORIARTY:   And does each of the employees have to sign that they read it and understand it?

MS. EGEA:  I don't believe *sign*, but we all have to acknowledge it.  I don't believe sign; I could be wrong about that, but I don't remember signing--

ASSEMBLYMAN MORIARTY:  How do you acknowledge it if you don't sign it?  Verbally?

MS. EGEA:  You know, I'm not sure, I'm not sure.  I would think that--  I don't know.  I mean, I know I've received multiple instructions as a result, in terms of the retention and we're all complying now.

ASSEMBLYMAN MORIARTY:  Now, you testified earlier that you believe that you deleted the test to the Governor prior to January; you're not sure, but you think as a matter of course, you probably would have.  Do you agree that the subpoena issued to you on January 27, 2014, and then another one in February, requires the production of all communication, including texts, regarding the lane violations?

MS. EGEA:  Absolutely.

ASSEMBLYMAN MORIARTY:  Okay.

MS. EGEA:  And I have handed over all my personal, as well as government, account devices.

ASSEMBLYMAN MORIARTY:  So you agree that texts fall within that, if you have the text?

MS. EGEA:  Absolutely.

ASSEMBLYMAN MORIARTY:  Do you still have the same phone that you had back then?

MS. EGEA:  Yes.

ASSEMBLYMAN MORIARTY:  And do you have the same service?

MS. EGEA:  Yes.

ASSEMBLYMAN MORIARTY:  And do you have the same phone number?

MS. EGEA:  Yes.

ASSEMBLYMAN MORIARTY:  Are you willing to, or is your attorney willing to have your phone imaged so as to preserve

data, and metadata, and deleted items, as they exist on the device today?

MR. MARTINEZ:  We haven't discussed that with counsel for the Committee.

SENATOR O'TOOLE:  Just a point of clarification, is that an extension of the original subpoena, through the Chair?  I'm just trying to understand the nature of that.  Is that a request to extend the subpoena that's been asked?

ASSEMBLYMAN MORIARTY:  No.  The witness agrees that the subpoena includes texts, if she has them.  She believes that they were deleted prior to January.  My question is, are they willing to allow imaging of the phone that she has -- which is the same phone that she had then, the same provider, and the same phone number -- to preserve whatever is on there, that may be on there, that she may not know is still there as of today?

SENATOR O'TOOLE:  Well, through the Chair, I just want to ask the counsel -- I suspect that you've looked at the subpoena and you complied with the subpoena, or you have not?

MR. MARTINEZ:  We have.  We've worked in coordination with Gibson Dunn, and there were protocols in place. And I believe this has been discussed with counsel for this Committee.

SENATOR O'TOOLE:  I need to know, through the Chair, that this is an extension or an expansion of the underlying subpoena -- we're going in a different direction -- or you're saying to comply with the subpoena I'm hearing from you, and I'd like to

Exhibit C

# INTERIM REPORT TO THE NEW JERSEY LEGISLATURE REGARDING THE SEPTEMBER 2013 CLOSURE OF GEORGE WASHINGTON BRIDGE ACCESS LANES IN FORT LEE, N.J.

December 8, 2014

Reid J. Schar

# JENNER & BLOCK LLP

have defeated the document control purpose asserted as the basis for avoiding email transmission, and it calls into question whether document control was the reason for hand delivering the draft in the first instance.

On November 20, 2013, Baroni was officially invited to testify on November 25, 2013, before the Assembly Transportation Committee concerning the lane closures.[799]  Baroni forwarded the invitation to Crifo[800] and to Egea.[801]  Crifo then forwarded it to McKenna (and Egea),[802] and McKenna passed a copy along to O'Dowd.[803]

A similar invitation was extended to Wildstein.[804]

On November 22, 2013, Baroni blocked off an hour at 10:00 a.m. and another two hours at 3:00 p.m. to meet with Kwon and Wildstein;[805] however, neither Baroni's nor Kwon's calendar indicates the purpose of these meetings.

### b.   Assembly Transportation Committee Testimony:  November 25, 2013

Shortly after 10:00 a.m. on November 25, 2013, Baroni, accompanied by Kwon, testified before the Assembly Transportation Committee.[806]  Baroni's testimony was not given under oath.  Despite the significant editing proposed by Egea, Baroni's opening statement to the committee contained much of the material Egea had recommend cutting.[807]  Baroni testified that, after "multiple conversations with members of the Port Authority Police[808] regarding traffic conditions," Wildstein met in August 2013 with Port Authority staff in Engineering, Traffic Engineering, and TBT "to review the situation."[809]  The clear theme of Baroni's testimony was that the lane closures had been part of a bona fide traffic study.[810] During his testimony, Baroni frequently responded to questions by attempting to debate whether it was

---

[799]   Email from Chance to Baroni (Nov. 20, 2013, at 4:43 p.m.).  OGNJ-LEG-009869.

[800]   Email from Baroni to Crifo (Nov. 20, 2013, at 5:51 p.m.).  OGNJ-LEG-009869.

[801]   Email from Baroni to Egea (Nov. 20, 2013, at 5:51 p.m.).  OGNJ-LEG-010248.

[802]   Email from Crifo to Egea & McKenna (Nov. 20, 2013, at 6:17 p.m.).  OGNJ-LEG-032334.

[803]   Email from McKenna to O'Dowd (Nov. 20, 2013, at 6:18 p.m.).  OGNJ-LEG-032334.

[804]   Letter from Asm. Wisniewski to Wildstein (Nov. 20, 2013).  NJGA-000439.

[805]   Outlook calendar entry (Nov. 22, 2013, at 10:00 a.m.) BARONI003351  and Outlook calendar entry (Nov. 22, 2013, at 3:00 p.m.) BARONI003356.

[806]   See Baroni Testimony.  On Kwon's attendance, see, e.g., Ted Mann, "Bridge Lane Closures Are Questioned," Wall St. J. (Nov. 25, 2013).

[807]   Compare Baroni Testimony at 3-8 with Draft Statement with Handwritten Edits NJGA-000688.

[808]   Baroni identified the PAPD police personnel as PAPBA President Paul Nunziato and PAPBA Delegate Mike DeFilippis.  Baroni Testimony at 29.

[809]   Id. at 5.

[810]   See, e.g., id. at 6 ("Mr. Wildstein requested that a one-week study be conducted . . . .") (emphasis added).

At 3:48 p.m., Drewniak emailed Governor Christie one of the revised statements that he had shared with Wildstein:  "Mr. Wildstein has been a tireless advocate for New Jersey's interests at the Port Authority.  We are grateful for his commitment and dedication to the important work of the Port Authority."[871]  The Governor replied back, adding to the end of the statement, "and we thank him for his service to the people of New Jersey and the region."[872]  Governor Christie then forwarded the email thread to his political advisor DuHaime, writing, "FYI . . . keep to yourself."[873]

At 4:51 p.m., Wildstein texted Drewniak, "My calls are made."[874]  Drewniak replied, "I know.  Saw [*Record* reporter Shawn] Boburg's story.  They are calling here now."[875]  Drewniak then forwarded to Boburg the statement as approved by Governor Christie.[876]  Initially, Wildstein intended his resignation to become effective at the end of the year,[877] but the following week Wildstein was asked to step down immediately.[878]

The next evening, December 7, 2013, Drewniak texted Wildstein to see how he was faring after the resignation announcement.[879]  Wildstein replied, "Doing fine.  A little bummed out, a small amount of growing anger.  My father thinks it's the end of the world.  But in the village having dinner and nothing some Valium won't fix.  Thanks for checking in and for being a great friend."[880]

5.   Port Authority Officials Testify Before Assembly Transportation Committee:  December 9, 2013

On December 9, 2013, three Port Authority officials appeared and testified under oath before the Assembly Transportation Committee:  (1) Executive Director Patrick Foye;[881] (2) TBT Director Cedrick Fulton;[882] and (3) GWB General Manager Robert Durando.[883]  As detailed throughout this Report, the

---

[870]   *Id.*

[871]   Email from Drewniak to Governor Christie (Dec. 6, 2013, at 3:48 p.m.).  NJGA-035783.

[872]   Email from Governor Christie to Drewniak (Dec. 6, 2013, at 3:51 p.m.).  NJGA-035784.

[873]   Email from Governor Christie to DuHaime (Dec. 6, 2013, at 3:55 p.m.).  NJSCI005787.

[874]   Text message from Wildstein to Drewniak (Dec. 6, 2013, at 4:51 p.m.).  NJGA-028740.

[875]   Text message from Drewniak to Wildstein (Dec. 6, 2013, at 4:53 p.m.).  NJGA-028740.

[876]   Email from Drewniak to Boburg (Dec. 6, 2013, at 5:14 p.m.).  NJGA-000655.

[877]   *See, e.g.*, Shawn Boburg, "Port Authority official at center of lane-closure controversy quits," *Record* (Bergen) (Dec. 6, 2013).

[878]   *See* O'Dowd Testimony at 57.

[879]   Text message from Drewniak to Wildstein (Dec. 7, 2013, at 8:30 p.m.).  NJGA-028740.

[880]   Text message from Wildstein to Drewniak (Dec. 7, 2013, at 8:33 p.m.).  NJGA-028740.

[881]   Foye Testimony.

[882]   Fulton Testimony.

[883]   Durando Testimony.

testimony raised serious questions about the existence of any traffic study and cited numerous irregularities and violations of Port Authority policy in the way the lane closures had been implemented.

Foye stated during his testimony that he was not aware of any traffic study prepared in connection with the lane closures.[884] He also testified that none of the Port Authority's standard procedures or policies were followed in closing off the Fort Lee Access Lanes.[885] Foye said that he, as the Port Authority's Executive Director, was not informed of the lane closures until the evening of September 12th, *i.e.*, the fourth day.[886] And, finally, Foye testified that he believed the lane closures had violated federal law.[887]

Fulton testified that traffic studies are typically conducted "through the use of technology" embedded in the roadway that provides traffic counts or from actual individuals stationed to monitor traffic flows.[888] He further said it was unprecedented for an instruction on lane closures or diversions to have been given directly to the GWB manager rather than through himself as the director of TBT.[889] According to Fulton, he warned Wildstein, "This will not end well."[890] When asked by the Committee if he would have feared for his employment had he resisted, Fulton stated that he had been concerned he "could be accused of not following the chain of command."[891]

In his appearance, Durando stated it was "odd" and "wrong" for Wildstein to direct changes in Bridge traffic patterns.[892] He also suggested that he implemented the change, despite his reservations, because he believed Wildstein had the authority to terminate his employment and he did not want to "tempt fate."[893] When asked by the Committee if it was possible that he could have been fired for defying Wildstein, Durando testified, "Anything is possible."[894] According to Durando, the changes were made without careful deliberation, without following proper processes, and without notification to the

---

[884]  Foye Testimony at 167.

[885]  *Id.* at 144.

[886]  *Id.* at 151.

[887]  *Id.* at 187.

[888]  Fulton Testimony at 13-14.  As noted above, the Assembly Transportation Committee also heard from licensed engineer Hal Simoff, a specialist in traffic engineering.  Simoff testified that he would not conduct a traffic study by physically diverting lanes but would instead measure traffic volumes and use computer models to estimate impacts.  *See supra* at Part IV.D *and* Simoff Testimony at 219.

[889]  Fulton Testimony at 17.

[890]  *Id.* at 28.

[891]  *Id.* at 27.

[892]  Durando Testimony at 89.

[893]  *Id.* at 96-97.

[894]  *Id.*

public.[895]  Durando testified under oath that he has never seen any traffic study that resulted from the lane closures.[896]

Egea monitored the committee proceedings and, by her own account, texted Governor Christie that the witnesses were professional in their testimony.[897]  She described her messages to the Governor as "not at all substantive,"[898] and did not recall receiving any response from the Governor.[899]  However, Egea's cellular telephone records indicate that, in fact, it was actually Governor Christie who initiated a text conversation during Fulton's testimony.[900]  Egea replied twice, and the Governor responded once during Fulton's testimony.[901]  The contents of these messages are currently unknown.

At 12:19 p.m.—around the time that Fulton's testimony was concluding and Durando's was beginning—Egea sent two more texts to Governor Christie.[902]  During Durando's testimony, Egea sent two additional texts to the Governor, who immediately replied with a text of his own.[903]  Again, the contents of the texts are not currently known.

Foye testified last on December 9th, and in the course of his testimony, Egea sent three texts to the Governor.[904]  There is no record of any reply from Governor Christie, nor are the contents of Egea's texts known.

Subsequently, however, Egea deleted the texts in question and testified that it was her normal practice to delete texts when she no longer needed to refer to them.[905]  As these texts are responsive to the subpoenas issued, Special Counsel to the Committee asked OOG to produce any copies of these texts that may exist on Governor Christie's personal mobile device.[906]  In response, counsel for OOG indicated it has been unable to locate any such texts on either the Governor's or Egea's mobile telephones.[907]  Given Egea's testimony and the AT&T records, there is little doubt the texts were

---

[895]   *Id.* at 117-19.

[896]   *Id.* at 120.

[897]   Egea Testimony at 121.

[898]   *Id.* at 124.

[899]   *Id.* at 181.

[900]   Fulton began testifying at or about 10:00 a.m. on December 9, 2013.  Governor Christie first texted Egea at 10:51 a.m.  *See* Egea SMS Records.

[901]   *Id.*

[902]   *Id.*

[903]   *Id.*

[904]   *Id.*

[905]   Egea Testimony at 186.

[906]   Letter from Schar to Southwell (July 30, 2014).

[907]   Letter from Southwell to Schar (Aug. 1, 2014).

composed and transmitted.  OOG's inability to provide their contents indicates that both Egea and Governor Christie deleted the messages at some unknown point.

The day after the Assembly Transportation Committee hearing, the Port Authority OIG announced an investigation into the lane closures, and Crifo forwarded to Egea a news story of the OIG's decision.[908]

### 6.  Events Rapidly Unfold:  December 11-14, 2013

#### a.  December 11, 2013

On the morning of December 11, 2013, Governor Christie called political consultant DuHaime, and the two spoke for fifteen minutes.[909]  A few hours later, Stepien called DuHaime for an eighteen-minute call.[910]  And late that evening, DuHaime called Baroni and spoke for 26 minutes.[911]

While the Committee does not currently know the content of these calls, the timing of the calls—given the events, as described below, over the next two days—raises the prospect that some lane closure issues may have been discussed.

#### b.  December 12, 2013

##### (1)  Drumthwacket

On the morning of December 12, 2013, Governor Christie met with Stepien at Drumthwacket.[912] At some point before 11:00 a.m., O'Dowd arrived at Drumthwacket for a separate appointment and encountered the Governor and Stepien speaking in the dining room.[913]  O'Dowd testified before the Committee that, when he entered the room, the Governor looked up and stated that the Bridge issue had become a major distraction.  The Governor therefore asked O'Dowd to "talk to Bridget Kelly and ask her whether or not she had anything to do with closing the lanes at the Bridge."[914]  According to O'Dowd, he did not ask the Governor why he was making such a request, but O'Dowd said it seemed

---

[908]  Email from Crifo to Egea (Dec. 10, 2013, at 6:49 p.m.).  OGNJ-LEG-010105.

[909]  *See* DuHaime Call Logs.  NJSCI0008264.

[910]  *Id.*

[911]  *Id.*

[912]  O'Dowd Testimony at 8.

[913]  *Id.*  It is not clear precisely when the Governor met with Stepien.  However, O'Dowd testified that he walked into their meeting just as it was concluding and just as he was entering Drumthwacket for an 11:00 a.m. appointment of his own.  *Id.*  It therefore appears the Governor and Stepien met sometime in the 10:00 hour, *i.e.*, following DuHaime's 8:55 a.m. call to Stepien.

[914]  *Id.* at 9-10.

# Exhibit D

LORETTA WEINBERG
*Co-Chair*

JOHN S. WISNIEWSKI
*Co-Chair*

**SENATE**

NIA H. GILL
LINDA R. GREENSTEIN
KEVIN J. O'TOOLE

**ASSEMBLY**

MARLENE CARIDE
LOUIS D. GREENWALD
VALERIE VAINIERI HUTTLE
BONNIE WATSON COLEMAN
MICHAEL PATRICK CARROLL
AMY H. HANDLIN
HOLLY T. SCHEPISI



CHARLES A. BUONO, JR.
*Office of Legislative Services*
*Committee Aide*
(609) 847-3840
(609) 292-0561 fax

## 𝔑𝔢𝔴 𝔍𝔢𝔯𝔰𝔢𝔶 𝔖𝔱𝔞𝔱𝔢 𝔏𝔢𝔤𝔦𝔰𝔩𝔞𝔱𝔲𝔯𝔢

### NEW JERSEY LEGISLATIVE SELECT COMMITTEE
### ON INVESTIGATION
STATE HOUSE ANNEX
PO BOX 068
TRENTON NJ 08625-0068

January 27, 2014

Office of the Governor
Attn: Custodian of Records
PO Box 001
Trenton, New Jersey 08625

Dear Custodian of Records:

Please find attached hereto a subpoena requesting certain documents concerning all aspects of the finances, operations, and management of the Port Authority of New York and New Jersey and any other matter raising concerns about abuse of government power or an attempt to conceal an abuse of government power, including, but not limited to, the reassignment of access lanes in Fort Lee, New Jersey to the George Washington Bridge. The New Jersey Legislative Select Committee on Investigation would accept mail or messenger delivery of the requested records at the following address on or before 5:00 p.m., February 3, 2014: Charles A. Buono, Jr., Office of Legislative Services, State House Annex, PO Box 068, Trenton, New Jersey 08625. We also enclose herewith a copy of the Code of Fair Procedure. The preferred method of delivery of the requested records is compact disc, DVD, or similar format.

This subpoena supersedes the subpoena issued to you by the Select Committee on Investigation on January 16, 2014.

If you have any substantive questions about this request, please contact Special Counsel Reid J. Schar, Jenner & Block LLP, at (312) 923-2629.

Very truly yours,

NEW JERSEY LEGISLATIVE SELECT COMMITTEE
ON INVESTIGATION

Loretta Weinberg
Co-Chair

John S. Wisniewski
Co-Chair

JW/kj
Enclosures
c  Members – New Jersey Legislative Select Committee on Investigation
Reid J. Schar, Jenner & Block LLP
Aaron Binder, Assembly Majority Office
Keith Loughlin, Assembly Republican Office
Francisco Maldonado, Senate Majority Office
Frank Dominguez, Senate Republican Office

NEW JERSEY LEGISLATIVE SELECT COMMITTEE ON INVESTIGATION
## S U B P O E N A

**TO**   Office of the Governor
Attn: Custodian of Records
PO Box 001
Trenton, New Jersey  08625

**WE COMMAND YOU,** Laying aside all and singular business and excuses, to produce all books, papers, correspondence, other documents and materials, and electronic records and data described below, that you have in your possession or have access to relevant to the New Jersey Legislative Select Committee on Investigation's inquiry and investigation into all aspects of the finances, operations, and management of the Port Authority of New York and New Jersey and any other matter raising concerns about abuse of government power or an attempt to conceal an abuse of government power, including, but not limited to, the reassignment of access lanes in Fort Lee, New Jersey to the George Washington Bridge, as more particularly set forth on the attached Schedule A.  These books, papers, correspondence, other documents and materials, and electronic records and data shall be returned on or before 5:00 p.m., Monday, February 3, 2014 to:  Charles A. Buono, Jr., Office of Legislative Services, State House Annex, PO Box 068, Trenton, New Jersey 08625.  The New Jersey Legislative Select Committee on Investigation was constituted as a special committee of the Senate and the General Assembly pursuant to concurrent resolution.

Your production of documents is governed by the Code of Fair Procedure and Chapter 13 of Title 52 of the Revised Statutes.  A copy of the Code of Fair Procedure is delivered to you herewith.

Failure to comply with this Subpoena shall make you liable for such penalties as are provided by law.

**WITNESS,** the hand of The Honorable Loretta Weinberg and the hand of The Honorable John S. Wisniewski, Co-Chairs of the New Jersey Legislative Select Committee on Investigation, on this 27th day of January, 2014.

Loretta Weinberg, Co-Chair
New Jersey Legislative Select Committee
on Investigation

John S. Wisniewski, Co-Chair
New Jersey Legislative Select Committee
on Investigation

## SCHEDULE A

(to Subpoena dated January 27, 2014, issued by the New Jersey Legislative Select Committee on Investigation.)

Please deliver the following:

1. All communications of any kind, including, but not limited to, any correspondence, notes, documents, electronic mail transmissions, text messages, Blackberry Messenger messages (a/k/a "BBM messages"), any and all "instant messages" or other electronically stored data or information, including, without limitation, any "instant messages" sent via any web or cellular phone based messaging systems, whether exchanged via use of a personal computational device, including without limitation devices commonly known as 'desktops', 'laptops', 'smartbooks', 'tablets', 'smartphones', 'cellular phones', or 'iPads', and exchanged between you and any other person or entity, whether used by you in a business, personal, or any other capacity, between September 1, 2012 and the present date regarding the reduction from three to one of the eastbound Fort Lee, New Jersey access lanes to the George Washington Bridge from September 9, 2013 through September 13, 2013.

2. All documents and records of any kind, including, but not limited to, any correspondence, notes, documents, electronic mail transmissions, text messages, Blackberry Messenger messages (a/k/a "BBM messages"), any and all "instant messages" whether sent via a personal computational device or cellular phone via any and all web or cellular phone based messaging systems, any other electronically stored data or information which is currently stored on any and all personal computational devices in your possession, dominion, or control, including, without limitation, devices commonly known as 'desktops', 'laptops', 'smartbooks', 'tablets', 'smartphones', 'cellular phones', or 'iPads', exchanged between you and any other person or entity, whether used by you in a business, personal, or any other capacity, between September 1, 2012 and the present date regarding the reduction from three to one of the eastbound Fort Lee, New Jersey access lanes to the George Washington Bridge from September 9, 2013 through September 13, 2013.

3. All documents of any kind whatsoever sufficient to show the date, time, originating and receiving telephone number, originating cell site and sector, and duration for all incoming and outgoing calls for any phone number associated with you in your personal capacity or in your capacity as an employee of the State of New Jersey, or any other capacity, between September 1, 2012 and the present date regarding the reduction from three to one of the eastbound Fort Lee, New Jersey access lanes to the George Washington Bridge from September 9, 2013 through September 13, 2013.

4. All documents of any kind whatsoever evidencing electronic mail communications sent via any and all personal computational devices in your possession, dominion, or control, including without limitation devices commonly known as 'desktops', 'laptops', 'smartbooks', 'tablets', 'smartphones', 'cellular phones', or 'iPads', whether used by

you in a business, personal, or any other capacity, relative to any and all communications between September 1, 2012 and the present date regarding the reduction from three to one of the eastbound Fort Lee, New Jersey access lanes to the George Washington Bridge from September 9, 2013 through September 13, 2013.

5. All video and audio recordings, and all voice mails, regarding the reduction from three to one of the eastbound Fort Lee, New Jersey access lanes to the George Washington Bridge from September 9, 2013 through September 13, 2013.

6. All calendars, day planners, notes, and/or diaries from September 1, 2012 to the present.

7. All call and visitor logs from August 1, 2013 to December 31, 2013.

Please produce a log of any documents and/or correspondence withheld from production on the basis of any claimed privilege or protection, or withheld or redacted for any reason, and retain such documents and/or correspondence.

# Code of Fair Procedure

**52:13E-1. Definitions**

As used in this act:

(a) "Agency" means any of the following while engaged in an investigation or inquiry: (1) the Governor or any person or persons appointed by him acting pursuant to P.L.1941, c. 16, s. 1 (C. 52:15-7), (2) any temporary State commission or duly authorized committee thereof having the power to require testimony or the production of evidence by subpoena, or (3) any legislative committee or commission having the powers set forth in Revised Statutes 52:13-1.

(b) "Hearing" means any hearing in the course of an investigatory proceeding (other than a preliminary conference or interview at which no testimony is taken under oath) conducted before an agency at which testimony or the production of other evidence may be compelled by subpoena or other compulsory process.

(c) "Public hearing" means any hearing open to the public, or any hearing, or such part thereof, as to which testimony or other evidence is made available or disseminated to the public by the agency.

(d) "Private hearing" means any hearing other than a public hearing.

L.1968, c. 376, s. 1, eff. Dec. 27, 1968.

**52:13E-2. Personal service**

No person may be required to appear at a hearing or to testify at a hearing unless there has been personally served upon him prior to the time when he is required to appear, a copy of this act, and a general statement of the subject of the investigation. A copy of the resolution, statute, order or other provision of law authorizing the investigation shall be furnished by the agency upon request therefor by the person summoned.

L.1968, c. 376, s. 2, eff. Dec. 27, 1968.

**52:13E-3. Right to counsel; submission of proposed questions**

A witness summoned to a hearing shall have the right to be accompanied by counsel, who shall be permitted to advise the witness of his rights, subject to reasonable limitations to prevent obstruction of or interference with the orderly conduct of the hearing. Counsel for any witness who testifies at a public hearing may submit proposed questions to be asked of the witness relevant to the matters upon which the witness has been questioned and the agency shall ask the witness such of the questions as it may deem appropriate to its inquiry.

L.1968, c. 376, s. 3, eff. Dec. 27, 1968.

**52:13E-4. Records of public hearings; copies**

A complete and accurate record shall be kept of each public hearing and a witness shall be entitled to receive a copy of his testimony at such hearing at his own expense. Where testimony which a witness has given at a private hearing becomes relevant in a criminal proceeding in which the witness is a defendant, or in any subsequent hearing in which the witness is summoned to testify, the witness shall be entitled to a copy of such

testimony, at his own expense, provided the same is available, and provided further that the furnishing of such copy will not prejudice the public safety or security.

L.1968, c. 376, s. 4, eff. Dec. 27, 1968.

**52:13E-5. Sworn statement by witness; incorporation in the record**

A witness who testifies at any hearing shall have the right at the conclusion of his examination to file a brief sworn statement relevant to his testimony for incorporation in the record of the investigatory proceeding.

L.1968, c. 376, s. 5, eff. Dec. 27, 1968.

**52:13E-6. Persons affected by proceedings; appearance or statement of facts**

Any person whose name is mentioned or who is specifically identified and who believes that testimony or other evidence given at a public hearing or comment made by any member of the agency or its counsel at such a hearing tends to defame him or otherwise adversely affect his reputation shall have the right, either to appear personally before the agency and testify in his own behalf as to matters relevant to the testimony or other evidence complained of, or in the alternative at the option of the agency, to file a statement of facts under oath relating solely to matters relevant to the testimony or other evidence complained of, which statement shall be incorporated in the record of the investigatory proceeding.

L.1968, c. 375, s. 6, eff. Dec. 27, 1968.

**52:13E-7. Rights or privileges granted by agencies**

Nothing in this act shall be construed to prevent an agency from granting to witnesses appearing before it, or to persons who claim to be adversely affected by testimony or other evidence adduced before it, such further rights and privileges as it may determine.

L.1968, c. 376, s. 7, eff. Dec. 27, 1968.

**52:13E-8. Dissemination of evidence adduced at private hearing**

Except in the course of subsequent hearing which is open to the public, no testimony or other evidence adduced at a private hearing or preliminary conference or interview conducted before a single-member agency in the course of its investigation shall be disseminated or made available to the public by said agency, its counsel or employees without the approval of the head of the agency. Except in the course of a subsequent hearing open to the public, no testimony or other evidence adduced at a private hearing or preliminary conference or interview before a committee or other multimember investigating agency shall be disseminated or made available to the public by any member of the agency, its counsel or employees, except with the approval of a majority of the members of such agency. Any person who violates the provisions of this subdivision shall be adjudged a disorderly person.

L.1968, c. 376, s. 8, eff. Dec. 27, 1968.

**52:13E-9. Hearing conducted by temporary state commission**

No temporary State commission having more than two members shall have the power to take testimony at a public or private hearing unless at least two of its members are present at such hearing.

Nothing in this section, however, shall be deemed to prevent the State Commission of Investigation from conducting private hearings, on an investigation previously undertaken by a majority of the members of the commission, with one commissioner present, when so designated by resolution pursuant to the provisions of section 12 of P.L.1968, c. 266 (C. 52:9M-12).

L.1968, c. 376, s. 9, eff. Dec. 27, 1968.  Amended by L.1984, c. 110, s. 5, eff. Aug. 3, 1984.

**52:13E-10. Right of members to file statement of minority views**

Nothing in this act shall be construed to affect, diminish or impair the right, under any other provision of law, rule or custom, of any member or group of members of a committee or other multimember investigating agency to file a statement or statements of minority views to accompany and be released with or subsequent to the report of the committee or agency.

L.1968, c. 376, s. 10, eff. Dec. 27, 1968.

# Chapter 13 of Title 52 of the Revised Statutes

## Article 1. General Provisions.

### 52:13-1. Attendance of witnesses; production of books and papers; legal and clerical assistance

Any joint committee of the legislature, any standing committee of either house, or any special committee directed by resolution to enter upon any investigation or inquiry, the pursuit of which shall necessitate the attendance of persons or the production of books or papers, shall have power to compel the attendance before it of such persons as witnesses and the production before it of such books and papers as it may deem necessary, proper and relevant to the matter under investigation.  Any such committee shall also have the power to employ such legal and clerical assistance as it may deem necessary to the proper conduct of the investigation.

### 52:13-2. Summons for witnesses; execution

If any person upon being summoned in writing by order of any committee mentioned in section 52:13-1 of this title to appear before such committee and testify, fails to obey such summons, the speaker of the house of assembly or the president of the senate may, upon application to him, by warrant under his hand order the sergeant at arms of the house over which he presides to arrest such person and bring him before the committee, and the sergeant at arms shall thereupon execute the warrant to him so directed.

### 52:13-3. Compensation of witnesses; swearing witnesses; perjury; immunity; refusal to answer or be sworn

Witnesses summoned to appear before any committee authorized by this article or any other law to conduct an investigation or inquiry shall be entitled to receive the same fees and mileage as persons summoned to testify in the courts of the state.  All such witnesses may be sworn by any member of the committee conducting the investigation or inquiry; and all witnesses sworn before any such committee shall answer truly all questions put to them which the committee shall decide to be proper and pertinent to the investigation or inquiry; and any witness so sworn who shall swear falsely shall be guilty of perjury.  No such witness shall be excused from answering any such questions on the ground that to answer the same might or would incriminate him; but no answers made by any witness to any such questions shall be used or admitted in evidence in any proceeding against such witness, except in a criminal prosecution against the witness for perjury in respect to his answers to such questions.

Any witness who refuses to answer any questions decided by the committee to be proper and pertinent shall be guilty of a misdemeanor; and any witness who, having been summoned to appear before any such committee, fails to appear in obedience to the summons or, appearing, refuses to be sworn shall be guilty of a misdemeanor.

### 52:13-4. Expenses of investigations; payment

The state treasurer shall, upon the warrant of the state comptroller, pay the fees and mileage of witnesses called, the compensation of legal and clerical assistance employed and the expenses of the sergeant at arms of either house in the execution of warrants

pursuant to section 52:13-2 of this title, when the same shall be certified as correct and necessary by the chairman of the committee under whose authority and by whose order the same shall have been incurred, but only when the chairman's certificate has received the approval of the governor.

## Article 2. Contempts of Joint Legislative Committees.

### 52:13-5. What constitutes contempt; report thereof to legislature

Whenever, in any investigation or inquiry by any committee constituted by joint resolution of the legislature to enter upon or make such investigation or inquiry, any witness summoned or subpoenaed to appear before such committee to testify or to produce books, documents, papers or records, shall willfully neglect or refuse to appear in obedience to the summons or subpoena, or shall willfully neglect or refuse to produce any books, documents, papers or records commanded to be produced by the summons or subpoena, or shall refuse to be sworn or affirmed, or shall refuse to answer any question put to him which the committee shall decide to be proper and pertinent to such investigation or inquiry, or shall in any other way contemn the authority or privileges of the legislature, and the facts alleged to constitute any such contempt shall have been reported by any such committee to the legislature, the alleged contemner shall be tried, and the alleged contempt determined, as hereinafter provided.

### 52:13-6. Joint session to determine alleged contempt; order for arrest; service

The senate and general assembly may by concurrent resolution direct that the senate and general assembly meet in joint session at a time and place therein fixed for the purpose of hearing the evidence and arguments regarding the alleged contempt and may order that a warrant, directed to any sergeant at arms of either house or of the joint session or to any sheriff, police officer, member of the state police, constable or other peace officer, issue in such manner as shall be prescribed in and by the concurrent resolution for the arrest of the alleged contemner and the production of him at the bar of such joint session, there to be heard.

### 52:13-7. Hearing by joint session

At the time and place fixed as aforesaid, or at any adjournment, the joint session shall sit and summarily hear the evidence and the arguments relating to the alleged contempt. The joint session shall adjourn from time to time until the matter shall have been disposed of and the alleged contemner shall appear and attend at each and every such adjourned session.

### 52:13-8. Contemner's rights

Any alleged contemner shall have the right to be heard before the joint session, to be represented by counsel, to call witnesses in his behalf, and to examine and cross-examine witnesses.

### 52:13-9. Determination of contempt by each house separately; concurrent resolution

After the joint session shall have heard the evidence and such arguments as may be made, the senate and the general assembly shall separately convene and shall separately

consider and determine the alleged contempt; and the determination shall be by a concurrent resolution, which may originate in either house.

### 52:13-10. Sentence; order of commitment

Any person found to be guilty of a contempt of the legislature by a concurrent resolution of the two houses thereof, as hereinbefore provided, may be sentenced to imprisonment in the state prison or in the common jail of any county for any period not exceeding six months as shall be directed in and by the concurrent resolution determining the contempt, for the execution of which such concurrent resolution may order that a commitment shall issue, directed to any sheriff, police officer, member of the state police, constable or other peace officer, and to the keeper of the state prison or the keeper of the common jail of any county, which commitment shall be signed by the president of the senate and the speaker of the house of assembly in office at the date of the issue thereof.

### 52:13-11. Continuing validity of commitment

Any commitment issued in accordance with section 52:13-10 of this title shall remain valid and effective until the imprisonment therein set forth shall have been served, notwithstanding the legislature which directed the issue of the commitment may meanwhile have adjourned or ended.

### 52:13-12. Bail of contemner

Any judge of the Superior Court may let to bail any person apprehended for hearing on a charge of contempt under a warrant issued by direction of a concurrent resolution as provided in section 52:13-6 of this Title, in such amount and with such surety as the judge shall determine to be reasonable, to appear before the Joint Session of the Legislature, at the time and place fixed by the warrant as well as at any and all adjournments thereof, and to stand to and abide such determination and sentence as may thereafter be found or imposed against the person so apprehended. Such recognizances shall run in favor of the State of New Jersey and shall be filed by the judge in the office of the Secretary of State.

Amended by L.1953, c. 49, p. 853, s. 2.

### 52:13-13. Powers given additional to other powers

The powers given by this article shall be in addition to the powers given by article 1 of this chapter (s. 52:13-1 et seq.).

STATE OF NEW JERSEY, ss:

_____ being duly sworn according to law on his oath say that on the _____ day of

_____, 2014 at _____ he served the within Subpoena upon Office of the Governor, Attn: Custodian

of Records by exhibiting the same to her and informing her of the contents

thereof _____ and giving to Office of the Governor, Attn:

Custodian of Records a true copy thereof, addressed to Office of the Governor, Attn: Custodian of Records, Office of the Governor,

PO Box 001, Trenton, New Jersey 08625.

Subscribed and sworn to before me at _____ the _____ day of

_____ 2014.

STATE OF NEW JERSEY

_____

New Jersey Legislative Select Committee on Investigation

       to

Office of the Governor
Attn: Custodian of Records
PO Box 001
Trenton, New Jersey  08625

_____

SUBPOENA

Duces Tecum

_____

Writ Returnable on or before
5:00 p.m., February 3, 2014

      to

New Jersey Legislative Select Committee on Investigation

                                  **c/o  Charles A. Buono, Jr.**
                                  **Office of Legislative Services**
                                  **State House Annex**
                                  **PO Box 068**
                                  **Trenton, New Jersey  08625**



LORETTA WEINBERG
Co-Chair

JOHN S. WISNIEWSKI
Co-Chair

SENATE

NIA H. GILL
LINDA R. GREENSTEIN
KEVIN J. O'TOOLE

ASSEMBLY

MARLENE CARIDE
LOUIS D. GREENWALD
VALERIE VAINIERI HUTTLE
BONNIE WATSON COLEMAN
MICHAEL PATRICK CARROLL
AMY H. HANDLIN
HOLLY T. SCHEPISI

CHARLES A. BUONO, JR.
Office of Legislative Services
Committee Aide
(609) 847-3840
(609) 292-0561 fax

MICHAEL R. MOLIMOCK
Office of Legislative Services
Committee Aide
(609) 847-3855
(609) 292-0561 fax

## New Jersey State Legislature
### NEW JERSEY LEGISLATIVE SELECT COMMITTEE
### ON INVESTIGATION
STATE HOUSE ANNEX
PO BOX 068
TRENTON NJ 08625-0068

February 10, 2014

Office of the Governor
Attn: Custodian of Records
c/o Randy M. Mastro
Gibson Dunn, New York Office
200 Park Avenue
New York, New York 10166

Dear Custodian of Records:

Please find attached hereto a subpoena requesting certain documents concerning all aspects of the finances, operations, and management of the Port Authority of New York and New Jersey and any other matter raising concerns about abuse of government power or an attempt to conceal an abuse of government power, including, but not limited to, the reassignment of access lanes in Fort Lee, New Jersey to the George Washington Bridge. The New Jersey Legislative Select Committee on Investigation would accept mail or messenger delivery of the requested records at the following address on or before 5:00 p.m., February 24, 2014: Charles A. Buono, Jr., Office of Legislative Services, State House Annex, PO Box 068, Trenton, New Jersey 08625. We also enclose herewith a copy of the Code of Fair Procedure. The preferred method of delivery of the requested records is compact disc, DVD, or similar format.

If you have any substantive questions about this request, please contact Special Counsel Reid J. Schar, Jenner & Block LLP, at (312) 923-2629.

Very truly yours,

NEW JERSEY LEGISLATIVE SELECT COMMITTEE
ON INVESTIGATION

Loretta Weinberg
Co-Chair

John S. Wisniewski
Co-Chair

JW/kj
Enclosures
c  Members – New Jersey Legislative Select Committee on Investigation
Reid J. Schar, Jenner & Block LLP
Aaron Binder, Assembly Majority Office
Keith Loughlin, Assembly Republican Office
Francisco Maldonado, Senate Majority Office
Frank Dominguez, Senate Republican Office

## NEW JERSEY LEGISLATIVE SELECT COMMITTEE ON INVESTIGATION
# S U B P O E N A

**TO**   Office of the Governor
Attn: Custodian of Records
c/o Randy M. Mastro
Gibson Dunn, New York Office
200 Park Avenue
New York, New York 10166

**WE COMMAND YOU**, Laying aside all and singular business and excuses, to produce all books, papers, correspondence, other documents and materials, and electronic records and data described below, that you have in your possession or have access to relevant to the New Jersey Legislative Select Committee on Investigation's inquiry and investigation into all aspects of the finances, operations, and management of the Port Authority of New York and New Jersey and any other matter raising concerns about abuse of government power or an attempt to conceal an abuse of government power, including, but not limited to, the reassignment of access lanes in Fort Lee, New Jersey to the George Washington Bridge, as more particularly set forth on the attached Schedule A. These books, papers, correspondence, other documents and materials, and electronic records and data shall be returned on or before 5:00 p.m., Monday, February 24, 2014 to: Charles A. Buono, Jr., Office of Legislative Services, State House Annex, PO Box 068, Trenton, New Jersey 08625. The New Jersey Legislative Select Committee on Investigation was constituted as a special committee of the Senate and the General Assembly pursuant to concurrent resolution.

Your production of documents is governed by the Code of Fair Procedure and Chapter 13 of Title 52 of the Revised Statutes. A copy of the Code of Fair Procedure is delivered to you herewith.

Failure to comply with this Subpoena shall make you liable for such penalties as are provided by law.

**WITNESS**, the hand of The Honorable Loretta Weinberg and the hand of The Honorable John S. Wisniewski, Co-Chairs of the New Jersey Legislative Select Committee on Investigation, on this 10th day of February, 2014.

_____
Loretta Weinberg, Co-Chair
New Jersey Legislative Select Committee
on Investigation

_____
John S. Wisniewski, Co-Chair
New Jersey Legislative Select Committee
on Investigation

### SCHEDULE A
### (TO SUBPOENA DATED FEBRUARY 10, 2014, ISSUED BY THE NEW JERSEY
### LEGISLATIVE SELECT COMMITTEE ON INVESTIGATION.)

Please deliver the following:

1.    All documents and records of any kind, including, but not limited to, any dossiers, correspondence, notes, documents, electronic mail transmissions, text messages, including any sent over applications including Whatsapp, Blackberry Messenger messages (a/k/a "BBM messages"), any and all "instant messages" whether sent via a personal computational device or cellular phone via any and all web or cellular phone based messaging systems, any other electronically stored data or information which is currently stored on any and all personal computational devices in your possession, dominion, or control, including, without limitation, devices commonly known as 'desktops', 'laptops', 'smartbooks', 'tablets', 'smartphones', 'cellular phones', or 'iPads', exchanged between you and any other person or entity, whether used by you in a business, personal, or any other capacity, between April 2013 and the present date regarding Mark Sokolich, Mayor of Fort Lee, New Jersey.

2.    All documents and records of any kind, including, but not limited to, any correspondence, notes, documents, electronic mail transmissions, text messages, including any sent over applications including Whatsapp, Blackberry Messenger messages (a/k/a "BBM messages"), any and all "instant messages" whether sent via a personal computational device or cellular phone via any and all web or cellular phone based messaging systems, any other electronically stored data or information which is currently stored on any and all personal computational devices in your possession, dominion, or control, including, without limitation, devices commonly known as 'desktops', 'laptops', 'smartbooks', 'tablets', 'smartphones', 'cellular phones', or 'iPads', whether used by you in a business, personal, or any other capacity, which reflect or contain any drafts or earlier versions of, comments on, or changes or edits to the statement read by William E. Baroni during his testimony before the New Jersey General Assembly Transportation, Public Works, and Independent Authorities Committee on November 25, 2013, whether handwritten, electronic, or in any other form.

Please produce a log of any documents and/or correspondence withheld from production on the basis of any claimed privilege or protection, or withheld or redacted for any reason, and retain such documents and/or correspondence.

## PRODUCTION SPECIFICATIONS

All responsive information shall be produced as follows:

I.   **PAPER DOCUMENTS, FILES AND INFORMATION**

    a.    **Form of Production.** Produce all documents originally maintained in paper files as Group IV single page tiff format files imaged at 300 dpi. Name each tiff file with a unique name matching the Bates number labeled on the corresponding page. Group every 500 tiffs into a new folder; do not create a separate folder for each document.

    b.    **Image Load File.** Provide an image load file (Opticon file) that contains document boundaries.

    c.    **Document Text.** The OCR text will be produced from the image(s) associated with each document as a separate .txt file for each page of the document named for the Bates number of the page, in the same directory as the corresponding page of the document.

    d.    **Document Metadata**. Produce data for each document in the form of a .dat file including the following fields:

| | |
|---|---|
| Bates_Begin | The bates label of the first page of the document |
| Bates_End | The bates label of the last page of the document |
| Attach_Begin | The bates label of the first page of a family of documents (*e.g.*, email and attachment) |
| Attach_End | The bates label of the last page of a family of documents |
| Custodian | The custodian in whose file the document was found |

    e.    **Unitization of Documents.** In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). Re-unitize improperly unitized documents.

II.   **ELECTRONICALLY STORED INFORMATION**

    a.    **Form of Production.** All responsive electronically stored information ("ESI") shall be produced as Group IV singe page TIFF format files imaged at 300 dpi. Each TIFF file shall be named with a unique name matching the Bates number labeled on the corresponding page. Every 500 TIFFs shall be grouped into a new folder; there shall not be a separate folder created for each document. Documents originally stored as native electronic files should be processed using the custodian's local time zone.

    b.    **Image Load File.** For each document, produce an image load file (*i.e.* Opticon file) that contains document boundaries.

c.   **Document Text.**  For documents that were originally stored as native electronic files and which do not have redactions, produce the extracted, full text from the body of each document in a separate .txt file named for the beginning Bates number of the document in the same directory as the image of the first page of the document.   For documents that were originally stored as native electronic files and that have redactions, produce OCR text from the redacted image(s) associated with each document as a separate .txt file named for the Bates number of the document in the same directory as the image of the first page of the document.  Any redacted, privileged material should be clearly labeled to show the redactions on the TIFF image.

d.   **Special File Types.**  Produce files created by Excel or other spreadsheet programs, and PowerPoint or other presentation programs, which do not have redactions, in native format.   The produced file should be named with the Bates number of the first page of the corresponding tiff production of the document (*e.g.*, "ABC00001.xls").

e.   **Document Metadata.**  Produce extracted metadata for each document in the form of a .dat file, and include the following fields, except that if the field contains privileged information, the field should be left blank.  Any redactions for privilege reasons shall be recorded on a privilege log:

| | |
|---|---|
| Bates_Begin | The bates label of the first page of the document |
| Bates_End | The bates label of the last page of the document |
| Attach_Begin | The bates label of the first page of a family of documents (*e.g.*, email and attachment) |
| Attach_End | The bates label of the last page of a family of documents |
| Title | The subject of an email or the filename of an attachment or stand-alone e-file |
| Time_Zone | The time zone used to process the document |
| Sent_Date | For email, the sent date of the message |
| Sent_Time | For email, the sent time of the message |
| Create_Date | For e-files or attachments, the document's creation date or operating system creation date |
| Create_Time | For e-files or attachments, the document's creation time or operating system creation time |
| Modified_Date | For e-files or attachments, the document's last modified date or operating system last modified date |
| Modified_Time | For e-files or attachments, the document's last modified time or operation system last modified time |
| Author | The author of a stand-alone e-file or attachment |
| From | The sender of an email message |
| To | The recipient(s) of an email message, in a semi-colon delimited multi-value list |
| CC | The copyee(s) of an email message, in a semi-colon delimited multi-value list |

| BCC | The blind copyee(s) of an email message, in a semi-colon delimited multi-value list |
|---|---|
| Custodians | The custodian in whose file the document was found, and the custodians of any duplicates, in a semi-colon delimited multi-value list |
| MD5 | The calculated MD5 hash value of the document |
| Native_File | The file path to the location of the native file if produced |
| Conf_Desig | The confidentiality designation, if any, for the document pursuant to any protective order in the case |

# Code of Fair Procedure

### 52:13E-1. Definitions

As used in this act:

(a) "Agency" means any of the following while engaged in an investigation or inquiry: (1) the Governor or any person or persons appointed by him acting pursuant to P.L.1941, c. 16, s. 1 (C. 52:15-7), (2) any temporary State commission or duly authorized committee thereof having the power to require testimony or the production of evidence by subpoena, or (3) any legislative committee or commission having the powers set forth in Revised Statutes 52:13-1.

(b) "Hearing" means any hearing in the course of an investigatory proceeding (other than a preliminary conference or interview at which no testimony is taken under oath) conducted before an agency at which testimony or the production of other evidence may be compelled by subpoena or other compulsory process.

(c) "Public hearing" means any hearing open to the public, or any hearing, or such part thereof, as to which testimony or other evidence is made available or disseminated to the public by the agency.

(d) "Private hearing" means any hearing other than a public hearing.

L.1968, c. 376, s. 1, eff. Dec. 27, 1968.

### 52:13E-2. Personal service

No person may be required to appear at a hearing or to testify at a hearing unless there has been personally served upon him prior to the time when he is required to appear, a copy of this act, and a general statement of the subject of the investigation. A copy of the resolution, statute, order or other provision of law authorizing the investigation shall be furnished by the agency upon request therefor by the person summoned.

L.1968, c. 376, s. 2, eff. Dec. 27, 1968.

### 52:13E-3. Right to counsel; submission of proposed questions

A witness summoned to a hearing shall have the right to be accompanied by counsel, who shall be permitted to advise the witness of his rights, subject to reasonable limitations to prevent obstruction of or interference with the orderly conduct of the hearing. Counsel for any witness who testifies at a public hearing may submit proposed questions to be asked of the witness relevant to the matters upon which the witness has been questioned and the agency shall ask the witness such of the questions as it may deem appropriate to its inquiry.

L.1968, c. 376, s. 3, eff. Dec. 27, 1968.

### 52:13E-4. Records of public hearings; copies

A complete and accurate record shall be kept of each public hearing and a witness shall be entitled to receive a copy of his testimony at such hearing at his own expense. Where testimony which a witness has given at a private hearing becomes relevant in a criminal proceeding in which the witness is a defendant, or in any subsequent hearing in which the witness is summoned to testify, the witness shall be entitled to a copy of such

testimony, at his own expense, provided the same is available, and provided further that the furnishing of such copy will not prejudice the public safety or security.

L.1968, c. 376, s. 4, eff. Dec. 27, 1968.

**52:13E-5. Sworn statement by witness; incorporation in the record**

A witness who testifies at any hearing shall have the right at the conclusion of his examination to file a brief sworn statement relevant to his testimony for incorporation in the record of the investigatory proceeding.

L.1968, c. 376, s. 5, eff. Dec. 27, 1968.

**52:13E-6. Persons affected by proceedings; appearance or statement of facts**

Any person whose name is mentioned or who is specifically identified and who believes that testimony or other evidence given at a public hearing or comment made by any member of the agency or its counsel at such a hearing tends to defame him or otherwise adversely affect his reputation shall have the right, either to appear personally before the agency and testify in his own behalf as to matters relevant to the testimony or other evidence complained of, or in the alternative at the option of the agency, to file a statement of facts under oath relating solely to matters relevant to the testimony or other evidence complained of, which statement shall be incorporated in the record of the investigatory proceeding.

L.1968, c. 375, s. 6, eff. Dec. 27, 1968.

**52:13E-7.  Rights or privileges granted by agencies**

Nothing in this act shall be construed to prevent an agency from granting to witnesses appearing before it, or to persons who claim to be adversely affected by testimony or other evidence adduced before it, such further rights and privileges as it may determine.

L.1968, c. 376, s. 7, eff. Dec. 27, 1968.

**52:13E-8. Dissemination of evidence adduced at private hearing**

Except in the course of subsequent hearing which is open to the public, no testimony or other evidence adduced at a private hearing or preliminary conference or interview conducted before a single-member agency in the course of its investigation shall be disseminated or made available to the public by said agency, its counsel or employees without the approval of the head of the agency.  Except in the course of a subsequent hearing open to the public, no testimony or other evidence adduced at a private hearing or preliminary conference or interview before a committee or other multimember investigating agency shall be disseminated or made available to the public by any member of the agency, its counsel or employees, except with the approval of a majority of the members of such agency.  Any person who violates the provisions of this subdivision shall be adjudged a disorderly person.

L.1968, c. 376, s. 8, eff. Dec. 27, 1968.

**52:13E-9. Hearing conducted by temporary state commission**

No temporary State commission having more than two members shall have the power to take testimony at a public or private hearing unless at least two of its members are present at such hearing.

Nothing in this section, however, shall be deemed to prevent the State Commission of Investigation from conducting private hearings, on an investigation previously undertaken by a majority of the members of the commission, with one commissioner present, when so designated by resolution pursuant to the provisions of section 12 of P.L.1968, c. 266 (C. 52:9M-12).

L.1968, c. 376, s. 9, eff. Dec. 27, 1968.  Amended by L.1984, c. 110, s. 5, eff. Aug. 3, 1984.

**52:13E-10. Right of members to file statement of minority views**

Nothing in this act shall be construed to affect, diminish or impair the right, under any other provision of law, rule or custom, of any member or group of members of a committee or other multimember investigating agency to file a statement or statements of minority views to accompany and be released with or subsequent to the report of the committee or agency.

L.1968, c. 376, s. 10, eff. Dec. 27, 1968.

# Chapter 13 of Title 52 of the Revised Statutes

**Article 1. General Provisions.**

### 52:13-1. Attendance of witnesses; production of books and papers; legal and clerical assistance

Any joint committee of the legislature, any standing committee of either house, or any special committee directed by resolution to enter upon any investigation or inquiry, the pursuit of which shall necessitate the attendance of persons or the production of books or papers, shall have power to compel the attendance before it of such persons as witnesses and the production before it of such books and papers as it may deem necessary, proper and relevant to the matter under investigation. Any such committee shall also have the power to employ such legal and clerical assistance as it may deem necessary to the proper conduct of the investigation.

### 52:13-2. Summons for witnesses; execution

If any person upon being summoned in writing by order of any committee mentioned in section 52:13-1 of this title to appear before such committee and testify, fails to obey such summons, the speaker of the house of assembly or the president of the senate may, upon application to him, by warrant under his hand order the sergeant at arms of the house over which he presides to arrest such person and bring him before the committee, and the sergeant at arms shall thereupon execute the warrant to him so directed.

### 52:13-3. Compensation of witnesses; swearing witnesses; perjury; immunity; refusal to answer or be sworn

Witnesses summoned to appear before any committee authorized by this article or any other law to conduct an investigation or inquiry shall be entitled to receive the same fees and mileage as persons summoned to testify in the courts of the state. All such witnesses may be sworn by any member of the committee conducting the investigation or inquiry; and all witnesses sworn before any such committee shall answer truly all questions put to them which the committee shall decide to be proper and pertinent to the investigation or inquiry; and any witness so sworn who shall swear falsely shall be guilty of perjury. No such witness shall be excused from answering any such questions on the ground that to answer the same might or would incriminate him; but no answers made by any witness to any such questions shall be used or admitted in evidence in any proceeding against such witness, except in a criminal prosecution against the witness for perjury in respect to his answers to such questions.

Any witness who refuses to answer any questions decided by the committee to be proper and pertinent shall be guilty of a misdemeanor; and any witness who, having been summoned to appear before any such committee, fails to appear in obedience to the summons or, appearing, refuses to be sworn shall be guilty of a misdemeanor.

### 52:13-4. Expenses of investigations; payment

The state treasurer shall, upon the warrant of the state comptroller, pay the fees and mileage of witnesses called, the compensation of legal and clerical assistance employed and the expenses of the sergeant at arms of either house in the execution of warrants

pursuant to section 52:13-2 of this title, when the same shall be certified as correct and necessary by the chairman of the committee under whose authority and by whose order the same shall have been incurred, but only when the chairman's certificate has received the approval of the governor.

## Article 2. Contempts of Joint Legislative Committees.

### 52:13-5. What constitutes contempt; report thereof to legislature

Whenever, in any investigation or inquiry by any committee constituted by joint resolution of the legislature to enter upon or make such investigation or inquiry, any witness summoned or subpoenaed to appear before such committee to testify or to produce books, documents, papers or records, shall willfully neglect or refuse to appear in obedience to the summons or subpoena, or shall willfully neglect or refuse to produce any books, documents, papers or records commanded to be produced by the summons or subpoena, or shall refuse to be sworn or affirmed, or shall refuse to answer any question put to him which the committee shall decide to be proper and pertinent to such investigation or inquiry, or shall in any other way contemn the authority or privileges of the legislature, and the facts alleged to constitute any such contempt shall have been reported by any such committee to the legislature, the alleged contemner shall be tried, and the alleged contempt determined, as hereinafter provided.

### 52:13-6. Joint session to determine alleged contempt; order for arrest; service

The senate and general assembly may by concurrent resolution direct that the senate and general assembly meet in joint session at a time and place therein fixed for the purpose of hearing the evidence and arguments regarding the alleged contempt and may order that a warrant, directed to any sergeant at arms of either house or of the joint session or to any sheriff, police officer, member of the state police, constable or other peace officer, issue in such manner as shall be prescribed in and by the concurrent resolution for the arrest of the alleged contemner and the production of him at the bar of such joint session, there to be heard.

### 52:13-7. Hearing by joint session

At the time and place fixed as aforesaid, or at any adjournment, the joint session shall sit and summarily hear the evidence and the arguments relating to the alleged contempt. The joint session shall adjourn from time to time until the matter shall have been disposed of and the alleged contemner shall appear and attend at each and every such adjourned session.

### 52:13-8. Contemner's rights

Any alleged contemner shall have the right to be heard before the joint session, to be represented by counsel, to call witnesses in his behalf, and to examine and cross-examine witnesses.

### 52:13-9. Determination of contempt by each house separately; concurrent resolution

After the joint session shall have heard the evidence and such arguments as may be made, the senate and the general assembly shall separately convene and shall separately

consider and determine the alleged contempt; and the determination shall be by a concurrent resolution, which may originate in either house.

### 52:13-10. Sentence; order of commitment

Any person found to be guilty of a contempt of the legislature by a concurrent resolution of the two houses thereof, as hereinbefore provided, may be sentenced to imprisonment in the state prison or in the common jail of any county for any period not exceeding six months as shall be directed in and by the concurrent resolution determining the contempt, for the execution of which such concurrent resolution may order that a commitment shall issue, directed to any sheriff, police officer, member of the state police, constable or other peace officer, and to the keeper of the state prison or the keeper of the common jail of any county, which commitment shall be signed by the president of the senate and the speaker of the house of assembly in office at the date of the issue thereof.

### 52:13-11. Continuing validity of commitment

Any commitment issued in accordance with section 52:13-10 of this title shall remain valid and effective until the imprisonment therein set forth shall have been served, notwithstanding the legislature which directed the issue of the commitment may meanwhile have adjourned or ended.

### 52:13-12. Bail of contemner

Any judge of the Superior Court may let to bail any person apprehended for hearing on a charge of contempt under a warrant issued by direction of a concurrent resolution as provided in section 52:13-6 of this Title, in such amount and with such surety as the judge shall determine to be reasonable, to appear before the Joint Session of the Legislature, at the time and place fixed by the warrant as well as at any and all adjournments thereof, and to stand to and abide such determination and sentence as may thereafter be found or imposed against the person so apprehended. Such recognizances shall run in favor of the State of New Jersey and shall be filed by the judge in the office of the Secretary of State.

Amended by L.1953, c. 49, p. 853, s. 2.

### 52:13-13. Powers given additional to other powers

The powers given by this article shall be in addition to the powers given by article 1 of this chapter (s. 52:13-1 et seq.).

STATE OF NEW JERSEY, ss:

_____ being duly sworn according to law on his oath say that on the _____ day of

_____, 2014 at _____ he served the within Subpoena upon Office of the Governor, Attn: Custodian

of Records, c/o Randy M. Mastro, by exhibiting the same to her and informing her of the contents

thereof _____ and giving to Office of the Governor, Attn:

Custodian of Records, c/o Randy M. Mastro, a true copy thereof, addressed to Office of the Governor, Attn: Custodian of Records, c/o

Randy M. Mastro, Gibson Dunn, New York Office, 200 Park Avenue, New York, New York 10166.

Subscribed and sworn to before me at _____ the _____ day of

_____ 2014.

_____

STATE OF NEW JERSEY

_____

New Jersey Legislative Select Committee on Investigation

       to

Office of the Governor
Attn: Custodian of Records
c/o Randy M. Mastro
Gibson Dunn, New York Office
200 Park Avenue
New York, New York 10166

_____

SUBPOENA

Duces Tecum

_____

Writ Returnable on or before
5:00 p.m., February 24, 2014

       to

New Jersey Legislative Select Committee on Investigation

                                     **c/o  Charles A. Buono, Jr.**
                                     **Office of Legislative Services**
                                     **State House Annex**
                                     **PO Box 068**
                                     **Trenton, New Jersey  08625**

Exhibit E

LORETTA WEINBERG
*Co-Chair*

JOHN S. WISNIEWSKI
*Co-Chair*

**SENATE**

NIA H. GILL
LINDA R. GREENSTEIN
KEVIN J. O'TOOLE

**ASSEMBLY**

MARLENE CARIDE
LOUIS D. GREENWALD
PAUL D. MORIARTY
VALERIE VAINIERI HUTTLE
MICHAEL PATRICK CARROLL
AMY H. HANDLIN
HOLLY T. SCHEPISI



CHARLES A. BUONO, JR.
*Office of Legislative Services*
*Committee Aide*
(609) 847-3840
(609) 292-0561 fax

MICHAEL R. MOLIMOCK
*Office of Legislative Services*
*Committee Aide*
(609) 847-3855
(609) 292-0561 fax

# 𝔑𝔢𝔴 𝔍𝔢𝔯𝔰𝔢𝔶 𝔖𝔱𝔞𝔱𝔢 𝔏𝔢𝔤𝔦𝔰𝔩𝔞𝔱𝔲𝔯𝔢
## NEW JERSEY LEGISLATIVE SELECT COMMITTEE
## ON INVESTIGATION
STATE HOUSE ANNEX
PO BOX 068
TRENTON NJ 08625-0068

June 13, 2014

Office of the Governor
Attn: Mr. Randy M. Mastro
Gibson Dunn, New York Office
200 Park Avenue
New York, New York 10166

Dear Mr. Mastro:

Please find attached hereto a subpoena requesting certain documents concerning all aspects of the finances, operations, and management of the Port Authority of New York and New Jersey and any other matter raising concerns about abuse of government power or an attempt to conceal an abuse of government power, including, but not limited to, the reassignment of access lanes in Fort Lee, New Jersey to the George Washington Bridge. The New Jersey Legislative Select Committee on Investigation would accept mail or messenger delivery of the requested records at the following address on or before 5:00 p.m., June 27, 2014: Michael R. Molimock, Office of Legislative Services, State House Annex, PO Box 068, Trenton, New Jersey 08625. We also enclose herewith a copy of the Code of Fair Procedure. The preferred method of delivery of the requested records is compact disc, DVD, or similar format.

We look forward to your anticipated cooperation in this matter. If you have questions on this matter, please contact the Committee's Special Counsel Reid J. Schar, Jenner & Block LLP, at (312) 923-2629.

Very truly yours,

NEW JERSEY LEGISLATIVE SELECT COMMITTEE
ON INVESTIGATION

Loretta Weinberg
Co-Chair

John S. Wisniewski
Co-Chair

LW/JW/kj
Enclosures
c  Members – New Jersey Legislative Select Committee on Investigation
Reid J. Schar, Jenner & Block LLP
Francisco Maldonado, Senate Majority Office
Aaron Binder, Assembly Majority Office
Frank Dominguez, Senate Republican Office
Keith Loughlin, Assembly Republican Office

## NEW JERSEY LEGISLATIVE SELECT COMMITTEE ON INVESTIGATION
# S U B P O E N A

**TO**   Office of the Governor
Attn: Mr. Randy M. Mastro
Gibson Dunn, New York Office
200 Park Avenue
New York, New York 10166

**WE COMMAND YOU**, Laying aside all and singular business and excuses, to produce all books, papers, correspondence, other documents and materials, and electronic records and data described below, that you have in your possession or have access to relevant to the New Jersey Legislative Select Committee on Investigation's inquiry and investigation into all aspects of the finances, operations, and management of the Port Authority of New York and New Jersey and any other matter raising concerns about abuse of government power or an attempt to conceal an abuse of government power, including, but not limited to, the reassignment of access lanes in Fort Lee, New Jersey to the George Washington Bridge, as more particularly set forth on the attached Schedule A. These books, papers, correspondence, other documents and materials, and electronic records and data shall be returned on or before 5:00 p.m., Friday, June 27, 2014 to:  Michael R. Molimock, Office of Legislative Services, State House Annex, PO Box 068, Trenton, New Jersey 08625. The New Jersey Legislative Select Committee on Investigation was constituted as a special committee of the Senate and the General Assembly pursuant to concurrent resolution.

Your production of documents is governed by the Code of Fair Procedure and Chapter 13 of Title 52 of the Revised Statutes. A copy of the Code of Fair Procedure is delivered to you herewith.

Failure to comply with this Subpoena shall make you liable for such penalties as are provided by law.

**WITNESS**, the hand of The Honorable Loretta Weinberg and the hand of The Honorable John S. Wisniewski, Co-Chairs of the New Jersey Legislative Select Committee on Investigation, on this 13th day of June, 2014.

Loretta Weinberg, Co-Chair
New Jersey Legislative Select Committee
on Investigation

John S. Wisniewski, Co-Chair
New Jersey Legislative Select Committee
on Investigation

**SCHEDULE A**
**(TO SUBPOENA DATED JUNE 13, 2014, ISSUED BY THE NEW JERSEY**
**LEGISLATIVE SELECT COMMITTEE ON INVESTIGATION.)**

Please deliver the following:

All documents and records of any kind, including, but not limited to, any (1) correspondence, (2) notes, (3) electronic mail transmissions, (4) text messages, (5) Blackberry Messenger messages (a/k/a "BBM messages"), (6) "instant messages," whether sent via a personal computational device or cellular phone via any and all Web- or cellular phone-based messaging systems, and/or (7) any other electronically stored data or information which is currently stored on any and all personal computational devices to which the Office of the Governor of New Jersey ("OGNJ") has access or over which OGNJ has possession, dominion, or control, including, without limitation, devices commonly known as 'desktops,' 'laptops,' 'smartbooks,' 'tablets,' 'smartphones,' 'cellular phones,' or 'iPads,' whether used in a business, personal, or any other capacity, produced, created, sent, or received between January 1, 2013, and the present date relating to, regarding, reflecting, concerning, or constituting any of the following:

a. the resignation, termination, or separation on or about December 6, 2013, of David Wildstein from his previous position at the Port Authority of New York and New Jersey (the "Port Authority");

b. the resignation, termination, or separation on or about December 13, 2013, of William Baroni from his previous position at the Port Authority;

c. the resignation, termination, or separation on or about March 28, 2014, of David Samson from his previous position at the Port Authority;

d. the story published on the *Wall Street Journal*'s website on or about December 12, 2013, regarding communications between Governor Chris Christie of New Jersey and Governor Andrew Cuomo of New York in connection with the September 2013 reconfiguration of access lanes at the George Washington Bridge;

e. all documents, including all copies with handwritten annotations, produced by Michael Drewniak to Paul Matey on or about January 8, 2014, as described on page 7 of the *Matey Interview Memorandum* memorializing Gibson, Dunn & Crutcher's January 17, 2014 interview of Paul Matey;

f. all text messages or email sent between or among Kevin O'Dowd and either (1) Bridget Anne Kelly or (2) William Stepien and presented to or discussed with O'Dowd during his January 19, 2014 interview with Gibson, Dunn & Crutcher and/or his March 8, 2014 interview with Gibson, Dunn & Crutcher;

g. all versions of any "Top 100 Towns" list, "T-100 Towns" list, "T-117 Towns" list, or any similar list of towns created or maintained by OGNJ's Department of Legislative & Intergovernmental Affairs, where such lists include the Borough of Fort Lee ("Fort Lee") or Fort Lee Mayor Mark Sokolich ("Sokolich"), including any and all documents discussing the

creation of such lists or any criteria or considerations for including or excluding Fort Lee or Sokolich on or from such lists.

Please produce a log of any documents and/or correspondence withheld from production on the basis of any claimed privilege or protection, or withheld or redacted for any reason, and retain such documents and/or correspondence.

## PRODUCTION SPECIFICATIONS

All responsive information shall be produced as follows:

I.    **PAPER DOCUMENTS, FILES AND INFORMATION**

**Form of Production.**  Produce all documents originally maintained in paper files as Group IV single page tiff format files imaged at 300 dpi.  Name each tiff file with a unique name matching the Bates number labeled on the corresponding page.  Group every 500 tiffs into a new folder; do not create a separate folder for each document.

**Image Load File.**  Provide an image load file (Opticon file) that contains document boundaries.

**Document Text.**  The OCR text will be produced from the image(s) associated with each document as a separate .txt file for each page of the document named for the Bates number of the page, in the same directory as the corresponding page of the document.

**Document Metadata**.  Produce data for each document in the form of a .dat file including the following fields:

| Bates_Begin | The bates label of the first page of the document |
|---|---|
| Bates_End | The bates label of the last page of the document |
| Attach_Begin | The bates label of the first page of a family of documents (*e.g.*, email and attachment) |
| Attach_End | The bates label of the last page of a family of documents |
| Custodian | The custodian in whose file the document was found |

**Unitization of Documents.**  In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized).  Re-unitize improperly unitized documents..

II.   **ELECTRONICALLY STORED INFORMATION**

**Form of Production.**  All responsive electronically stored information ("ESI") shall be produced as Group IV singe page TIFF format files imaged at 300 dpi.  Each TIFF file shall be named with a unique name matching the Bates number labeled on the corresponding page.  Every 500 TIFFs shall be grouped into a new folder; there shall not be a separate folder created for each document.  Documents originally stored as native electronic files should be processed using the custodian's local time zone.

**Image Load File.**  For each document, produce an image load file (*i.e.* Opticon file) that contains document boundaries.

**Document Text.** For documents that were originally stored as native electronic files and which do not have redactions, produce the extracted, full text from the body of each document in a separate .txt file named for the beginning Bates number of the document in the same directory as the image of the first page of the document. For documents that were originally stored as native electronic files and that have redactions, produce OCR text from the redacted image(s) associated with each document as a separate .txt file named for the Bates number of the document in the same directory as the image of the first page of the document. Any redacted, privileged material should be clearly labeled to show the redactions on the TIFF image.

**Special File Types.** Produce files created by Excel or other spreadsheet programs, and PowerPoint or other presentation programs, which do not have redactions, in native format. The produced file should be named with the Bates number of the first page of the corresponding tiff production of the document (*e.g.*, "ABC00001.xls").

**Document Metadata.** Produce extracted metadata for each document in the form of a .dat file, and include the following fields, except that if the field contains privileged information, the field should be left blank. Any redactions for privilege reasons shall be recorded on a privilege log:

| | |
|---|---|
| Bates_Begin | The bates label of the first page of the document |
| Bates_End | The bates label of the last page of the document |
| Attach_Begin | The bates label of the first page of a family of documents (*e.g.*, email and attachment) |
| Attach_End | The bates label of the last page of a family of documents |
| Title | The subject of an email or the filename of an attachment or stand-alone e-file |
| Time_Zone | The time zone used to process the document |
| Sent_Date | For email, the sent date of the message |
| Sent_Time | For email, the sent time of the message |
| Create_Date | For e-files or attachments, the document's creation date or operating system creation date |
| Create_Time | For e-files or attachments, the document's creation time or operating system creation time |
| Modified_Date | For e-files or attachments, the document's last modified date or operating system last modified date |
| Modified_Time | For e-files or attachments, the document's last modified time or operation system last modified time |
| Author | The author of a stand-alone e-file or attachment |
| From | The sender of an email message |
| To | The recipient(s) of an email message, in a semi-colon delimited multi-value list |
| CC | The copyee(s) of an email message, in a semi-colon delimited multi-value list |

| BCC | The blind copyee(s) of an email message, in a semi-colon delimited multi-value list |
|---|---|
| Custodians | The custodian in whose file the document was found, and the custodians of any duplicates, in a semi-colon delimited multi-value list |
| MD5 | The calculated MD5 hash value of the document |
| Native_File | The file path to the location of the native file if produced |
| Conf_Desig | The confidentiality designation, if any, for the document pursuant to any protective order in the case |

# Code of Fair Procedure

**52:13E-1. Definitions**

As used in this act:

(a) "Agency" means any of the following while engaged in an investigation or inquiry: (1) the Governor or any person or persons appointed by him acting pursuant to P.L.1941, c. 16, s. 1 (C. 52:15-7), (2) any temporary State commission or duly authorized committee thereof having the power to require testimony or the production of evidence by subpoena, or (3) any legislative committee or commission having the powers set forth in Revised Statutes 52:13-1.

(b) "Hearing" means any hearing in the course of an investigatory proceeding (other than a preliminary conference or interview at which no testimony is taken under oath) conducted before an agency at which testimony or the production of other evidence may be compelled by subpoena or other compulsory process.

(c) "Public hearing" means any hearing open to the public, or any hearing, or such part thereof, as to which testimony or other evidence is made available or disseminated to the public by the agency.

(d) "Private hearing" means any hearing other than a public hearing.

L.1968, c. 376, s. 1, eff. Dec. 27, 1968.

**52:13E-2. Personal service**

No person may be required to appear at a hearing or to testify at a hearing unless there has been personally served upon him prior to the time when he is required to appear, a copy of this act, and a general statement of the subject of the investigation. A copy of the resolution, statute, order or other provision of law authorizing the investigation shall be furnished by the agency upon request therefor by the person summoned.

L.1968, c. 376, s. 2, eff. Dec. 27, 1968.

**52:13E-3. Right to counsel; submission of proposed questions**

A witness summoned to a hearing shall have the right to be accompanied by counsel, who shall be permitted to advise the witness of his rights, subject to reasonable limitations to prevent obstruction of or interference with the orderly conduct of the hearing. Counsel for any witness who testifies at a public hearing may submit proposed questions to be asked of the witness relevant to the matters upon which the witness has been questioned and the agency shall ask the witness such of the questions as it may deem appropriate to its inquiry.

L.1968, c. 376, s. 3, eff. Dec. 27, 1968.

**52:13E-4. Records of public hearings; copies**

A complete and accurate record shall be kept of each public hearing and a witness shall be entitled to receive a copy of his testimony at such hearing at his own expense. Where testimony which a witness has given at a private hearing becomes relevant in a criminal proceeding in which the witness is a defendant, or in any subsequent hearing in which the witness is summoned to testify, the witness shall be entitled to a copy of such

testimony, at his own expense, provided the same is available, and provided further that the furnishing of such copy will not prejudice the public safety or security.

L.1968, c. 376, s. 4, eff. Dec. 27, 1968.

**52:13E-5. Sworn statement by witness; incorporation in the record**

A witness who testifies at any hearing shall have the right at the conclusion of his examination to file a brief sworn statement relevant to his testimony for incorporation in the record of the investigatory proceeding.

L.1968, c. 376, s. 5, eff. Dec. 27, 1968.

**52:13E-6. Persons affected by proceedings; appearance or statement of facts**

Any person whose name is mentioned or who is specifically identified and who believes that testimony or other evidence given at a public hearing or comment made by any member of the agency or its counsel at such a hearing tends to defame him or otherwise adversely affect his reputation shall have the right, either to appear personally before the agency and testify in his own behalf as to matters relevant to the testimony or other evidence complained of, or in the alternative at the option of the agency, to file a statement of facts under oath relating solely to matters relevant to the testimony or other evidence complained of, which statement shall be incorporated in the record of the investigatory proceeding.

L.1968, c. 375, s. 6, eff. Dec. 27, 1968.

**52:13E-7. Rights or privileges granted by agencies**

Nothing in this act shall be construed to prevent an agency from granting to witnesses appearing before it, or to persons who claim to be adversely affected by testimony or other evidence adduced before it, such further rights and privileges as it may determine.

L.1968, c. 376, s. 7, eff. Dec. 27, 1968.

**52:13E-8. Dissemination of evidence adduced at private hearing**

Except in the course of subsequent hearing which is open to the public, no testimony or other evidence adduced at a private hearing or preliminary conference or interview conducted before a single-member agency in the course of its investigation shall be disseminated or made available to the public by said agency, its counsel or employees without the approval of the head of the agency. Except in the course of a subsequent hearing open to the public, no testimony or other evidence adduced at a private hearing or preliminary conference or interview before a committee or other multimember investigating agency shall be disseminated or made available to the public by any member of the agency, its counsel or employees, except with the approval of a majority of the members of such agency. Any person who violates the provisions of this subdivision shall be adjudged a disorderly person.

L.1968, c. 376, s. 8, eff. Dec. 27, 1968.

**52:13E-9. Hearing conducted by temporary state commission**

No temporary State commission having more than two members shall have the power to take testimony at a public or private hearing unless at least two of its members are present at such hearing.

Nothing in this section, however, shall be deemed to prevent the State Commission of Investigation from conducting private hearings, on an investigation previously undertaken by a majority of the members of the commission, with one commissioner present, when so designated by resolution pursuant to the provisions of section 12 of P.L.1968, c. 266 (C. 52:9M-12).

L.1968, c. 376, s. 9, eff. Dec. 27, 1968.  Amended by L.1984, c. 110, s. 5, eff. Aug. 3, 1984.

**52:13E-10. Right of members to file statement of minority views**

Nothing in this act shall be construed to affect, diminish or impair the right, under any other provision of law, rule or custom, of any member or group of members of a committee or other multimember investigating agency to file a statement or statements of minority views to accompany and be released with or subsequent to the report of the committee or agency.

L.1968, c. 376, s. 10, eff. Dec. 27, 1968.

# Chapter 13 of Title 52 of the Revised Statutes

**Article 1. General Provisions.**

**52:13-1. Attendance of witnesses; production of books and papers; legal and clerical assistance**

Any joint committee of the legislature, any standing committee of either house, or any special committee directed by resolution to enter upon any investigation or inquiry, the pursuit of which shall necessitate the attendance of persons or the production of books or papers, shall have power to compel the attendance before it of such persons as witnesses and the production before it of such books and papers as it may deem necessary, proper and relevant to the matter under investigation. Any such committee shall also have the power to employ such legal and clerical assistance as it may deem necessary to the proper conduct of the investigation.

**52:13-2. Summons for witnesses; execution**

If any person upon being summoned in writing by order of any committee mentioned in section 52:13-1 of this title to appear before such committee and testify, fails to obey such summons, the speaker of the house of assembly or the president of the senate may, upon application to him, by warrant under his hand order the sergeant at arms of the house over which he presides to arrest such person and bring him before the committee, and the sergeant at arms shall thereupon execute the warrant to him so directed.

**52:13-3. Compensation of witnesses; swearing witnesses; perjury; immunity; refusal to answer or be sworn**

Witnesses summoned to appear before any committee authorized by this article or any other law to conduct an investigation or inquiry shall be entitled to receive the same fees and mileage as persons summoned to testify in the courts of the state. All such witnesses may be sworn by any member of the committee conducting the investigation or inquiry; and all witnesses sworn before any such committee shall answer truly all questions put to them which the committee shall decide to be proper and pertinent to the investigation or inquiry; and any witness so sworn who shall swear falsely shall be guilty of perjury. No such witness shall be excused from answering any such questions on the ground that to answer the same might or would incriminate him; but no answers made by any witness to any such questions shall be used or admitted in evidence in any proceeding against such witness, except in a criminal prosecution against the witness for perjury in respect to his answers to such questions.

Any witness who refuses to answer any questions decided by the committee to be proper and pertinent shall be guilty of a misdemeanor; and any witness who, having been summoned to appear before any such committee, fails to appear in obedience to the summons or, appearing, refuses to be sworn shall be guilty of a misdemeanor.

**52:13-4. Expenses of investigations; payment**

The state treasurer shall, upon the warrant of the state comptroller, pay the fees and mileage of witnesses called, the compensation of legal and clerical assistance employed and the expenses of the sergeant at arms of either house in the execution of warrants

pursuant to section 52:13-2 of this title, when the same shall be certified as correct and necessary by the chairman of the committee under whose authority and by whose order the same shall have been incurred, but only when the chairman's certificate has received the approval of the governor.

## Article 2. Contempts of Joint Legislative Committees.

### 52:13-5. What constitutes contempt; report thereof to legislature

Whenever, in any investigation or inquiry by any committee constituted by joint resolution of the legislature to enter upon or make such investigation or inquiry, any witness summoned or subpoenaed to appear before such committee to testify or to produce books, documents, papers or records, shall willfully neglect or refuse to appear in obedience to the summons or subpoena, or shall willfully neglect or refuse to produce any books, documents, papers or records commanded to be produced by the summons or subpoena, or shall refuse to be sworn or affirmed, or shall refuse to answer any question put to him which the committee shall decide to be proper and pertinent to such investigation or inquiry, or shall in any other way contemn the authority or privileges of the legislature, and the facts alleged to constitute any such contempt shall have been reported by any such committee to the legislature, the alleged contemner shall be tried, and the alleged contempt determined, as hereinafter provided.

### 52:13-6. Joint session to determine alleged contempt; order for arrest; service

The senate and general assembly may by concurrent resolution direct that the senate and general assembly meet in joint session at a time and place therein fixed for the purpose of hearing the evidence and arguments regarding the alleged contempt and may order that a warrant, directed to any sergeant at arms of either house or of the joint session or to any sheriff, police officer, member of the state police, constable or other peace officer, issue in such manner as shall be prescribed in and by the concurrent resolution for the arrest of the alleged contemner and the production of him at the bar of such joint session, there to be heard.

### 52:13-7. Hearing by joint session

At the time and place fixed as aforesaid, or at any adjournment, the joint session shall sit and summarily hear the evidence and the arguments relating to the alleged contempt. The joint session shall adjourn from time to time until the matter shall have been disposed of and the alleged contemner shall appear and attend at each and every such adjourned session.

### 52:13-8. Contemner's rights

Any alleged contemner shall have the right to be heard before the joint session, to be represented by counsel, to call witnesses in his behalf, and to examine and cross-examine witnesses.

### 52:13-9. Determination of contempt by each house separately; concurrent resolution

After the joint session shall have heard the evidence and such arguments as may be made, the senate and the general assembly shall separately convene and shall separately

consider and determine the alleged contempt; and the determination shall be by a concurrent resolution, which may originate in either house.

**52:13-10. Sentence; order of commitment**

Any person found to be guilty of a contempt of the legislature by a concurrent resolution of the two houses thereof, as hereinbefore provided, may be sentenced to imprisonment in the state prison or in the common jail of any county for any period not exceeding six months as shall be directed in and by the concurrent resolution determining the contempt, for the execution of which such concurrent resolution may order that a commitment shall issue, directed to any sheriff, police officer, member of the state police, constable or other peace officer, and to the keeper of the state prison or the keeper of the common jail of any county, which commitment shall be signed by the president of the senate and the speaker of the house of assembly in office at the date of the issue thereof.

**52:13-11. Continuing validity of commitment**

Any commitment issued in accordance with section 52:13-10 of this title shall remain valid and effective until the imprisonment therein set forth shall have been served, notwithstanding the legislature which directed the issue of the commitment may meanwhile have adjourned or ended.

**52:13-12. Bail of contemner**

Any judge of the Superior Court may let to bail any person apprehended for hearing on a charge of contempt under a warrant issued by direction of a concurrent resolution as provided in section 52:13-6 of this Title, in such amount and with such surety as the judge shall determine to be reasonable, to appear before the Joint Session of the Legislature, at the time and place fixed by the warrant as well as at any and all adjournments thereof, and to stand to and abide such determination and sentence as may thereafter be found or imposed against the person so apprehended. Such recognizances shall run in favor of the State of New Jersey and shall be filed by the judge in the office of the Secretary of State.

Amended by L.1953, c. 49, p. 853, s. 2.

**52:13-13. Powers given additional to other powers**

The powers given by this article shall be in addition to the powers given by article 1 of this chapter (s. 52:13-1 et seq.).

STATE OF NEW JERSEY, ss:

_____ being duly sworn according to law on his oath say that on the _____ day of

_____, 2014 at _____ he served the within Subpoena upon Office of the Governor, Attn: Mr. Randy

M. Mastro, by exhibiting the same to her and informing her of the contents

thereof _____ and giving to Office of the Governor, Attn:

Mr. Randy M. Mastro, a true copy thereof, addressed to Office of the Governor, Attn: Mr. Randy M. Mastro, Gibson Dunn, New York

Office, 200 Park Avenue, New York, New York 10166.

Subscribed and sworn to before me at _____ the _____ _____ day of

_____ 2014.

_____

STATE OF NEW JERSEY

_____

New Jersey Legislative Select Committee on Investigation

                    to

Office of the Governor
Attn: Mr. Randy M. Mastro
Gibson Dunn, New York Office
200 Park Avenue
New York, New York 10166


_____


SUBPOENA

Duces Tecum


_____


Writ Returnable on or before
5:00 p.m., June 27, 2014

                    to

New Jersey Legislative Select Committee on Investigation

                                        **c/o  Michael R. Molimock**
                                        **Office of Legislative Services**
                                        **State House Annex**
                                        **PO Box 068**
                                        **Trenton, New Jersey  08625**

Exhibit F

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Alexander H. Southwell
Direct: +1 212.351.3981
Fax: +1 212.351.6281
ASouthwell@gibsondunn.com

October 10, 2014

<u>VIA ELECTRONIC MAIL</u>

Reid J. Schar, Esq.
Jenner & Block LLP
353 North Clark Street
Chicago, Illinois 60654-3456

Re:     *New Jersey Legislative Select Committee on Investigation Subpoenas*

Dear Mr. Schar:

We write as counsel for the Office of the Governor of New Jersey ("OGNJ") in response to your August 25, 2014 letter regarding documents produced by the OGNJ in response to the June 13, 2014 subpoena issued by the New Jersey Legislative Select Committee on Investigation (the "June 13 subpoena").

As you know, the OGNJ has already produced nearly 89,000 pages of records to the Committee, including records responsive to the Committee's June 13 subpoena. Notwithstanding the OGNJ's extensive and well-documented cooperation with the Committee, your August 25 letter erroneously asserts that "there continue to be significant gaps" in the OGNJ's production. That is incorrect. Indeed, we produced several months ago many of the records about which you inquire. In short, we have produced the non-privileged records responsive to the June 13 subpoena in the OGNJ's possession. Documents withheld, in whole or in part, on the basis of an asserted privilege or other protection are described in the logs produced to the Committee, updated versions of which were sent to you on September 26, 2014.

Your August 25 letter seeks clarification regarding each of the seven requests in the June 13 subpoena. You acknowledge, however, that with respect to three of those requests, the OGNJ's compliance is complete or that the Committee lacks a specific basis to believe that the OGNJ's production is deficient. In any event, with respect to requests (b), (c), and (e) of the June 13 subpoena, we confirm that we are unaware of any additional responsive documents yet to be produced. We hereby confirm that our compliance with requests (b), (c), and (e) of the June 13 subpoena is complete.

Your August 25 letter seeks clarification regarding two communications pertaining to the resignation of David Wildstein. Specifically, you inquire about a December 6, 2013 e-mail chain between Governor Christie and Michael Drewniak and a December 6, 2013 e-mail

**GIBSON DUNN**

Reid J. Schar, Esq.
October 10, 2014
Page 2

chain between Governor Christie and Michael DuHaime, both of which relate to Wildstein's resignation. To be clear, as your August 25 letter frankly acknowledges, the Committee already has in its possession the specific communications about which you inquire. Notwithstanding that fact, we have re-reviewed the relevant electronic data in response to your August 25 letter and telephone calls. In short, that re-review did not identify any additional documents responsive to this request that have not already been produced. Indeed, the OGNJ produced the December 6, 2013 communications between Governor Christie and Mr. Drewniak to you more than five months ago; certain of those communications were annexed to our Report, published to a publicly available website, inquired about by members of the Committee during Mr. Drewniak's May 13, 2014 public hearing, and published by the Committee to its own publicly available website as exhibits to that hearing. *See* Report at n.583–84; Exhibits to Committee's May 13, 2014 Hearing of M. Drewniak. In sum, you have received the communications pertaining to Wildstein's resignation specified in your August 25 letter, and we do not possess any non-privileged responsive records that have not already been produced. In any event, in order to further cooperate with the Committee and to resolve this matter with finality, we hereby produce the same two December 6, 2013 communications that you have already received. *See* OGNJ-LEG-088980 to 088982. We believe our compliance with request (a) of the June 13 subpoena is complete.

Your August 25 letter seeks clarification about certain December 2013 text messages sent to or from Kevin O'Dowd. Again, the Committee has already received the messages about which you inquire. First, more than two months ago, the OGNJ produced to the Committee the December 13, 2013 text from Bridget Kelly to Mr. O'Dowd about which you inquire. *See* OGNJ-LEG-076352. Second, the entire substance of the texts sent or received between Mr. O'Dowd, Paul Matey, and/or Howard Glaser was reproduced at footnote 8 of the O'Dowd interview memorandum, which the OGNJ produced to the Committee more than four months ago and which is publicly available online. *See* K. O'Dowd Interview Memorandum at 14 n.8. In any event, in order to further cooperate with the Committee and to resolve this matter with finality, we hereby produce those same texts to you again. *See* OGNJ-LEG-088983 to 088988. We believe our compliance with requests (d) and (f) of the June 13 subpoena is complete.[1]

Finally, you have continued to inquire about a December 9, 2013 text message sent by Regina Egea to Governor Christie, which Ms. Egea said that she deleted during her July 17

---

[1] We continue to object to subpoena request (g), which is overbroad and goes far beyond the present scope of the Committee's investigation. Furthermore, your August 25 letter seeks confirmation that our June 27 representation—that "we have not found any documents 'discussing the creation of such lists or any criteria or considerations for including or excluding Fort Lee or [Mayor] Sokolich on or from such lists'"—remains accurate. It does.

**GIBSON DUNN**

Reid J. Schar, Esq.
October 10, 2014
Page 3

testimony before the Committee.  As we explained to you in our August 1, 2014 letter, no
responsive text messages from Ms. Egea to Governor Christie were recovered, and that is the
reason none were produced to the Committee.  You then asked that we make a specific effort
to identify the specific text message described by Ms. Egea during her testimony.  We did so.
As before, no responsive text messages between Ms. Egea and Governor Christie were
identified.  You then made further inquiries.  We now confirm—following yet another re-
review of OGNJ and personal records—that no responsive text messages from Ms. Egea to
Governor Christie have been identified.

We trust that this letter has fully addressed the Committee's inquiries.  As I conveyed during
our telephone conversations, I remain available to respond to any other questions you may
have in this regard, and reiterate my request that those questions be addressed to me in the
first instance.

Sincerely,

Alexander H. Southwell
Enclosures