# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ———————————————— | : | |
| UNITED STATES OF AMERICA | : | Hon. Susan D. Wigenton |
| | : | |
| v. | : | Crim. No. 15-193 (SDW) |
| | : | |
| WILLIAM E. BARONI, JR. and | : | |
| BRIDGET ANNE KELLY | : | |
| ———————————————— | : | |

---

## SENTENCING MEMORANDUM OF THE UNITED STATES

---

PAUL J. FISHMAN
United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
(973) 645-2742

On the Memorandum:

Lee M. Cortes, Jr.
Vikas Khanna
David W. Feder
Assistant United States Attorneys

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................... 3

FACTUAL AND PROCEDURAL BACKGROUND.................................... 5

    A.   THE EVIDENCE AT TRIAL ..................................................... 5

        1.   Planning of the Lane Reductions ................................ 5

        2.   Week of the Lane Reductions ................................... 8

        3.   The Cover Up ........................................................ 14

    B.   THE INDICTMENT AND TRIAL ............................................ 18

ARGUMENT ............................................................................................. 19

I.   STEP ONE: THE CORRECTLY CALCULATED ADVISORY GUIDELINES RANGE IS 37 TO 46 MONTHS' IMPRISONMENT ..................................... 20

    A.   THE LOSS AMOUNT IS PROPERLY SUPPORTED BY EVIDENCE AT TRIAL ................. 21

    B.   THE OBSTRUCTION OF JUSTICE ENHANCEMENT IS APPROPRIATE ........................ 22

        1.   Baroni's Perjury at Trial ........................................ 24

        2.   Kelly's Perjury at Trial ........................................... 28

    C.   KELLY DID NOT ACCEPT RESPONSIBILITY FOR HER CRIMINAL CONDUCT ........... 32

    D.   U.S.S.G. § 2H1.1 IS THE PROPER GUIDELINE TO CALCULATE THE OFFENSE LEVEL for the CIVIL RIGHTS CONVICTIONS .................................... 35

II.   STEP TWO:  NO GUIDELINES DEPARTURE IS WARRANTED............................. 35

III.   STEP THREE:  THE 3553(A) FACTORS SUPPORT A MEANINGFUL PRISON SENTENCE .................................................................................. 36

    A.   THE SERIOUSNESS OF THE OFFENSE AND THE ADVISORY GUIDELINES RANGE ...... 37

    B.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ........................................... 38

    C.   THE HISTORY AND CHARACTERISTICS OF THE DEFENDANTS ............................... 41

        1.   Bill Baroni........................................................... 44

        2.   Bridget Kelly ....................................................... 49

    D.   THE NEED FOR DETERRENCE, TO PROTECT THE PUBLIC, AND TO PROMOTE RESPECT for the LAW ........................................................... 51

    E.   AVOIDING UNWARRANTED SENTENCING DISPARITIES ......................................... 53

    F.   THE COURT SHOULD EXPLAIN THE REASONS FOR ITS SENTENCE .......................... 54

CONCLUSION........................................................................................... 55

## PRELIMINARY STATEMENT

The United States submits this memorandum in connection with the sentencing of Defendants William E. Baroni, Jr. and Bridget Anne Kelly, scheduled for March 15, 2017. The United States respectfully requests the opportunity to supplement this memorandum by oral argument.

In 2013, Baroni and Kelly were high ranking public officials entrusted with the responsibility of serving the interests of the citizens of New Jersey. Baroni was the Deputy Executive Director of the Port Authority of New York and New Jersey ("Port Authority"). Kelly was the Deputy Chief of Staff for Legislative and Intergovernmental Affairs ("IGA") in the Office of the Governor of the State of New Jersey (the "Governor's Office"). In these positions, Baroni and Kelly were assigned substantial civic duties. Baroni had the power to control some of the region's most important public resources and infrastructure, including the George Washington Bridge ("GWB"). Kelly oversaw the Governor's Office's interactions with hundreds of New Jersey municipalities and local government officials. In these roles, Defendants' decisions directly affected fundamental aspects of the lives of New Jersey residents, including how they traveled to work, to school, and otherwise conducted their daily routines in a safe environment.

As their six-week trial confirmed, Baroni and Kelly, along with their co-conspirator, David Wildstein, abdicated those responsibilities and betrayed the public they were supposed to serve. They chose instead to misuse the resources of the Port Authority, including the world's busiest bridge, to harm the public by deliberately manufacturing severe traffic problems in Fort Lee, all to execute a personal agenda to punish Fort Lee Mayor Mark Sokolich for not endorsing Governor Christopher J. Christie—their "one constituent"—for his 2013 reelection bid. They deliberately chose to make the traffic as severe as possible by selecting the first week of school in Fort Lee and providing no advanced warning. And just so Mayor Sokolich got their message, when he asked

them for help, Baroni and Kelly gave him the "radio silence" treatment, meaning no communication and no response whatsoever.

Time and again, Baroni and Kelly displayed a shocking disregard for the obvious public safety risks that the traffic caused, as well as the toll it was taking on the ordinary people of Fort Lee trying to move about their town, get their children to school, and commute to their jobs. And Baroni and Kelly were not passive participants: throughout the scheme and cover-up, they enthusiastically propelled it forward and enjoyed its impact, particularly Mayor Sokolich's pain and frustration. It was Kelly who gave the green light with her email to Wildstein, "Time for some traffic problems in Fort Lee" and who was "smiling" at the thought of Fort Lee schoolchildren stuck in traffic. It was Baroni who took center stage during the cover-up when he "danced around" a New Jersey legislative committee and lied to its members repeatedly by asserting that the lane reductions had been merely a "traffic study," and that Mayor Sokolich had not been contacted because of a "communication breakdown" at the Port Authority.

Then, both Baroni and Kelly came before this Court and the jury and testified for several days—falsely. They lied about what they knew, what they said, and what they did. They evaded, obstructed, and gave alternative explanations that bore no relation whatsoever to the truth. Their flagrantly false testimony was rejected by the jury, which convicted them of all counts of the Indictment.

In sum, Defendants' crimes were a stunningly brazen and vindictive abuse of power warranting a sentence that includes a meaningful term of imprisonment. That both of them lied under oath at trial and have not exhibited a shred of remorse for their wrongful conduct bolsters this conclusion. Accordingly, the Government seeks a sentence of imprisonment for both Baroni

and Kelly at the bottom of or modestly below the Guidelines range of 37 to 46 months' imprisonment.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    THE EVIDENCE AT TRIAL

The evidence introduced at trial established that during the week of September 9, 2013, Defendants and Wildstein (who effectively served as Baroni's chief of staff at the Port Authority), used their public positions and their ability to control the Port Authority and its vast resources to reduce the local access lanes to the upper level of the GWB (the "Local Access Lanes") from three to one so that only one toll booth, instead of the usual three, were accessible to the Fort Lee Local Approach. They knew that doing so would cause massive traffic backups in Fort Lee and accomplish their objective of punishing Fort Lee's Mayor for declining to endorse Governor Christie's reelection. After executing their scheme, when people started asking questions about what had happened in Fort Lee, Defendants and Wildstein lied, clinging to the false narrative that the lane reductions were part of a traffic study. It was clearly no such thing.

### 1.    *Planning of the Lane Reductions*

Between March 2011 and August 12, 2013, Wildstein had separate discussions with Baroni (who was Wildstein's boss) and Kelly about using the Local Access Lanes as leverage against Mayor Sokolich. When, in the summer of 2013, Kelly complained that Mayor Sokolich was not

---

[1]    Because the Defendants' sentencing submission is not due until after the Government's, the Government has not had the opportunity to review the Defendants' position as to the appropriate sentence or what specific arguments they intend to advance. While the Government does not believe that any of the 18 U.S.C. § 3553(a) factors warrant a sentence substantially lower than the Guidelines range, the Government will review the arguments in their memoranda and respectfully requests the opportunity to respond to them at the sentencing hearing.

In addition, the Government also requests the opportunity to address whether the Defendants' should be treated differently from one another based upon their sentencing submissions.

likely to endorse Governor Christie—despite IGA's efforts to court him—Wildstein reminded Kelly of their earlier discussions.

On August 12, 2013, Kelly telephoned Matt Mowers (a former IGA staff member) who, earlier that year, had spoken with Mayor Sokolich about his possible endorsement. Kelly asked Mowers if Mayor Sokolich was definitely not endorsing Governor Christie. After Mowers confirmed that Mayor Sokolich would not be endorsing, Kelly responded that was all she needed to know.

On August 13, 2013—now having confirmed that Mayor Sokolich would not be endorsing Governor Christie—Kelly instructed Wildstein by email to punish Mayor Sokolich: "Time for some traffic problems in Fort Lee." Wildstein agreed: "Got it," and communicated Kelly's instruction to Baroni. Defendants and Wildstein also agreed to use the cover story of a traffic study to enlist the help of the unwitting Port Authority personnel they needed to implement their plan and to conceal their true punitive purpose for the lane reductions.

On August 19, 2013, Kelly and Wildstein had a text message exchange, during which they made clear that punishment was the purpose of the lane reductions. The exchange concerned a rabbi, who, like Mayor Sokolich, had fallen into disfavor with them:

| SOURCE | TEXT |
|---|---|
| WILDSTEIN CELL | "And he [the rabbi] has officially pissed me off" |
| KELLY CELL | "Clearly" |
| KELLY CELL | "We cannot cause traffic problems in front of his house, can we?" |
| WILDSTEIN CELL | "Flights to Tel Aviv all mysteriously delayed" |
| KELLY CELL | "Perfect" |

Kelly's and Wildstein's joke about causing traffic for the rabbi resonated because they already had a real plan to punish Mayor Sokolich exactly that way.

The Defendants' focus then shifted to the timing of the lane reductions. Defendants and Wildstein wanted to make sure that the lane reductions were timed so as to maximize their impact in Fort Lee. Baroni recommended against implementing the reductions in August, when lighter traffic would mitigate the damage. Baroni, Kelly, and Wildstein ultimately agreed that implementing the reductions on September 9, 2013, which they knew would be the first day of school in Fort Lee, would intensify Mayor Sokolich's punishment.

In that same vein, Defendants and Wildstein agreed not to give Mayor Sokolich and other Fort Lee officials advance notice. Baroni and Wildstein in particular knew that the town, its residents, and other motorists depend on such advance notice to plan alternative travel routes and to manage public safety impacts. By withholding notice, they contemplated that public officials, like Fort Lee police officers, could not prepare for the reductions and members of the public could not adjust their travel routines.

Defendants and Wildstein further agreed that the Port Authority and IGA would direct any resulting inquiries by Mayor Sokolich or other Fort Lee officials to Baroni as the Deputy Executive Director of the Port Authority. The plan was then for Baroni to deliberately duck those inquiries. To ensure that Mayor Sokolich would get the "silent treatment," Kelly made clear to her staff that IGA employees also were not to interact with Mayor Sokolich. For example, on August 17, 2013, Kelly told her deputy, Christina Renna, that IGA's Evan Ridley "should not have met with Fort Lee without approval." Similarly, on August 22, 2013, when Renna told Kelly that the Fort Lee Chamber of Commerce wanted to invite the Lieutenant Governor to an event, Kelly asked Renna: "Should we do this in light of the Mayor?" Only when Renna pointed out that Mayor Sokolich was unlikely to attend if he was not aware of the event did Kelly respond: "Correct. Good call."

In addition, in late August 2013, when IGA regional director Chris Stark asked Kelly if IGA could meet with Mayor Sokolich, Kelly responded: "[N]o, we're doing enough to mess with him."

On Friday, September 6, 2013, Wildstein told the GWB General Manager to start the lane reductions that coming Monday, September 9, intentionally giving Port Authority staff just a weekend to make the necessary arrangements. The preparations for and implementation of the lane reductions marked a clear departure from usual Port Authority traffic study procedures, which normally did not necessitate or involve sudden, unannounced, and extreme disruptions for motorists. Rather, the Port Authority ordinarily did conduct traffic studies without actually affecting traffic, generally using existing traffic data or computer models. In addition, to mitigate delay and inconvenience, the Port Authority also would prioritize notifying affected communities and the traveling public well in advance of Port Authority projects and operations that might create or exacerbate traffic conditions.

### 2. Week of the Lane Reductions

On the morning of Monday, September 9, 2013, just as Baroni, Kelly, and Wildstein had intended, the lane reductions caused severe traffic congestion for rush-hour motorists attempting to access the GWB via the Local Approach, as well as those traveling locally within Fort Lee. The gridlock also spoiled data collection for a legitimate Port Authority traffic study that was being conducted at Center and Lemoine Avenues in Fort Lee, a study that the Port Authority would later have to repeat.

That first morning, Wildstein went to the GWB to observe the impact personally and then report back to Baroni and Kelly. In separate telephone conversations, he told them both about the horrendous traffic they had caused in Fort Lee. Both Kelly and Baroni were content with what they had done.

Mayor Sokolich had a different experience.  That morning, he experienced firsthand what he later described as "concrete gridlock" and worried that emergency vehicles could not get where they needed to go. Years earlier, Baroni had asked Mayor Sokolich to contact him personally about Port Authority-related issues affecting Fort Lee. So when Mayor Sokolich saw the gridlock and learned that the GWB lane reductions were the cause, he immediately reached out for Baroni and left a message with his assistant. Baroni in turn received an email from his office that Mayor Sokolich had called about an "urgent matter of public safety in Fort Lee." Baroni forwarded the email to Wildstein, who answered with an email reiterating the plan: "radio silence," notwithstanding the words "urgent matter of public safety." Baroni followed the plan and did not return the Mayor's call for help. And he made no effort to ascertain the scope of the danger.

Wildstein also forwarded to Kelly the email about Mayor Sokolich's call. Kelly and Wildstein later exchanged emails confirming their strategy to deliberately ignore the Mayor:

| SOURCE | TEXT |
| --- | --- |
| KELLY EMAIL | "Did he [Baroni] call him [Mayor Sokolich] back?" |
| WILDSTEIN EMAIL | "Radio silence<br>His name comes right after mayor Fulop" |
| KELLY EMAIL | "Ty [Thank you]" |

Wildstein's mention of "Fulop" reflected that Defendants and Wildstein had just recently given the same "radio silence" treatment to another elected official—Steven Fulop, the Mayor of Jersey City. And they did so for the same reason—because, like Mayor Sokolich, Mayor Fulop had declined to endorse Governor Christie's reelection.

Later in the morning of September 9, 2013, Baroni and Wildstein received an email from Tina Lado, the director of the Port Authority's New Jersey Government and Community Relations department ("GOCOR"):

9

> Wanted you both have [*sic*] a heads up--[the Fort Lee] Borough Administrator, called me regarding the increased volume and congestion of AM rush traffic throughout the Borough as a result of the GWB toll lanes adjustment that occurred.
>
> She mentioned that there were 2 incidents that Ft Lee PD and EMS had difficulty responding to; a missing child (later found) and a cardiac arrest.
>
> She stated additionally that the Borough and PD had no advance notice of the planned change. Also, Bill the Mayor [Sokolich] had placed calls to your office.
>
> If there is anything you need me to do, let me know. Thank you.

Despite the references in Lado's email to a "missing child" and a medical emergency, Baroni and Wildstein refused to contact Mayor Sokolich or the Fort Lee Chief of Police about those safety issues.

Baroni also heard from Mayor Sokolich directly. Following Baroni's advice to contact him in emergent circumstances, Mayor Sokolich called and left a voicemail on Baroni's cell phone. Mayor Sokolich was unequivocal. He asked Baroni to call him about the traffic problems in Fort Lee, emphasizing that "schools are open." Baroni, who previously had prioritized being responsive to Mayor Sokolich in situations far less serious and urgent, deliberately refused to respond to this voicemail from Mayor Sokolich, despite knowing full well that he had a hand in creating the "big problem" Mayor Sokolich wanted to discuss. And Baroni remained uninterested in learning what harm might have ensued.

Word of the gridlock in Fort Lee also began filtering back to Trenton. On September 9 or 10, 2013, Jeanne Ashmore, the Director of the Governor's Office's Office of Constituent Relations ("OCR"), went to Kelly's office, explained that OCR had received angry constituent calls about traffic conditions in Fort Lee, and asked Kelly if IGA had any information. Despite having ordered the lane reductions and sent the "time for some traffic problems" email, Kelly altogether dismissed

Ashmore's inquiry, smiling at times during the interaction and saying nothing more than "okay" to end the conversation.

Also on September 9, 2013—and on each of the next three days—Kelly and Wildstein had a telephone conversation during which Kelly instructed Wildstein to continue the lane reductions. Baroni agreed with Kelly's instructions.

On September 10, 2013, Baroni received another voicemail and two text messages from Mayor Sokolich, again highlighting the dire situation and the impact that the lane reductions were having on schoolchildren. In the voicemail, Mayor Soklich told Baroni:

> I gotta talk to somebody about this new policy at the bridge. It's truly shutting Fort Lee down . . . I can't get the kids to school, so forth and so on. Please give me a call back. [Telephone Number.] I'm here with my chief now at the intersection of Lemoine and Main and it's – we're in, we're in total gridlock. I'm just trying to figure out who – uh – who's mad at me. Thanks.

Once again, Baroni deliberately ignored this voicemail from Mayor Sokolich. One of the text messages from Mayor Sokolich to Baroni stated:

> Bill: Mark Sokolich here . . . Port Authority has reduced the toll Boots [*sic*] for Fort Lee from three to only one. As of yesterday we are in total gridlock. Same thing today. Have a town that is ready to revolt. Who's mad at me? What do I do when Redevelopment 5 is online. Would not otherwise bother you however I have no choice. Please call me. Rather urgent.

The other message from Mayor Sokolich stated: "Presently we have four [*sic*] very busy traffic lanes merging into only one toll booth . . . . . The bigger problem is getting kids to school. Help please. It's maddening." Baroni forwarded the second text message to Wildstein; Wildstein, in turn, forwarded that message to Kelly. Both Baroni and Wildstein found Mayor Sokolich's use of the word "maddening" amusing and Baroni mocked him for it. After receiving Mayor Sokolich's text message about problems getting children to school, Kelly texted her satisfaction at the Mayor's suffering:

| Source | Text |
|---|---|
| KELLY CELL | "Is it wrong that I am smiling?" |
| WILDSTEIN CELL | "No" |
| KELLY CELL | "I feel badly about the kids" |
| KELLY CELL | "I guess" |
| WILDSTEIN CELL | "They are the children of Buono voters . . . " |
| WILDSTEIN CELL | "Bottom line is he didn't say safety" |
| KELLY CELL | "Exactly!" |

Despite Mayor Sokolich's pleas for help and information and his reference to schoolchildren stuck in traffic gridlock, neither Baroni nor Kelly responded to him.

On September 10, 2013, Baroni received two other communications regarding Mayor Sokolich's attempts to seek information about the lane reductions. First, Baroni's assistant advised that Mayor Sokolich had called regarding a "change of traffic patterns." Second, Lado emailed, detailing a call that she had with Mayor Sokolich "regarding the traffic in Fort Lee":

> The Mayor would like to talk to you as soon as possible, regarding the traffic congestion due to the change in GWB toll booths configuration. He remains concerned, doesn't understand the purpose/need of the traffic test and doesn't understand why the borough was not alerted. Additionally, he said that he is trying to "keep a lid on this" (politically) and is getting pressure from members of Borough Council who want to take some action. He feels this is a "life /safety" issue.

Again, Baroni ignored and refused to respond to Mayor Sokolich's entreaties, not even to follow up on a "life/safety" issue. Also on September 10, 2013, Wildstein had a telephone conversation during which Wildstein told Kelly that Mayor Sokolich was upset about the traffic.

Wildstein testified that on September 11, 2013, the third day of the lane reductions, Baroni and Wildstein attended a 9/11 memorial event at the World Trade Center with Governor Christie.

Before the ceremonies began, when Baroni, Wildstein, and Governor Christie were alone, Baroni told Governor Christie sarcastically that there was a tremendous amount of traffic in Fort Lee, and that the Governor would be pleased to know that Mayor Sokolich was very frustrated that he could not get his telephone calls returned, and that Wildstein was monitoring the traffic and watching over everything. Governor Christie responded sarcastically that he was sure Mr. Edge wouldn't do anything political. Mr. Edge was a reference to the pseudonym "Wally Edge" that Wildstein had used as a political blogger.

On September 12, 2013, Baroni received a letter from Mayor Sokolich describing the lane reductions' severe impact in Fort Lee, including emergency vehicle response time delays. Mayor Sokolich again complained that "this decision has negatively impacted public safety here in Fort Lee." Shortly after receiving Mayor Sokolich's letter, Baroni forwarded it by email to Wildstein, who then forwarded it to Kelly. As Baroni, Kelly, and Wildstein had agreed, Baroni deliberately ignored and refused to respond to Mayor Sokolich's letter.

In addition to the letter, on September 12, 2013, Mayor Sokolich called to try and reach Baroni. Lado then sent a message to Baroni's assistant asking whether Baroni wanted Lado to return Mayor Sokolich's call. Baroni called Lado and told her not to make any calls to New Jersey because GOCOR's phone bills were too high. Of course, Lado knew that there was no genuine issue with the phone bills. Nor would the Port Authority likely be charged for phone calls from New York to Fort Lee in any event. Rather, to maintain the "radio silence" treatment, Baroni was conveying that she should not contact Mayor Sokolich.

Also on September 12, 2013, in response to a media inquiry about the lane reductions and the resulting traffic congestion in Fort Lee, Wildstein, with Baroni's knowledge and approval, caused the Port Authority's Media Relations department ("Media Relations") to issue a statement falsely claiming that: (A) "The Port Authority is reviewing traffic safety patterns at the George

13

Washington Bridge to ensure proper placement of toll lanes"; and (B) the "PAPD has been in contact with Fort Lee throughout the transition." Wildstein sent a draft of this false statement to Kelly before it was issued.

That same day, Kelly received an email from an IGA employee, Christina Renna, who summarized a telephone call that IGA regional director Evan Ridley had received from Mayor Sokolich. The email outlined Mayor Sokolich's deep concern about the impact of the lane reductions, including problems that First Responders had been having getting to their destinations. Kelly forwarded Renna's email to Wildstein. As Baroni, Kelly, and Wildstein had agreed, despite receiving the email from Renna and its references to "horrendous traffic back up" and the problems facing emergency responders, Kelly did not contact Mayor Sokolich or take any steps to address his concerns. Instead, later on September 12, 2013, Kelly responded to Renna's email stating that Mayor Sokolich was extremely upset with one word: "Good."

### 3.    *The Cover Up*

On the morning of September 13, 2013, Baroni, among others, received an email from Port Authority Executive Director Pat Foye announcing that he had learned about and was ending the lane reductions. Foye explained that he was doing so because, among other reasons: (A) the lane reductions had been implemented without notifying Fort Lee, the commuting public, Media Relations, or Foye; and (B) the lane reductions had overwhelmed the Fort Lee area with severe traffic, resulting in emergency vehicle delays.

After sending this email, Foye copied Baroni on an email that he sent to the head of Media Relations, asking how the Port Authority could inform the public that the lane reductions had ended. Baroni, intent on concealing the true purpose of the lane reductions, emailed Foye that they "need[ed] to discuss prior to any communications" and that "[t]here can be no public discourse."

Later that day, Baroni met with Foye twice. In each meeting, Baroni asked that Foye reinstate the lane reductions—despite the litany of reasons, including public safety, that Foye gave for ending them in his email—because the reductions were important to "Trenton," referring to the Governor's Office. Foye refused.

Also on September 13, 2013, Baroni and Wildstein drafted, approved, and caused Media Relations to issue yet another false and misleading media statement: "The Port Authority has conducted a week of study at the George Washington Bridge of traffic safety patterns. We will now review those results and determine the best traffic patterns at the GWB. We will continue to work with our local law enforcement partners."

On September 17, 2013, Mayor Sokolich sent the following text messages to Baroni:

> We should talk. Someone needs to tell me that the recent traff[ic] debacle was not punitive in nature. The last four reporters that contacted me suggest that the people they are speaking with absolutely believe it to be punishment. Try as I may to dispel these rumors I am having a tough time.
>
> A private face-to-face would be important to me. Perhaps someone can enlighten me as to the errors of my ways. Let me know if you'll give me 10 minutes. Regards Mark

Rather than respond, Baroni immediately forwarded Mayor Sokolich's text messages to Wildstein and noted derisively that they were from "Serbia," referring to Mayor Sokolich (who is actually of Croatian descent). Wildstein then forwarded the text messages to Kelly and sought instructions from her about how Baroni should respond. Demonstrating that he understood that he was taking direction from Kelly, Baroni was upset when Wildstein told him that he had not yet heard from Kelly about how to respond to Mayor Sokolich's texts.  Ultimately, Baroni suggested that he set up a meeting with Mayor Sokolich with no intention of actually meeting him, and then later cancel the meeting, another tactic he and Wildstein had previously employed. Accordingly, Baroni's

assistant scheduled a meeting with Mayor Sokolich that Baroni intended to cancel. Subsequently, Mayor Sokolich cancelled the meeting before Baroni had the chance to do so.

In November 2013, Baroni and Wildstein prepared a written statement for a Port Authority report reiterating their agreed upon cover story that the lane reductions were part of a traffic study. To do so, Baroni and Wildstein improperly used Port Authority resources, including the time and services of Port Authority personnel. Wildstein told Kelly that Baroni and he were preparing the misleading statement using their traffic study cover story. Before they could issue the statement, however, Baroni was invited to testify on November 25, 2013 before the Assembly Transportation Committee, which was investigating the lane reductions. Baroni and Wildstein converted their draft into Baroni's opening testimony, incorporating the same false and misleading arguments. Wildstein told Kelly that Baroni would repeat the traffic study cover story when appearing before the Assembly Transportation Committee.

On November 22, 2013, with the intention of insulating himself from further scrutiny and to advance the false narrative that the lane reductions had been a traffic study, Baroni met with two PAPD officers, Paul Nunziato and Mike DeFilippis, to enlist their assistance in falsely corroborating that the PAPD had suggested a study of the Local Access Lanes. During this meeting, Baroni advised Nunziato and DeFilippis that he would be appearing before the Assembly Transportation Committee. He then asserted that two officers had approached Wildstein about officer safety in relation to the Local Access Lanes. When Nunziato and DeFilippis asked who the officers were, Baroni pointed at the officers and said, "you two," in a manner calculated to coerce their cooperation. Both Nunziato and DeFilippis made clear to Baroni that this was completely false, and that they had had not been involved in the lane reductions.

On November 25, 2013, Baroni testified before the Assembly Transportation Committee for an over an hour, providing false and misleading answers. Throughout the hearing, Baroni

16

sought to deceive, obstruct, obfuscate, and lie to prevent the committee members from learning about what had really happened in Fort Lee. He made a slew of misleading statements and false representations, including that:

A.   Communications between members of the PAPD, specifically, Nunziato and DeFilippis, and Wildstein had triggered the lane reductions.

B.   The lane reductions had been part of a one-week traffic study.

C.   Baroni had been working on recommending and putting into place certain new policies at the Port Authority as a direct result of the lane reductions.

D.   None of the other Port Authority crossings, including the Lincoln Tunnel, had segregated local access like the GWB did.

E.   Port Authority data showed that approximately 95% of motorists who used the upper level of the GWB used the Main Line approach and approximately 4.5% used the Local Access Lanes.

F.   The Port Authority had only two days of "data" that had been collected in connection with the lane reductions.

Baroni also testified that he had not responded to Mayor Sokolich or Fort Lee regarding the lane reductions because of what he repeatedly and falsely described as innocent and unintentional "communication breakdowns." In one instance, Baroni falsely and unashamedly claimed that "[t]he communication was flawed internally, the communication was flawed with our neighbors—no question. And I'm—given the amount of time I've spent building a relationship with Mark Sokolich—hugely problematic, personally." Of course, Baroni never admitted to the Committee that he intentionally chose to ignore the Mayor and to instruct others at the Port Authority to do the same.  He hid from them that the real reason for the lack of communication was his intentionally maintaining "radio silence" toward Mayor Sokolich.

Kelly monitored the hearing from her office in Trenton. She was well aware that Baroni planned to offer lies and obfuscation, and her communications with Wildstein as the hearing progressed showed that she was rooting for Baroni's cover up tactics to succeed.

Like Baroni, Kelly also worked to eliminate evidence of her involvement in the scheme to cause traffic problems in Fort Lee. On December 12, 2013, Kelly telephoned Renna and discussed their September 12, 2013 email exchange in which Renna had recounted Ridley's conversation with Mayor Sokolich about the traffic problems in Fort Lee, and to which Kelly had responded, "Good." During their conversation, Kelly asked Renna to delete that email exchange.

On December 13, 2013, Kelly falsely denied having had anything to do with the lane reductions in a conversation with Deborah Gramiccioni, a member of Governor Christie's staff.

Sometime prior to January 9, 2014, Kelly intentionally deleted inculpatory emails and text messages that showed her involvement in the lane reductions, including the "time for some traffic problems" email and the "is it wrong that I am smiling" text message.

## B.     THE INDICTMENT AND TRIAL

On April 23, 2015, the grand jury returned a nine-count Indictment against Baroni and Kelly. Count 1 of the Indictment charged Defendants with conspiracy to obtain by fraud, knowingly convert, and intentionally misapply property of the Port Authority, an organization receiving federal benefits, contrary to 18 U.S.C. § 666(a)(1)(A), in violation of 18 U.S.C. § 371. Count 2 charged Defendants with the substantive offense of obtaining by fraud, knowingly converting, and intentionally misapplying property of the Port Authority, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2. Count 3 charged Defendants with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Counts 4 and 6 charged Kelly with wire fraud, and Counts 5 and 7 charged Baroni with wire fraud, all in violation of 18 U.S.C. §§ 1343 and 2. Count 8 charged Defendants with conspiracy against civil rights, in violation of 18 U.S.C. § 241. Finally, Count 9

charged Defendants with having deprived the residents of Fort Lee of their civil rights, while acting under color of law, in violation of 18 U.S.C. §§ 242 and 2.

Trial commenced with jury selection on September 8, 2016, and concluded on November 3, 2016, when the jury found Defendants guilty of each of the crimes with which they were charged. Both Defendants testified at trial and did so falsely in an attempt to escape accountability for their conduct.

Sentencing currently is scheduled for March 15, 2017.

## ARGUMENT

It is well-established in this Circuit that district courts must apply a three-step procedure at sentencing.  *See United States v. Levinson*, 543 F.3d 190, 194 (3d Cir. 2008).  First, the court must calculate the applicable Sentencing Guidelines range.  Second, the court must rule on any motions for departure and, if such a motion is granted, must state how that departure affects its Guidelines calculations. Third, after allowing the parties an opportunity for argument, the court must consider all of the remaining factors set forth in 18 U.S.C. § 3553(a) and determine what sentence to impose. This sentence may vary from the sentencing range called for by the Guidelines, but any variance must be supported by an adequate justification. The Supreme Court has stated that it finds it "uncontroversial that a major departure [from the Guidelines range] should be supported by a more significant justification than a minor one." *Gall v. United States*, 552 U.S. 38 (2007).

To date, neither the Government nor the Defendants have sought a departure from the correctly calculated Sentencing Guidelines range, so this Memorandum substantively addresses only steps one and three. At step one, the correctly calculated advisory Guidelines range is 37 to 46 months' imprisonment, on the basis of a total Guidelines offense level of 21 and a Criminal History Category of I.  At step three, the Government believes that a sentence at the bottom of or

modestly below the Guidelines range is sufficient but not greater than necessary to accomplish the sentencing aims set forth in 18 U.S.C. § 3553(a).

## I.     STEP ONE: THE CORRECTLY CALCULATED ADVISORY GUIDELINES RANGE IS 37 TO 46 MONTHS' IMPRISONMENT

The U.S. Probation Office has calculated a total offense level of 21 for Baroni and Kelly. The total offense level calculation is as follows:

Count Group 1: Counts 1-7—18 U.S.C. §§ 371, 666(a)(1)(A), 1349, 1343

| | |
|---|---|
| Base Offense Level (loss of more than $6,500): | 9 (disputed) |
| Abuse of Position of Public Trust: | +2 |
| Obstruction of Justice: | +2 (disputed) |
| **Adjusted Offense Level:** | **13** |

Count Group 2:  Counts 8-9—18 U.S.C. §§ 241, 242

| | |
|---|---|
| Base Offense Level: | 12 (disputed) |
| Public Official at Time of Offense: | +6 |
| Obstruction of Justice: | +2 (disputed) |
| **Adjusted Offense Level:** | **20** |

Combined Offense Level

| | |
|---|---|
| Multiple Count Adjustment: | +1 |
| Acceptance of Responsibility: | 0 (disputed) |
| **TOTAL OFFENSE LEVEL:** | **21** |

Both Defendants have zero criminal history points, placing them in criminal history category I. Therefore, the applicable advisory Guidelines range is 37 to 46 months' imprisonment. As indicated in the table above, Defendants have raised certain objections to the Guidelines calculation, none of which have any merit.

A.    THE LOSS AMOUNT IS PROPERLY SUPPORTED BY EVIDENCE AT TRIAL

In addition to causing severe traffic gridlock in Fort Lee, as a result of the Defendants' and Wildstein's actions in enacting the lane reductions, the following Port Authority resources, among others (including the lanes and toll booths themselves), were misapplied: (a) approximately $3,600 in overtime paid to additional toll collectors who worked because of the lane reductions; (b) approximately $6,000 in Port Authority salaries that were paid for work done on the lane reductions by Port Authority traffic professionals and for the time spent by Baroni and Wildstein to implement and cover up the lane reductions; and (c) approximately $4,400 in costs paid by the Port Authority for a legitimate traffic study that was ruined by the traffic caused by the lane reductions and had to be redone.

The evidence at trial demonstrated that the loss to the Port Authority resulting from the offenses covering Counts 1 through 7 was $14,314.04. The specific components of that loss include the hours misapplied by Port Authority personnel, including Baroni and Wildstein, spent not on legitimate Port Authority business, but on the lane reductions, and the costs associated with the Center-Lemoine traffic study that was spoiled by the traffic congestion caused by Defendants:

| CONTRACTOR/ SUB-CONTRACTOR | MISAPPLIED HOURS | HOURLY RATE | LOSS TO PORT AUTHORITY |
|---|---|---|---|
| Amy Hwang | 10 | $43.793103 | $437.93 |
| Victor Chung | 14 | $52.110345 | $729.54 |
| Umang Patel | 14 | $47.241379 | $661.37 |
| Additional Toll Collectors | | | $3,696.09 |
| William E. Baroni, Jr. | 15 | $153.669497 | $2,305.04 |
| David Wildstein | 25 | $79.586207 | $1,989.65 |
| Hardesty & Hanover | | | $897.20 |

| Contractor/ Sub-Contractor | Misapplied Hours | Hourly Rate | Loss to Port Authority |
|---|---|---|---|
| CHA Consulting, Inc. | | | $3,597.22 |
| **TOTAL** | | | **$14,314.04** |

This Court, having held that the Government introduced sufficient evidence from which "[t]he jury could reasonably find that" these expenditures "satisfied the $5,000 threshold" in § 666(a)(1)(A)(i), *United States v. Baroni*, Crim. No. 15-193, 2017 WL 787122, at *6 (D.N.J. Mar. 1, 2017), should reject Defendants' challenges to the loss calculation.

### B.    THE OBSTRUCTION OF JUSTICE ENHANCEMENT IS APPROPRIATE

U.S. Probation has recommended a two-level enhancement under U.S.S.G. § 3C1.1, because Defendants committed perjury at trial. *See* BPSR ¶¶ 76, 93-94; KPSR ¶¶ 64, 81, 91-92.[2] Both Defendants have objected, claiming that the enhancement is not appropriate. BPSR at 51; KPSR at 50-51. They are wrong. Both Defendants provided perjurious trial testimony filled with demonstrable lies and intentional obfuscations. The two-level enhancement for obstruction of justice is warranted.[3]

Section 3C1.1 provides for the enhancement if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to . . . the prosecution." The commentary provides that offering perjurious testimony constitutes an

---

[2]    The Government abbreviates the PSR for Baroni as "BPSR," the PSR for Kelly as "KPSR," Baroni's January 31, 2017 objection letter to the draft PSR as "BOL," and Kelly's January 31, 2017 objection letter to the draft PSR as "KOL."

[3]    In addition to both Defendants' committing perjury at trial, U.S. Probation concluded that the obstruction enhancement also was warranted based on Baroni's false testimony to the Assembly Transportation Committee to further the cover-up and Kelly's destruction of her own incriminating emails and texts and direction to her subordinate to delete another email. The Government does not seek the obstruction enhancement on these grounds, but only on the basis of the Defendants' perjury at trial.

obstruction of justice. *See* U.S.S.G. § 3C1.1, cmt. n. 4(B). A defendant who testifies under oath at trial commits perjury within § 3C1.1 if he or she "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). The Third Circuit has emphasized "that, in evaluating whether to apply the perjury enhancement under § 3C1.1, a district court must make an explicit factual finding that the defendant did or did not give false testimony concerning a material matter with the willful intent to mislead the jury." *United States v. Napolitan*, 762 F.3d 297, 315 (3d Cir. 2014).

In their objections to the draft PSRs, Defendants raised two legal challenges to the perjury-based obstruction enhancement. Neither is valid.

First, Defendants invoked the Third Circuit's holding in *United States v. Miller*, 527 F.3d 54 (3d Cir. 2008), that "the perjury of the defendant must be clearly established and supported by evidence other than the jury's having disbelieved him." *Id.* at 76 (quoted in BOL3; KOL3).[4] In this case there is abundant "other" evidence, discussed below, describing those instances in which Defendants' testimony was not merely rejected by the jury, but contradicted by other evidence, including documents and the testimony of other witnesses.

The quoted language from *Miller* should not be taken, however, to mean that the jury verdict is irrelevant to the perjury assessment. To the contrary, it "binds the sentencing court to accept the facts necessarily implicit in the verdict." *United States v. Johnson*, 302 F.3d 139, 154 (3d Cir. 2002) (affirming an adjustment pursuant to § 3C1.1 where "several portions of [the

---

[4]      This challenge was directed at a sentence in the draft PSRs, which is repeated in the final PSRs, that each defendant "testified on [his/her] own behalf" and "that testimony was rejected by the jury." BPSR ¶ 94; KPSR ¶ 92. U.S. Probation by no means limited the basis for the enhancement on the jury's finding—the next sentence advises that the Court may base the obstruction enhancement on "specific, independent" findings regarding Defendants' testimony.

defendant's] sworn testimony at trial were irreconcilably inconsistent with the jury's verdict"); *United States v. Boggi*, 74 F.3d 470, 479 (3d Cir. 1996) (affirming a § 3C1.1 adjustment where the jury's guilty verdict necessarily entailed its disbelief of the defendant's trial testimony). To take the most obvious example, Defendants and Wildstein offered starkly different accounts of Defendants' knowledge of and participation in the lane reductions. In finding Defendants' guilty, the jury clearly credited Wildstein's version over Defendants.' Accordingly, the Court should consider not merely that the jury disbelieved Defendants, but that the jury did so because it believed "other" testimony from Wildstein that contradicted Defendants' testimony.

Second, in his objection letter to the draft PSR, Baroni signaled his intention to "assert that imposing an enhancement based on testimony in his own defense at a criminal trial is a violation of his constitutional rights." BOL3. As even Baroni concedes, his argument is foreclosed by Supreme Court precedent. *Id.* (prefacing reservation of argument with "notwithstanding *Dunnigan*"). "A district court cannot refuse to apply § 3C1.1 based solely on a policy concern that the enhancement deters defendants from exercising their fundamental right to testify at trial." *Napolitan*, 762 F.3d at 312. The Supreme Court has explained "on a number of occasions that a defendant's right to testify does not include a right to commit perjury." *Dunnigan*, 507 U.S. at 96.

### 1. Baroni's Perjury at Trial

Against the backdrop of overwhelming evidence of his guilt, including evidence that he had deliberately provided false and misleading testimony to the Assembly Transportation Committee, Baroni testified at trial over a three-day period. During his trial testimony, he doubled down on his false and misleading legislative testimony by exhibiting a stunning disregard for the truth, and by responding with more evasions, misleading statements, and outright lies. Baroni's testimony was contradicted by documents, other witnesses, and even his own words, and

ultimately was rejected by the jury. Although Baroni provided numerous instances of patently false testimony, several stand out as particularly astonishing.

First, Baroni maintained at trial that he had told the truth during his testimony to the Assembly Transportation Committee. *See, e.g.*, 10/17/2016 Tr. at 76:18-20 (Q: Was it your intention to provide accurate information to the committee? A: Absolutely). His repeated assertions were deliberately false. To begin with, Baroni lied both in his legislative testimony and at trial when he testified that the lane reductions had been a traffic study. There was no traffic study and Baroni knew it. His false assertions to the contrary at trial were contradicted not only by the evidence that he participated in the lane reductions scheme and then took steps to conceal it, but also by the abundant evidence that the Port Authority did not conduct traffic studies by suddenly and without warning altering a facility and then refusing to discuss that change with an affected community. Wildstein testified that Baroni and he agreed to conceal the true nature of the lane reductions by calling them a "traffic study" when they were no such thing. 9/26/2016 Tr. at 93:6-24, 94:23-95:20.

Additionally, Baroni claimed at trial that the reason he had not responded to Mayor Sokolich's desperate pleas for help was Wildstein's warning that Baroni would "wimp out, and this study would get cancelled, or it would get skewed, and it was too important." 10/17/2016 Tr. at 37:3-6. But Baroni never provided that explanation to the Assembly Transportation Committee. 10/18/2016 Tr. at 116:5-119:4. Rather, he deliberately misled them by insisting again and again that he did not contact Mayor Sokolich because of "communication breakdowns" at the Port Authority, suggesting an innocent and honest mistake, rather than acknowledging his own deliberate decision not to do so. When confronted repeatedly with his failure to tell the Committee members that he had intentionally ignored Mayor Sokolich, Baroni inexplicably repeated his false legislative testimony that there had been "communication breakdowns" and incredibly maintained

that he was "not sure what stronger word I could have used than failure." 10/18/2016 Tr. at 114:5-10, 125:11-12. As an email between Baroni and Wildstein reflected and as Wildstein testified, the "radio silence" treatment of Mayor Sokolich intentional and punitive and not an innocent "breakdown" of communication. 9/26/2016 Tr. at 97:22-98:18, 169:15-170:11; GX-274.

Second, Baroni's testimony in which he sought to provide innocent explanations for his actions was contradicted by multiple witnesses. For example, Tina Lado testified that Baroni had instructed her in coded language that she should not return Mayor Sokolich's phone calls:

> He said to me that they had been looking at phone bills for GOCOR and had found that we had high charges on our outgoing phone calls, so we needed to be careful and not make any unnecessary calls outside, particularly to, you know, to New Jersey.

9/22/2016 Tr. at 177:12-16. Lado's testimony demonstrated Baroni's complicity in the scheme through his willingness to lie to a Port Authority employee about phone bills to continue the radio silence treatment of Mayor Sokolich. After Lado's testimony went unchallenged on cross-examination, Baroni lied by claiming that he had been "more direct" in his conversation with Lado, did not recall speaking in code, and then maintained that his instruction that she not contact Mayor Sokolich was his innocent attempt to protect her from being fired by Wildstein if she "skewed the study." 10/18/2016 Tr. at 132:13-135:14. That explanation was preposterous.

Another example is the testimony of PAPD Officers Nunziato and DeFillipis, both of whom testified that Baroni personally engaged them to back his false cover story to the Committee that they had approached Wildstein with the idea of the lane reductions and they told him that this was untrue. 10/11/2016 Tr. at 131:21-133:2, 134:2-8, 138:19-139:6, 139:16-141:1, 141:13-143:4, 196:7-25. Although he acknowledged that the officers told him that they denied originating the lane reductions, Baroni denied pushing them to lie and, instead, blamed Wildstein for telling him that the officers were only trying to minimize their role.  10/17/2016 Tr. at 89:3-10.

Third, Baroni gave patently and deliberately false explanations of his own emails and text messages. For example, to explain away a text exchange in which Baroni suggested to Wildstein that they implement a traffic causing scheme Jersey City just as they were doing in Fort Lee, Baroni simply made up a fake story. On Sunday, September 1, 2013, after the plan to begin the Fort Lee lane reductions on the first day of school was in place, Baroni sent Wildstein a text message asking when the first day of school was in Jersey City. GX-5003-BB-04. After Wildstein responded that it was "Thursday" and Baroni asked if there was "anything we can do." After Wildstein told him "probably not," Baroni expressed that this was "u[n]fortunate." Wildstein testified that this text exchange concerned Baroni's suggestion to consider causing traffic problems in Jersey City on the first day of school to punish Mayor Fulop, just as they were planning to do in Fort Lee to punish Mayor Sokolich. 9/27/2016 Tr. at 31:23-33:24.

However, during his redirect, Baroni provided an innocent explanation for this text exchange with Wildstein:

> The Port Authority had been approached in 2011 by the Urban League of Hudson County to help them build a school, which has now been built. And they requested I think three million dollars, I think it ended up being two and a half million dollars, to build a school in Jersey City that would train young people to do building trades. And it was a project with the Hudson County Building Trades. And the Board of Commissioners actually had to vote on the item and we—the Board, two and a half million dollars, and there had been an ongoing discussion with the Urban League about doing a shovel ground breaking media event. And one of the discussions was, do you do something like that on the first day of school? So that was the conversation. And I have no idea when that day was. And I asked David the day -- David Wildstein the day before to find that out whether or not we could schedule something. It turned out it was just too quick to turn something around.

10/19/2016 Tr. at 48:4-20. Baroni then stuck with this explanation during recross, emphatically asserting that the grant was for building a school and not a program. 10/19/2016 Tr. at 59:18-60:24. But, in addition to being contradicted by Wildstein, Baroni was contradicted by his own emails demonstrating that the grant to the Urban League was a three-year grant of $1.5 million for

a pre-apprenticeship training program, not the construction of a building. GX-9018-19. The documents included a draft press release from February 2013 regarding the grant that quoted Baroni: "Our investment in these training programs helps address all three aspects of our mission and underscores our commitment to the people of our region." GX-9018. There was never a contemplated groundbreaking. Nor was any construction of a school ever planned. Caught in a lie, Baroni perjured himself by offering a phony explanation for a text message exchange that clearly demonstrated his willingness to use traffic to punish local officials.

### 2. Kelly's Perjury at Trial

During her extensive testimony, Kelly similarly made many intentionally false statements that were directly contradicted by other witness testimony as well as Kelly's own communications during the time period of the lane reductions.

First, Kelly's testimony was directly contradicted by seven witnesses: Wildstein, Chris Stark, Matt Mowers, Jeanne Ashmore, Christina Renna, Deborah Gramiccioni, and Michael Drewniak, all of whom described interactions with Kelly about the lane reductions that she denied or distorted. Given that, in each instance, Kelly denied testimony that demonstrated her guilt, Kelly's self-serving accounts of these interactions cannot reasonably be chalked up to mistaken recollection or an alternative perception of what happened.

For example, Chris Stark testified that Kelly told him that IGA employees should not contact Mayor Sokolich, because "we're doing enough to mess with him." 10/5/2016 Tr. at 119:14-16. This testimony demonstrated that, after the "time for some traffic problems" email, but before the start of the lane reductions, Kelly admitted treating Mayor Sokolich with malice. When she testified, Kelly denied making that statement to Stark. 10/25/2016 Tr. at 141:16-19.

Similarly, Jeanne Ashmore testified that during the lane reductions when she went into Kelly's office and asked Kelly if IGA had any information on what was going on in Fort Lee,

Kelly merely smiled during the conversation and provided Ashmore with no information that she knew anything about or had been involved in the lane reductions. 10/6/2016 Tr. at 82-83. During her testimony, however, Kelly denied Ashmore's account of the conversation. 10/25/2016 Tr. at 154:16-156:1.

Christina Renna also testified that on or about December 12, 2013, Kelly asked her to delete the email in which she responded "Good" to Renna's summary of Ridley's September 12, 2013 call with Mayor Sokolich. 10/16/2016 Tr. at 174-75. Renna's testimony established that Kelly wanted Renna to destroy evidence demonstrating Kelly's satisfaction with Mayor Sokolich's plight during the lane reductions. Kelly denied asking Renna to delete the email. 10/26/2016 Tr. at 37:12-14.

In addition, Kelly's testimony was directly contradicted by her own communications, the clear meaning of which she continually denied. For example, she testified that during the lane reductions she did not understand that Mayor Sokolich was being purposely ignored, even though on September 9, 2013, Wildstein emailed her that Mayor Sokolich was being treated with "radio silence," and his name came "right after mayor Fulop." GX-279; 10/25/2016 Tr. at 5:19-6:12. The evidence at trial established that in July and August 2013, only weeks earlier, Kelly clearly understood that the Governor's Office and the Port Authority were deliberately ignoring the Mayor of Jersey City, Steven Fulop, and were not responding to any of his communications. In fact, on July 22, 2013, Kelly was copied on an email from the Governor Christie's campaign manager, William Stepien, explicitly advising Wildstein that he should maintain "[r]adio silence" with respect to Mayor Fulop's request to meet with Baroni. GX-122. Kelly admitted that she understood that, by "radio silence," Stepien meant that Mayor Fulop should be deliberately ignored. 10/25/2016 Tr. at 44:11-45:6. Despite that admission, at trial, Kelly maintained that she did not understand Wildstein's September 9, 2013 email forwarding a message that Mayor Sokolich had

called Baroni regarding an urgent matter of public safety, and Wildstein's statement, "Radio silence [h]is name comes right after mayor Fulop," to mean that Mayor Sokolich, like Mayor Fulop, was being deliberately ignored. 10/25/2016 Tr. at 47:7-14. Kelly's testimony in this regard was staggering and deliberately false.

Kelly's own communications with Wildstein during Baroni's testimony before the Assembly Transportation Committee also demonstrate that she deliberately testified falsely when she stated that she did not understand until early December 2013 that Wildstein had ignored Mayor Sokolich during the lane reductions. During her testimony, Kelly maintained that, until that time, she thought that Wildstein had, in fact, responded to Mayor Sokolich's pleas for help. 10/25/2016 Tr. at 164:25-165:19. However, during Baroni's legislative testimony (which Kelly was following in real-time), he made clear that the Port Authority had not appropriately communicated with Fort Lee during the lane reductions because of a communications breakdown. If this had been the first time Kelly was hearing this, she likely would have reacted with outrage, or at the very least, would have asked Wildstein why he had been falsely telling her all these months that the Port Authority had communicated with Mayor Sokolich. Kelly's reaction during Baroni's testimony, however, was entirely different. She merely shared her thoughts that Baroni was doing a good job and that she hoped the members of the Assembly Transportation Committee would believe Baroni's testimony. GX-5003-BK-08. Her actions in this regard further demonstrate that Kelly did understand during the lane reductions that Mayor Sokolich was being deliberately ignored, and her trial testimony to the contrary was perjurious.

Kelly also provided patently and deliberately false interpretations and explanations of her own emails and text messages. In addition to her revisionist definition of "radio silence," she testified that her reaction to a text message from Mayor Sokolich was not in fact a reaction to that text message. On September 10, 2013 at 8:04 a.m., Wildstein sent a text message to Kelly, which

stated "Sokolich text to Baroni," and quoted a text message Mayor Sokolich had sent to Baroni indicating that the Mayor was having problems getting kids to school, and that he was finding the lane reductions "maddening." Immediately after receiving this text message from Wildstein, also at 8:04 a.m., Kelly responded: "[i]s it wrong that I am smiling?" GX-5003-BK-03a. Kelly's text message to Wildstein provided damning evidence that Kelly celebrated the suffering that the lane reductions had wreaked on Fort Lee and Mayor Sokolich. Kelly committed perjury by trying to change the clear meaning of her message, testifying that when she referenced her "smiling," she was not in any way referring to the Mayor's text message that Wildstein had just forwarded to her, but rather to the success of the traffic study. 10/24/2016 Tr. at 27:11-28:11. However, there was absolutely no reference to the success of any traffic study in the message from Wildstein to which Kelly was responding.

Similarly, Kelly denied the clear meaning of other emails demonstrating her guilt. She denied that her "Good" response to Renna was an expression of satisfaction at Mayor Sokolich's plight, despite the fact that after receiving Renna's email she did not herself or instruct anyone in IGA to respond to Mayor Sokolich. 10/24/2016 Tr. at 43:18-44:10; 10/26/2016 Tr. at 29:17-35:10, GX-565. Kelly also denied that her reaction on or about August 17, 2013 to Evan Ridley's purported meeting with Mayor Sokolich (when she asked: "[a]nd why did he think it was ok to meet with Sokolich" and stated that he "should not have met with Fort Lee without approval") was not a reaction to the fact that he had met with Mayor Sokolich in particular, but rather was solely a reaction to Ridley's performance issues. GX-200; 10/21/2016 Tr. at 156:13-157:10; 10/25/2016 Tr. at 139:2-140:22. The evidence at trial demonstrated, however, that Ridley also had claimed to have met with the Mayor of New Milford, yet Kelly did not advise Renna that Ridley should not have met with the Mayor of New Milford without approval. *Id*. Kelly also testified that, when on August 22, 2013 she responded "[s]hould we do this in light of the Mayor" in response to Renna's

forwarding her a Fort Lee Chamber of Commerce invitation for the Lieutenant Governor, she was not expressing concern about Mayor Sokolich. Rather, Kelly claimed that the email reflected her cautious state of mind in relation to placing the Lieutenant Governor at events with any local officials. GX-3012; 10/21/2016 Tr. at 180:17-181:3. The evidence at trial demonstrated, however, that at that same time, Kelly showed no such caution in placing the Lieutenant Governor at events with other local Mayors. GX-628; GX-639; GX-640; GX-641; 10/25/2016 Tr. at 144:21-153:14. Kelly's repeated distortion of her own language, therefore, was contradicted by the weight of the evidence and the clear meaning and context of her own words.

*       *       *

Based on the above evidence and the trial record itself, this Court has more than sufficient evidence to conclude that specific aspects of Defendants' testimony were false, material, and willful. That is all that is needed to apply the perjury enhancement under § 3C1.1, *Boggi*, 74 F.3d at 479, and the Court should make specific, factual findings—supported by references to the record—that Defendants lied under oath and apply the obstruction enhancement.

### C.    KELLY DID NOT ACCEPT RESPONSIBILITY FOR HER CRIMINAL CONDUCT

Kelly argues that pursuant to U.S.S.G. § 3E1.1, she is entitled to a two-point reduction based on her acceptance of responsibility. In assessing whether acceptance of responsibility is appropriate, "[t]he trial judge has the obligation to assess the totality of the situation." *United States v. McDowell*, 888 F.2d 285, 292 n.2 (3d Cir. 1989). Kelly bears the burden of establishing acceptance of responsibility by a preponderance of evidence. *United States v. Best*, 639 F. App'x 848, 852 (3d Cir.), *cert. denied*, 137 S. Ct. 146 (2016). Kelly's burden is particularly difficult to meet in this case because she chose to put the Government to its proof. Although the commentary to § 3E1.1 leaves open the possibility that the adjustment may apply after a jury trial, that is appropriate only in "rare situations" such as "where a defendant goes to trial to assert and preserve

issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." U.S.S.G. § 3E1.1, cmt. n. 2.

This is not such a "rare situation" deserving of acceptance credit, because Kelly by no means "truthfully admitt[ed] the conduct comprising the offense(s) of conviction." *Id.* § 3E1.1, cmt. n.1. Kelly did not go to trial and testify for several days merely to preserve a technical legal argument for appeal. Quite the contrary, Kelly steadfastly denied any *factual* culpability by maintaining that she believed that what had happened in Fort Lee was the product of a legitimate Port Authority "traffic study." She never acknowledged even to the slightest degree that she did anything in connection with the lane reductions but adhere to her duties as a faithful public servant. Indeed, she did not just refuse to accept responsibility. She repeatedly refused to accept even the plain meaning of "Is it wrong that I'm smiling?" and the other damning communications introduced at trial, offering instead only flimsy and self-serving explanations for why she did not mean what she said. Kelly's is the case-in-point for why "[c]onduct resulting in an [obstruction] enhancement under § 3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for h[er] criminal conduct." U.S.S.G. § 3E1.1, cmt. n.4. And this is hardly the "extraordinary case[] in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." Kelly took the stand and lied repeatedly. Her deceptive testimony was the very antithesis of acceptance. Her claim to have accepted responsibility is preposterous, and she should not receive any corresponding reduction in the offense level. *See Best*, 639 F. App'x at 852-53.

In her objection letter, Kelly claimed that she was entitled to acceptance credit because "she did not deny 'the essential factual elements of guilt' " and denied only that the purpose of the lane reductions was to punish Mayor Sokolich, which the Court held was not an essential element of the offense. KOL3. She then claims that the Government did not prove that the lane reductions

were meant to punish Mayor Sokolich. *Id.* Otherwise, Kelly continues, the jury would not have asked Jury Note 4. *Id.* Kelly's contorted arguments are incorrect for several reasons.

First, Kelly completely mischaracterizes her testimony by insisting that she denied only one aspect of the scheme—the punitive motivation for the lane reductions—and embraced everything else. As noted above, Kelly testified falsely on a wide range of material, factual issues, including that she participated knowingly and intentionally in the conspiracies charged in the Indictment. At every turn, she gave answers that negated her awareness and understanding of key aspects of the scheme and that were contradicted by multiple witnesses. Most glaringly, she denied having any idea that the lane reductions were not a legitimate traffic study. By testifying falsely about these issues, Kelly indeed denied "the essential factual elements of guilt," which disqualifies her from acceptance credit.

Second, by disclaiming any awareness of the punitive motive behind the lane reductions, Kelly did deny an "essential *factual* element"—her *mens rea*. The Government presented overwhelming evidence that Defendants and Wildstein sought to punish Mayor Sokolich. That evidence of Kelly's motive was highly probative of her knowledge and intent. As the Third Circuit's model charge on motive makes clear: "Intent and motive are different concepts" but "[e]vidence of [] motive may . . . help" establish "intent." 3d Cir. Model Crim. Jury Instr. § 5.04; *see Baroni*, 2017 WL 787122, at *2. By testifying falsely that she lacked a punitive motive, Kelly attempted to weaken the case that she acted with the requisite state of mind.

Third, Kelly's argument depends on her sheer speculation that Jury Note 4 necessarily means that the jury was dubious of the Government's evidence of Defendants' punitive motive. The note sheds no light on the jury's views of the evidence. "[C]ourts have felt bound to resist the temptation to view any one jury note or series of notes as a meaningful reflection of the jury's decisionmaking process." *Colon v. Mitchell*, Civ. No. 93-4951, 1995 WL 758776, at *4 (S.D.N.Y.

Dec. 26, 1995) (citing *United States v. Powell*, 469 U.S. 57, 66-67 (1984)); *Freeman v. Franzen*, 695 F.2d 485, 490 (7th Cir. 1982) (concluding that speculation over the meaning of a jury note is an improper basis for a judgment notwithstanding the verdict). As the court explained in *Colon*:

> Jury notes are but one of many stages in the jury's decisionmaking process. The notes may reveal the thoughts of one or more of the jurors at the time the notes are sent, but the light they cast on the verdict that the jury ultimately renders is too wavering and uncertain to be measured with the degree of reliability that the law demands.

*Id.* (citing *Powell*, 469 U.S. at 66-67).

In sum, none of the arguments levied by Kelly withstands scrutiny. The Court has roundly rejected the premise at the heart of Kelly's argument—that the Government was required to prove a particular motive beyond a reasonable doubt. *Baroni*, 2017 WL 787122, at *2-3. This Court should similarly reject Kelly's request for acceptance credit as yet another variant of this baseless theory.

### D.   U.S.S.G. § 2H1.1 IS THE PROPER GUIDELINE TO CALCULATE THE OFFENSE LEVEL FOR THE CIVIL RIGHTS CONVICTIONS

Without explanation, Kelly objected to the PSR's use of U.S.S.G. § 2H1.1 to calculate the offense level for her convictions on Counts 8 and 9 of the Indictment, which charged respectively violations of 18 U.S.C. §§ 241 and 242. The Guidelines' specifically call for the application of § 2H1.1, titled "Offenses Involving Individual Rights," for those violations. Thus, this Guideline properly was used to calculate the Defendants offense level for Counts 8 and 9. Because Kelly did not explain the rationale for her objection or cite any legal authority for its basis, the Government cannot further respond to the argument in this submission and respectfully requests the opportunity to do so at oral argument after reviewing Kelly's submission.

## II.   STEP TWO:  NO GUIDELINES DEPARTURE IS WARRANTED

The Government does not seek a Guidelines based departure. To date, Defendants also have not sought a departure, although the Court has permitted them to file their submissions after

the Government. Thus, the Government respectfully requests the opportunity to respond to any Guidelines departure motions the Defendants may seek. In any event, based on the information in the PSR, no departures pursuant to the Guidelines appear warranted, and of course, Defendants would have the burden of demonstrating by a preponderance of the evidence that a departure is appropriate in any event. *United States v. Fisher*, 502 F.3d 293, 295, 305-08 (3d Cir. 2007).[5]

## III.     STEP THREE:  THE 3553(A) FACTORS SUPPORT A MEANINGFUL PRISON SENTENCE

Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Those purposes are "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).  In determining that sentence, this Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

---

[5]     If the Court were contemplating a departure "from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission," it must give the parties "reasonable notice." FED. R. CRIM. P. 32(h); *United States v. Vampire Nation*, 451 F.3d 189, 197-98 (3d Cir. 2006).

### A. THE SERIOUSNESS OF THE OFFENSE AND THE ADVISORY GUIDELINES RANGE

The Guidelines calculation conducted by U.S. Probation of an offense level 21 with a resulting range of 37 to 46 months' imprisonment reflects "the seriousness of the offense[s]." 18 U.S.C. § 3553(a)(2)(A); *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("the Guidelines reflect a carefully considered assessment of the seriousness of federal crimes"). As both Baroni and Kelly surely understood given their lengthy tenures in New Jersey government, crimes committed by public officials are particularly insidious because they destroy the community's faith in its own public institutions. *See United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill), *aff'd* 447 F.3d 517 (7th Cir. 2006) ("Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all—not only to the average citizen, but to all elected and appointed officials"). As one federal judge recently explained in sentencing an elected official:

> Defendant's conduct, viewed through the lens of America's traditional understanding of the profound evils of political corruption, requires a substantial sentence. This Court cannot countenance a sentence of probation as requested by the parties. Such a sentence would in no way "reflect the seriousness" of Defendant's offenses. It would simultaneously erode, if only by an increment, America's foundational, utter rejection of tolerance for corrupt governance. As Chief Justice Roberts noted, this Court, in discharging its duty to sentence Defendant, must act as the voice of the community. When it comes to political corruption, the community—historically and presently—requires that real, tangible, and severe consequences meet those who gain a position of public trust and then abuse that trust for personal gain. Unless that traditional principle is honored, political corruption will slowly corrode the foundations of our democracy until it collapses under its own weight.

*United States v. Sorenson*, ___ F. Supp. 3d ___, 2017 WL 194283, at *7 (S.D. Iowa Jan. 18, 2017).

Given the importance of protecting the integrity and fairness of our public institutions—and, in particular, how the resources of those institutions are used—crimes that undermine the

public's faith in the good faith and integrity of its public servants are inherently serious. Equally serious are criminal violations of constitutional civil rights, which protect the essential freedoms of all citizens. And civil rights violations committed by public officials, acting under color of law, for personal reasons are particularly destructive of the public's faith that its representatives, both elected and appointed, have their best interests in mind at all times.

The Court also must give meaningful weight to the Guidelines range, which "represent[s] the collective determination of three governmental bodies—Congress, the Judiciary, and the Sentencing Commission—as to the appropriate punishments for a wide range of criminal conduct." *United States v. Cooper*, 437 F.3d 324, 331 n.10 (3d Cir. 2006) (quotation omitted). "The fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *United States v. Langford*, 516 F.3d 205, 211-12 (3d Cir. 2008) (quotation omitted). Moreover, "the authors of the Guidelines, no less than district courts, have been tasked with ensuring that criminal sentences meet the goals of sentencing set forth in § 3553(a)," *United States v. Merced*, 603 F.3d 203, 221-22 (3d Cir. 2010), and have prepared "Guidelines that seek to embody the § 3553(a) considerations," *Rita v. United States*, 551 U.S. 338, 347-50 (2007). 28 U.S.C. §§ 991(b)(1)(A), 994(f). Accordingly, in general, "a within-guidelines range sentence is *more likely* to be reasonable than one that lies outside the advisory guidelines range[.]" *Goff*, 501 F.3d at 257 (quotation omitted).

### B.     THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Baroni and Kelly committed a monumental betrayal of the public trust. They were two of the highest ranking public officials in New Jersey. They had the type of access, influence, and power entrusted to only a select few by the citizens of this state. Baroni oversaw a multibillion dollar public authority that operates several of the world's most significant transportation

facilities—bridges, tunnels, and airports that New Jersey citizens use every day. Kelly was one of the more senior advisors to the Governor of New Jersey, sitting a mere 20 feet from his office, helping guide policy and shape his public profile, and operating the unit that represented the Governor's Office with local New Jersey officials. With the awesome advantages of their positions, however, came the equally serious and significant responsibility to act in the best interests of the public they were supposed to serve.

But in planning, implementing, and covering up the lane reductions, Baroni and Kelly violated that cardinal responsibility and broke the law. With Wildstein, Baroni and Kelly used their government power to create—on purpose—a massive traffic jam in Fort Lee using public property and resources, including the busiest bridge in the world. They agreed to make the traffic as bad as possible, reducing the local access to a single toll booth, beginning the reductions on the first day of school, and providing no warning at all to Fort Lee or the commuting public. On top of that, Baroni and Kelly froze out Mayor Sokolich from getting answers or assistance from the Port Authority and the Governor's Office and met his pleas for help with "radio silence."

Baroni and Kelly took all of these actions for the pettiest of reasons: to punish a local mayor and send him a nasty political message because he did not endorse Governor Christie for reelection. Nothing about Baroni's and Kelly's actions or motivations in committing these crimes mitigates their conduct. And when told repeatedly about the harmful impacts of the traffic havoc that they had caused in Fort Lee—including delays to emergency vehicles and children attempting to get to school—Baroni and Kelly did not experience an outbreak of conscience. To the contrary, they celebrated they pain they had inflicted: Baroni mocked Mayor Sokolich for expressing that the traffic nightmare in his town was "maddening," 9/27/2016 Tr. at 50:6-20, and Kelly told Wildstein that she was "smiling" that the schoolchildren of Fort Lee had trouble getting to school, GX-5003-BK-03.

Nor did they stop the lane reductions of their own accord. Instead, after having been kept in the dark about the lane reductions by Baroni and Wildstein as part of the fraud, the Port Authority's Executive Director reversed them over Baroni's repeated objections and insistence that lane reductions were important to "Trenton," where Kelly worked. And when questioned about the lane reductions by colleagues in the Port Authority and Governor's Office, the press, the legislature, and ultimately before this jury, these Defendants lied repeatedly to conceal the truth of their criminal acts.

Baroni has suggested that the "unique nature of these charges" warrants a downward variance. PSR ¶ 195. But he articulates no principled reason why the fact that Defendants' scheme was so ludicrously audacious that it lacked close factual precedent is deserving of leniency. Indeed, he could not be more wrong. If anything, the stunning facts of this case—senior public officials ruthlessly using public resources and property, including a bridge, to deliberately trap the residents of a small town in debilitating traffic to punish a local mayor for a political decision—warrant serious punishment to send a clear and unmistakable message to public officials at all levels of government in New Jersey and across this country that public property and official power are never to be used for such base and selfish reasons.

In sum, Baroni and Kelly were long-time New Jersey public officials who knew that they should not misuse their public positions. Nevertheless, both of them eagerly embraced Wildstein's idea to use the GWB to cause a massive traffic jam in Fort Lee to punish Mayor Sokolich for not endorsing Governor Christie's reelection and to lie about it. Thus, the "nature and circumstances," 18 U.S.C. § 3553(a)(1), of the Defendants' criminal abuse of their government power was truly outrageous and warrants a meaningful term of imprisonment for both Baroni and Kelly.

### C.    THE HISTORY AND CHARACTERISTICS OF THE DEFENDANTS

The Court must consider "the history and characteristics of the defendant[s]" in imposing sentence. 18 U.S.C. § 3553(a)(1). Although the history and characteristics of each Defendant must be considered separately, there are several characteristics they share that warrant a sentence at or modestly below the Guidelines range.

First, Baroni and Kelly were seasoned public officials with access to innumerable resources on which to call with any questions about the right thing to do in a given situation. Nothing in their personal or professional lives necessitated their reckless abuse of public power. For example, on the first day of the lane reductions, Defendants each learned that Mayor Sokolich had reached out about an "urgent matter of public safety." Neither did anything to help Mayor Sokolich or the residents of Fort Lee that day, or even to determine the scope of the danger. Nor did they do so the next day, or on the two days after that. Despite continued urgent warnings about public safety risks, Baroni and Kelly maintained radio silence. Their deliberate refusal to respond to Mayor Sokolich's calls for help, or simply to stop the harm they and Wildstein were causing the citizens they were supposed to serve, is an integral part of their offense that reveals an immensely troubling aspect of their character.

Second, the Government anticipates that both Baroni and Kelly may submit testimonials from family, friends, and colleagues. As with the testimony of Defendants' character witnesses, the Government expects that those submissions will support that, in many respects, both Baroni and Kelly are devoted to their families and friends and have engaged in many commendable acts and kindnesses over many years.

It is of course fitting and proper that Defendants submit those letters and that the Court weigh them and the good deeds they may describe in considering the appropriate sentence. But such letters should not be dispositive as many defendants who receive them often are deserving of

imprisonment. *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 423 (S.D.N.Y. 2004) (commenting that the "vast majority of defendants . . . continue to receive the love and support of their families," and "[m]any, in turn, love their families and friends . . . and participate in charitable activities"). Moreover, those good deeds described by the character witnesses or detailed in any letters on the Defendants' behalf must be squared with their actions and words in this case. Here, past good deeds do not mitigate the Defendants' actions, such as failing to respond or even look into an "urgent matter of public safety." Nor can they supersede their words, such as Baroni's mocking Mayor Sokolich as "the Serbian" who found the traffic problems "maddening," and Kelly who felt comfortable enough in their relationship to let Wildstein know that she was smiling at the thought of children being stuck in traffic.

More broadly, defendants like Baroni and Kelly, who have had the opportunity to do good work and build relationships with influential people, are not entitled to a get-out-of-jail-free card, particularly for serious crimes. If individuals with the resources and connections to make more contributions to the community than less fortunate people are given special accommodation in the criminal justice system, the message will be sent to the public—in a case where it is particularly attuned to the result—that the severity of corruption sentences depends on social circumstances and financial means. Respectfully, in a justice system that is required to treat all similarly situated defendants equally, that would be an unfair and hypocritical result, and it would send the wrong message to the public, some of whom already believe that the "haves" are treated far better by the justice system than the "have nots." *See Emmenegger*, 329 F. Supp. 2d at 427 ("To permit such an offender to avoid meaningful incarceration, while jailing thieves and other non-violent offenders of lower social status, would trivialize the seriousness of white-collar offenses.").

Third, the Court should carefully consider how Defendants' perjurious trial testimony reflects on their character. Baroni and Kelly violated the oath they took before the Court by lying

over and over again, despite risking additional criminal sanction. In doing so, both Defendants demonstrated that part of their character includes a willingness to lie when it suits them. And it was not just what they said, but how they said it. On cross-examination, Baroni prevaricated and repeatedly offered nonresponsive canned lines to pointed questioning. Kelly took umbrage when questions were put to her on cross-examination. Defendants' perjury undermined the solemnity of the courtroom much like their fraudulent scheme damaged the integrity of the public offices they served. Thus, apart from the obstruction enhancement, Defendants' demonstrated character for deception strongly counsels in favor of a meaningful term of imprisonment.

Fourth, the Court should take into account the Defendants' complete lack of remorse for their wrongful conduct. Baroni and Kelly deliberately caused a four-day traffic nightmare on the streets of Fort Lee, affecting the citizens of that borough and anyone else unlucky enough to be using Fort Lee roads during that week. They deliberately shut out the Fort Lee Mayor from getting help from the Port Authority and the Governor's Office. They covered-up their crimes through lies and the destruction of records. And they did each of these things with relish.

But during their trial testimony, Baroni and Kelly absolved themselves of wrongdoing and blamed a laundry list of others. They demonstrated no appreciation of the wrongfulness of their conduct. BPSR at 53; KPSR at 52, 54. Courts consistently find a demonstrated lack of remorse by the defendant to be highly relevant to the sentence that must be imposed. *See United States v. Jahagirdar*, 466 F.3d 149, 157 (1st Cir. 2006) (noting district court's reliance on lack of remorse, among other factors, in upholding sentence as reasonable); *United States v. Johnson*, 903 F.2d 1084, 1090 (7th Cir.1990) (citing cases). Defendants should not be treated more favorably than otherwise similarly situated defendants who have expressed contrition and attempted to make amends for their wrongful acts.

### 1.     *Bill Baroni*

Baroni proffered several variance arguments based on his personal history and characteristics to Probation as grounds for a variance. PSR ¶ 195. None of these arguments justify a significant variance from the Guidelines range.

First, Baroni cites his "lifelong commitment to public service" and "his personal history of helping others." There is no doubt that Baroni's life has been marked by his share of good works, both in his personal life and through his public positions as a New Jersey Assemblyman, Senator, and Port Authority Deputy Executive Director. While those good deeds are commendable, doing them was part of Baroni's job as a public official. They are not a shield that can protect Baroni from the punishment that is warranted by his egregious betrayal of the public trust. *See United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (good works as a public official "reflect[ ] merely the political duties ordinarily performed by public servants" and "if a public servant performs civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such work from our public servants."); *see also* U.S.S.G. § 5H1.11 ("Civic, charitable, or public service . . . and similar prior good works are not ordinarily relevant in determining whether a departure is warranted.").

Furthermore, Baroni cannot escape the fact that it was because of his public service career that he was appointed the Port Authority's Deputy Executive Director. But once Baroni obtained that position, he brought on board his right hand man, Wildstein, and together they approached their jobs as a means of serving their "one constituent"—Governor Christie—and, ultimately, to misuse Port Authority resources to commit these criminal acts.

Second, Baroni asks for leniency because of "the people who rely upon him, not the least of whom is his 74-year-old father." While Baroni's loving relationship with his family is admirable, most defendants who come before a court for sentencing are loved and depended upon

by family and friends. Baroni's family circumstances are not extraordinary and do not diminish the necessity of a meaningful prison sentence for his criminal conduct. *See Emmenegger*, 329 F. Supp. 2d at 423-24; *see also* U.S.S.G. § 5H1.6 ("family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted").

Third, Baroni claims that a variance is justified by "the punishment that he is suffering by losing his law license (which proceedings are already underway) and his ability to hold public office." The Court should reject any claims for leniency by these Defendants based upon collateral consequences, such as the loss of a law license, the inability to hold public office or vote, the public nature of this prosecution, or reputational damage. Indeed, "it is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also* 28 U.S.C. § 994(d) (requiring the sentencing guidelines to be "entirely neutral as to the . . . socioeconomic status of offenders"). Section 3553(a)(2)(A) "requires *the sentence* imposed . . . to reflect the seriousness of his offense.' None of these collateral consequences are properly included in [Baroni's] sentence." *United States v. Morgan*, 635 F. App'x 423, 445-46 (10th Cir. 2015). Accordingly, a "district court's reliance on these factors does nothing to show that [the defendant's] sentence reflects the seriousness of his offense. Were it otherwise, these sorts of consequences—particularly ones related to a defendant's humiliation before his community, neighbors, and friends—would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines." *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (quotation omitted).

"Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and

deprived brethren in crime." *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999). In other words, it would be unjust and inappropriate for the Court to send the message that those with more to lose are subject to less punishment, while the less fortunate should receive longer terms of imprisonment. *Cf. United States v. Rosier*, 218 F. App'x 182, 187 (3d Cir. 2007) (above-Guidelines sentence affirmed where, among other things, defendant's educational background placed him "in a position to pursue a lawful career, instead of engaging his abilities to persuade people in order to swindle money from them"). Further, Baroni's loss of his law license is a result of his conviction and is merited: a law license is a privilege and not a right.

Fourth, Baroni argues that a mitigating factor is "the complete absence of any pecuniary or other gain attributable to Mr. Baroni as a result of the conduct for which he was convicted."[6] Baroni is wrong—he did benefit. He may not have not accepted an envelope full of cash but, in effect, he stole from a public agency by wasting its valuable resources for a purely personal vendetta.

Moreover, Baroni sought and, as the evidence at trial showed, obtained the intangible benefit of making his "one constituent" happy. Baroni bragged to Governor Christie about the traffic in Fort Lee and how Mayor Sokolich was not getting his calls returned and received the Governor's approval.

Courts have resoundingly declined to consider personal profit motives—or their absence—when imposing sentences. In *United States v. Seacott*, in the context of a downward departure motion, the Seventh Circuit held that even an allegedly altruistic profit motives were "legally insufficient" to warrant a departure, recognizing that "[i]t makes little difference to the[] victims

---

[6] As the Court has ruled, neither § 666(a)(1)(A) nor the wire fraud statute require proof that the defendant personally obtained a pecuniary benefit. Even if Baroni had not obtained both a pecuniary and an intangible benefit, he would still not deserve leniency for violating these statutes in one way (where he did not benefit) rather than another (where he did).

if [defendants] illegally transfer funds to themselves or third parties, or if they pile up the money in the parking lot and burn it. The same amount of money has been taken from the victim no matter what the fate of the funds." 15 F.3d 1380, 1387 (7th Cir. 1994). The Third Circuit similarly has recognized that a defendant is not punished based on who the criminal activity benefits; instead "the Court must focus on the extent of the harm inflicted by the defendant on his victims." *United States v. Kopp*, 951 F.2d 521, 535-36 (3d Cir. 1991).

In addition, the Guidelines range already reflects the extent of the financial impact to the Port Authority. The loss calculation for the property-based offenses (§ 666 and wire fraud) yields a two-level enhancement for loss—such that the offense level calculation for those offenses is eclipsed by the calculation for the civil rights offenses. This reflects that, in the collective experience of federal judges as embodied in the Sentencing Guidelines, characteristics like abuse of official power and infringement on constitutional rights carry more weight than pecuniary gain in punishing crimes like Baroni's.

Accordingly, the fact that Baroni's fraud did not redound to his bank account is irrelevant. Although this Court can consider the lack of pecuniary gain (like any factor) when considering a variance request, the federal circuits have made clear that a defendant's profit motive (or lack thereof) in a crime should not be grounds for leniency.

Finally, Baroni cites "the significant assistance he provided to the government" during the time he spent as a source for the FBI, which ended in December 2010. Irrespective of the significance of whatever information Baroni provided to the FBI, Baroni should not receive credit for information that he may have provided *before* he committed multiple felonies. Although past cooperation, like family ties, may be considered under the factor of "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); *see also United States v. Garcia*, 596 F. App'x 24, 28 (2d Cir. 2015), the Court should reject doing so here. Prior cooperation that occurred long ago "is

47

akin to a prior good deed, which is a discouraged basis for departure." *United States v. Gaines*, 295 F.3d 293, 303 (2d Cir. 2002); *see* U.S.S.G. § 5H1.11 ("prior good works . . . not ordinarily relevant").

More broadly, Baroni's prior experiences, including his previous cooperation with FBI, do not mitigate his offense—they aggravate it. Because of his familiarity with the efforts to stop public corruption in this state, Baroni knew as well as anyone the line between what is corrupt and what is not. When confronted with corrupt or criminal actions by others, Baroni knew exactly whom to tell—FBI agents whom he knew personally. And in addition to previously cooperating with the FBI, Baroni had been a practicing attorney, a law professor who taught professional responsibility, and a New Jersey State Assemblyman and Senator. His past experiences made Baroni singularly capable of being able to distinguish right from wrong, and corrupt from non-corrupt—a capability that Baroni himself trumpeted to the public by repeatedly speaking out against the evils of corruption. For example, as a state assemblyman in 2004, Baroni said that "New Jersey has a political culture of corruption" and, "It's not just Democrats. It's a pox on both political parties." Michael Powell, *Associates' Scandals Taint N.J. Governor's Reputation*, WASH. POST, July 31, 2004, at A03. As a state senator in 2009, Baroni said,"We must finally clean up New Jersey's culture of corruption and restore New Jerseyans' faith and trust in their government." Rudy Larini, *Pay-to-play law garners court's seal of approval*, THE STAR-LEDGER, Jan. 16, 2009, at NJ 13.

But his time at the Port Authority revealed a different Baroni. When Governor Christie wanted to deliver nasty political messages to a fire union official and a United States Senator, he chose Baroni as the messenger. When giving Jersey City Mayor Fulop the "radio silence" treatment was the plan, Baroni's reaction was "Great." GX-5003-BB-03. When planning the lane reductions in Fort Lee, Baroni not only recommended starting them when traffic was heavier, but he also pitched Wildstein on creating an entirely different traffic jam in Jersey City on the first day

of school as a message to Mayor Fulop, just as they were doing in Fort Lee. None of Baroni's prior history stopped him from brazenly abusing his public position by intentionally misusing Port Authority resources and violating the civil rights of Fort Lee residents. Nor did those experiences stop Baroni from showing his disdain for the Assembly Transportation Committee with his lies and deceit during his lengthy testimony, such as telling them falsely that no other Port Authority facilities have segregated local access, that he had proposed certain new policies to the Port Authority, that two police officers raised the issue of the Local Access Lanes to Wildstein, and on and on. It also is disgraceful that Baroni was a former Assemblyman and served with some of the members of the Assembly Transportation Committee and that, after his testimony, he gloated that "he had danced them around." 9/19/2016 Tr. at 144:20-145:65. Corruption committed by someone of Baroni's experience, training, and familiarity with law enforcement and the state legislature causes the public to become particularly jaded about the integrity of their public officials. Baroni's conduct warrants a meaningful term of imprisonment.

### 2. *Bridget Kelly*

Although Kelly has not disclosed the particular grounds on which she will move for a variance, many of the arguments addressed above regarding Baroni are equally applicable to her. In addition, the Government anticipates that Kelly will argue that a non-custodial sentence is necessary to account for her family circumstances, specifically the care of her children. While the impact on Kelly's family is a terrible and unfortunate byproduct of her crimes, the Government recognizes that some consideration in this regard may be appropriate. But Kelly's is not the extraordinary case that warrants a substantial variance. As the Sentencing Commission recognized, family circumstances ordinarily do not warrant leniency. U.S.S.G. § 5H1.6. This is because, "all families suffer when one of their members goes to prison." *United States v. Shortt*, 919 F.2d 1325, 1328 (8th Cir. 1990). Courts have declined to grant leniency in cases where the impact on the

family from a defendant's incarceration was similar to this case. *See, e.g.*, *United States v. Young*, 387 F. App'x 229, 230 (3d Cir. 2010) (upholding sentencing court's refusal to depart or vary on the basis of family circumstances where the child would be sent to foster care upon both parents being incarcerated because "[t]he placement of a child in foster care for the poor decisions of the parents, though tragic, is not extraordinary); *United States v. Headley*, 923 F.2d 1079, 1082 (3d Cir. 1991) (district court did not abuse its discretion in denying downward departure to single mother of five based on "extraordinary" family circumstances); *see also United States v. Monach*, 429 F. App'x 179, 180 (3d Cir. 2011) (upholding 30-month sentence where sentencing court declined to vary based on family circumstances).

Moreover, Kelly's arguments for leniency must be contrasted with her conduct as demonstrated by the evidence and revealed at trial. Though Kelly likely was a dedicated and hard-working public servant throughout her career, when she was promoted to a leadership position in the Governor's Office with IGA, Kelly fully embraced a mentality of payback to political enemies by developing her "dead to me gene" and "hatred of the world." Kelly had no problem giving the "radio silence" treatment to disfavored public officials, including Jersey City Mayor Fulop. Thus, when Kelly directed Wildstein that it was "time for some traffic problems in Fort Lee," her motivation was clear. She wanted to punish Mayor Sokolich who, having been courted by her IGA staff, had the nerve to decline to endorse Governor Christie's reelection. That Wildstein concocted the idea in the first place, and primarily engineered its implementation, does not mitigate Kelly's role in the slightest. Kelly directed him to do enact the plan and continue it, even upon learning of its consequences. And Kelly was "smiling" when Mayor Sokolich howled about the difficulties getting Fort Lee children to school through the traffic.

Kelly's expression of pleasure at children being stuck in traffic is an unfathomably cruel sentiment and is singularly revealing of her character. Although she may ask for leniency from

this Court because of her own children, Kelly cannot wash away the fact that she celebrated when other people's children—the "children of Buono voters," as Wildstein described them—were locked in a traffic stand-still and unable to get to school. Recognizing how awful her words were, and rather than accepting responsibility for their plain meaning, Kelly concocted an absurd lie to explain them away. But she could not. Kelly was exposed as a liar again and again during her testimony. Based on the totality of her character, this § 3553(a) factor warrants a meaningful sentence of imprisonment.

### D.   THE NEED FOR DETERRENCE, TO PROTECT THE PUBLIC, AND TO PROMOTE RESPECT FOR THE LAW

Section 3553(a) requires the Court to consider both general deterrence—the "need for the sentence imposed . . . to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B)—and specific deterrence—the "need for the sentence imposed . . . to protect the public from further crimes of the defendant," § 3553(a)(2)(C)—in determining the sentence that it will impose in this case.[7] The Court also must consider "the need for the sentence . . . to promote respect for the law." *Id.* § 3553(a)(2)(A).

The Defendants' conduct was neither spontaneous, nor thoughtless. Instead, it was a carefully designed criminal scheme with a built-in cover story that served the dual function of helping them abuse Port Authority resources to cause traffic problems in Fort Lee and to conceal that purpose using the guise of a "traffic study." Intentional, calculated conduct like theirs calls for a custodial sentence to deter others from making similar decisions and to promote respect for the law. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted); *see also United States v. Shortt*, 485 F.3d

---

[7]    While it may be unlikely that Baroni or Kelly return to criminal conduct in the future, the Government has concerns regarding their capacity for truthfulness.

51

243, 251-52 (4th Cir. 2007) ("As a practical matter, extensive efforts to conceal demand greater punishment, because they make it less likely that authorities will detect the scheme.").

When dealing with public corruption, only imprisonment can effectively promote general deterrence. *See United States v. Hayes*, 762 F.3d 1300, 1311 (11th Cir. 2014) (recognizing that a sentence of probation is ineffective in deterring corruption). "General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized." *Morgan*, 635 F. App'x at 450.

Baroni and Kelly took advantage of their public positions to execute this scheme and corrupted their offices. They put their own interests first and used their public positions not to help the public, but to actually harm them. In so doing, they violated the constitutional and civil rights of the people they were supposed to serve. And then they did not tell the truth when under oath. This case presents the Court with a unique opportunity to deter other public officials both in this District and beyond from corruptly misusing their public positions and government resources and flagrantly committing perjury to shirk responsibility for their crimes. Defendants are well-known former public officials who occupied high positions in New Jersey government. And just as the proceedings in this matter have received substantial attention, so too will the sentences. The Court should reaffirm what is expected of those who occupy positions of public trust and what will befall them if they stray so seriously.

A sentence that could be perceived as a mere "slap on the wrist" would send precisely the wrong message to the public, as well as to thousands and thousands of New Jersey public officials, elected and appointed. It would effectively "encourage[] rather than discourage[] [public officials] from engaging in [corruption] because they might conclude that the only penalties they will face if they are caught are" non-incarceratory. *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013). If two long-serving public servants like Baroni and Kelly, who had the experience and

judgment to serve the public faithfully and honestly, do not receive meaningful imprisonment for their conduct, then the message to all public officials is that engaging in criminal conduct that involves the betrayal of the public trust will not result in life-altering punishment. Absent a meaningful term of imprisonment, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976); *see also United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008) (affirming sentence where the "judge stressed the corrosive effect that corruption has on the public trust and expressed his belief that the scandals will not end unless they are treated 'appropriately hard' ").

### E.   AVOIDING UNWARRANTED SENTENCING DISPARITIES

Imposition of a sentence within the advisory Guidelines range generally best serves "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Indeed, in creating the Guidelines, "Congress sought *uniformity* in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct." *Rita*, 551 U.S. at 349 (quotation omitted). Here, a sentence at the bottom of the Guidelines range, or modestly below it, would not result in an unwarranted sentencing disparity with other similarly situated defendants. However, a more substantial variance from the Guidelines range is unwarranted, and would create an unwarranted sentencing disparity with defendants convicted of similar property and civil rights offenses. A substantial variance is particularly unwarranted here in light of the nature and circumstances of the offense and in light of Baroni's and Kelly's repeated lies, lack of remorse, and failure to accept any responsibility for their conduct.

F.     THE COURT SHOULD EXPLAIN THE REASONS FOR ITS SENTENCE

Finally, "it is not enough for the district court to carefully analyze the sentencing factors. A separate and equally important procedural requirement is *demonstrating that it has done so*." *Merced*, 603 F.3d at 215-16 (quotation omitted). First, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors." *United States v. Sevilla*, 541 F.3d 226, 232 (3d Cir. 2008) (quotation omitted). Second, "the court must acknowledge and respond to any properly presented sentencing argument which has colorable legal merit and a factual basis." *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (quotation omitted). "Explicit rulings are plainly to be preferred" even for lesser arguments, "both for the benefit of the parties and for this court on review." *Goff*, 501 F.3d at 254-56 & n.10. Third, the Court must provide "sufficient justifications on the record to support the sentencing conclusions." *United States v. Tomko*, 562 F.3d 558, 567-68 (3d Cir. 2009) (*en banc*) (quotation omitted). "[M]erely reciting the § 3553(a) factors, saying that counsel's arguments have been considered, and then declaring a sentence, are insufficient[.]" *United States v. Manzella*, 475 F.3d 152, 161 (3d Cir. 2007) (quotation omitted).

## CONCLUSION

Defendants Baroni and Kelly should be sentenced to a term of imprisonment at the bottom of or modestly below the Guidelines' range of 37 to 46 months' imprisonment, and 3 years' supervised release. This sentence, which accounts for Defendants' abuse of power, perjury, and lack of remorse, is sufficient, but not greater than necessary, to achieve the sentencing goals set forth in § 3553(a).

Respectfully submitted,

PAUL J. FISHMAN
UNITED STATES ATTORNEY

/s/ *Lee M. Cortes, Jr.*
By:   Lee M. Cortes, Jr.
      Assistant U.S. Attorney

/s/ *Vikas Khanna*
By:   Vikas Khanna
      Assistant U.S. Attorney

/s/ *David W. Feder*
By:   David W. Feder
      Assistant U.S. Attorney

Dated: Newark, New Jersey
       March 8, 2017